# EXHIBIT 1

 **CT Corporation**

**Service of Process Transmittal**
02/19/2015
CT Log Number 526608525

TO: Barbara Hyman
CNA Financial Corporation
333 South Wabash
Chicago, IL 60604

RE: **Process Served in California**

FOR: The Continental Insurance Company (Domestic State: PA)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | San Diego Gas and Electric Company, Pltf. vs. Northern Assurance Company of America, etc., et al. including Continental Insurance Company, Dfts. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Summons, Attachment(s), Notice(s), Complaint, Demand for Jury Trial, Cover Sheet, Stipulation, Exhibit(s) |
| **COURT/AGENCY:** | San Diego County - Superior Court - San Diego, CA Case # 37201500004804CUICCTL |
| **NATURE OF ACTION:** | Insurance Litigation - Claim for policy benefits |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 02/19/2015 at 13:30 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service (Document(s) may contain additional answer dates) |
| **ATTORNEY(S) / SENDER(S):** | Kirk A. Pasich Dickstein Shapiro LLP 2049 Century Park East Suite 700 Los Angeles, CA 90067-3109 310-772-8300 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 02/20/2015, Expected Purge Date: 02/25/2015 Image SOP Email Notification, Barbara Hyman barbara.hyman@cna.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 818 West Seventh Street Los Angeles, CA 90017 |
| **TELEPHONE:** | 213-337-4615 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

2-19-15  1:30PM

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr>
<td>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
NORTHERN ASSURANCE COMPANY OF AMERICA as successor in interest
to EMPLOYERS' SURPLUS LINES INSURANCE COMPANY; [see Attachment
"A" for complete list]

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
SAN DIEGO GAS AND ELECTRIC COMPANY

</td>
<td>

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

CIVIL BUSINESS OFFICE 1
CENTRAL DIVISION

**2015 FEB 11  PM 3: 53**

CLERK SUPERIOR COURT
SAN DIEGO COUNTY, CA

</td>
</tr>
</table>

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

   *¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

<table>
<tr>
<td>

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California
County of San Diego
Central Division
330 W. Broadway
San Diego, CA 92101

</td>
<td>

CASE NUMBER:
*(Número del Caso):*
37-2015-00004804-CU-IC-CTL

</td>
</tr>
</table>

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Kirk Pasich (SBN 94242); Sandra Thayer (SBN 200294); Fiona Chaney (SBN 227725)
DICKSTEIN SHAPIRO LLP, 2049 Century Park East, Suite 700, Los Angeles, CA 90067-3109
Tel.: (310) 772-8300; Fax: (310) 772-8301

<table>
<tr>
<td>DATE: **FEB 11 2015**<br>*(Fecha)*</td>
<td>Clerk, by **V. Navarette**<br>*(Secretario)*</td>
<td>, Deputy<br>*(Adjunto)*</td>
</tr>
</table>

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

<table>
<tr>
<td>[SEAL]</td>
<td>

**NOTICE TO THE PERSON SERVED:** You are served
1.  ☐ as an individual defendant.
2.  ☐ as the person sued under the fictitious name of *(specify):*
3.  ☒ on behalf of *(specify):* Continental Insuranse company,
    under: ☒ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
           ☐ other *(specify):*  as successor In Interest to
4.  ☐ by personal delivery on *(date):* Harbor Insurance company

</td>
</tr>
</table>

Page 1 of 1

<table>
<tr>
<td>Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009]</td>
<td>**SUMMONS**</td>
<td>American LegalNet, Inc.<br>www.FormsWorkflow.com</td>
<td>Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov</td>
</tr>
</table>

VIA FAX

*San Diego Gas and Electric Company v. Northern Assurance Company of America, et al.*

ATTACHMENT "A"

NORTHERN ASSURANCE COMPANY OF AMERICA, as successor in interest to
EMPLOYERS' SURPLUS LINES INSURANCE COMPANY; CONTINENTAL INSURANCE
COMPANY, as successor in interest to HARBOR INSURANCE COMPANY; ASSOCIATED
ELECTRIC & GAS INSURANCE SERVICES LIMITED; and DOES 1-10



Superior Court of California
County of San Diego

# NOTICE OF ELIGIBILITY TO eFILE
# AND ASSIGNMENT TO IMAGING DEPARTMENT

**This case is eligible for eFiling. Should you prefer to electronically file documents, refer to General Order 051414 at www.sdcourt.ca.gov for rules and procedures or contact the Court's eFiling vendor at www.onelegal.com for information.**

**This case has been assigned to an Imaging Department and original documents attached to pleadings filed with the court will be imaged and destroyed. Original documents should not be filed with pleadings. If necessary, they should be lodged with the court under California Rules of Court, rule 3.1302(b).**

On August 1, 2011 the San Diego Superior Court began the Electronic Filing and Imaging Pilot Program ("Program"). As of August 1, 2011 in all new cases assigned to an Imaging Department all filings will be imaged electronically and the electronic version of the document will be the official court file. The official court file will be electronic and accessible at one of the kiosks located in the Civil Business Office and on the Internet through the court's website.

You should be aware that the electronic copy of the filed document(s) will be the official court record pursuant to Government Code section 68150. The paper filing will be imaged and held for 30 days. After that time it will be destroyed and recycled. Thus, **you should not attach any original documents to pleadings filed with the San Diego Superior Court. Original documents filed with the court will be imaged and destroyed except those documents specified in California Rules of Court, rule 3.1806.** Any original documents necessary for a motion hearing or trial shall be lodged in advance of the hearing pursuant to California Rules of Court, rule 3.1302(b).

It is the duty of each plaintiff, cross-complainant or petitioner to serve a copy of this notice with the complaint, cross-complaint or petition on all parties in the action.

On all pleadings filed after the initial case originating filing, all parties must, to the extent it is feasible to do so, place the words **"IMAGED FILE"** in all caps immediately under the title of the pleading on all subsequent pleadings filed in the action.

# Please refer to the General Order - Imaging located on the San Diego Superior Court website at:

http://www.sdcourt.ca.gov/CivilImagingGeneralOrder

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
STREET ADDRESS:    330 W Broadway
MAILING ADDRESS:    330 W Broadway
CITY AND ZIP CODE:    San Diego, CA 92101-3827
BRANCH NAME:    Central
TELEPHONE NUMBER:    (619) 450-7072

PLAINTIFF(S) / PETITIONER(S):    San Diego Gas and Electric Company

DEFENDANT(S) / RESPONDENT(S):  NORTHERN ASSURANCE COMPANY OF AMERICA et.al.

SAN DIEGO GAS AND ELECTRIC COMPANY VS. NORTHERN ASSURANCE COMPANY OF AMERICA

| NOTICE OF CASE ASSIGNMENT and CASE MANAGEMENT CONFERENCE | CASE NUMBER: 37-2015-00004804-CU-IC-CTL |
|---|---|

## CASE ASSIGNMENT

Judge:  Timothy Taylor                                  Department: C-72

**COMPLAINT/PETITION FILED:** 02/11/2015

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Civil Case Management Conference | 07/17/2015 | 09:30 am | C-72 | Timothy Taylor |

A case management statement must be completed by counsel for all parties or self-represented litigants and timely filed with the court at least 15 days prior to the initial case management conference. (San Diego Local Rules, Division II, CRC Rule 3.725).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR* options.

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT), THE ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION FORM (SDSC FORM #CIV-730), A STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) (SDSC FORM #CIV-359), AND OTHER DOCUMENTS AS SET OUT IN SDSC LOCAL RULE 2.1.5.

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS: The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil cases consist of all civil cases except: small claims proceedings, civil petitions, unlawful detainer proceedings, probate, guardianship, conservatorship, juvenile, parking citation appeals, and family law proceedings.

COMPLAINTS: Complaints and all other documents listed in SDSC Local Rule 2.1.5 must be served on all named defendants.

DEFENDANT'S APPEARANCE: Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than 15 day extension which must be in writing and filed with the Court.) (SDSC Local Rule 2.1.6)

JURY FEES: In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

*ALTERNATIVE DISPUTE RESOLUTION (ADR): THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO TRIAL, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. PARTIES MAY FILE THE ATTACHED STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (SDSC FORM #CIV-359).

| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO** | |
|---|---|
| STREET ADDRESS: | 330 W Broadway |
| MAILING ADDRESS: | 330 W Broadway |
| CITY AND ZIP CODE: | San Diego, CA 92101-3827 |
| BRANCH NAME: | Central |
| TELEPHONE NUMBER: | (619) 450-7072 |

PLAINTIFF(S) / PETITIONER(S):   San Diego Gas and Electric Company

DEFENDANT(S) / RESPONDENT(S):   NORTHERN ASSURANCE COMPANY OF AMERICA et.al.

SAN DIEGO GAS AND ELECTRIC COMPANY VS. NORTHERN ASSURANCE COMPANY OF AMERICA

| **NOTICE OF CASE ASSIGNMENT** and **CASE MANAGEMENT CONFERENCE** | CASE NUMBER: 37-2015-00004804-CU-IC-CTL |
|---|---|

## CASE ASSIGNMENT

Judge:  Timothy Taylor                                        Department:  C-72

## COMPLAINT/PETITION FILED: 02/11/2015

| **TYPE OF HEARING SCHEDULED** | **DATE** | **TIME** | **DEPT** | **JUDGE** |
|---|---|---|---|---|
| Civil Case Management Conference | 07/17/2015 | 09:30 am | C-72 | Timothy Taylor |

A case management statement must be completed by counsel for all parties or self-represented litigants and timely filed with the court at least 15 days prior to the initial case management conference. (San Diego Local Rules, Division II, CRC Rule 3.725).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR* options.

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT), THE ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION FORM (SDSC FORM #CIV-730), A STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) (SDSC FORM #CIV-359), AND OTHER DOCUMENTS AS SET OUT IN SDSC LOCAL RULE 2.1.5.

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS:  The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time.  General civil cases consist of all civil cases except: small claims proceedings, civil petitions, unlawful detainer proceedings, probate, guardianship, conservatorship, juvenile, parking citation appeals, and family law proceedings.

COMPLAINTS:  Complaints and all other documents listed in SDSC Local Rule 2.1.5 must be served on all named defendants.

DEFENDANT'S APPEARANCE:  Defendant must generally appear within 30 days of service of the complaint.  (Plaintiff may stipulate to no more than 15 day extension which must be in writing and filed with the Court.) (SDSC Local Rule 2.1.6)

JURY FEES:  In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

*ALTERNATIVE DISPUTE RESOLUTION (ADR):  THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO TRIAL, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. PARTIES MAY FILE THE ATTACHED STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (SDSC FORM #CIV-359).

1   Kirk Pasich (SBN 94242)
    pasichk@dicksteinshapiro.com
2   Sandra Thayer (SBN 200294)
    thayers@dicksteinshapiro.com
3   Fiona Chaney (SBN 227725)
    chaneyf@dicksteinshapiro.com
4   DICKSTEIN SHAPIRO LLP
    2049 Century Park East, Suite 700
5   Los Angeles, CA  90067-3109
    Telephone: (310) 772-8300
6   Facsimile: (310) 772-8301
7

8   Attorneys for Plaintiff

9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                   FOR THE COUNTY OF SAN DIEGO

12   SAN DIEGO GAS AND ELECTRIC        Case No.
     COMPANY,
13                                      COMPLAINT FOR BREACH OF
             Plaintiff,                 CONTRACT, TORTIOUS
14                                      BREACH OF THE IMPLIED
         vs.                            COVENANT OF GOOD FAITH
15                                      AND FAIR DEALING, AND
     NORTHERN ASSURANCE COMPANY         DECLARATORY RELIEF
16   OF AMERICA, as successor in interest to
     EMPLOYERS' SURPLUS LINES           DEMAND FOR JURY TRIAL
17   INSURANCE COMPANY;
     CONTINENTAL INSURANCE
18   COMPANY, as successor in interest to
     HARBOR INSURANCE COMPANY;
19   ASSOCIATED ELECTRIC & GAS
     INSURANCE SERVICES LIMITED; and
20   DOES 1-10,
21
             Defendants.
22

23

24

25

26

27

28

DICKSTEIN
SHAPIRO LLP

                          COMPLAINT

                                              DOCSLA-124752

Plaintiff San Diego Gas & Electric Company complains of defendants and alleges as follows:

1.     This is a lawsuit by San Diego Gas & Electric Company ("SDG&E") against certain of its insurers for their continuing and multi-year refusal to pay for any of the fees and expenses incurred in the defense of underlying actions that are at least potentially covered under commercial general liability ("CGL") and excess and/or umbrella insurance policies.  Specifically, defendants have wrongfully refused to pay for any part of SDG&E's defense against claims and suits brought by the California Regional Water Quality Control Board and the City of San Diego relating to marine sediments in the San Diego Bay that allegedly migrated from the Silvergate Power Plant, and other sources.  As a result, SDG&E has been forced to pay millions of dollars for its defense that defendants should have paid.  Furthermore, in addition to breaching their contractual duties, defendants also have acted in bad faith.

### JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to California Code of Civil Procedure section 410.10 on the basis that the wrongful acts complained of in this complaint occurred in California within this judicial district.  Further, the amount in controversy exceeds the jurisdictional minimum of this Court.

3.     Venue is proper in this Court pursuant to Code of Civil Procedure section 395(b) because the obligations of the insurance policies at issue were to be performed and were incurred in in the State of California and the County of San Diego.

### THE PARTIES

4.     SDG&E is a California corporation with its principal place of business in San Diego, California.

5.     Northern Assurance Company of America is a Massachusetts corporation with its principal place of business in Minnetonka, Minnesota.  SDG&E is informed and believes, and based thereon, alleges that Northern is the successor-in-interest to the rights and obligations under certain insurance policies issued by Employers

DICKSTEIN
SHAPIRO LLP

1
COMPLAINT

DOCSLA-124752

Surplus Lines Insurance Company ("ESLIC") to SDG&E, and owes all duties to SDG&E that ESLIC originally owed.

6. Continental Insurance Company is a Pennsylvania corporation with its principal place of business in Chicago, Illinois, authorized to transact, and transacting, business in the State of California and the County of San Diego. SDG&E is informed and believes, and based thereon alleges, that Continental is the successor-in-interest to the rights and obligations under certain insurance policies issued by Harbor Insurance Company to SDG&E, and owes all duties to SDG&E that Harbor originally owed.

7. Associated Electric & Gas Insurance Services Limited ("AEGIS") is a mutual insurance company organized under the laws of Bermuda with its principal place of business in Jersey City, New Jersey, authorized to transact, and transacting, business in the State of California and the County of San Diego.

8. SDG&E is ignorant of the true names and capacities, whether individual, associate, partnership, corporate, or otherwise, of the defendants fictitiously designated herein as Does 1 through 10, and therefore sues those defendants by these fictitious names. SDG&E will seek leave of Court to amend this Complaint when the true names and capabilities of these fictitiously-designated defendants have been ascertained. SDG&E is informed and believes, and on that basis alleges, that Does 1 through 10, in some way unknown to SDG&E, have underwritten or provided insurance coverage to SDG&E or are otherwise responsible for the damage alleged herein, and that Does 1 through 10 are authorized to, and do, transact business in the County of San Diego and State of California.

## THE INSURANCE POLICIES
### The ESLIC Policy (1967-1970)

9. ESLIC issued general liability insurance policies to SDG&E from at least February 1, 1961, to October 7, 1970. The ESLIC policies in effect from February 1, 1961, to October 7, 1970, are "occurrence"-based insurance policies, meaning that they apply to claims and suits alleging or potentially involving injury during those

1  policy periods.

2       10.     ESLIC policy no. E512982 was in effect from October 7, 1967, to

3  October 7, 1970 (the "ESLIC Policy"), with a $1,000,000 per occurrence limit of

4  liability, excess of a $50,000 self-insured retention ("SIR") as to indemnity only.  A

5  true and correct copy of at least the relevant portions of the ESLIC Policy is attached

6  hereto as Exhibit A and incorporated by reference.

7       11.     The ESLIC Policy defines "Insured" and "Assured" to include SDG&E.

8  Ex. __, at 1 & Third Party Property Damage (B).

9       12.     The ESLIC Policy obligates Northern to "investigate and/or to defend in

10 the name and on behalf of the Assured all claims or suits for such injury or damage for

11 which the Assured is, or is alleged to be liable."  Ex. A at Third Party Property

12 Damage (B), 1.c.

13      13.     SDG&E has complied with all terms and conditions precedent contained

14 in the ESLIC Policy, to the extent not waived or otherwise excused.  SDG&E is

15 entitled to the full benefits and protections provided by the ESLIC Policy.

16                     **The Harbor Policy (1970-1972)**

17      14.     Harbor issued policy number 108461, in effect from January 1, 1970, to

18 January 1, 1973 (the "Harbor Policy"), with a $1,000,000 per occurrence limit of

19 liability, excess of a $100,000 SIR.  A true and correct copy of at least the relevant

20 portions of the Harbor Policy is attached hereto as Exhibit B and incorporated by

21 reference.

22      15.     The Harbor Policy defines "Named Insured" to include SDG&E.  Ex. B,

23 Declarations, Item 1.

24      16.     The Harbor Policy obligates Continental

25             [t]o indemnify [SDG&E] for all sums which [SDG&E] shall

26             become obligated to pay by reason of:

27             (I) any and all liability imposed by law against the Insured for loss

28             of or damage to or destruction of property of others (including but

DICKSTEIN
SHAPIRO LLP

                              3
                          COMPLAINT

not limited to, damage resulting from loss of use of property damaged or destroyed and all other indirect or consequential damage for which legal liability exists in connection with such damage to or destruction of property of others;

(II) Any and all liability for damage to or destruction of property of others assumed by the insured under contracts, leases or agreement usual and incidental to the operations, activities, work and/or business of the Insured.

Ex. B, Insuring Agreements, Coverage C – Third Party Property Damage.

17.     The Harbor Policy also obligates Continental to pay for "ULTIMATE NET LOSS," including defense costs.  Specifically, the Harbor Policy defines "ULTIMATE NET LOSS" as:

The total sum which the insured becomes obligated to pay by reason of personal injury or workers compensation or third party property damage claims, either through adjudication or compromise, and all sums paid for expense, including premiums for attachment or appeal bonds, in respect to litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of employees and office expense of the insured.

Ex. B, Definitions, 5 – ULTIMATE NET LOSS.

18.     SDG&E has complied with all terms and conditions precedent contained in the Harbor Policy, to the extent not waived or otherwise excused.  SDG&E is entitled to the full benefits and protections provided by the Harbor Policy.

### The AEGIS Policies (1981-1985)

19.     AEGIS issued general liability policies to SDG&E from at least July 1, 1981, through the present.  The AEGIS policies in effect until December 1, 1986, are "occurrence"-based insurance policies.  They obligate AEGIS to pay for SDG&E's

defense and indemnity costs incurred for claims, including suits, alleging or potentially involving injury during their policy periods.

20.     AEGIS issued three policies to SDG&E from July 1, 1981, to July 1, 1985:

- Policy No. 022A, in effect from July 1, 1981, to July 1, 1983, with a per occurrence limit of $25,000,000, excess of a $250,000 self-insured retention SIR. A true and correct copy of at least the relevant portions of Policy No. 022A is attached hereto as Exhibit C and incorporated by reference.

- Policy No. 022NJ, in effect from July 1, 1983, to July 1, 1984, with a per occurrence limit of $25,000,000, excess of a $250,000 SIR. A true and correct copy of at least the relevant portions of Policy No. 022NJ is attached hereto as Exhibit D and incorporated by reference.

- Policy No. 022ANJ, in effect July 1, 1984, to July 1, 1985, with a per occurrence limit of $25,000,000, excess of a $250,000 SIR. A true and correct copy of at least the relevant portions of Policy No. 022ANJ is attached hereto as Exhibit E and incorporated by reference.

21.     AEGIS Policy Nos. 022A, 022NJ, and 022ANJ define "Named Insured" to include SDG&E. Ex. C, Declarations, Item 1 & § III.h; Ex. D, Declarations, Item 1 & § III.f; Ex. E, Declarations, Item 1 & § III.h.

22.     The AEGIS policies obligate AEGIS to pay for "ULTIMATE NET LOSS." The AEGIS policies define "ULTIMATE NET LOSS" as:

> The total of the following sums with respect to each OCCURRENCE or WRONGFUL ACT to which this POLICY applies;
>
> (1)     all sums which the INSURED shall become legally obligated to pay as damages either by adjudication or

compromise with the consent of the COMPANY, after
making proper deductions for all recoveries and salvages
collectible and for other insurance that is in excess of the
UNDERLYING LIMITS; and

(2)     all expenses incurred by the INSURED in the
investigation, negotiation, settlement and defense of any
claim or suit seeking such damages, excluding all salaries of
employees and office expense of the INSURED.
However, the COMPANY shall not be liable for expenses as
aforesaid when such expenses are included in other valid
and collectible insurance, except where that insurance is
subject to at least 100 percent reimbursement by the
INSURED.

Ex. C, § III.l; Ex. D, § III.l; Ex. E, § III.l.

23.     The AEGIS policies define "OCCURRENCE" as
(1) an accident; or (2) an event; or (3) continuous or
repeated exposure to conditions which results in BODILY
INJURY, PERSONAL INJURY OR PROPERTY
DAMAGE.  All damages arising out of such exposure to
substantially the same general conditions shall be considered
as arising out of one OCCURRENCE.

Ex. C, § III.i; Ex. D, § III.i; Ex. E, § III.i.

24.     SDG&E has complied with all terms and conditions precedent contained
in the AEGIS policies, to the extent not waived or otherwise excused.

## THE CLEANUP ORDER AND LAWSUIT

25.     On or about April 29, 2005, the California Regional Water Quality
Control Board (the "Board") served SDG&E with a Tentative Cleanup and Abatement

DOCSLA-124752

1  Order (the "Order") (the "Board claim").  The Order required SDG&E, among other
2  parties, to develop and implement a remedial action plan to clean up certain marine
3  sediments in San Diego Bay (the "Shipyard Sediment Site"), which allegedly
4  migrated from the Silvergate Power Plant and other sources.  SDG&E owned and
5  operated the Silvergate Power Plant from approximately the early 1940's until the
6  early 1990's.

7       26.    On October 14, 2009, the City of San Diego (the "City") filed a lawsuit
8  in the United States District Court, Southern District of California, Case No. 3:09-CV-
9  02275, against SDG&E and other parties, for environmental cost recovery and
10 contribution, injunctive relief, declaratory relief, and damages relating to marine
11 sediments at the Shipyard Sediment Site (the "*City* lawsuit").  The defendants in the
12 *City* lawsuit, including SDG&E, filed contribution and cost-recovery counterclaims
13 against the City, and contribution and cost-recovery cross-claims and supplemental
14 cross-claims against each other, under both state and federal law.  In addition, the San
15 Diego Unified Port District (the "Port District"), another defendant, asserted claims
16 for express contractual indemnity and breach of contract against SDG&E and several
17 other defendants.  A true and correct copy of the City Complaint is attached hereto as
18 Exhibit F and incorporated by reference.

19       27.    SDG&E retained outside defense counsel to defend it against the Order
20 and *City* lawsuit.  SDG&E also had its in-house lawyers assist in the defense of both
21 matters, thus reducing the overall costs of defense by a substantial margin.

22       28.    On July 15, 2010, the Magistrate Judge in the *City* lawsuit issued an
23 order adopting a phased discovery plan proposed by the parties, which included court-
24 ordered mediation before which no discovery would take place.

25       29.    The court-ordered mediation began in May 2011, and continued through
26 June 2013.

27       30.    On March 14, 2012, the Board issued its final Cleanup and Abatement
28 Order (the "CAO"), along with a Technical Report, which mandated an extensive

DICKSTEIN
SHAPIRO LLP

DOCSLA-124752

cleanup and monitoring of the Shipyard Sediment Site. The CAO required SDG&E and the other parties to prepare and submit Remedial Action Plans as well as Post Remedial Monitoring Plans. The CAO further ordered the parties to submit quarterly progress reports until the submission of the final Cleanup and Abatement Completion Report verifying completion of the Remedial Action Plan for the Shipyard Sediment Site. A true and correct copy of the CAO is attached hereto as Exhibit G and incorporated by reference.

31.    On June 24, 25, and 26, 2013, the parties to the *City* lawsuit attended a Mandatory Settlement Conference with the Magistrate Judge, a mediator, and the parties' insurers. A settlement was not reached.

32.    On August 1, 2013, SDG&E accepted a settlement offer in principle from one of the *City* defendants, BAE Systems, which required court confirmation before becoming final.

33.    On October 11, 2013, SDG&E and BAE Systems filed a Joint Motion for Order Confirming Good Faith Settlement and Barring Claims in the *City* lawsuit, stating they had reached a final settlement resolving SDG&E's alleged liability for past and future response costs for remediation and contamination at the Shipyard Sediment Site.

34.    On July 11, 2014, the *City* court issued an Order approving SDG&E's Joint Motion for Order Confirming Good Faith Settlement and Barring Claims. The court also found that SDG&E and certain other defendants could request bar orders barring contribution-based claims by non-settling parties because the settling parties had discharged their contribution obligations.

35.    Between July 21, 2014, and August 8, 2014, the parties submitted proposed bar orders and objections thereto and filed briefs seeking clarification of the July 11, 2014, Order.

36.    On September 9, 2014, the *City* court issued an Order sustaining certain objections made by the Port District and the City to SDG&E's proposed bar order.

The court also ruled that the City's First and Seventh Claims for cost recovery are not subject to a bar order and that the Port District is not required to dismiss its counterclaims and cross-claims in order to benefit from a bar order. Thus, as of the filing of this Complaint, the *City* lawsuit continues.

37.     From the issuance of the Board's April 29, 2005, Order, until the date of the filing of this lawsuit, SDG&E paid millions of dollars in defense fees and costs in the defense of the Board claim and the *City* lawsuit, and incurred substantial additional amounts in the form of the services of its in-house counsel.

## SDG&E'S CLAIM AND THE INSURERS' BREACHES

38.     On October 13, 2005, SDG&E timely notified Northern, Continental, and AEGIS (collectively, the "Insurers") of the Board claim.

39.     On November 17, 2005, Continental acknowledged SDG&E's claim but did not acknowledge any of its duties to SDG&E. Instead, Continental stated that it would review the Harbor policies and conduct an investigation into the claim.

40.     On November 29, 2005, AEGIS acknowledged the Board claim but declined to provide any coverage.

41.     Thereafter, SDG&E provided the Insurers with status reports regarding the Board claim.

42.     On February 2, 2009, SDG&E provided the Insurers with an update on the Board claim and advised that most of the relevant reports and other documents could be found on the Board's website. SDG&E also provided the Insurers with hard-drives containing the current electronic record of the Board's proceedings. SDG&E also requested that the Insurers participate in a meeting with the mediator in San Diego.

43.     On March 13, 2012, SDG&E provided the Insurers with copies of SDG&E's invoices for fees and costs incurred in response to and defense of the Board claim and the *City* lawsuit, for the period of April 29, 2005, through January 31, 2012.

44.     On March 28, 2012, SDG&E provided the Insurers with an update

concerning the *City* lawsuit. SDG&E also advised the Insurers that the Board issued the CAO. SDG&E also reiterated its demand for reimbursement of its defense costs and advised the Insurers that SDG&E also would seek indemnity from them for any resulting liability in the *City* lawsuit.

45. On May 25, 2012, SDG&E provided the Insurers with another update concerning the *City* lawsuit and advised them that SDG&E continued to incur significant defense costs.

46. On July 9, 2012, SDG&E provided the Insurers with a CD containing a summary of SDG&E's defense costs and related backup materials for the Board claim and the *City* lawsuit, for the period of February 1, 2012, through May 31, 2012.

47. On September 20, 2012, SDG&E provided the Insurers with another update concerning the *City* lawsuit and advised them that SDG&E continued to incur significant defense costs. SDG&E also alerted the Insurers to the California Supreme Court's decision in *State v. Continental*, 55 Cal. 4th 186 (2012), in which the California Supreme Court held, among other things, that (i) when continuous property damage occurs during the period of several successive insurance policy periods, each insurer on risk during that period is liable for all damage both during and outside its policy period up to its policy limit; and (ii) absent a specific anti-stacking provision, an insured may stack policy limits of all available policies (in other words, an insured can recover under multiple liability insurance policies for the same occurrence).

48. On June 4, 2013, SDG&E advised the Insurers of a settlement demand made by BAE Systems and sought approval for SDG&E's counter-offer proposal. None of the Insurers objected to SDG&E's counter-offer proposal.

49. On June 7, 2013, SDG&E advised the Insurers that the *City* court had ordered the Insurers to attend a Mandatory Settlement Conference on June 26, 2013.

50. On June 19, 2013, SDG&E again demanded that the Insurers reimburse SDG&E for its defense fees and costs. SDG&E also advised that because it was largely utilizing in-house defense counsel, it should be reimbursed for the reasonable

1  value of those services provided by its in-house attorneys in the defense of the Board

2  claim and *City* lawsuit. .

3    51.    On June 24, 2013, SDG&E provided the Insurers with additional

4  information relating to the reasonable value of the services provided by SDG&E's in-

5  house attorneys in the defense of the Order and *City* lawsuit.

6    52.    On June 26, 2013, the Insurers attended the Mandatory Settlement

7  Conference.

8    53.    On July 25, 2013, SDG&E provided the Insurers with an update on the

9  *City* lawsuit, advised it of a settlement recommendation from the Magistrate Judge,

10  and asked the Insurers to immediately advise if it objected to the proposed settlement.

11  None of the Insurers objected.

12    54.    On July 29, 2013, SDG&E provided the Insurers with additional

13  information, including the Magistrate Judge's explanation, for the proposed

14  settlement.

15    55.    On November 5, 2013, SDG&E provided the Insurers with its defense

16  counsel invoices and related backup material, covering the period of June 1, 2013,

17  through October 22, 2013.

18    56.    On December 9, 2013, SDG&E provided the Insurers with information

19  relating to the reasonable value of the services provided by SDG&E's in-house

20  attorneys in the defense of the Board claim and *City* lawsuit.

21  ## NORTHERN'S BREACH OF ITS DUTIES

22    57.    Northern had a duty to construe its policies' coverage in light of

23  California law, and Northern knew, or reasonably should have known, that it was

24  obligated to consider its policies in light of California law.

25    58.    Northern knew, or should have known, of, and should have followed

26  California law and insurance industry standards regarding the interpretation of

27  insurance policies, and its defense duties at all times.  Under this law and these

28  standards:

DICKSTEIN
SHAPIRO LLP

DOCSLA-124752

a.   The duty to defend is implied in all liability insurance policies unless the policy clearly and unambiguously excludes such a duty;

b.   The duty to defend arises as soon as notice is given, unless the policy expressly provides otherwise;

c.   An insurer's duty to defend is separate and independent from any other insurer's duty to defend and the insurer must provide a complete defense to its insured;

d.   An insurer is required to pay an insured's defense costs as they are incurred;

e.   Coverage exclusions and limitations are strictly construed against the insurer and liberally interpreted in favor of the insured;

f.   An insurer's failure to use limiting language gives rise to the inference that the parties intended not to so limit coverage;

g.   Even if an insurer's interpretation of a policy provision is considered reasonable, it still will not prevail on that interpretation unless it establishes that its interpretation is the only reasonable one;

h.   An insurer is required to acknowledge an insured's claim within 15 days of receipt and begin its investigation of the claim;

i.   An insurer is required to accept or deny the insured's claim in whole or in part within 40 days of receipt and clearly document the claim file the amounts accepted or denied.;

j.   An insurer is required to provide its insured with notification every 30 days if it needs additional time to conduct its investigation and/or specify what additional information it requires in order to make its determination and state any

DICKSTEIN
SHAPIRO LLP

12

COMPLAINT

DOCSLA-124752

1             continuing reasons for its inability to make a determination; and

2       k.      An insurer may not give greater consideration to its own

3             interests than to its insured's interests.

4     59.     It has now been over nine years since SDG&E first notified Northern of

5 the Board claim and over five years since the *City* lawsuit was filed. Northern has not

6 defended or paid SDG&E any part of the outstanding defense fees and costs.

7     60.     Northern has taken its positions notwithstanding the facts stated herein.

8 Furthermore, Northern is doing so even though:

9       a.      SDG&E'S interpretation of the policies' language is

10             reasonable; and

11       b.      Northern's positions are contrary to the policies' provisions and

12             SDG&E's reasonable expectations, and render illusory, at a

13             minimum, Northern's duty to defend and/or the duty to pay

14             defense costs.

15     61.     Northern has improperly failed and refused to defend or pay SDG&E's

16 defense costs. As a result, SDG&E has been forced to pay all of its defense costs.

17 Northern has not only effectively denied coverage without any proper basis, but it also

18 has breached its other duties and acted contrary to insurance industry customs,

19 practices, and standards.

20           **CONTINENTAL'S BREACH OF ITS DUTIES**

21     62.     Continental had a duty to construe its policies' coverage in light of

22 California law, and Continental knew, or reasonably should have known, that it was

23 obligated to consider its policies in light of California law.

24     63.     Continental knew, or should have known, of, and should have followed

25 California law and insurance industry standards regarding the interpretation of

26 insurance policies, and its defense duties at all times. Under this law and these

27 standards:

28       a.      The duty to defend is implied in all liability insurance policies

DICKSTEIN
SHAPIRO LLP

COMPLAINT

DOCSLA-124752

unless the policy clearly and unambiguously excludes such a duty;

b.    The duty to defend arises as soon as notice is given, unless the policy expressly provides otherwise;

c.    An insurer's duty to defend is separate and independent from any other insurer's duty to defend and the insurer must provide a complete defense to its insured;

d.    An insurer is required to pay an insured's defense costs as they are incurred;

e.    Coverage exclusions and limitations are strictly construed against the insurer and liberally interpreted in favor of the insured;

f.    An insurer's failure to use limiting language gives rise to the inference that the parties intended not to so limit coverage;

g.    Even if an insurer's interpretation of a policy provision is considered reasonable, it still will not prevail on that interpretation unless it establishes that its interpretation is the only reasonable one;

h.    An insurer is required to acknowledge an insured's claim within 15 days of receipt and begin its investigation of the claim;

i.    An insurer is required to accept or deny the insured's claim in whole or in part within 40 days of receipt and clearly document the claim file the amounts accepted or denied.;

j.    An insurer is required to provide its insured with notification every 30 days if it needs additional time to conduct its investigation and/or specify what additional information it requires in order to make its determination and state any continuing reasons for its inability to make a determination; and

1         k.    An insurer may not give greater consideration to its own

2              interests than to its insured's interests.

3        64.    It has now been over nine years since SDG&E first notified Continental

4    of the Board claim and over five years since the *City* lawsuit was filed. Continental

5    has not defended or paid SDG&E any part of the outstanding defense fees and costs.

6        65.    Continental has taken its positions notwithstanding the facts stated

7    herein. Furthermore, Continental is doing so even though:

8         a.    SDG&E'S interpretation of the policies' language is

9              reasonable; and

10        b.    Continental's positions are contrary to the policies' provisions

11             and SDG&E's reasonable expectations, and render illusory, at a

12             minimum, Continental's duty to defend and/or the duty to pay

13             defense costs.

14       66.    Continental has improperly failed and refused to defend or pay SDG&E's

15   defense costs. As a result, SDG&E has been forced to pay all of its defense costs.

16   Continental has not only effectively denied coverage without any proper basis, but it

17   also has breached its other duties and acted contrary to insurance industry customs,

18   practices, and standards.

19                 **AEGIS'S BREACH OF ITS DUTIES**

20       67.    AEGIS had a duty to construe its policies' coverage in light of California

21   law, and AEGIS knew, or reasonably should have known, that it was obligated to

22   consider its policies in light of California law.

23       68.    AEGIS knew, or should have known, of, and should have followed

24   California law and insurance industry standards regarding the interpretation of

25   insurance policies, and its defense duties at all times. Under this law and these

26   standards:

27        a.    Coverage exclusions and limitations are strictly construed

28             against the insurer and liberally interpreted in favor of the

1   insured;

b.   An insurer's failure to use limiting language gives rise to the
inference that the parties intended not to so limit coverage;

c.   Even if an insurer's interpretation of a policy provision is
considered reasonable, it still will not prevail on that
interpretation unless it establishes that its interpretation is the
only reasonable one;

d.   An insurer is required to pay an insured's defense costs as they
are incurred;

e.   An insurer is required to acknowledge an insured's claim within
15 days of receipt and begin its investigation of the claim;

f.   An insurer is required to accept or deny the insured's claim in
whole or in part within 40 days of receipt and clearly document
the claim file the amounts accepted or denied.;

g.   An insurer is required to provide its insured with notification
every 30 days if it needs additional time to conduct its
investigation and/or specify what additional information it
requires in order to make its determination and state any
continuing reasons for its inability to make a determination; and

h.   An insurer may not give greater consideration to its own
interests than to its insured's interests.

69.   It has now been over nine years since SDG&E first notified AEGIS of
the Board claim and over five years since the *City* lawsuit was filed.  AEGIS has not
paid SDG&E any part of the outstanding defense fees and costs.

70.   AEGIS has taken its positions notwithstanding the facts stated herein.
Furthermore, AEGIS is doing so even though:

a.   SDG&E'S interpretation of the policies' language is
reasonable; and

b.    AEGIS's positions are contrary to the policies' provisions and SDG&E's reasonable expectations, and render illusory, at a minimum, AEGIS's duty to pay defense costs.

71.    AEGIS has improperly failed and refused to pay SDG&E's defense costs. As a result, SDG&E has been forced to pay all of its defense costs. AEGIS has not only effectively denied coverage without any proper basis, but it also has breached its other duties and acted contrary to insurance industry customs, practices, and standards.

## FIRST CAUSE OF ACTION

### (Breach of Contract against Northern)

72.    SDG&E incorporates by reference each allegation contained in paragraphs 1 through 71, above.

73.    The Board claim and the *City* lawsuit sought damages on account of "loss of or damage to or destruction of property of others" as provided in the ESLIC policy.

74.    Northern had a duty to defend SDG&E with respect to the Board claim and the *City* lawsuit. Northern's duty to defend arose at the time of notice and continues until the final resolution of the *City* lawsuit.

75.    Northern breached its duty to defend SDG&E by failing to defend SDG&E and by failing and refusing to pay any portion of SDG&E's defense costs incurred since April 2005.

76.    As a direct and proximate result of Northern's breach of its duty to defend SDG&E under the ESLIC policy, SDG&E has been damaged in an amount in excess of $10,000,000, plus interest.

## SECOND CAUSE OF ACTION

### (Breach of Contract against Continental)

77.    SDG&E incorporates by reference each allegation contained in paragraphs 1 through 76, above.

78.    The Board claim and the *City* lawsuit sought damages on account of "loss

1   of or damage to or destruction of property of others" as provided in the Harbor Policy.

2       79.    Continental has a duty under the Harbor Policy to indemnify SDG&E for

3   its defense and investigation costs incurred related to the Board claim and in the *City*

4   lawsuit. Continental's duty arose at the time of notice until the final resolution of the

5   *City* lawsuit.

6       80.    Continental breached its duty to pay SDG&E's defense costs by failing

7   and refusing to pay any portion of SDG&E's defense costs incurred since April 2005.

8   As a direct and proximate cause of Continental's breach of its duty to pay SDG&E's

9   defense costs, SDG&E has been damaged in an amount in excess of $10,000,000, plus

10  interest.

11              **THIRD CAUSE OF ACTION**

12          **(Breach of Contract against AEGIS)**

13      81.    SDG&E incorporates by reference each allegation contained in

14  paragraphs 1 through 80, above.

15      82.    The Board claim and the *City* lawsuit sought damages on account of an

16  alleged "Occurrence" as that term is defined under the AEGIS Policies.

17      83.    AEGIS has a duty under its policies to pay SDG&E for its defense and

18  investigation costs incurred related to the Board claim  and in the *City* lawsuit.

19  AEGIS's duty arose at the time of notice and continues until the final resolution of the

20  *City* lawsuit.

21      84.    AEGIS breached its duty to pay SDG&E's defense costs by failing and

22  refusing to pay any portion of SDG&E's defense costs incurred since April 2005.

23      85.    As a direct and proximate cause of AEGIS's breach of its duty to pay

24  SDG&E's defense costs, SDG&E has been damaged in an amount in excess of

25  $10,000,000, plus interest.

26

27

28

DICKSTEIN
SHAPIRO LLP

COMPLAINT

DOCSLA-124752

# FOURTH CAUSE OF ACTION

## (Tortious Breach of the Implied Covenant of
## Good Faith and Fair Dealing against Northern)

86. SDG&E incorporates by reference each allegation contained in paragraphs 1 through 85, above.

87. Implied in the ESLIC Policy is a covenant that Northern would act in good faith and deal fairly with SDG&E, that it would do nothing to interfere with the rights of SDG&E to receive the benefits due under the ESLIC Policy, and that it would give at least the same level of consideration to SDG&E's interests as it gave to its own.

88. In the course of failing and/or refusing to defend or indemnify SDG&E, Northern breached the implied covenant of good faith and fair dealing by, among other things

- failing to acknowledge receipt of SDG&E's claims within 15 days of receipt of SDG&E's claim in violation of California Code of Regulations ("CCR"), Title 10, § 2695.5(b);

- failing and refusing to accept or deny SDG&E's claims in whole or in part within 40 days of receipt and clearly document the claim file the amounts accepted or denied.in violation of CCR, Title 10, § 2695.7(b);

- failing and refusing to provide SDG&E with notification every 30 days that Northern needed additional time to conduct its investigation and/or specify what additional information it required in order to make its determination and state any continuing reasons for its inability to make a determination in violation of CCR, Title 10, § 2695.7(c)(1);

- failing and refusing to defend SDG&E or reimburse any of SDG&E's defense costs incurred in connection with the Board claim or the *City* lawsuit;

- asserting grounds for denying coverage that it knew, or should have known, were not supported by, and in fact were contrary to, the terms of its policies, the law, insurance industry custom and practice, and the facts, including that the ESLIC Policy contains a duty to defend;
- failing to conduct an adequate investigation of the Board claim or the *City* lawsuit, and asserting grounds for denying coverage based on its inadequate investigation;
- failing to provide SDG&E with notification every thirty (30) days that it needed additional time to conclude its investigation and/or specify what additional information Northern required in order to make its determination and state any continuing reasons for its inability to make a determination, thereby violating CCR, Title 10, § 2695.7(c)(1);
- failing to honor its promises and representations in its policies that it would defend and indemnify SDG&E in matters, such as the Board claim or the *City* lawsuit, involving potentially covered claims for property damage;
- ignoring California law and insurance industry standards;
- giving greater consideration to its own interests than to SDG&E's interests; and
- otherwise acting as alleged above.

89.     Northern did the things and committed the acts alleged above for the purpose of consciously withholding from SDG&E the rights and benefits to which SDG&E was entitled under the ESLIC Policy and without considering the interests of SDG&E to at least the same extent as it considered its own interests.  Northern's acts were inconsistent with the reasonable expectations of its insureds, were contrary to established claims practices and legal requirements, and therefore constitute bad faith.

90.     As a direct and proximate result of Northern's acts and omissions, SDG&E has been damaged in an amount to be proven at trial.  SDG&E's damages

DICKSTEIN
SHAPIRO LLP

20

COMPLAINT

DOCSLA-124752

include the fees and expenses that SDG&E has incurred, and is incurring, in defense of the Board claim or the *City* lawsuit, plus interest. The precise amount of these fees and expenses exceeds $10,000,000.

91.   Pursuant to the holding in *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985), SDG&E is entitled to recover as damages all attorneys' fees and expenses that it reasonably has incurred, and is incurring, in its efforts to obtain the policy benefits that Northern wrongfully withheld, and is withholding, in bad faith, plus interest, in an amount to be proven at trial.

92.   Northern's conduct was despicable and was done with a conscious disregard of SDG&E's rights, constituting oppression, fraud, and/or malice, in that Northern engaged in a series of acts designed to deny the benefits due under the ESLIC Policy. Specifically, Northern, through the acts and omissions alleged above, and in light of information, facts, and relevant law to the contrary, consciously disregarded SDG&E's rights and forced SDG&E to bear the financial burden of the Board claim and the *City* lawsuit and incur substantial financial losses, without any assistance from Northern, thereby inflicting substantial financial damage on SDG&E. Northern ignored SDG&E's interests and concerns, with the requisite intent to injure within the meaning of California Civil Code section 3294. Therefore, SDG&E is entitled to recover punitive damages from Northern in an amount sufficient to punish and to make an example of Continental and in order to deter similar conduct.

## FIFTH CAUSE OF ACTION

### (Tortious Breach of the Implied Covenant of

### Good Faith and Fair Dealing against Continental)

93.   SDG&E incorporates by reference each allegation contained in paragraphs 1 through 92, above.

94.   Implied in the Harbor Policy is a covenant that Continental would act in good faith and deal fairly with SDG&E, that it would do nothing to interfere with the rights of SDG&E to receive the benefits due under the Harbor Policy, and that it

1   would give at least the same level of consideration to SDG&E's interests as it gave to
2   its own.

3         95.    In the course of failing and/or refusing to defend or indemnify SDG&E,
4   Continental breached the implied covenant of good faith and fair dealing by, among
5   other things

6       &bull;  failing to acknowledge receipt of SDG&E's claim within 15 days of
7           receipt of SDG&E's claim in violation of CCR, Title 10, § 2695.5(b);

8       &bull;  failing and refusing to accept or deny SDG&E's claims in whole or in
9           part within 40 days of receipt and clearly document the claim file the
10          amounts accepted or denied.in violation of CCR, Title 10, § 2695.7(b);

11      &bull;  failing and refusing to provide SDG&E with notification every 30 days
12          that Northern needed additional time to conduct its investigation and/or
13          specify what additional information it required in order to make its
14          determination and state any continuing reasons for its inability to make a
15          determination in violation of CCR, Title 10, § 2695.7(c)(1);

16      &bull;  failing and refusing to reimburse any of SDG&E's defense costs incurred
17          in connection with the Board claim or the *City* lawsuit;

18      &bull;  asserting grounds for denying coverage that it knew, or should have
19          known, were not supported by, and in fact were contrary to, the terms of
20          its policies, the law, insurance industry custom and practice, and the
21          facts, including that (i) the Harbor Policy was not obligated to respond
22          until all underlying limits of insurance had been exhausted, and (ii) the
23          Harbor Policy was not required to pay in-house defense costs;

24      &bull;  failing to conduct an adequate investigation of the Board claim or the
25          *City* lawsuit, and asserting grounds for denying coverage based on its
26          inadequate investigation;

27      &bull;  failing to provide Sempra with notification every thirty (30) days that it
28          needed additional time to conclude its investigation and/or specify what

DICKSTEIN
SHAPIRO LLP

DOCSLA-124752

1   additional information Continental required in order to make its
2   determination and state any continuing reasons for its inability to make a
3   determination, thereby violating CCR, Title 10, § 2695.7(c)(1);

4   • failing to honor its promises and representations in its policies that it
5   would defend and indemnify SDG&E in matters, such as the Board claim
6   or the *City* lawsuit litigation, involving covered claims for property
7   damage;

8   • ignoring California law and insurance industry standards;

9   • giving greater consideration to its own interests than to SDG&E's
10   interests; and

11   • otherwise acting as alleged above.

12   96.   Continental did the things and committed the acts alleged above for the
13   purpose of consciously withholding from SDG&E the rights and benefits to which
14   SDG&E was entitled under the Harbor Policy and without considering the interests of
15   SDG&E to at least the same extent as it considered its own interests.  Continental's
16   acts were inconsistent with the reasonable expectations of its insureds, were contrary
17   to established claims practices and legal requirements, and therefore constitute bad
18   faith.

19   97.   As a direct and proximate result of Continental's acts and omissions,
20   SDG&E has been damaged in an amount to be proven at trial.  SDG&E's damages
21   include its unreimbursed fees and expenses that SDG&E incurred in defense of the
22   Board claim  or the *City* lawsuit, plus interest.

23   98.   Pursuant to the holding in *Brandt*, 37 Cal. 3d 813, SDG&E is entitled to
24   recover all attorneys' fees and expenses that it reasonably has incurred, and is
25   incurring, in its efforts to obtain the policy benefits that Continental wrongfully
26   withheld, and is withholding, in bad faith, plus interest, in an amount to be proven at
27   trial.

28   99.   Continental's conduct was despicable and was done with a conscious

DICKSTEIN
SHAPIRO LLP

DOCSLA-124752

1  disregard of SDG&E's rights, constituting oppression, fraud, and/or malice, in that

2  Continental engaged in a series of acts designed to deny the benefits due under the

3  Harbor Policy.  Specifically, Continental, through the acts and omissions alleged

4  above, and in light of information, facts, and relevant law to the contrary, consciously

5  disregarded SDG&E's rights and forced SDG&E to bear the financial burden of the

6  Board claim and the *City* lawsuit and incur substantial financial losses, without any

7  assistance from Continental, thereby inflicting substantial financial damage on

8  SDG&E.  Continental ignored SDG&E's interests and concerns, with the requisite

9  intent to injure within the meaning of California Civil Code section 3294.  Therefore,

10  SDG&E is entitled to recover punitive damages from Continental in an amount

11  sufficient to punish and to make an example of Continental and in order to deter

12  similar conduct.

### SIXTH CAUSE OF ACTION

**(Tortious Breach of the Implied Covenant of**

**Good Faith and Fair Dealing against AEGIS)**

16  100.  SDG&E incorporates by reference each allegation contained in

17  paragraphs 1 through 99, above.

18  101.  Implied in AEGIS's policies is a covenant that AEGIS would act in good

19  faith and deal fairly with SDG&E, that it would do nothing to interfere with the rights

20  of SDG&E to receive the benefits due under AEGIS's policies, and that it would give

21  at least the same level of consideration to SDG&E's interests as it gave to its own.

22  102.  In the course of denying coverage and failing and/or refusing to defend or

23  indemnify SDG&E, AEGIS breached the implied covenant of good faith and fair

24  dealing by, among other things

25  • failing to acknowledge receipt of SDG&E's claim within 15 days of

26  receipt of SDG&E's claim in violation of CCR, Title 10, § 2695.5(b);

27  • failing and refusing to accept or deny SDG&E's claims in whole or in

28  part within 40 days of receipt and clearly document the claim file the

DICKSTEIN
SHAPIRO LLP

DOCSLA-124752

amounts accepted or denied in violation of CCR, Title 10, § 2695.7(b);

- failing and refusing to provide SDG&E with notification every 30 days that AEGIS needed additional time to conduct its investigation and/or specify what additional information it required in order to make its determination and state any continuing reasons for its inability to make a determination in violation of CCR, Title 10, § 2695.7(c)(1);

- failing and refusing to pay or reimburse any of SDG&E's defense costs incurred in connection with the Board claim  or the *City* lawsuit;

- asserting grounds for denying coverage that it knew, or should have known, were not supported by, and in fact were contrary to, the terms of its policies, the law, insurance industry custom and practice, and the facts, including that (i) the AEGIS policies were not obligated to respond until after the conclusion of the Board claim or the *City* lawsuit, (ii) the AEGIS policies were not required to respond in the existence of SDG&E's other available insurance, and (iii) certain claims took place either before or after the AEGIS polices;

- failing to conduct an adequate investigation of the Board claim or the *City* lawsuit, and asserting grounds for denying coverage based on its inadequate investigation;

- failing to provide Sempra with notification every thirty (30) days that it needed additional time to conclude its investigation and/or specify what additional information AEGIS required in order to make its determination and state any continuing reasons for its inability to make a determination, thereby violating CCR, Title 10, § 2695.7(c)(1);

- failing to honor its promises and representations in its policies that it would defend and indemnify SDG&E in matters, such as the Board claim or the *City* lawsuit, involving covered claims for property damage;

- ignoring California law and insurance industry standards;

DICKSTEIN
SHAPIRO LLP

25

COMPLAINT

- giving greater consideration to its own interests than to SDG&E's interests; and

- otherwise acting as alleged above.

103.   AEGIS did the things and committed the acts alleged above for the purpose of consciously withholding from SDG&E the rights and benefits to which SDG&E was entitled under the AEGIS policies and without considering the interests of SDG&E to at least the same extent as it considered its own interests. AEGIS's acts were inconsistent with the reasonable expectations of its insureds, were contrary to established claims practices and legal requirements, and therefore constitute bad faith.

104.   As a direct and proximate result of AEGIS's acts and omissions, SDG&E has been damaged in an amount to be proven at trial. SDG&E's damages include its unreimbursed fees and expenses that SDG&E incurred in defense of the Board claim or the *City of San Diego* litigation, plus interest.

105.   Pursuant to the holding in *Brandt*, 37 Cal. 3d 813, SDG&E is entitled to recover all attorneys' fees and expenses that it reasonably has incurred, and is incurring, in its efforts to obtain the policy benefits that AEGIS wrongfully withheld, and is withholding, in bad faith, plus interest, in an amount to be proven at trial.

106.   AEGIS's conduct was despicable and was done with a conscious disregard of SDG&E's rights, constituting oppression, fraud, and/or malice, in that AEGIS engaged in a series of acts designed to deny the benefits due under AEGIS's policies. Specifically, AEGIS, through the acts and omissions alleged above, and in light of information, facts, and relevant law to the contrary, consciously disregarded SDG&E's rights and forced SDG&E to bear the financial burden of the Board claim and the *City* lawsuit and incur substantial financial losses, without any assistance from AEGIS, thereby inflicting substantial financial damage on SDG&E. AEGIS ignored SDG&E's interests and concerns, with the requisite intent to injure within the meaning of California Civil Code section 3294. Therefore, SDG&E is entitled to

DOCSLA-124752

1    recover punitive damages from AEGIS in an amount sufficient to punish and to make
2    an example of AEGIS and in order to deter similar conduct.

3                              **SEVENTH CAUSE OF ACTION**

4              **(DECLARATORY RELIEF AGAINST DOES 1 THROUGH 10)**

5              107.   SDG&E incorporates by reference each and every allegation contained in
6    paragraphs 1 through 106, above.

7              108.   SDG&E is informed and believes, and on that basis alleges, that Does 1
8    through 10 dispute that SDG&E is entitled to insurance coverage for the Order or the
9    *City* lawsuit.  Therefore, an actual and justiciable controversy exists between SDG&E
10   and Does 1 through 10 concerning the matters alleged herein.  SDG&E seeks a
11   judicial declaration as to the duties and obligations of Does 1 through 10.  A
12   declaration is necessary at this time in order that the parties' dispute may be resolved
13   and that they be aware of their respective rights and duties.

14                                      **PRAYER**

15             WHEREFORE, Plaintiff prays for judgment as follows:

16                          **ON THE FIRST CAUSE OF ACTION**

17        1.     For damages, plus interest, according to proof at the time of trial.

18                        **ON THE SECOND CAUSE OF ACTION**

19        2.     For damages, plus interest, according to proof at the time of trial.

20                          **ON THE THIRD CAUSE OF ACTION**

21        3.     For damages, plus interest, according to proof at the time of trial.

22                        **ON THE FOURTH CAUSE OF ACTION**

23        4.     For damages, plus interest, according to proof at the time of trial.

24        5.     For reasonable attorneys' fees and expenses, incurred in obtaining the
25   benefits due under the ESLIC Policy, plus interest;

26        6.     For punitive damages in an amount to be determined at the time of trial;

27                          **ON THE FIFTH CAUSE OF ACTION**

28        7.     For damages, plus interest, according to proof at the time of trial.

DOCSLA-124752

8.    For reasonable attorneys' fees and expenses, incurred in obtaining the benefits due under the Harbor Policy, plus interest;

9.    For punitive damages in an amount to be determined at the time of trial;

### ON THE SIXTH CAUSE OF ACTION

10.    For damages, plus interest, according to proof at the time of trial.

11.    For reasonable attorneys' fees and expenses, incurred in obtaining the benefits due under the AEGIS policies, plus interest;

12.    For punitive damages in an amount to be determined at the time of trial;

### ON THE SEVENTH CAUSE OF ACTION

13.    For declarations in accord with SDG&E's contentions stated above;

### ON ALL CAUSES OF ACTION

14.    For costs of suit incurred herein; and

15.    For such other, further, and/or different relief as may be just and proper.

DATED: February 11, 2015        DICKSTEIN SHAPIRO LLP

By: _____
    Kirk A. Pasich
    Sandra Thayer
    Fiona Chaney
    Attorneys for Plaintiff

COMPLAINT

DICKSTEIN
SHAPIRO LLP

DOCSLA-124752

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action.

DATED:  February 11, 2015          DICKSTEIN SHAPIRO LLP


By: _____
       Kirk A. Pasich
       Sandra Thayer
       Fiona Chaney
       Attorneys for Plaintiff

COMPLAINT

DICKSTEIN
SHAPIRO LLP

DOCSLA-124752

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Kirk Pasich (94242);  Sandra Thayer (200294);  Fiona Chaney (227725)<br>DICKSTEIN SHAPIRO LLP<br>2049 Century Park East, Suite 700<br>Los Angeles, CA 90067-3109<br>TELEPHONE NO.: 310-772-8300      FAX NO.: 310-772-8301<br>ATTORNEY FOR (Name): Plaintiff | CIVIL BUSINESS OFFICE 1<br>CENTRAL DIVISION<br><br>2015 FEB 11  PM 3:54<br><br>CLERK-SUPERIOR COURT<br>SAN DIEGO COUNTY. CA |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 330 W. Broadway
MAILING ADDRESS: 330 W. Broadway
CITY AND ZIP CODE: San Diego, CA 92101
BRANCH NAME: Central Division

CASE NAME: SAN DIEGO GAS AND ELECTRIC COMPANY v. NORTHERN
ASSURANCE COMPANY OF AMERICA, et al. [See Attachment "A"]

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☒ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter      ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | 37-2015-00004804-CU-IC-CTL |
| | | | | JUDGE: |
| | | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☒ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☐ is ☒ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties     d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel   e. ☐ Coordination with related actions pending in one or more courts
        issues that will be time-consuming to resolve            in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence        f. ☐ Substantial postjudgment judicial supervision
3. Remedies sought (check all that apply): a. ☒ monetary  b. ☒ nonmonetary; declaratory or injunctive relief   c. ☒ punitive
4. Number of causes of action (specify): Seven
5. This case ☐ is ☒ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)
Date: February 11, 2015
Fiona Chaney
_____          ▶ _____
(TYPE OR PRINT NAME)                                         (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

*San Diego Gas and Electric Company v. Northern Assurance Company of America, et al.*

ATTACHMENT "A"

NORTHERN ASSURANCE COMPANY OF AMERICA, as successor in interest to
EMPLOYERS' SURPLUS LINES INSURANCE COMPANY; CONTINENTAL INSURANCE
COMPANY, as successor in interest to HARBOR INSURANCE COMPANY; ASSOCIATED
ELECTRIC & GAS INSURANCE SERVICES LIMITED; and DOES 1-10



# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

CASE NUMBER: 37-2015-00004804-CU-IC-CTL   CASE TITLE: San Diego Gas and Electric Company vs. NORTHERN ASSURANCE COMPANY OF AMERICA

**NOTICE: All plaintiffs/cross-complainants in a general civil case are required to serve a copy of the following three forms on each defendant/cross-defendant, together with the complaint/cross-complaint:**
        **(1) this Alternative Dispute Resolution (ADR) Information form (SDSC form #CIV-730),**
        **(2) the Stipulation to Use Alternative Dispute Resolution (ADR) form (SDSC form #CIV-359), _and_**
        **(3) the Notice of Case Assignment form (SDSC form #CIV-721).**

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts, community organizations, and private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. The San Diego Superior Court expects that litigants will utilize some form of ADR as a mechanism for case settlement before trial, and it may be beneficial to do this early in the case.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. A form for agreeing to use ADR is attached (SDSC form #CIV-359).

## Potential Advantages and Disadvantages of ADR
ADR may have a variety of advantages or disadvantages over a trial, depending on the type of ADR process used and the particular case:

| Potential Advantages | Potential Disadvantages |
|---|---|
| • Saves time | • May take more time and money if ADR does not resolve the dispute |
| • Saves money | |
| • Gives parties more control over the dispute resolution process and outcome | • Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable |
| • Preserves or improves relationships | |

## Most Common Types of ADR
You can read more information about these ADR processes and watch videos that demonstrate them on the court's ADR webpage at http://www.sdcourt.ca.gov/adr.

**Mediation:** A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners, or when parties want to discuss non-legal concerns or creative resolutions that could not be ordered at a trial.

**Settlement Conference:** A judge or another neutral person called a "settlement officer" helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge or settlement officer does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Arbitration:** A neutral person called an "arbitrator" considers arguments and evidence presented by each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to binding arbitration, they waive their right to a trial and agree to accept the arbitrator's decision as final. With nonbinding arbitration, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time, and expense of a trial.

**Other ADR Processes:** There are several other types of ADR which are not offered through the court but which may be obtained privately, including neutral evaluation, conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR processes. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute. Be sure to learn about the rules of any ADR program and the qualifications of any neutral you are considering, and about their fees.

## Local ADR Programs for Civil Cases

**Mediation:** The San Diego Superior Court maintains a Civil Mediation Panel of approved mediators who have met certain minimum qualifications and have agreed to charge $150 per hour for each of the first two (2) hours of mediation and their regular hourly rate thereafter in court-referred mediations.

On-line mediator search and selection: Go to the court's ADR webpage at www.sdcourt.ca.gov/adr and click on the "Mediator Search" to review individual mediator profiles containing detailed information about each mediator including their dispute resolution training, relevant experience, ADR specialty, education and employment history, mediation style, and fees and to submit an on-line Mediator Selection Form (SDSC form #CIV-005). The Civil Mediation Panel List, the Available Mediator List, individual Mediator Profiles, and Mediator Selection Form (CIV-005) can also be printed from the court's ADR webpage and are available at the Mediation Program Office or Civil Business Office at each court location.

**Settlement Conference:** The judge may order your case to a mandatory settlement conference, or voluntary settlement conferences may be requested from the court if the parties certify that: (1) settlement negotiations between the parties have been pursued, demands and offers have been tendered in good faith, and resolution has failed; (2) a judicially supervised settlement conference presents a substantial opportunity for settlement; and (3) the case has developed to a point where all parties are legally and factually prepared to present the issues for settlement consideration and further discovery for settlement purposes is not required. Refer to SDSC Local Rule 2.2.1 for more information. To schedule a settlement conference, contact the department to which your case is assigned.

**Arbitration:** The San Diego Superior Court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. Refer to SDSC Local Rules Division II, Chapter III and Code Civ. Proc. § 1141.10 et seq or contact the Arbitration Program Office at (619) 450-7300 for more information.

More information about court-connected ADR: Visit the court's ADR webpage at www.sdcourt.ca.gov/adr or contact the court's Mediation/Arbitration Office at (619) 450-7300.

**Dispute Resolution Programs Act (DRPA) funded ADR Programs:** The following community dispute resolution programs are funded under DRPA (Bus. and Prof. Code §§ 465 et seq.):
- In Central, East, and South San Diego County, contact the National Conflict Resolution Center (NCRC) at www.ncrconline.com or (619) 238-2400.
- In North San Diego County, contact North County Lifeline, Inc. at www.nclifeline.org or (760) 726-4900.

**Private ADR:** To find a private ADR program or neutral, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

## Legal Representation and Advice

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or your local County Bar Association can assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California courts website at *www.courtinfo.ca.gov/selfhelp/lowcost*.

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS: 330 West Broadway | |
| MAILING ADDRESS: 330 West Broadway | |
| CITY, STATE, & ZIP CODE: San Diego, CA 92101-3827 | |
| BRANCH NAME: Central | |

| PLAINTIFF(S): San Diego Gas and Electric Company |
|---|
| DEFENDANT(S): NORTHERN ASSURANCE COMPANY OF AMERICA et.al. |
| SHORT TITLE: SAN DIEGO GAS AND ELECTRIC COMPANY VS. NORTHERN ASSURANCE COMPANY OF AMERICA |

| STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: 37-2015-00004804-CU-IC-CTL |
|---|---|

Judge: Timothy Taylor                                    Department: C-72

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution (ADR) process. Selection of any of these options will not delay any case management timelines.

☐ Mediation (court-connected)          ☐ Non-binding private arbitration

☐ Mediation (private)                  ☐ Binding private arbitration

☐ Voluntary settlement conference (private)   ☐ Non-binding judicial arbitration (discovery until 15 days before trial)

☐ Neutral evaluation (private)         ☐ Non-binding judicial arbitration (discovery until 30 days before trial)

☐ Other (specify e.g., private mini-trial, private judge, etc.): _____

_____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____

_____

_____

Alternate neutral (for court Civil Mediation Program and arbitration only): _____

Date: _____          Date: _____

_____                 _____
Name of Plaintiff                            Name of Defendant

_____                 _____
Signature                                    Signature

_____                 _____
Name of Plaintiff's Attorney                 Name of Defendant's Attorney

_____                 _____
Signature                                    Signature

If there are more parties and/or attorneys, please attach additional completed and fully executed sheets.

It is the duty of the parties to notify the court of any settlement pursuant to Cal. Rules of Court, rule 3.1385. Upon notification of the settlement, the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court.

**IT IS SO ORDERED.**

Dated: 02/12/2015                            _____
                                             JUDGE OF THE SUPERIOR COURT

| SDSC CIV-359 (Rev 12-10) | STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION | Page: 1 |
|---|---|---|

3

# EXHIBIT A

# FRED. S. JAMES & CO./TRANSWEST

*Insurance Brokers and Consultants Since 1858*      INSURANCE BROKERS

625 SOUTH KINGSLEY DRIVE · LOS ANGELES, CALIFORNIA 90005 · 385-0545

July 17, 1968                    *INF300*

Mr. Craig Hubble, Insurance Analyst
San Diego Gas & Electric Company
P. O. Box 1831
San Diego, California  92112

          EMPLOYERS SURPLUS LINES INSURANCE CO.
          POLICY NO. E 512982

Dear Craig:

You probably will recall that there were certain changes
to be made in the Employers Surplus Lines policy to make
it more concurrent with the balance of the program.  We
placed this in such a hurry that they simply issued the
original contract on a Lloyd's Form B, which left a little
bit to be desired when it came to such matters as appor-
tionment of costs, etc.

The actual manuscript policy has now been substituted and
it appears to be everything that we asked for.  Other endorse-
ments concerning Commonwealth Plan and Cosmodyne Corporation
are included as well.

After you have reviewed this, if you have any questions,
we can certainly go over them when we next get together.

                         Sincerely,

                         Robert L. Degner

RLD/st

Enclosures

CC:  Robson-Cavignac

RECEIVED
San Diego Gas & Electric Company

JUL 18 1968

ADMINISTRATIVE FUNCTIONS
DEPARTMENT.

NEW YORK · BUFFALO · PHILADELPHIA · PITTSBURGH · CHICAGO · MINNEAPOLIS · OKLAHOMA CITY · PORTLAND · SEATTLE · SAN FRANCISCO · LONDON
INTERNATIONAL SERVICE THROUGH ASSOCIATES IN 30 MAJOR CITIES THROUGHOUT THE WORLD

NO. E 512982

# EMPLOYERS' SURPLUS LINES INSURANCE COMPANY

WILMINGTON, DELAWARE

*Special Lines*

# SAYRE & TOSO, Inc.

*Underwriting Managers*

San Francisco, California

Los Angeles, California
Seattle, Washington

Portland, Oregon
Denver, Colorado

Employers' Surplus Lines Insurance Company, Wilmington, Delaware (hereinafter called the Company), agrees with the assured named below, in consideration of the payment of the premium and subject to the limits of liability, exclusions, conditions and other terms of this policy, to provide insurance as set forth in the form(s) and endorsement(s) attached.

In favor of...........................SAN DIEGO GAS & ELECTRIC COMPANY..........................
...........................(SEE ENDORSEMENT # 1)...........................ASSURED.

| AMOUNT | PREMIUM |
|--------|---------|
| $1,000,000.00 | $ 15,000.00 |
| EXCESS OF | $ |
| $50,000.00 | $ |
| POLICY FEE | 5.00 |
| TOTAL | $ 15,005.00 |

Address   P. O. BOX 1831
SAN DIEGO, CALIFORNIA

Type of Coverage:   THIRD PARTY PROPERTY DAMAGE
INCLUDING AUTOMOBILES

in the amount of   $1,000,000.00 EXCESS OF
$50,000.00

Beginning at noon on the 7TH day of   OCTOBER   19 67
and ending at noon on the 7TH day of   OCTOBER   19 70
Standard time at the place of location of risks insured, and in accordance with terms and conditions of the form(s) attached.

1. SAYRE & TOSO, INC. NOT AN ASSURER.  It is expressly understood and agreed by the assured in accepting this policy that Sayre & Toso, Inc. is not an Assurer hereunder and neither is nor shall be in any way or to any extent liable for any loss or claim whatever as an Assurer. The Assurer hereunder is Employers' Surplus Lines Insurance Company.

2. ASSIGNMENT.  An assignment of any interest under this policy not bind the Company unless the consent of Sayre & Toso, Inc. to such assignment is endorsed hereon.

3. MISREPRESENTATION AND FRAUD.  This policy shall be void if the assured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof or in case of any fraud, attempted fraud or false swearing by the assured touching any matters relating to this insurance or the subject thereof, whether before or after a loss.

4. COOPERATION BY ASSURED.  The assured shall cooperate with the Company and, upon the Company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits.

5. DECLARATIONS.  Wherever the word "Underwriters" appears in any endorsement attached to this policy, the words "Employers' Surplus Lines Insurance Company" shall be deemed substituted therefor.

6. SMALL AMOUNTS.  It is a condition of this policy that no additional premium will be charged nor return premium allowed when the amount involved does not exceed $2.00.

7. TERMS OF POLICY SUBJECT TO ENDORSEMENTS.  This insurance is made and accepted subject to all the provisions, conditions and warranties set forth herein and in any forms or endorsements attached hereto, all of which are to be considered as incorporated herein, and any provisions or conditions appearing in any forms or endorsements attached hereto which give the policy provisions stated herein shall supersede such policy provisions in so far as they are inconsistent therewith.

8. CHANGES.  Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the Company from asserting any right under the terms of this policy, nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

9. DECLARATIONS.  By accepting this policy the assured agrees that the statements in all declarations and warranties made in connection with this insurance provided hereunder are his agreements and representations, that this policy is issued in reliance upon the truth of such representations, and that this policy embodies all agreements between the assured and the Company or any of its agents relating to this insurance.

IN WITNESS WHEREOF, this Company has caused these presents, but this policy shall not be valid unless countersigned by SAYRE & TOSO, INC.

*J. Marshall Taylor*
Secretary.

*Frank J. Carey*
President.

Dated at   LOS ANGELES, CALIFORNIA   , this 20TH day of   OCTOBER   , 19 67

SAYRE & TOSO, INC.

By *J. Marsh*   Mkt

ORIGINAL POLICY

FORM 770

DIRECTORS

IN CASE OF LOSS NOTIFY
IMMEDIATELY YOUR AGENT
OR BROKER OR OUR NEAREST
OFFICE ALSO REFER TO
NOTIFICATION OF LOSS
PROVISIONS IN POLICY WORDING.

Policy No. B 512982

EMPLOYERS'
Surplus Lines Insurance Company
WILMINGTON, DELAWARE

The Assured is required to read this Policy
and, if incorrect, return it immediately for
alteration.

SAYRE & TOSO, Inc.
UNDERWRITING MANAGERS

SAN DIEGO GAS & ELECTRIC COMPANY, SAN DIEGO GASCO EMPLOYEES'
FEDERAL CREDIT UNION, AND ALL ALLIED, AFFILIATED, PROPRIETARY
AND SUBSIDIARY CORPORATIONS OR ORGANIZATIONS WHETHER NAMED OR
NOT AND THE SUCCESSORS OR ASSIGNS OF THE FORE-GOING, IN WHICH
THE NAMED INSURED OWNS MAJORITY INTEREST IN THE VOTING STOCK,
AND ALL THEIR OFFICERS, DIRECTORS, EXECUTIVES, STOCKHOLDERS
AND EMPLOYEES WHILE ACTING IN THEIR CAPACITY AS SUCH, JOINTLY
AND SEVERALLY.

hereinafter called the "Insured", as follows:

1.  COVERAGE:  From and against all loss which the Insured may sustain or
    incur by reason of or in consequence of:

    (A)  Any and all liability imposed by law against the Insured for loss of
         or damage to or destruction of property of others (including but not
         limited to, damage resulting from loss of use of property damaged or
         destroyed and all other indirect and consequential damage for which
         legal liability exists in connection with such damage to or destruc-
         tion of property of others) sustained or alleged to have been sus-
         tained during the currency of this Policy and arising from any cause
         whatsoever out of the operations, activities, work and/or business
         of the Insured in the United States of America, its territories and
         possessions and/or Canada.

    (B)  Any and all liability for damage to or destruction of property of
         others assumed by the Insured in writing under contracts, leases or
         agreements usual and incidental to the operations, activities, work
         and/or business of the Insured, but this Policy shall not be held to
         cover any liability assumed by the Insured in any contract for
         damage to or destruction of property in the care, custody or control
         of the Insured, or rented, leased or used by the Insured, unless such
         liability would have been covered hereunder even in the absence of
         such contract, lease or agreement.

    (C)  The Company also agree to investigate and/or to defend in the name
         and on behalf of Insured all claims or suits for such injury or
         damage for which the Insured is, or is alleged to be liable.

    (D)  The Company further agrees to contribute to (a) all expenses incurred
         for investigation, negotiation and settlement of claims (other than
         salaries of employees and office expenses of the Insured); (b) All
         costs taxed against the Insured in any legal proceeding and interest
         accruing, up to the date of payment by the Company, upon any judgment
         or judgments rendered in connection therewith; and (c) All premium
         charges on bonds required in legal proceedings resulting from claims
         under this Policy, including release of attachment bonds.

         All such contributions to be in the same proportion that the Company's
         liability for payment hereunder bear to the total of any judgment or
         loss payment which shall be in addition to the Company's limit of
         liability as set forth in Paragraph 2.

- 1 -

2.  **LIMITS OF LIABILITY:** It is expressly agreed that the agreement of the Company to insure attaches only when the liability exceeds:

    (A)  FIFTY THOUSAND DOLLARS                    $50,000.00

as respects any claim or series of claims arising out of any one occurrence by reason of the ownership, operation, maintenance or control of any automobile, trailer, semi-trailer, tractor or any other motor vehicle licensed for use on public highways, or;

    (B)  FIFTY THOUSAND DOLLARS                    $50,000.00

as respects any claim or series of claims arising out of any one occurrence other than described in section (A); and then only in excess of section (A) amount up to;

ONE MILLION DOLLARS                          $1,000,000.00

it being understood, however, that there is no limit to the number of claims to which the agreement of the Company to insure attaches hereunder, provided the occurrence out of which any claim or claims arise occur during the life of this Policy. The term "one occurrence" shall be taken to mean a single event, or originating cause and shall include all resultant or concomitant loss or losses whether to one or more locations.

3.  **EXCLUSIONS:** This Policy DOES NOT COVER LIABILITY:

    (a)  For loss of or damage to property of others carried in or upon any motor vehicle or motor vehicle trailer maintained or operated by the Insured.

    (b)  For loss or damage caused by maintenance or operation of powered craft or marine floating equipment by the Insured.

    (c)  For damage to any property of others in the care and custody of the Insured for repair or storage, or for sale;

    (d)  For claims made against the Insured -

        1.  For repairing or replacing any defective product or products manufactured, sold or supplied by the Insured or any defective part or parts thereof nor for the cost of such repair or replacement or

        2.  For the loss of use of any such defective product or products or parts thereof or

        3.  For damage to that particular part of any property upon which the Insured is or has been working caused by the faulty manner in which the work has been performed.

4. ADDITIONAL INSURED: It is understood and agreed that wherever the Insured has contracted to protect any individual, firm or corporation by Property Damage Insurance, such individual, firm or corporation shall be deemed an Insured under this Policy but the liability of the Company as respects such individual, firm or corporation shall be limited to the amount of insurance contracted to be carried by the Insured but in no event shall such liability in the aggregate exceed the Company's limit of liability as expressed in Paragraph 2 of this Policy.

It is understood, however, that this Policy does not insure any individual, firm or corporation whose operations or business is not incidental or necessary to the business of the Insured herein named.

5. DIRECTORS AND STOCKHOLDERS: None of the provisions of this Policy shall insure to the benefit of any firm, person or corporation other than the Insured, it being agreed and understood, however, that the provisions of this Policy extend to and cover any director, executive officer or stockholder of any corporation named as insured insofar as any liability exists on their part, as respects the operations insured under the Policy, by reason of their being directors, officers or stock-holders of the named Insured, but without prejudice to protection on account of claims which might arise by reason of damage to property of any director, officer, or stockholder as a member of the public.

6. CROSS LIABILITY:  In the event of damage to or destruction of property belonging to any one or more Insureds (except property specifically excluded in Paragraph 3) for which another insured is or may be held liable, then this Policy shall cover such Insured against whom claim is or may be made, the same as if separate Policies had been issued to each Insured but the Company's total liability under this Policy shall not exceed the limits set forth in Paragraph 2, irrespective of the number of Insureds involved.

7. OTHER INSURANCE:  In the event that there shall be in effect any other good, valid and collectible insurance inuring to the benefit of the Insured, or any additional Insured hereunder, with respects to loss or claim covered hereby, then this insurance shall be excess insurance only, over and above the amount of any such other good, valid and collectible insurance.

8.  CONTROL OF CLAIMS:

(1)    The Insured shall have control and charge of any claim or suit or group of claims or suits resulting from a single occurrence including all litigation in respect thereto involving liability covered by this Policy but the Company may, at their option and at their own cost and expense, join in or assist in the investi-gation or defense thereof.

- 3 -

(2)    The Insured shall not, without the written consent of the Company, agree to any adjustments, settlements, or payments for which the Company would be liable under this Policy. Should the Company refuse to consent to the settlement or payment of any claim or group of claims involving liability under this Policy, then the Company shall, at their own cost and expense, take charge of any further investigation, defense or settlement of such claims.

(3)    In the event that the Insured elects not to appeal against a judgment in excess of the amount of $50,000.00 the Company may elect to conduct such appeal at their own cost and expense and shall be liable for the taxable costs and interest incidental thereto, but in no event shall the total liability of the Company exceed $1,000,000.00 as the result of a single occurrence, plus the expense of such appeal.

9.    CANCELLATION:  This Policy may be cancelled on the customary short rate basis by the Insured at any time by written notice or by surrender of the Policy to the Company. This Policy may also be cancelled with or without the return or tender of the unearned premium, by the Company by delivery to the Insured or by sending to the Insured by mail, registered or unregistered at the Insured's address as shown herein not less than thirty (30) days' written notice stating when the cancellation shall be effective, and in such case the Company shall refund the paid premium less the earned portion thereof on demand, subject always to the retention by the Company hereon, of any minimum premium stipulated herein (or proportion thereof previously agreed upon) in the event of cancellation either by the Company or Insured.

10.    DENIAL OF LIABILITY:  In the event the Insured is self-insured, in part against loss which may be basis of claim under this Policy, the Company reserves the right to require the Insured upon written notice to deny any such claim and in the event the Company shall exercise their right, the Company shall defend the Insured and pay all costs in accordance with the terms set forth in Insuring Agreement (D).

11.    CO-OPERATION:  The Insured, when requested by the Company, shall aid in effecting settlement, in securing evidence and the attendance of witnesses, in defending suits, and in prosecuting appeals, and shall at all times render to the Company all co-operation and assistance in the Insureds power (except in a pecuniary way).
The Insured shall not voluntarily assume any liability, settle any claim or incur any expense in connection with any claim(s) or loss in excess of the amount(s) expressed in item (A) and/or (B) of Paragraph 2 of this Policy.

12.    SUBROGATION:  Upon payment of any claim, demand, suit or judgment covered hereby the Company (or other insurers or the Insured in the event that more than one Insurer or the Insured as a self-insurer has paid any part of such claim it being understood that other insurance

or excess insurance or self-insurance is permitted) shall be subrogated to all rights which the Insured may have against any and every person, partnership or corporation in respect of such claim, demand, suit, or judgment and the Insured shall, at the request of the Company (or other insurers) execute all papers necessary or convenient to effect such subrogation. Any recoveries under such subrogation shall be applied to reimburse the said insurers or self-insurers in the inverse order in which they were called upon to make payment and any balance remaining from such recoveries after repayment to all of said insurers shall be paid to the Insured; except that all right of subrogation is waived under this Policy if for any reason such subrogation is contrary to any law, contract or agreement of the Insured with any other parties, usual, incidental or necessary to the business of the Insured herein named.

13. NOTICE OF LOSS:  The Insured shall, upon learning of an occurrence which in its judgment is likely to result in a claim or claims under this policy give written notice thereof to Sayre & Toso, Inc., 2601 Wilshire Boulevard, Los Angeles, California.  If a claim is made on account of any such occurrence, the Insured shall give like notice thereof.  If any suit is brought against the Insured on account of any such occurrence, the insured shall forward to Company summons or process (or copies thereof), served upon the Insured.

It shall be considered sufficient compliance with this condition if notice is given within reasonable time after knowledge of such occurrence, claim or law suit or other civil proceeding has been acquired by the individuals designated to handle such matters by the insured.

14. DUE DILIGENCE:  Upon the happening of any occurrence likely to give rise to a claim under this Certificate, the Assured shall use due diligence and do and concur in doing all things reasonably practicable to diminish the loss.

ATTACHED TO AND FORMING PART OF POLICY # E 512982

ISSUED TO:  SAN DIEGO GAS & ELECTRIC COMPANY, ETAL

DATED AT:    LOS ANGELES, CALIFORNIA

        MAY 13, 1968                   SAYRE & TOSO, INC.

                                         BY _____.

THIRD PARTY PROPERTY DAMAGE
INCLUDING AUTOMOBILE

ENDORSEMENT # 1                    EFFECTIVE: OCTOBER 7, 1967

IT IS HEREBY UNDERSTOOD AND AGREED THAT THE COMPLETE NAME OF
THE ASSURED IS TO READ AS FOLLOWS:

> SAN DIEGO GAS & ELECTRIC COMPANY, SAN DIEGO GASCO
> EMPLOYEES CREDIT UNION, AND ALL ALLIED, AFFILIATED,
> PROPRIETARY AND SUBSIDIARY CORPORATIONS OR ORGANI-
> ZATIONS WHETHER NAMED OR NOT AND THE SUCCESSORS OR
> ASSIGNS OF THE FOREGOING, IN WHICH THE NAMED INSURED
> OWNS MAJORITY INTEREST IN THE VOTING STOCK, AND ALL
> THEIR OFFICERS, DIRECTORS, EXECUTIVES, STOCKHOLDERS
> AND EMPLOYEES WHILE ACTING IN THEIR CAPACITY AS
> SUCH, JOINTLY AND SEVERALLY.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED
THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF   POLICY # E 512982

ISSUED TO     SAN DIEGO GAS & ELECTRIC COMPANY

DATED AT     LOS ANGELES, CALIFORNIA                   SAYRE & TOSO, INC.

            OCTOBER 20,            19 67        BY

FORM 727 (8-65)

THIRD PARTY PROPERTY DAMAGE
INCLUDING AUTOMOBILE

ENDORSEMENT # 2                          EFFECTIVE: OCTOBER 7, 1967

IT IS UNDERSTOOD AND AGREED THAT THIS POLICY IS WRITTEN ON AN INS-
TALLMENT BASIS AND THE PREMIUM HEREUNDER SHALL BE DUE AND PAYABLE
AS FOLLOWS:

| INSTALLMENTS | ADVANCE | 1ST. ANNIVERSARY | 2ND. ANNIVERSARY |
|---|---|---|---|
| DUE: | 10-7-67 | 10-7-68 | 10-7-69 |
| PREMIUM | $15,000.00 | $15,000.00 | $15,000.00 |
| POLICY FEE | 5.00 | ---- | ---- |
| | $15,005.00 | $15,000.00 | $15,000.00 |

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED
THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF  POLICY # E 512982

ISSUED TO  SAN DIEGO GAS & ELECTRIC COMPANY

DATED AT  LOS ANGELES, CALIFORNIA                    SAYRE & TOSO, INC.

OCTOBER 20,              19 67       BY

FORM 787 (8-66)

## THIRD PARTY PROPERTY DAMAGE

ENDORSEMENT #   3

It is understood and agreed that Paragraph #3 of the Form is deleted in its entirety and the following substituted in lieu thereof:

3. LIMITS OF LIABILITY

The Underwriters' Limits of Liability under this Certificate shall be only for the excess of loss over

a) EXCESS AUTOMOBILE PROPERTY DAMAGE
   FIFTY THOUSAND DOLLARS _____ DOLLARS ($   50,000.00   ) as respects any claim or series of claims arising out of any one occurrence by reason of the ownership, maintenance, operation or control of any automobile; (THE word "AUTOMOBILE" shall mean any land motor vehicle, trailer, or semi-trailer, provided the following described equipment shall not be an automobile except while towed by or carried on a motor vehicle not so described; any crawler-type tractor, farm implement, ditch or trench digger, power crane or shovel, grader, scraper, roller, well drilling machinery, asphalt spreader, concrete mixer, mixing and finishing equipment for highway work and other than a concrete mixer of the mix-in-transit type, and, if not subject to motor vehicle registration, any equipment used principally on premises owned by or rented to the named Assured, or on premises on which the named Assured is working, farm tractor or trailer. The word "TRAILER" includes semi-trailer).

and then only in excess of above amounts up to
   ONE MILLION ----------------------- DOLLARS ($1,000,000.00 )
or

b) OTHER THAN AUTOMOBILE PROPERTY DAMAGE
   FIFTY THOUSAND ------------------ DOLLARS ($ 50,000.00   )
   as respects any claim or series of claims arising out of any one occurrence other than described in 3 a) above; and then only in excess of above amounts up to
   DOLLARS ($               ) it being understood, however, that Underwriters' Limit of Liability shall not exceed   ONE MILLION ----------- DOLLARS ($1,000,000.00 )
   in the aggregate during any one period of insurance.


ONE OCCURRENCE

The term "ONE OCCURRENCE" shall be taken to mean a single event or originating cause and shall include all resultant or concomitant loss or losses whether to one or more locations.


PERIOD OF INSURANCE

The words "PERIOD OF INSURANCE" shall be understood to mean a period of one calendar year commencing each year on the inception date of this insurance.

All other terms and conditions of this Certificate remain unchanged.

ATTACHED TO AND FORMING PART OF:  POLICY # E 512982

ISSUED TO:   SAN DIEGO GAS & ELECTRIC COMPANY

DATED AT:   LOS ANGELES, CALIFORNIA
            OCTOBER 20, 1967         BY:       SAYRE & TOSO, INC.

                                      BY: J Marsh   WW

THIRD PARTY PROPERTY DAMAGE
INCLUDING AUTOMOBILE

ENDORSEMENT NO. 4                        EFFECTIVE: OCTOBER 7, 1967

In consideration of the Premium charged, it is understood and
agreed that:

1) Paragraphs 9 and 10 of the insuring Form are deleted and
the following substituted therefor:

> The Company shall not be called upon to assume charge
> of the settlement or defense of any claim made or suit
> brought or proceedings instituted against the Insured,
> but the Company shall have the right and shall be given
> the opportunity to associate with the Insured or the In-
> sured's underlying insurers, or both, in the defense and
> control of any claim, suit or proceeding relative to an
> occurrence where the claim or suit involves, or appears
> reasonably likely to involve, the Company, in which event
> the Insured, the underlying insurers and the Company shall
> cooperate in all things in the defense of such claim, suit
> or proceeding.

2) Such Coverage as is afforded by this Policy is extended to
apply World-wide but only as pertains to claims brought with-
in the United States of America:

ATTACHED TO AND FORMING PART OF POLICY NO. E 512982

ISSUED TO: SAN DIEGO GAS & ELECTRIC COMPANY, ETAL

DATED AT:   LOS ANGELES, CALIFORNIA           SAYRE & TOSO, INC.

            NOVEMBER 22, 1967                  By_____

THIRD PARTY PROPERTY DAMAGE
INCLUDING AUTOMOBILE

ENDORSEMENT NO. 5                    EFFECTIVE: OCTOBER 7, 1967

IN CONSIDERATION OF THE PREMIUM CHARGED, IT IS UNDERSTOOD AND
AGREED THAT THE INSURING FORM IS AMENDED TO READ AS FOLLOWS:

OTHER TERMS AND CONDITIONS REMAIN UNCHANGED
THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF       POLICY # E 512982

ISSUED TO      SAN DIEGO GAS & ELECTRIC COMPANY, ETAL

DATED AT      LOS ANGELES, CALIFORNIA                  SAYRE & TOSO, INC.

             JUNE 25,           19 68          BY

FORM 737 (8-68)

THIRD PARTY PROPERTY DAMAGE
INCLUDING AUTOMOBILE

ENDORSEMENT NO. 10                    EFFECTIVE: OCTOBER 7, 1967

IT IS AGREED THAT:

(1) ENDORSEMENT NOS. 1 AND 3 ARE DELETED FROM THE POLICY.

(2) ENDORSEMENT NO. 4 IS AMENDED TO DELETE PARAGRAPH NO. 11 RATHER THAN
    AS WRITTEN.

(3) COVERAGE (c) IS DELETED FROM THE POLICY.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED
THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF     POLICY # E 512982

ISSUED TO     SAN DIEGO GAS & ELECTRIC COMPANY

DATE AT     LOS ANGELES, CALIFORNIA                    SAYRE & TOSO, INC.

       FEBRUARY 4,          19 69 mm     BY

FORM 737 (8-65)

## THIRD PARTY PROPERTY DAMAGE (B)

UNDERWRITERS, in consideration of the premium as provided herein and subject to the terms and conditions hereinafter contained, do hereby agree to insure

## SAN DIEGO GAS & ELECTRIC COMPANY

hereinafter called the "Assured", as follows

1. COVERAGE. From and against all loss which the Assured may sustain or incur by reason of or in consequence of:
   (a) Any and all liability imposed by law against the Assured for loss of or damage to or destruction of property of others (including but not limited to, damage resulting from loss of use of property damaged or destroyed and all other indirect and consequential damage for which legal liability exists in connection with such damage to or destruction of property of others) sustained or alleged to have been sustained during the currency of this Certificate and arising from any cause whatsoever out of the operations, activities, work and/or business of the Assured in the United States of America, its territories and possessions and/or Canada, in connection with the Assured's business consisting principally of

## PUBLIC UTILITY

   (b) Any and all liability for damage to or destruction of property of others assumed by the Assured in writing under contracts, leases or agreements usual and incidental to the operations, activities, work and/or business of the Assured, but this Certificate shall not be held to cover any liability assumed by the Assured in any contract for damage to or destruction of property in the care, custody or control of the Assured, or rented, leased or used by the Assured, unless such liability would have been covered hereunder even in the absence of such contract, lease or agreement.
   (c) The Underwriters also agree:
      1. To investigate and/or to defend in the name and on behalf of Assured all claims or suits for such injury or damage for which the Assured is, or is alleged to be liable.
      2. To pay in addition to the limits of liability expressed in Paragraph 3 of this Form, all expenses incurred by the Underwriters for investigation, negotiation and defense of any such claims or proceedings; all premiums on attachment and/or appeal bonds required in any such proceedings; all costs taxed against the Assured in any such proceedings; and all interest on Underwriters' share of any judgment accruing before or after entry of such judgment and up to the date of payment by Underwriters of their share of any such judgment.
      It is a further condition of this Certificate, however, that as respects claims arising out of the ownership, operation, maintenance, or control of any automobile, trailer, semi-trailer, tractor or any other motor vehicle licensed for use on public highways, Underwriters shall contribute to the expenses above-mentioned in the proportion that their share of the loss as finally settled bears to the total sum paid. If the Assured, a settlement of the loss be practicable prior to taking the case into Court whether by compromise or otherwise for a sum not exceeding the amount borne by the Assured no expenses shall be payable by the Underwriters hereon.

2. EXCLUSIONS.  THIS CERTIFICATE DOES NOT COVER LIABILITY:
   (a) For damage to property carried in or upon any vehicle in charge of the Assured;
   (b) For damage to property caused by the ownership or operation of any power driven vessel owned or operated by the Assured under Bare Boat Charter; or
   (c) For damage to any property of others in the care and custody of the Assured for storage or for sale.
   (d) For Claims made against the Assured:
      1. For repairing or replacing any defective product or products manufactured, sold or supplied by the Assured or any defective part or parts thereof nor for the cost of such repair or replacement or
      2. For the loss of use of any such defective product or products or part or parts thereof or
      3. For damage to that particular part of any property upon which the Assured is or has been working caused by the faulty manner in which the work has been performed.

3. LIMITS OF LIABILITY. The Underwriters' Limit of Liability under this Certificate shall be only for the excess of loss over
   (a)                                                                    DOLLARS $
      as respects any claim or series of claims arising out of any one occurrence by reason of the ownership, maintenance, operation or control of any automobile, or
      (The word "automobile" shall mean any land motor vehicle, trailer, or semi-trailer, provided the following described equipment shall not be deemed an automobile except while towed by or carried on a motor vehicle not so described; any crawler-type tractor, farm implement, ditch or trench digger, power crane or shovel, grader, scraper, roller, well drilling machinery, asphalt spreader, concrete mixer, mixing and finishing equipment for highway work and other contractors equipment, other than a concrete mixer of the mix-in-transit type, and, if not subject to motor vehicle registration, any equipment used principally on premises owned by or rented to the named Assured, or on premises on which the named Assured is working, farm tractor or trailer. The word "trailer" includes semi-trailer.)

   (b)                                                                    DOLLARS $
      as respects any claim or series of claims arising out of any one occurrence other than described above, and then only in excess of above amounts up to:                DOLLARS $

Said insurance is made and accepted subject to the foregoing stipulations and conditions, and to the stipulations and conditions printed on the back hereof, which are hereby made a part of said insurance, together with such other provisions, stipulations and conditions as may be endorsed on said Certificate of Insurance or added thereto as therein provided.

Attached to and forming part of   POLICY # E 512982
ISSUED TO:   SAN DIEGO GAS & ELECTRIC COMPANY
DATED AT:   LOS ANGELES, CALIFORNIA   By:                    SAYRE & TOSO, INC.

20th day of   OCTOBER   19 67   By   O Marsh  Mgr

## NUCLEAR INCIDENT EXCLUSION CLAUSE – LIABILITY – DIRECT (BROAD)

The insurance afforded under any liability coverage of this Policy/Certificate does not apply: --

I. Under any Liability Coverage, to injury, sickness, disease, death or destruction

    (a) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II. Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III. Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

    (a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

    (b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

    (c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV. As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or byproduct material; "source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means

    (a) any nuclear reactor,

    (b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

    (c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

    (d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

Attached to and forms part of __POLICY # E 512982__ _____

issued to __SAN DIEGO GAS & ELECTRIC COMPANY_____

Dated at __LOS ANGELES, CALIFORNIA__

    __OCTOBER 20,_____ 19 __67__

                           **SAYRE & TOSO, INC.**

                      By _J Marsh WW_

ENDORSEMENT NO. _____

NMA 1296

it being understood, however, th. .nere it no limit to the number of claims to which the agreement of the Underwriters to insure attaches hereunder, provided the occurrence of which any claim or claims arise occur during the life of this Certificate. The term "One Occurrence" . . a single event, or originating cause and shall include all resultants or concomitant loss or lo. . . to one or more locations.

4. ADDITIONAL ASSURED. It is understood and agreed that wherever the Assured has contracted to protect any individual, firm, or corporation by Property Damage Insurance, such individual, firm or corporation shall be deemed an Assured under this Certificate but the liability of the Underwriters as respects such individual, firm, or corporation shall be limited to the amount of insurance contracted to be carried by the Assured but in no event shall such liability in the aggregate exceed the Underwriters' limit of liability as expressed in Paragraph No. 3 of this Certificate. It is understood, however, that coverage afforded the additional Assureds shall be restricted to liability for loss, damage or destruction arising out of the operations, activities, work and/or business of the named Assured.

5. DIRECTORS AND STOCKHOLDERS. None of the provisions of this Certificate shall inure to the benefit of any firm, person or corporation other than the Assured, it being agreed and understood, however, that the provisions of this Certificate extend to and cover any director, executive officer or stockholder of any corporation named as Assured insofar as any liability exists on their part, as respects the operations insured under the Certificate, by reason of their being directors, officers or stockholders of the named Assured, but without prejudice to protection on account of claims which might arise by reason of damage to property of any director, officer, or stockholder as a member of the public.

6. CROSS LIABILITY. In the event of damage to or destruction of property belonging to any one or more Assureds (except property specifically excluded in Paragraph No. 2) for which another Assured is or may be held liable, then this Certificate shall cover such Assured against whom claim is or may be made, the same as if separate Certificates had been issued to each Assured but Underwriters total liability under this Certificate shall not exceed the limits set forth in Paragraph 3 irrespective of the number of Assureds involved.

7. OTHER INSURANCE. In the event that there shall be in effect any other good, valid and collectible insurance inuring to the benefit of the Assured, or any additional Assured hereunder, with respects to loss or claim covered hereby, then this insurance shall be excess insurance only, over and above the amount of any such other good, valid and collectible insurance.

8. CANCELLATION. This Certificate may be cancelled on the customary short rate basis by the Assured at any time by written notice or by surrender of the Certificate to Underwriters.

This Certificate may also be cancelled with or without the return or tender of the unearned premium, by the Underwriters or by their correspondents, on their behalf, by delivering to the Assured or by sending to the Assured by mail, registered or unregistered, at the Assured's address as shown herein not less than thirty (30) days' written notice stating when the cancellation shall be effective, and in such case the Underwriters shall refund the paid premium less the earned portion thereof on demand, subject always to the retention by Underwriters hereon on any minimum premium stipulated herein (or proportion thereof previously agreed upon) in the event of cancellation either by Underwriters or Assured.

9. DENIAL OF LIABILITY. In the event the Assured is self-insured, in part, against loss which may be the basis of claim under this Certificate the Underwriters reserve the right to require the Assured upon written notice to deny any such claim and in the event the Underwriters shall exercise their right, the Underwriters shall defend the Assured and pay all costs in accordance with the terms set forth in Insuring Agreement C.

10. COOPERATION. The Assured, when requested by the Underwriters, shall aid in effecting settlements, in securing evidence and the attendance of witnesses, in defending suits, and in prosecuting appeals, and shall at all times render to the Underwriters all cooperation and assistance in the Assured's power (except in a pecuniary way). The Assured shall not voluntarily assume any liability, settle any claim or incur any expense in connection with any claim(s) or loss in excess of the amount(s) expressed in Items (a) and/or (b) of Paragraph No. 3 of this Certificate.

11. SUBROGATION. Upon payment of any claim, demand, suit or judgment covered hereby the Underwriters (or other insurers or the Assured in the event that more than one insurer or the Assured as a self-insurer has paid any part of such claim it being understood that other insurance or excess insurance or self-insurance is permitted) shall be subrogated to all rights which the Assured may have against any and every person, partnership or corporation in respect of such claim, demand, suit or judgment and the Assured shall, at the request of the Underwriters (or other insurers) execute all papers necessary or convenient to effect such subrogation. Any recoveries under such subrogation shall be applied to reimburse the said insurers or self-insurer in the inverse order in which they were called upon to make payment, and any balance remaining from such recoveries after repayment of all of said insurers shall be paid to the Assured; except that all right of subrogation is waived under this Certificate if for any reason such subrogation is contrary to any law, contract or agreement of the Assured with any other parties, usual, incidental or necessary to the business of the Assured herein named.

12. NOTICE OF LOSS. As soon as reasonably possible after the occurrence of every accident or loss coming under the conditions of this Certificate the Assured shall give to Underwriters written notice thereof with the fullest information obtainable at the time. The Assured in like manner shall give like notice with full particulars of any claim made on account of such accident. If suit is brought against the Assured, the Assured shall immediately forward to Underwriters, summons or other process that may be served upon them.

13. DUE DILIGENCE. Upon the happening of any occurrence likely to give rise to a claim under this Certificate, the Assured shall use due diligence and do and concur in doing all things reasonably practicable to diminish the loss.

# Argonaut Insurance Companies

MENLO  PARK  •  CALIFORNIA
BATON  ROUGE  •  LOUISIANA



NAME
OF
INSURED

POLICY PERIOD
PRODUCER

## COMPREHENSIVE GENERAL — AUTOMOBILE LIABILITY POLICY

The Company named on the declarations page
(A Stock Insurance Company Herein Called the Company)

agrees with the insured, named in the Declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy:

## INSURING AGREEMENTS

**I.** Coverage A — Bodily Injury Liability — Automobile  To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and arising out of the ownership, maintenance or use of any automobile.

Coverage B — Bodily Injury Liability — Except Automobile  To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person.

Coverage C — Property Damage Liability — Automobile  To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, arising out of the ownership, maintenance or use of any automobile.

Coverage D — Property Damage Liability — Except Automobile  To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident.

**II.** Defense, Settlement, Supplementary Payments  With respect to such insurance as is afforded by this policy, the Company shall:

(a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the Company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;

(b) (1) pay all premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy, all premiums on appeal bonds required in any such defended suit, the cost of bail bonds required of the insured in the event of automobile accident or automobile traffic law violation during the policy period, not to exceed $100 per bail bond, but without any obligation to apply for or furnish any such bonds;

(2) pay all expenses incurred by the Company, all costs taxed against the insured in any such suit and all interest accruing after entry of judgment until the Company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the Company's liability thereon,

(3) pay expenses incurred by the insured for such immediate medical and surgical relief to others as shall be imperative at the time of the accident;

(4) reimburse the insured for all reasonable expenses, other than loss of earnings, incurred at the Company's request;

and the amounts so incurred, except settlement of claims and suits, are payable by the Company in addition to the applicable limit of liability of this policy.

**III.** Definition of Insured  The unqualified word "insured" includes the named insured and also includes (1) under Coverages B and D, any executive officer, director or stockholder thereof while acting within the scope of his duties as such, and any organization or proprietor with respect to real estate management for the named insured, and if the named insured is a partnership, the unqualified word "insured" also includes any partner therein but only with respect to his liability as such, and (2) under Coverages A and C, any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission, and any executive officer of the named insured with respect to the use of a non-owned automobile in the business of the named insured. The insurance with respect to any person or organization other than the named insured does not apply under division (2) of this insuring agreement:

(a) with respect to an automobile while used with any trailer owned or hired by the insured and not covered by like insurance in the Company; or with respect to a trailer while used with any automobile owned or hired by the insured and not covered by like insurance in the Company;

(b) to any person or organization, or to any agent or employee thereof, operating an automobile sales agency, repair shop, service station, storage garage or public parking place, with respect to any occurrence arising out of the operation thereof, but this provision does not apply to a resident of the same household as the named insured, to a partnership in which such resident or the named insured is a partner, or to any partner, agent or employee of such resident or partnership;

(c) to any employee with respect to injury to or sickness, disease or death of another employee of the same employer injured in the course of such employment in an occurrence arising out of the maintenance or use of an automobile in the business of such employer;

(d) with respect to any hired automobile, to the owner, or a lessee thereof other than the named insured, or to any agent or employee of such owner or lessee;

(e) with respect to any non-owned automobile, to any executive officer if such automobile is owned by him or a member of the same household.

**IV.** Policy Period, Territory  This policy applies only to occurrences or accidents during the policy period within the United States of America, its territories or possessions, or Canada. With respect to automobiles this policy also applies to occurrences during the policy period while the automobile is being transported between ports thereof or while in the Republic of Mexico for a period not exceeding ten days at any one time.

## EXCLUSIONS

This policy does not apply:

(a) to liability assumed by the insured under any contract or agreement except, under Coverages B and D, (1) a contract as defined herein or (2) as respects the insurance which is afforded by the Products Hazard as defined, a warranty of goods or products.

(b) to injury, sickness, disease, death or destruction due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act or condition incident to any of the foregoing, with respect to (1) liability assumed by the insured under any contract or agreement or (2) expenses under insuring Agreement II (b) (3);

(c) under Coverages B and D, to any obligation for which the insured may be held liable in an action on a contract or an agreement by a person not a party thereto;

(d) under Coverages B and D, except with respect to operations performed by independent contractors and except with respect to liability assumed by the insured under a contract as defined herein, to the ownership, maintenance, operation, use, loading or unloading of (1) watercraft if the injury or destruction occurs away from premises owned by, rented to or controlled by the named insured except insofar as this part of this exclusion is stated in this policy to be inapplicable. (2) automobiles if the injury or destruction occurs away from such premises or the ways immediately adjoining, or (3) aircraft;

(e) under Coverages B and D, to liability imposed upon the insured or any indemnitee, as a person or organization engaged in the business of manufacturing, selling or distributing alcoholic beverages, or as an owner or lessor of premises used for such purposes, by reason of any statute or ordinance pertaining to the sale, gift, distribution or use of any alcoholic beverage;

(f) under Coverages A and B, to any obligation for which the insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(g) under Coverage A, to bodily injury to or sickness, disease or death of any employee of the insured arising out of and in the course of (1) domestic employment by the insured, if benefits therefor are in whole or in part either payable or required to be provided under any workmen's compensation law, or (2) other employment by the insured;

(h) under Coverage B, except with respect to liability assumed by the insured under a contract as defined herein, to bodily injury to or sickness, disease

or death of any employee of the insured arising out of and in the course of his employment by the insured;

(i) under Coverage C, to injury to or destruction of property owned or transported by the insured, or property rented to or in charge of the insured other than a residence or private garage injured or destroyed by a private passenger automobile covered by this policy;

(j) under Coverage D, to injury to or destruction of
(1) property owned or occupied by or rented to the insured;
(2) except with respect to liability under sidetrack agreements covered by this policy, property used by the insured;
(3) except with respect to liability under such sidetrack agreements or the use of elevators or escalators at premises owned by, rented to or controlled by the named insured, property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control;
(4) any goods, products or containers thereof manufactured, sold, handled or distributed or premises alienated by the named insured or work completed by or for the named insured, out of which the accident arises;

(k) under Coverage D, to injury to or destruction of buildings or property therein, wherever occurring, arising out of any of the following causes, if such cause occurs on or from premises owned by or rented to the named insured:
(1) the discharge, leakage or overflow of water or steam from plumbing, heating, refrigerating or air-conditioning systems, standpipes for fire hose, or industrial or domestic appliances, or any substance from automatic sprinkler systems;
(2) the collapse or fall of tanks or the component parts or supports thereof which form a part of automatic sprinkler systems;
(3) rain or snow admitted directly to the building interior through defective roofs, leaders or spouting, or open or defective doors, windows, skylights, transoms or ventilators;
provided, however, this exclusion does not apply to loss due to fire, to the use of elevators or escalators, to operations performed by independent contractors, or to the extent that this exclusion is stated in this policy to be inapplicable.

## CONDITIONS

Premium  The advance premium stated in the Declarations is an estimated premium only. Upon termination of this policy, the earned premium shall be computed in accordance with the Company's rules, rates, rating plans, premiums and minimum premiums applicable to this insurance. If the earned premium thus computed exceeds the estimated advance premium paid, the named insured shall pay the excess to the Company; if less, the Company shall return to the named insured the unearned portion paid by such insured.

When used as a premium basis:
(1) the word "admissions" means the total number of persons, other than employees of the named insured, admitted to the event insured or to events conducted on the premises whether on paid admission tickets, complimentary tickets or passes;
(2) the word "cost" means the total cost to (a) the named insured with respect to operations performed for the named insured during the policy period by independent contractors, or (b) any indemnitee with respect to any contract covered by this policy, of all work let or sublet in connection with each specific project, including the cost of all labor, materials and equipment furnished, used or delivered for use in the execution of such work, whether furnished by the owner, contractor or subcontractor, including all fees, allowances, bonuses or commissions made, paid or due;
(3) the word "receipts" means the gross amount of money charged by the named insured for such operations by the named insured or by others during the policy period as are rated on a receipts basis other than receipts from telecasting, broadcasting or motion pictures, and includes taxes, other than taxes which the named insured collects as a separate item and remits directly to a governmental division;

(5) the word "sales" means the gross amount of money charged by the named insured or by others trading under his name for all goods and products sold or distributed during the policy period and charged during the policy period for installation, servicing or repair, and includes taxes, other than taxes which the named insured and such others collect as a separate item and remit directly to a governmental division;
(6) the words "cost of hire" means the amount incurred for (a) the hire of automobiles, including the entire remuneration of each employee of the named insured engaged in the operation of such automobiles subject to an average weekly maximum remuneration of $100, and for (b) pick-up, transportation or delivery service of property or passengers performed by motor carriers of property or passengers for hire, other than such services performed by motor carriers which are subject to the security requirements of any motor carrier law or ordinance. The rates for each $100 of "cost of hire" shall be 5% of the applicable hired automobile rates, provided the owner of such hired automobile has purchased automobile Bodily Injury Liability and Property Damage Liability insurance covering the interest of the named insured on a direct primary basis as respects such automobile and submits evidence of such insurance to the named insured.
(7) the words "Class 1 persons" mean the following persons, provided their usual duties in the business of the named insured include the use of non-owned automobiles: (a) all employees, including officers, of the named insured compensated for the use of such automobiles by salary, commission, terms of employment, or specific operating allowance of any sort; (b) all direct agents and representatives of the named insured;

(4) the word "remuneration" means the entire remuneration earned during the policy period by all employees of the named insured, other than drivers of teams or automobiles and aircraft pilots and co-pilots, subject to any over-

(8) the words "Class 2 employees" means all employees, including officers, of the named insured, not included in Class 1 persons.
The named insured shall maintain for each hazard records of the information nece-

> Insert Declarations here so that to ... je butts against fold of Contract, and pen ... name of insured and address
> to appear through window. ATTACH ENDORSEMENTS, IF ANY, TO TOP BACK OF DECLARATIONS.

2. ...ection and Audit  The Company shall be permitted to inspect the insured pre... operations, automobiles and elevators and to examine and audit the insu... books and records at any time during the policy period and any extension ther... and within three years after the final termination of this policy, as far as they relate to the premium bases of the subject matter of this insurance.

3. Definitions

(a) Contract — The word "contract" means, if in writing, a lease of premises, easement agreement, agreement required by municipal ordinance, sidetrack agreement or elevator or escalator maintenance agreement.

(b) Automobile — Except where stated to the contrary, the word "automobile" means a land motor vehicle or trailer as follows:

(1) owned automobile — an automobile owned by the named insured;

(2) hired automobile — an automobile used under contract in behalf of, or loaned to, the named insured provided such automobile is not owned by or registered in the name of (a) the named insured, (b) an executive officer thereof, or (c) an employee or agent of the named insured who is granted an operating allowance of any sort for the use of such automobile;

(3) non-owned automobile — any other automobile.

The following described equipment shall be deemed an automobile while towed by or carried on an automobile not so described, but not otherwise: if of the crawler-type, any tractor, power crane or shovel, ditch or trench digger; any farm-type tractor; any concrete mixer other than of the mix-in-transit type; any grader, scraper, roller or farm implement; and, if not subject to motor vehicle registration, any other equipment not specified below, which is designed for use principally off public roads.

The following described equipment shall be deemed an automobile while towed by or carried on an automobile as above defined solely for purposes of transportation or while being operated solely for locomotion, but not otherwise: if of the non-crawler-type, any power crane or shovel, ditch or trench digger; and any air-compressing, building or vacuum cleaning, spraying or welding equipment or well drilling machinery.

(c) Semitrailer — The word "trailer" includes semitrailer.

(d) Two or more automobiles — The terms of this policy apply separately to each automobile insured hereunder, but a motor vehicle and a trailer or trailers attached thereto shall be held to be one automobile as respects limits of liability.

(e) Use — Use of an automobile includes the loading and unloading thereof.

(f) Products Hazard — The term "products hazard" means:

(1) goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, if the occurrence or accident occurs after possession of such goods or products has been relinquished to others by the named insured or by others trading under his name and if such occurrence or accident occurs away from premises owned, rented or controlled by the named insured or on premises for which the classification stated in the Company's manual excludes any part of the foregoing; provided, such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold;

(2) operations, including any act or omission in connection with operations performed by or on behalf of the named insured on the premises or elsewhere and whether or not goods or products are involved in such operations, if the occurrence or accident occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the named insured; provided, operations shall not be deemed incomplete because operations performed or because further operations may be required pursuant to an agreement; provided further, the following shall not be deemed to be the "operations" within the meaning of this paragraph: (a) pick-up or delivery, except from or onto a railroad car, (b) the maintenance of vehicles owned or used by or on behalf of the insured, (c) the existence of tools, uninstalled equipment and abandoned or unused materials and (d) operations for which the classification stated in the Company's manual specifically includes completed operations.

(g) Assault and Battery — Assault and battery shall be deemed an accident or occurrence committed by or at the direction of the insured.

(h) Occurrence — The word "occurrence" as used in this policy means an event, or continuous or repeated exposure to conditions, which unexpectedly causes injury during the policy period. All such exposure to substantially the same general conditions existing at or emanating from each premises location shall be deemed one occurrence.

4. Limits of Liability, Coverages A and B: The limit of bodily injury liability stated in the Declarations as applicable to "each person" is the limit of the Company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by one person as the result of any one occurrence; the of such liability stated in the Declarations as applicable to "each occurrence" ...bject to the above provision respecting each person, the total limit of the Company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by two or more persons as the result of any one occurrence.

5. Limits of Liability, Coverages C and D: The limits of property damage liability stated in the Declarations as applicable to "each occurrence" and "each accident" respectively are the total limit of the Company's liability for all damages arising out of injury to or destruction of all property of one or more persons or organizations, including the loss of use thereof, as the result of any one occurrence under Cover-

injury and property damage whether stated in the Declarations as "aggregate products" are respectively the total limits of the Company's liability for all damages arising out of the products hazard [all such damages arising out of one set of goods or products prepared or acquired by the named insured or by another trading under his name shall be considered, if under Coverage B, as arising out of one occurrence and, if under Coverage D, as arising out of one accident.

7. Limits of Liability, Coverage D:  (for premiums)

Subject to the limit of liability with respect to "each accident";

(a) the limit of property damage liability stated in the Declarations as "aggregate operations" is the total limit of the Company's liability for all damages arising out of injury to or destruction of property, including the loss of use thereof, caused by the ownership, maintenance or use of premises or operations rated on a remuneration premium basis or by contractors' equipment rated on a receipts premium basis;

(b) the limit of property damage liability stated in the Declarations as "aggregate protective" is the total limit of the Company's liability for all damages arising out of injury to or destruction of property, including the loss of use thereof, caused by operations performed for the named insured by independent contractors or general supervision thereof by the named insured, except (1) maintenance and repairs at premises owned by or rented to the named insured and (2) structural alterations at such premises which do not involve changing the size of or moving buildings or other structures;

(c) the limit of property damage liability stated in the Declarations as "aggregate contractual" is the total limit of the Company's liability for all damages arising out of injury to or destruction of property, including the loss of use thereof, with respect to liability assumed by the insured under contracts covered by this policy in connection with operations for which there is an "aggregate operations" limit of property damage liability stated in the Declarations.

The limits of property damage liability stated in the Declarations as "aggregate operations," "aggregate protective" and "aggregate contractual" apply separately to each project with respect to operations being performed away from premises owned by or rented to the named insured.

8. Severability of Interests  The term "the insured" is used severally and not collectively, but the inclusion herein of more than one insured shall not operate to increase the limits of the Company's liability.

9. Financial Responsibility Laws: Coverages A and C:  When this policy is certified as proof of financial responsibility for the future under the provisions of the motor vehicle financial responsibility law of any state or province, such insurance as is afforded by this policy for bodily injury liability or for property damage liability shall comply with the provisions of such law which shall be applicable with respect to any such liability arising out of the ownership, maintenance or use during the policy period of any automobile insured hereunder, to the extent of the coverage and limits of liability required by such law, but in no event in excess of the limits of liability stated in this policy. The insured agrees to reimburse the Company for any payment made by the Company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

10. Notice of Occurrence or Accident  When an occurrence or accident occurs written notice shall be given by or on behalf of the insured to the Company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the occurrence or accident, the names and addresses of the injured and of available witnesses.

11. Notice of Claim or Suit  If claim is made or suit is brought against the insured, the insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative.

12. Assistance and Cooperation of the Insured  The insured shall cooperate with the Company and, upon the Company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of accident.

13. Action Against Company  No action shall lie against the Company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgement against the insured after actual trial or by written agreement of the insured, the claimant and the Company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. Nothing contained in this policy shall give any person or organization any right to join the Company as a co-defendant in any action against the insured to determine the insured's liability. Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the Company of any of its obligations hereunder.

14. Other Insurance  If the insured has other insurance against a loss covered by this policy the Company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the Declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; provided, however, the insurance under this policy with respect to loss arising out of the maintenance or use of any automobile in the Republic of Mexico, the maintenance or use of any hired automobile insured on a cost of hire basis, or the use of any non-owned automobile, shall be excess insurance over any other valid and collectible insurance.

The insurance under this policy shall be excess insurance with respect to loss

[illegible] for other insurance is given but shall apply only in the amount by which the [illegible] limit of liability stated in the Declarations exceeds the total applicable [illegible] of liability of all valid and collectible insurance upon the basis of which [illegible] is given.

[illegible] Subrogation. In the event of any payment under this policy, the Company [illegible] be subrogated to all the insured's rights of recovery therefor against any [illegible] or organization and the insured shall execute and deliver instruments and [illegible] and do whatever else is necessary to secure such rights. The insured shall [illegible] nothing after loss to prejudice such rights.

Three Year Policy. A policy period of three years is comprised of three con[illegible] annual periods. Rates for the automobile hazards are subject to amendment [illegible] second and third annual periods in accordance with the Company's rules and [illegible]. Computation and adjustment of the earned premium shall be made at [illegible] of each annual period. Aggregate limits of liability as stated in this policy [illegible] separately to each annual period.

Changes. Notice to any agent or knowledge possessed by any agent or by any [illegible] person shall not effect a waiver or a change in any part of this policy or [illegible] the Company from asserting any right under the terms of this policy, nor shall [illegible] terms of this policy be waived or changed, except by endorsement issued to [illegible] a part of this policy, signed by a duly authorized representative of the Company.

Assignment. Assignment of interest under this policy shall not bind the Com[illegible] until its consent is endorsed hereon. If, however, the named insured shall die, [illegible] policy shall cover (1) the named insured's legal representative as the named [illegible] and (2) under Coverages A and C, subject otherwise to the provisions of [illegible] Agreement III, any person having proper temporary custody of any owned automobile or hired automobile, as an insured, until the appointment and qualification of such legal representative; provided that notice of cancellation addressed to the insured named in the Declarations and mailed to the address shown in this policy shall be sufficient notice to effect cancellation of this policy.

19. Cancellation. This policy may be cancelled by the named insured by surrender thereof to the Company or any of its authorized agents or by mailing to the Company written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the Company by mailing to the named insured at the address shown in this policy written notice stating when not less than ten days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the named insured or by the Company shall be equivalent to mailing.

If the named insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the Company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

20. Declarations. By acceptance of this policy the named insured agrees that the statements in the Declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the Company or any of its agents relating to this insurance.

*Participating Provision.* The named insured shall be entitled to participate in the distribution of dividends to the extent and upon the conditions fixed and determined by the Board of Directors in accordance with law after expiration of the policy period to which the dividend is applicable.

Texas Exception. Dividend Provision — Participating Companies. The named insured shall be entitled to participate in a distribution of the surplus of the Company, as determined by its Board of Directors from time to time, after approval in accordance with the provisions of the Texas Insurance Code, of 1951, as amended.

IN WITNESS WHEREOF, the company has caused this policy to be signed by its president and secretary but this policy shall not be valid unless completed by the attachment hereto of a declarations page and countersigned on the aforesaid declarations page by a duly authorized representative of the company.

R S Morse Secretary [signature] President

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT — BROAD FORM

[illegible]s agreed that the policy does not apply:

Under any Liability Coverage, to injury, sickness, disease, death or destruction
[illegible] with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or
[illegible] resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

Under any Medical Payments Coverage, or under any Supplementary Payments [illegible] relating to immediate medical or surgical relief, to expenses incurred with [illegible] to bodily injury, sickness, disease or death resulting from the hazardous [illegible] of nuclear material and arising out of the operation of a nuclear facility [illegible] any person or organization.

Under any Liability Coverage, to injury, sickness, disease, death or destruction [illegible] from the hazardous properties of nuclear material, if
[illegible] the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;
[illegible] the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or
[illegible] the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

As used in this endorsement:
"hazardous properties" include radioactive, toxic or explosive properties;
"nuclear material" means source material, special nuclear material or by-product material;
"source material," "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;
"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;
"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;
"nuclear facility" means
(a) any nuclear reactor,
(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,
(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,
(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,
and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;
"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;
With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

## ENDORSEMENT: LIMITATION OF ADDITIONAL INTERESTS — LOADING AND UNLOADING

[illegible]s agreed that Coverage A — Bodily Injury Liability — Automobile and Coverage C — Property Damage Liability — Automobile do not apply to injury, sickness, [illegible]ease, death or destruction which arises out of the loading or unloading of an automobile, if the occurrence takes place on premises (including the ways immediately [illegible]) owned, rented or controlled either by the person or by the employer of the person against whom claim is made or suit is brought for such injury, sickness, [illegible], death or destruction. This limitation does not apply with respect to claims made or suits brought against the following insureds:

(a) the named insured or, if the named insured is an individual, his spouse, if a resident of the same household;

(b) a lessee or borrower of the automobile or an employee of either of them or of the named insured;

(c) if the named insured is classified and rated as a truckman, any person or organization, or any agent or employee thereof, engaged in the business of transporting property by automobile for the named insured or for others, subject nevertheless to the limitations of any endorsement made a part of the policy and specifically applicable to truckmen;

(d) any other person or organization but only with respect to his or its liability because of acts or omissions of an insured under (a), (b) or (c) above.

## *Argonaut Insurance Companies*

COMPREHENSIVE GENERAL
AUTOMOBILE LIABILITY
POLICY

1 ARGONAUT INSURANCE COMPANY ● MENLO PARK, CALIFORNIA
2 ARGONAUT INSURANCE COMPANY ● MENLO PARK, CALIFORNIA
3 ARGONAUT-SOUTHWEST INSURANCE COMPANY ● BATON ROUGE, LOUISIANA
4 ARGONAUT-NORTHWEST INSURANCE COMPANY ● BOISE, IDAHO

**POLICY NUMBER**

DECLARATIONS

| 1 | COVERAGE IS PROVIDED IN THE COMPANY DESIGNATED BY NUMBER |

CL 10-210-367193

| ITEM 1 | NAMED INSURED .DAVEY TREE SURGERY CO., LTD., ETAL | **RENEWAL OF** |
| | AND ADDRESS: .AS PER ENDORSEMENT NO. 11 ATTACHED | |
| | (Number and Street) .2011 RUSS BUILDING | CL 10-198-36719. |
| | City or Town, County & State) .SAN FRANCISCO, CALIFORNIA | |

| 2 | POLICY PERIOD: *12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE NAMED INSURED AS STATED HEREIN*   From :JANUARY 1, 1966   To: JANUARY 1, 1969 |

PRODUCER: .SECURITY INSURANCE ASSOCIATES, INC.   . PROD. CODE:
Office Address: .2041 PIONEER COURT
City or Town and State: .SAN MATEO, CALIFORNIA   . 7795

3
The insurance afforded is only with respect to such and so many of the following Coverages as are indicated by specific premium charge or charges. The limit of the Company's liability against each such Coverage shall be as stated herein, subject to all of the terms of this policy having reference thereto.

| COVERAGES | LIMITS OF LIABILITY | ADVANCE PREMIUMS |
|---|---|---|
| A. BODILY INJURY LIABILITY – AUTOMOBILE | $ 250 ,000 each person<br>$ 250 ,000 each occurrence | $ 150.00 |
| B. BODILY INJURY LIABILITY – EXCEPT AUTOMOBILE | $ 250 ,000 each person<br>$ 500 ,000 each occurrence<br>$ 500 ,000 aggregate products | $ 200.00 |
| C. PROPERTY DAMAGE LIABILITY – AUTOMOBILE | $ 200 ,000 each occurrence | $ 100.00 |
| J. PROPERTY DAMAGE LIABILITY – EXCEPT AUTOMOBILE | $ 100 ,000 each accident<br>$ 100 ,000 aggregate operations<br>$ 100 ,000 aggregate protective<br>$ 100 ,000 aggregate products<br>$ 100 ,000 aggregate contractual | $ 300.00 |

Endorsement Form Numbers:   1 THRU 21

Additional Premium
per Endorsements   $  75.00

| TOTAL ADVANCE PREMIUM | $ 825.00 |

If policy period is more than one year, the premium is payable:
$  825.00   on effective date of the policy
$ TO BE DET.   1st anniversary
$ TO BE DET.   2nd anniversary

4   Premium adjustment period: ☐ Annually   ☐ Semi-annually   ☐ Quarterly   ☒ Monthly

5   The named insured is: ☐ Individual   ☒ Corporation   ☐ Partnership   Other:
Business of the named insured is:   TREE SURGEONS

6   During the past three years no insurer has cancelled insurance, issued to the named insured, similar to that afforded by this policy, unless otherwise stated herein:  NO EXCEPTIONS

**DUPLICATE**
I HEREBY CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF THE ORIGINAL POLICY.

Countersigned at   SAN FRANCISCO, CALI.   on   JUNE 6   , 19 69   By:   *John Salinas*

ENDORSEMENT

## AMENDMENT OF LIMITS – SPECIFIC OPERATIONS

IN CONSIDERATION OF AN ADDITIONAL PREMIUM TO BE DETERMINED AT AUDIT IT IS AGREED THAT ONLY WITH RESPECTS TO OPERATIONS PERFORMED BY THE NAMED INSURED FOR SAN DIEGO GAS AND ELECTRIC COMPANY THE LIMITS OF LIABILITY SHALL BE AMENDED TO READ AS FOLLOWS:

COVERAGE A. BODILY INJURY LIABILITY –AUTOMOBILE
500,000.  EACH PERSON
1,000,000.  EACH OCCURRENCE

COVERAGE B. BODILY INJURY LIABILITY –EXCEPT AUTOMOBILE
500,000.  EACH PERSON
1,000,000.  EACH OCCURRENCE
1,000,000.  AGGREGATE PRODUCTS

COVERAGE C. PROPERTY DAMAGE LIABILITY – AUTOMOBILE
500,000.  EACH OCCURRENCE

COVERAGE D. PROPERTY DAMAGE LIABILITY – EXCEPT AUTOMOBILE
500,000.  EACH OCCURRENCE
500,000.  AGGREGATE OPERATIONS
500,000.  AGGREGATE PROTECTIVE
500,000.  AGGREGATE PRODUCTS
500,000.  AGGREGATE CONTRACTUAL

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements, or limitations of this policy other than as above stated.

Policy No: CL 10-210-367193        Issued by the company designated or named on the declarations page
Issued To: DAVEY TREE SURGERY COMPANY

Endorsement No: 38
Effective Date: 1/1/67

ARGONAUT INSURANCE COMPANY
ARGONAUT-SOUTHWEST INSURANCE COMPANY
ARGONAUT-NORTHWEST INSURANCE COMPANY

SECRETARY                           PRESIDENT

## "OCCURRENCE" BASIS — PROPERTY DAMAGE

It is agreed that such insurance as is afforded by the policy under Coverage D — Property Damage Liability — except Automobile applies subject to the following provisions:

1. The word "accident" except as used in paragraph 2 hereof is amended to read "occurrence".

2. The word "occurrence" as used herein shall mean either

   (a) an accident, or

   (b) in the absence of an accident, a condition for which the insured is responsible which during the policy period causes physical injury to or destruction of property which was not intended. All such injury or destruction arising out of the continuation or repetition of substantially the same condition or the same proximate cause shall be considered as arising out of one occurrence.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements, or limitations of this policy other than as above stated.

Policy No.: CL 10-210-367193

Issued To: DAVEY TREE SURGERY CO., LTD., ET AL

ARGONAUT INSURANCE COMPANY
ARGONAUT-NORTHWEST INSURANCE COMPANY
ARGONAUT-SOUTHWEST INSURANCE COMPANY

Endorsement No.: 12

Effective Date: 1/1/66

UND-1680-R1

*R S Uthouse*                                    *F R*

Secretary                                        President

ENDORSEMENT

BLANKET CONTRACTUAL

IT IS AGREED THAT CONDITION 3 (a), OF THE POLICY CONDITIONS, IS DELETED AND THE
FOLLOWING SUBSTITUTED THEREFORE:

  (a)  CONTRACT - THE WORK "CONTRACT" MEANS, IF IN
                  WRITING, ANY AGREEMENT CUSTOMARY,
                  USUAL AND INCIDENTAL TO THE NAMED
                  INSURED'S OPERATIONS, EXCEPT
                  RAILROAD CONSTRUCTION AGREEMENTS.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,
agreements, or limitations of this policy other than as above stated.

Policy No.: CL 10-210-367193    issued by the company designated or named on the declarations page
Issued To:  DAVEY TREE SURGERY CO., LTD., ETAL

Endorsement No.: 13                           ARGONAUT INSURANCE COMPANY
Effective Date: 1/1/66                   ARGONAUT-SOUTHWEST INSURANCE COMPANY
                                        ARGONAUT-NORTHWEST INSURANCE COMPANY

                                SECRETARY                    PRESIDENT

## ENDORSEMENT

IT IS AGREED THAT:

1. THE SAN DIEGO GAS AND ELECTRIC COMPANY IS NAMED AS AN ADDITIONAL INSURED WHILE DAVEY TREE SURGERY COMPANY LTD. IS PERFORMING WORK FOR THE SAN DIEGO GAS AND ELECTRIC COMPANY; AND

2. IN THE EVENT OF CANCELLATION THE POLICY SHALL NOT BE CANCELLED NOR REDUCED IN COVERAGE UNTIL AFTER TEN (10) DAYS WRITTEN NOTICE OF SUCH CANCELLATION OR REDUCTION IN COVERAGE SHALL HAVE BEEN MAILED TO:

> SAN DIEGO GAS AND ELECTRIC COMPANY
> ATTN: MR. E.B. KIPP PURCHASING MANAGER
> P. O. BOX 1831
> SAN DIEGO 12, CALIFORNIA

3. THE TERM "INSURED" IS USED SEVERALLY AND NOT COLLECTIVELY, BUT THE INCLUSION HEREIN OF MORE THAN ONE INSURED SHALL NOT OPERATE TO INCREASE THE LIMITS OF THE COMPANY'S LIABILITY.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements, or limitations of this policy other than as above stated.

Policy No.: CL 10-210-367193   issued by the company designated or named on the declarations page
Issued To: DAVEY TREE SURGERY CO., LTD., ETAL

Endorsement No.: 15
Effective Date: 1/1/66

ARGONAUT INSURANCE COMPANY
ARGONAUT - SOUTHWEST INSURANCE COMPANY
ARGONAUT - NORTHWEST INSURANCE COMPANY

SECRETARY                    PRESIDENT

**ENDORSEMENT**

IT IS AGREED THAT:

1.  THE SAN DIEGO GAS AND ELECTRIC COMPANY IS INCLUDED AS AN ADDITIONAL INSURED BUT ONLY WITH RESPECTS TO OPERATIONS PERFORMED FOR THEM BY THE NAMED INSURED; AND

2.  IN THE EVENT OF CANCELLATION THE POLICY SHALL NOT BE CANCELLED NOR REDUCED IN COVERAGE UNTIL AFTER TEN (10) DAYS WRITTEN NOTICE OF SUCH CANCELLATION OR REDUCTION IN COVERAGE SHALL HAVE BEEN MAILED TO:

    SAN DIEGO GAS AND ELECTRIC COMPANY
    ATTN: MR. E. B. KIPP, PURCHASING MANAGER
    P.O. BOX 1831
    SAN DIEGO 12, CALIFORNIA

3.  THE TERM "INSURED" IS USED SEVERALLY AND NOT COLLECTIVELY, BUT THE INCLUSION HEREIN OF MORE THAN ONE INSURED SHALL NOT OPERATE TO INCREASE THE LIMITS OF COMPANY'S LIABILITY.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements, or limitations of this policy other than as above stated.

Policy No.: CL 10-210-367193    issued by the company designated or named on the declarations page
Issued To:  DAVEY TREE SURGERY CO., LTD., ETAL

Endorsement No.: 15 (REVISED)
Effective Date:  8/26/66

ARGONAUT INSURANCE COMPANY
ARGONAUT - SOUTHWEST INSURANCE COMPANY
ARGONAUT - NORTHWEST INSURANCE COMPANY

SECRETARY                          PRESIDENT

ENDORSEMENT

## AMENDMENT OF LIMITS - SPECIFIC OPERATIONS

IN CONSIDERATION OF AN ADDITIONAL PREMIUM TO BE DETERMINED AT AUDIT IT IS AGREED THAT
ONLY WITH RESPECTS TO OPERATIONS PERFORMED BY THE NAMED INSURED FOR SAN DIEGO GAS AND
ELECTRIC COMPANY THE LIMITS OF LIABILITY SHALL BE AMENDED TO READ AS FOLLOWS:

| | | |
|---|---|---|
| COVERAGE A. BODILY INJURY LIABILITY -AUTOMOBILE | 500,000. | EACH PERSON |
| | 1,000,000. | EACH OCCURRENCE |
| COVERAGE B. BODILY INJURY LIABILITY -EXCEPT AUTOMOBILE | 500,000. | EACH PERSON |
| | 1,000,000. | EACH OCCURRENCE |
| | 1,000,000. | AGGREGATE PRODUCTS |
| COVERAGE C. PROPERTY DAMAGE LIABILITY - AUTOMOBILE | 500,000. | EACH OCCURRENCE |
| COVERAGE D. PROPERTY DAMAGE LIABILITY - EXCEPT AUTOMOBILE | 500,000. | EACH OCCURRENCE |
| | 500,000. | AGGREGATE OPERATIONS |
| | 500,000. | AGGREGATE PROTECTIVE |
| | 500,000. | AGGREGATE PRODUCTS |
| | 500,000. | AGGREGATE CONTRACTUAL |

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements,
or limitations of this policy other than as above stated.

Policy No.: CL 10-210-367193    Issued by the company designated or named on the declarations page
Issued To: DAVEY TREE SURGERY COMPANY

Endorsement No.: 38
Effective Date: 1/1/67

ARGONAUT INSURANCE COMPANY
ARGONAUT-SOUTHWEST INSURANCE COMPANY
ARGONAUT-NORTHWEST INSURANCE COMPANY

SECRETARY                    PRESIDENT

*Argonaut Insurance Companies*

COMPREHENSIVE GENERAL
AUTOMOBILE LIABILITY
POLICY

1 ARGONAUT INSURANCE COMPANY ● MENLO PARK, CALIFORNIA
3 ARGONAUT-SOUTHWEST INSURANCE COMPANY ● BATON ROUGE, LOUISIANA
4 ARGONAUT-NORTHWEST INSURANCE COMPANY ● BOISE, IDAHO

**DECLARATIONS**

| 1 | COVERAGE IS PROVIDED IN THE COMPANY DESIGNATED BY NUMBER |
|---|---|

**POLICY NUMBER**
CL 10-210-367193

| ITEM 1 | NAMED INSURED AND ADDRESS: (Number and Street) City or Town, County & State) | DAVEY TREE SURGERY CO., LTD., ETAL, AS PER ENDORSEMENT NO. 11 ATTACHED, 2011 RUSS BUILDING, SAN FRANCISCO, CALIFORNIA | RENEWAL OF CL 10-198-367193 |
|---|---|---|---|

| 2 | POLICY PERIOD: 12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE NAMED INSURED AS STATED HEREIN From: JANUARY 1, 1966   To: JANUARY 1, 1969 | | PROD. CODE: |
|---|---|---|---|

PRODUCER: SECURITY INSURANCE ASSOCIATES, INC.
Office Address: 2041 PIONEER COURT
City or Town and State: SAN MATEO, CALIFORNIA      **7795**

**3** The insurance afforded is only with respect to such and so many of the following Coverages as are indicated by specific premium charge or charges. The limit of the Company's liability against each such Coverage shall be as stated herein, subject to all of the terms of this policy having reference thereto.

| COVERAGES | LIMITS OF LIABILITY | | ADVANCE PREMIUMS |
|---|---|---|---|
| A. BODILY INJURY LIABILITY – AUTOMOBILE | $ 250 ,000 each person<br>$ 250 ,000 each occurrence | | $ 150.00 |
| B. BODILY INJURY LIABILITY – EXCEPT AUTOMOBILE | $ 250 ,000 each person<br>$ 500 ,000 each occurrence<br>$ 500 ,000 aggregate products | | $ 200.00 |
| C. PROPERTY DAMAGE LIABILITY – AUTOMOBILE | $ 200 ,000 each occurrence | | $ 100.00 |
| D. PROPERTY DAMAGE LIABILITY – EXCEPT AUTOMOBILE | $ 100 ,000 each accident<br>$ 100 ,000 aggregate operations<br>$ 100 ,000 aggregate protective<br>$ 100 ,000 aggregate products<br>$ 100 ,000 aggregate contractual | | $ 300.00 |

Endorsement Form Numbers:     **1 THRU 21**

Additional Premium
per Endorsements     $ 75.00

| TOTAL ADVANCE PREMIUM | $ 825.00 |
|---|---|

If policy period is more than one year, the premium is payable:
$ 825.00   on effective date of the policy
$ TO BE DET.   1st anniversary
$ TO BE DET.   2nd anniversary

| 4 | Premium adjustment period: ☐ Annually   ☐ Semi-annually   ☐ Quarterly   ☒ Monthly |
|---|---|

| 5 | The named insured is: ☐ Individual   ☒ Corporation   ☐ Partnership   Other:<br>Business of the named insured is:   TREE SURGEONS |
|---|---|

During the past three years no insurer has cancelled insurance, issued to the named insured, similar to that afforded hereunder, unless otherwise stated herein:   NO EXCEPTIONS

I HEREBY CERTIFY THAT THIS IS A TRUE COPY OF THE ORIGINAL POLICY.

DUPLICATE

Countersigned at   SAN FRANCISCO, CALI.   on   JUNE 6 , 19 69   By:   *John Islands*

## BROAD FORM PROPERTY DAMAGE COVERAGE ENDORSEMENT

It is agreed that exclusion *( J )* of the policy is replaced by the following:

Under Coverage †   E

1. to injury to or destruction of property owned or occupied by or rented to the insured, property held by the insured for sale or property entrusted to the insured for storage or safekeeping, or

2. except with respect to liability under written Agreements covered by this policy or the use of elevators or escalators at premises owned, rented or controlled by the insured, to injury to or destruction of

   (i) property while on premises owned by or rented to the insured for the purpose of having operations performed on such property by or on behalf of the insured,

   (ii) tools or equipment while being used by the insured in performing his operations,

   (iii) property in the custody of the insured which is to be installed, erected or used in construction by the insured,

   (iv) that particular part of any property upon premises owned by or rented to the insured,

      a) upon which operations are being performed by or on behalf of the insured at the time of the injury thereto or destruction thereof, arising out of such operations, or

      b) out of which any injury or destruction arises, or

      c) the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured,

   (v) property which is being transported by the insured by motor vehicle or team, including the loading or unloading thereof,

3. to injury or destruction of any goods, products or containers thereof manufactured, sold, handled or distributed or premises alienated by the named insured, or work completed by or for the named insured, out of which the accident arises.

\* Applicable designation of the Exclusion to be inserted.
† Applicable designation of the Coverage(s) to be inserted.

**Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements, or limitations of this Policy other than as above stated.**

Policy No. CL 10-215-30.7185

Issued To: CAVLY TREE SURGERY CO., LTD., ET AL

Endorsement No.   E

Effective Date   1/1/66

ARGONAUT INSURANCE COMPANY
ARGONAUT-SOUTHWEST INSURANCE COMPANY
ARGONAUT-NORTHWEST INSURANCE COMPANY

Secretary                    President

UND-000

## DEDUCTIBLE PROPERTY DAMAGE LIABILITY ENDORSEMENT
### (Per RLXX Basis)
### OCCURRENCE

It is agreed that such insurance as is afforded by the policy applies, subject to the following provisions:

1. $ 150.00 shall be deducted from the total amount of all sums which the insured shall become legally obligated to pay as damages on account of injury to or destruction of all property of each person or organization, including the loss of use thereof, and as respects claims for injury to or destruction of property, the company shall be liable only for the difference between the applicable limit of liability for "each OCCURRENCE in the policy and the sum of the deductible amounts applicable to all claims as the result of such OCCURRENCE

2. The terms of the policy, including those with respect to notice of OCCURRENCE and the company's right to investigate, negotiate and settle any claim or suit, apply irrespective of the application of the deductible amount.

3. The company may pay any part or all of the deductible amount to effect settlement of any claim or suit and, upon notification of the action taken, the named insured shall promptly reimburse the company for such part of the deductible amount as has been paid by the company.

4. This endorsement does not apply to injury or destruction arising out of the ownership, maintenance, operation, use, loading or unloading of automobiles.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements, or limitations of this policy other than as above stated.

Policy No.: CL 10-210-367193
Issued To: DAVEY TREE SURGERY CO., LTD., ET ARGONAUT INSURANCE COMPANY

Endorsement No.: 10
Effective Date: 1/1/66

USD-901-R2

Secretary                    President

## ENDORSEMENT

### ITEM 1 EXTENDED - NAMED INSURED

IN CONSIDERATION OF THE PREMIUM CHARGES, IT IS AGREED THAT ITEM 1
OF THE DECLARATIONS, NAMED INSURED, IS EXTENDED TO INCLUDE:

        KEITH L. DAVEY & ROSE G. DAVEY
        400 EL CAMINO
        BELMONT, CALIFORNIA

**Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements, or limitations of this policy other than as above stated.**

Policy No.: CL 10-210-367193   Issued by the company designated or named on the declarations page
Issued To: DAVEY TREE SURGERY CO., LTD., ETAL

Endorsement No.: 11
Effective Date: 1/1/66

ARGONAUT INSURANCE COMPANY
ARGONAUT - SOUTHWEST INSURANCE COMPANY
ARGONAUT - NORTHWEST INSURANCE COMPANY

SECRETARY         PRESIDENT

## "OCCURRENCE" BASIS — PROPERTY DAMAGE

It is agreed that such insurance as is afforded by the policy under Coverage D — Property Damage Liability — Except Automobile applies subject to the following provisions:

1. The word "accident" except as used in paragraph 2 hereof is amended to read "occurrence".

2. The word "occurrence" as used herein shall mean either

   (a) an accident, or

   (b) in the absence of an accident, a condition for which the insured is responsible which during the policy period causes physical injury to or destruction of property which was not intended. All such injury or destruction arising out of the continuation or repetition of substantially the same condition or the same proximate cause shall be considered as arising out of one occurrence.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements, or limitations of this policy other than as above stated.

Policy No.: CL 10-210-367193
Issued To: DAVEY TREE SURGERY CO., LTD., ET AL

ARGONAUT INSURANCE COMPANY
ARGONAUT-NORTHWEST INSURANCE COMPANY
ARGONAUT-SOUTHWEST INSURANCE COMPANY

Endorsement No.: 12
Effective Date:   1/1/66

UND-1680-R1

Secretary                               President

**ENDORSEMENT**

BLANKET CONTRACTUAL

IT IS AGREED THAT CONDITION 3 (a), OF THE POLICY CONDITIONS, IS DELETED AND THE
FOLLOWING SUBSTITUTED THEREFORE:

> (a)   CONTRACT – THE WORK "CONTRACT" MEANS, IF IN
> WRITING, ANY AGREEMENT CUSTOMARY,
> USUAL AND INCIDENTAL TO THE NAMED
> INSURED'S OPERATIONS, EXCEPT
> RAILROAD CONSTRUCTION AGREEMENTS.

**Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,
agreements, or limitations of this policy other than as above stated.**

Policy No.:  CL 10-210-367193      issued by the company designated or named on the declarations page
Issued To:   DAVEY TREE SURGERY CO., LTD., ETAL

Endorsement No.:   · 13
Effective Date:       1/1/66

ARGONAUT INSURANCE COMPANY
ARGONAUT - SOUTHWEST INSURANCE COMPANY
ARGONAUT - NORTHWEST INSURANCE COMPANY

SECRETARY                                              PRESIDENT

## ENDORSEMENT

IT IS AGREED THAT:

1.  THE SAN DIEGO GAS AND ELECTRIC COMPANY IS NAMED AS AN ADDITIONAL INSURED WHILE DAVEY TREE SURGERY COMPANY LTD. IS PERFORMING WORK FOR THE SAN DIEGO GAS AND ELECTRIC COMPANY; AND

2. IN THE EVENT OF CANCELLATION THE POLICY SHALL NOT BE CANCELLED NOR REDUCED IN COVERAGE UNTIL AFTER TEN (10) DAYS WRITTEN NOTICE OF SUCH CANCELLATION OR REDUCTION IN COVERAGE SHALL HAVE BEEN MAILED TO:

> SAN DIEGO GAS AND ELECTRIC COMPANY
> ATTN:  MR. E.B. KIPP PURCHASING MANAGER
> P. O. BOX 1831
> SAN DIEGO 12, CALIFORNIA

3. THE TERM "INSURED" IS USED SEVERALLY AND NOT COLLECTIVELY, BUT THE INCLUSION HEREIN OF MORE THAN ONE INSURED SHALL NOT OPERATE TO INCREASE THE LIMITS OF THE COMPANY'S LIABILITY.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements, or limitations of this policy other than as above stated.

Policy No.:  CL 10-210-367193    issued by the company designated or named on the declarations page
Issued To:  DAVEY TREE SURGERY CO., LTD., ETAL

Endorsement No.:  15
Effective Date:    1/1/66

ARGONAUT INSURANCE COMPANY
ARGONAUT - SOUTHWEST INSURANCE COMPANY
ARGONAUT - NORTHWEST INSURANCE COMPANY

SECRETARY                          PRESIDENT

**ENDORSEMENT**

IT IS AGREED THAT:

1. THE SAN DIEGO GAS AND ELECTRIC COMPANY IS INCLUDED AS AN ADDITIONAL INSURED BUT ONLY WITH RESPECTS TO OPERATIONS PERFORMED FOR THEM BY THE NAMED INSURED; AND

2. IN THE EVENT OF CANCELLATION THE POLICY SHALL NOT BE CANCELLED NOR REDUCED IN COVERAGE UNTIL AFTER TEN (10) DAYS WRITTEN NOTICE OF SUCH CANCELLATION OR REDUCTION IN COVERAGE SHALL HAVE BEEN MAILED TO:

        SAN DIEGO GAS AND ELECTRIC COMPANY
        ATTN: MR. E. B. KIPP, PURCHASING MANAGER
        P.O. BOX 1831
        SAN DIEGO 12, CALIFORNIA

3. THE TERM "INSURED" IS USED SEVERALLY AND NOT COLLECTIVELY, BUT THE INCLUSION HEREIN OF MORE THAN ONE INSURED SHALL NOT OPERATE TO INCREASE THE LIMITS OF COMPANY'S LIABILITY.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements, or limitations of this policy other than as above stated.

Policy No.: CL 10-210-367193    Issued by the company designated or named on the declarations page
Issued To: DAVEY TREE SURGERY CO., LTD., ETAL

Endorsement No.: 15 (REVISED)
Effective Date: 8/26/66

                             ARGONAUT INSURANCE COMPANY
                         ARGONAUT - SOUTHWEST INSURANCE COMPANY
                         ARGONAUT - NORTHWEST INSURANCE COMPANY

                  SECRETARY                         PRESIDENT

ENDORSEMENT

## COMPOSITE RATING ENDORSEMENT

IT IS AGREED THAT PARAGRAPH 1 OF CONDITION 1, "PREMIUM" IS DELETED AND THE FOLLOWING SUBSTITUTED THEREFORE:

THE ESTIMATED PREMIUM AS STATED IN ITEM 3 OF THE DECLARATIONS OF THE POLICY IS PROVISIONAL ONLY, AND THE ACTUAL PREMIUM EARNED SHALL BE COMPUTED BY APPLYING THE FOLLOWING RATES:

|  | SCHEDULE | | BASIS OF PREMIUM |
|---|---|---|---|
|  | B.I. | P.D. |  |
| GEN. LIABILITY (NOT P.G. & E.) | .326 | .709 | PER $100. OF REMUNERATION |
| P.G. & E. WORK ONLY (ENDT. NO. 8) | .023 | | |
| AUTOMOBILE LIABILITY | .627 | .301 | PER $100. OF REMUNERATION |
| AUTOMOBILE PHYSICAL DAMAGE (ENDT. NO. 2 ) | | .013 | PER $100. OF REMUNERATION |

THE WORD "REMUNERATION" MEANS THE ENTIRE REMUNERATION EARNED DURING THE POLICY PERIOD BY PROPRIETORS AND BY ALL EMPLOYEES OF THE NAMED INSURED, OTHER THAN CLERICAL OFFICE EMPLOYEES,
SUBJECT TO ANY OVERTIME EARNINGS OR LIMITATION OF REMUNERATION RULE APPLICABLE IN ACCORDANCE WITH THE MANUALS IN USE BY THE COMPANY.
IF, AT TERMINATION OF THIS POLICY, THE EARNED PREMIUM THUS COMPUTED EXCEEDS THE PREMIUM PAID, THE INSURED SHALL PAY THE EXCESS TO THE COMPANY; IF LESS, THE COMPANY SHALL RETURN TO THE INSURED THE UNEARNED PORTION PAID BY SUCH INSURED.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements, or limitations of this policy other than as above stated.

Policy No.: CL 10-210-367193   Issued by the company designated or named on the declarations page
Issued To: DAVEY TREE SURGERY CO., LTD., ETAL

Endorsement No.: 18
Effective Date: 1/1/66

ARGONAUT INSURANCE COMPANY
ARGONAUT-SOUTHWEST INSURANCE COMPANY
ARGONAUT-NORTHWEST INSURANCE COMPANY

SECRETARY                    PRESIDENT

ENDORSEMENT

IN CONSIDERATION OF THE PREMIUM AT WHICH THIS POLICY IS WRITTEN, IT IS UNDERSTOOD AND AGREED THAT THE NAME OF THE NAMED INSURED IS AMENDED TO READ:

DAVEY TREE SURGERY COMPANY LTD. AND DAVEY SHADE TREE FARM AND KEITH L. DAVEY AND ROSE G. DAVEY, ALL JOINTLY AND SEVERALLY.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements, or limitations of this policy other than as above stated.

Policy No.: CL 10-210-367193      Issued by the company designated or named on the declarations page
Issued To: DAVEY TREE SURGERY CO. LTD.

Endorsement No.: 24
Effective Date:      1/1/66

ARGONAUT INSURANCE COMPANY
ARGONAUT - SOUTHWEST INSURANCE COMPANY
ARGONAUT - NORTHWEST INSURANCE COMPANY

SECRETARY                          PRESIDENT

**ORIGINAL**

## SAYRE & TOSO, INC.
## W. B. BRANDT & CO., INC.

Nº 11172

### HAROLD J. TOSO, PRESIDENT
### UNDERWRITERS

| SAN FRANCISCO | LOS ANGELES | SEATTLE | PORTLAND | DENVER |
| HOUSTON | CHICAGO | | KANSAS CITY | NEW YORK |

## COVERING NOTE

*THIS IS TO CERTIFY that the undersigned have procured Insurance as hereinafter specified from certain Insurers. Insurance described herein has been effected, against which a Certificate(s) and/or Policy(ies) will be issued and in the event of any inconsistency, the terms, conditions and provisions of the Certificate(s) and/or Policy(ies) shall prevail.*

ASSURED: __SAN DIEGO GAS & ELECTRIC COMPANY__

ADDRESS: __SAN DIEGO, CALIFORNIA__

AMOUNT OR LIMITS: __$25,000,000.00 EXCESS OF $5,000,000.00 C.S.L.   EXCESS OF__
__$50,000.00 PERSONAL INJURY, $50,000.00 WORKMEN'S COMPENSATION__

COVERAGE: __AND $1,050,000.00 PROPERTY DAMAGE__

*This insurance is subscribed as follows:*

**EMPLOYERS** __100__ % of the amount and premium.   _____ ____% of the amount and premium.

_____ ____% of the amount and premium.   _____ ____% of the amount and premium.

From __JANUARY 1__ 19 __67__ To __JANUARY 1__ 19 __70__

*Insurance under this Covering Note to cease at the last above named date at the place of location of risk insured, or at such time prior thereto as the Certificate(s) and/or Policy(ies) may be issued on the above risk, or unless previously cancelled in writing.*
*The Undersigned are not the Insurers, however Insurance has been effected by the Signer Corporation.*

Dated at: __LOS ANGELES, CALIFORNIA__ This __15TH__ Day of __DECEMBER__ __1966__

BROKER: __FRED S. JAMES & CO.__
__625 S. KINGSLEY DRIVE__
__LOS ANGELES, CALIFORNIA__

### SAYRE & TOSO, INC.
BY: _(signature)_

## W. B. BRANDT & CO., INC.
BY:

FORM 743

# EXHIBIT B

# HARBOR INSURANCE COMPANY

## HOME OFFICE

### 4201 WILSHIRE BOULEVARD, LOS ANGELES, CALIFORNIA 90005



FRED. S. JAMES & Co./TRANSWEST
INSURANCE BROKERS
(213)-385-0545
685 SO. KINGSLEY DRIVE
LOS ANGELES, CALIF. 90005
Insurance Brokers and Consultants Since 1858



# HARBOR INSURANCE COMPANY

### 3450 WILSHIRE BOULEVARD, LOS ANGELES 5, CALIFORNIA

(A Stock Insurance Company, herein called "The Company")

10840

the Insured named in the declarations made a part of this policy (hereof), in consideration of the payment of the premium and in reliance upon the declarations to provide insurance to the insured in accordance with the terms stated in the declarations and in the documents attached hereto and drawn in this policy, subject to the undermentioned GENERAL POLICY CONDITIONS.

A. **CANCELLATION.** This policy may be cancelled by the named insured by surrender thereof to the company or representative or by mailing to the company written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the company by mailing to the named insured at the address shown in this policy written notice stating when not less than ten days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of the surrender or the effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the named insured or by the company shall be equivalent to mailing.

If the named insured cancels, earned premiums shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

B. **CHANGES.** The terms of this policy shall not be waived or changed, except by endorsement issued to form a part of this policy, signed by the duly authorized representative of the company.

C. This policy shall not be assigned in whole or in part without the written consent of the company or its authorized representative.

D. Loss of or damage to property insured occasioned by war, invasion, acts of Foreign enemies, civil war, rebellion, insurrection, military or usurped power or martial law or confiscation by order of any government or public authority not covered.

E. This insurance is made and accepted subject to all the provisions, conditions and warranties set forth herein and in any forms or endorsements attached hereto, all of which are to be considered as incorporated herein and any provisions or conditions appearing in any forms or endorsements attached hereto which alter the policy provisions stated above shall supersede such policy provisions in so far as they are inconsistent therewith.

IN WITNESS WHEREOF, The Harbor Insurance Company has caused this policy to be signed by its President and Secretary, but the policy shall not be binding on the company unless countersigned by a duly authorized representative of the company.

LELAND B. SWETT
Secretary

JOHN C. SPENCER
President

---

# DECLARATIONS

INSURED NO. AND ADDRESS

SAN DIEGO GAS & ELECTRIC COMPANY, ET AL

P. O. BOX 1831
SAN DIEGO, CALIFORNIA 92112

No. ☐ 108461

TYPE OF COVERAGE: PERSONAL INJURY, WORKMEN'S COMPENSATION AND EMPLOYER'S LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY

INFORMATION HERE ABBREVIATED. IN EVENT OF INCONSISTENCY WITH WORDINGS AND/OR ENDORSEMENTS ATTACHED HERETO, SAID WORDINGS AND/OR ENDORSEMENTS PREVAIL.

AMOUNT OR LIMITS: $1,000,000.00 COMBINED SINGLE LIMIT ANY ONE OCCURRENCE EXCESS OF $100,000.00 SELF-INSURED RETENTION

PERIOD OF INSURANCE:
COMMENCING — JANUARY 1, 1970
ENDING — JANUARY 1, 1973
12:01 A.M. STANDARD TIME AT THE PLACE OF LOCATION OF RISKS INSURED.

### INITIAL INSTALLMENT

| PREMIUM | TOTAL |
|---|---|
| $91,667.00 | $91,667.00 |



DATED AT LOS ANGELES, CALIF. THIS 1ST DAY OF JANUARY, 1970

HARBOR INSURANCE COMPANY

By _____
AUTHORIZED REPRESENTATIVE

## EXCESS THIRD PARTY LIABILITY

PERSONAL INJURY, WORKMEN'S COMPENSATION AND
EMPLOYER'S LIABILITY AND PROPERTY DAMAGE

### DECLARATIONS

ITEM I - NAMED INSURED:

SAN DIEGO GAS & ELECTRIC COMPANY, S. D. GAS & ELECTRIC
EMPLOYEES' FEDERAL CREDIT UNION, EMPLOYEES ASSOCIATION
OF SAN DIEGO GAS & ELECTRIC COMPANY AND ALL ALLIED,
AFFILIATED, PROPRIETARY AND SUBSIDIARY CORPORATIONS
OR ORGANIZATIONS WHETHER NAMED OR NOT AND THE SUCCESSORS
OR ASSIGNS OF THE FOREGOING, AND ALL THEIR OFFICERS,
DIRECTORS, EXECUTIVES, STOCKHOLDERS AND EMPLOYEES
WHILE ACTING IN THEIR CAPACITY AS SUCH, JOINTLY AND
SEVERALLY.

ADDRESS:  P. O. BOX 1831, SAN DIEGO, CALIFORNIA 92112

ITEM II - POLICY PERIOD:

FROM   JANUARY 1, 1970  TO  JANUARY 1, 1973
       (12:01 A.M. STANDARD TIME AT THE
       ADDRESS OF THE INSURED).

ITEM III - LIMIT OF LIABILITY:

$1,000,000.00   SINGLE LIMIT ANY ONE OCCURRENCE
                COMBINED PERSONAL INJURY AND/OR
                WORKMEN'S COMPENSATION AND/OR
                EMPLOYER'S LIABILITY AND/OR THIRD
                PARTY PROPERTY DAMAGE IN EXCESS OF
$  100,000.00   SELF-INSURED RETENTION.

ITEM IV - PREMIUM:

$  275,001.00   DEPOSIT PREMIUM
                PAYABLE IN INSTALLMENTS
                SEE ENDORSEMENT NO. 1

- 1 -

## EXCESS THIRD PARTY LIABILITY

### PERSONAL INJURY, WORKMEN'S COMPENSATION AND EMPLOYER'S LIABILITY AND PROPERTY DAMAGE

THE HARBOR INSURANCE COMPANY (HEREINAFTER CALLED THE COMPANY) HEREBY AGREES WITH THE NAMED INSURED SPECIFIED IN THE DECLARATIONS, MADE A PART HEREOF, SUBJECT TO THE LIMITATIONS, TERMS AND CONDITIONS HEREINAFTER MENTIONED:

### INSURING AGREEMENTS

I.  COVERAGE A – PERSONAL INJURY

TO INDEMNIFY THE INSURED FOR ALL SUMS WHICH THE INSURED SHALL BECOME OBLIGATED TO PAY – BY REASON OF LIABILITY IMPOSED UPON THE INSURED BY LAW OR ASSUMED BY THE INSURED UNDER CONTRACT OR AGREEMENT BUT ONLY WITH RESPECT TO OPERATIONS BY OR ON BEHALF OF THE NAMED INSURED, FOR DAMAGES ON ACCOUNT OF PER- SONAL INJURIES, INCLUDING DEATH AT ANY TIME RESULTING THERE- FROM CAUSED BY OR ARISING OUT OF EACH OCCURRENCE.

COVERAGE B – WORKMEN'S COMPENSATION AND EMPLOYER'S LIABILITY

TO INDEMNIFY THE INSURED BY REASON OF THE LIABILITY IMPOSED UPON THE INSURED BY LAW:

(I)   FOR COMPENSATION BENEFITS AND MEDICAL, SURGICAL, HOSPITAL AND FUNERAL EXPENSES AS ARE SPECIFICALLY PROVIDED BY THE WORKMEN'S COMPENSATION OR OCCU- PATIONAL DISEASE LAWS OF ANY STATE OF THE UNITED STATES (INCLUDING THE UNITED STATES LONGSHORE- MEN'S AND HARBOR WORKERS' COMPENSATION ACT) IN- CLUDING ALL LAWS AMENDATORY THEREOF OR SUPPLE- MENTARY THERETO AND,

(II)  FOR DAMAGES BECAUSE OF BODILY INJURY, DISEASE OR ILLNESS, INCLUDING DEATH AT ANY TIME RESULTING THEREFROM, SUSTAINED BY AN EMPLOYEE OR EMPLOYEES AS ARE LEGALLY EMPLOYED BY THE INSURED AND ARISING OUT OF THE BUSINESS OPERATIONS OF THE INSURED.

COVERAGE C – THIRD PARTY PROPERTY DAMAGE

TO INDEMNIFY THE INSURED FOR ALL SUMS WHICH THE INSURED SHALL

- 2 -

BECOME OBLIGATED TO PAY BY REASON OF:

(I)    ANY AND ALL LIABILITY IMPOSED BY LAW AGAINST
       THE INSURED FOR LOSS OF OR DAMAGE TO OR
       DESTRUCTION OF PROPERTY OF OTHERS (INCLUDING
       BUT NOT LIMITED TO, DAMAGE RESULTING FROM LOSS
       OF USE OF PROPERTY DAMAGED OR DESTROYED AND
       ALL OTHER INDIRECT OR CONSEQUENTIAL DAMAGE FOR
       WHICH LEGAL LIABILITY EXISTS IN CONNECTION WITH
       SUCH DAMAGE TO OR DESTRUCTION OF PROPERTY OF
       OTHERS).

(II)   ANY AND ALL LIABILITY FOR DAMAGE TO OR DESTRUC-
       TION OF PROPERTY OF OTHERS ASSUMED BY THE IN-
       SURED UNDER CONTRACTS, LEASES OR AGREEMENTS
       USUAL AND INCIDENTAL TO THE OPERATIONS,
       ACTIVITIES, WORK AND/OR BUSINESS OF THE IN-
       SURED.

2.   LIMIT OF LIABILITY

(A)    THE COMPANY SHALL ONLY BE LIABLE FOR THE ULTIMATE
       NET LOSS IN EXCESS OF THE AMOUNT STATED AS THE
       SELF-INSURED RETENTION IN ITEM III OF THE DECLARA-
       TIONS, AND THEN ONLY UP TO AN AMOUNT NOT EXCEED-
       ING THE COMPANY'S LIMIT OF LIABILITY, STATED IN
       ITEM III OF THE DECLARATIONS, AS A RESULT OF ANY
       ONE OCCURRENCE.

(B)    THE COMPANY'S TOTAL LIMIT OF LIABILITY AS RESPECTS
       COVERAGE A AND COVERAGE B AND COVERAGE C COMBINED
       SHALL IN NO EVENT EXCEED THE LIMIT OF LIABILITY
       STATED IN ITEM III OF THE DECLARATIONS IN ANY
       ONE OCCURRENCE.

3.   POLICY PERIOD - TERRITORY

THIS POLICY APPLIES ONLY TO OCCURRENCES HAPPENING DURING THE
POLICY PERIOD ANYWHERE IN THE WORLD, PROVIDED HOWEVER THAT
CLAIM IS MADE OR SUIT IS BROUGHT WITHIN THE UNITED STATES.

4.   ADDITIONAL INSURED

IT IS UNDERSTOOD AND AGREED THAT WHEREVER THE INSURED HAS
CONTRACTED TO PROTECT ANY INDIVIDUAL, FIRM OR CORPORATION
BY LIABILITY INSURANCE, AS PROVIDED BY THIS POLICY, SUCH

- 3 -

INDIVIDUAL, FIRM OR CORPORATION SHALL BE DEEMED AN INSURED
UNDER THIS POLICY BUT THE LIABILITY OF THE COMPANY AS
RESPECTS SUCH INDIVIDUAL, FIRM OR CORPORATION SHALL BE
LIMITED TO THE AMOUNT OF INSURANCE CONTRACTED TO BE CARRIED
BY THE INSURED BUT IN NO EVENT SHALL SUCH LIABILITY IN THE
AGGREGATE EXCEED THE COMPANY'S LIMIT OF LIABILITY EXPRESSED
IN PARAGRAPH 2 OF THIS POLICY.  IT IS UNDERSTOOD, HOWEVER,
THAT THIS POLICY DOES NOT INSURE ANY INDIVIDUAL, FIRM OR
CORPORATION WHOSE OPERATIONS OR BUSINESS IS NOT INCIDENTAL
OR NECESSARY TO THE BUSINESS OF THE INSURED HEREIN NAMED.

## DEFINITIONS

1.  PERSONAL INJURIES

THE TERM "PERSONAL INJURIES" WHEREVER USED HEREIN, SHALL
MEAN:

BODILY INJURY, MENTAL INJURY, MENTAL ANGUISH, SHOCK, SICK-
NESS, OCCUPATIONAL DISEASE, NON-OCCUPATIONAL DISEASE, DIS-
ABILITY, FALSE ARREST, FALSE IMPRISONMENT, WRONGFUL EVICTION,
WRONGFUL DETENTION, MALICIOUS PROSECUTION, DISCRIMINATION,
HUMILIATION, INVASION OF RIGHTS OF PRIVACY, LIBEL, SLANDER
OR DEFAMATION OF CHARACTER, ASSAULT AND BATTERY NOT COMMITED
BY OR AT THE DIRECTION OF AN OFFICER OF THE INSURED, UN-
LESS COMMITTED FOR THE PURPOSE OF PREVENTING OR ELIMINATING
DANGER IN THE OPERATION OF AIRCRAFT OR PROTECTING PERSONS
OR PROPERTY;

AND AS RESPECTS ADVERTISING LIABILITY SHALL MEAN:

LIBEL, SLANDER, DEFAMATION, PIRACY, INVASION OF RIGHT OF
PRIVACY, HUMILIATION, INFRINGEMENT OF COPYRIGHT OR OF TITLE
OR OF SLOGAN COMMITTED OR ALLEGED TO HAVE BEEN COMMITTED IN
ANY ADVERTISEMENT, PUBLICITY ARTICLE, BROADCAST OR TELECAST
AND ARISING OUT OF THE NAMED INSURED'S ADVERTISING ACTIVITIES.

2.  DISEASE OR ILLNESS

DISEASE OR ILLNESS, INCLUDING DEATH AT ANY TIME RESULTING
THEREFROM, SUFFERED BY ANY EMPLOYEE OF THE INSURED AND CAUSED
BY OR AGGRAVATED BY PERIODIC, FREQUENT OR CONTINUAL EXPOSURE
OVER A PERIOD OF DAYS, WEEKS, MONTHS OR LONGER TO CONDITIONS
IN THE COURSE OF EMPLOYMENT IN THE BUSINESS OF THE INSURED
SHALL, WITH RESPECT TO EACH EMPLOYEE, ANYTHING CONTAINED
ELSEWHERE IN THIS POLICY TO THE CONTRARY NOTWITHSTANDING, BE

CONSIDERED A SEPARATE OCCURRENCE AND THE DATE OF HAPPENING OF SUCH OCCURRENCE SHALL BE DEEMED TO BE THE FOLLOWING:

(A)  IF THE DISEASE OR ILLNESS IS COMPENSABLE UNDER THE APPLICABLE WORKMEN'S COMPENSATION LAW, THE DATE OF THE BEGINNING OF THE DISABILITY FOR WHICH COMPENSATION IS PAYABLE.

(B)  IF THE DISEASE OR ILLNESS IS NOT COMPENSABLE UNDER THE APPLICABLE WORKMEN'S COMPENSATION LAW, THE DATE THAT DISABILITY DUE TO SUCH DISEASE OR ILLNESS ACTUALLY BEGAN.

3.  LIABILITY IMPOSED BY LAW

THE WORDS "LIABILITY IMPOSED UPON THE INSURED BY LAW FOR DAMAGES", AS USED IN THIS POLICY, ARE INCLUSIVE OF THE LIA-BILITY IMPOSED UPON THE INSURED BY LAW BY REASON OF A CLAIM OR SUIT BROUGHT AGAINST THE INSURED BY ANOTHER TO RECOVER THE AMOUNT OF DAMAGES OBTAINED FROM SUCH OTHER BY AN EMPLOYEE OF THE INSURED FOR INJURY SUSTAINED BY SUCH EMPLOYEE ARISING OUT OF AND IN THE COURSE OF HIS EMPLOYMENT.

4.  OCCURRENCE

THE TERM "OCCURRENCE" MEANS AN EVENT OR CONTINUOUS OR REPEATED EXPOSURE TO CONDITIONS, WHICH UNEXPECTEDLY CAUSES PERSONAL INJURY AND/OR WORKMEN'S COMPENSATION AND/OR THIRD PARTY PRO-PERTY DAMAGE DURING THE POLICY PERIOD.  ALL SUCH EXPOSURE TO SUBSTANTIALLY THE SAME GENERAL CONDITIONS SHALL BE DEEMED ONE OCCURRENCE.

5.  ULTIMATE NET LOSS

THE TERM "ULTIMATE NET LOSS" SHALL MEAN THE TOTAL SUM WHICH THE INSURED BECOMES OBLIGATED TO PAY BY REASON OF PERSONAL INJURY OR WORKMEN'S COMPENSATION OR THIRD PARTY PROPERTY DAMAGE CLAIMS, EITHER THROUGH ADJUDICATION OR COMPROMISE, AND ALL SUMS PAID FOR EXPENSE, INCLUDING PREMIUMS FOR ATTACHMENT OR APPEAL BONDS, IN RESPECT TO LITIGATION, SETTLEMENT, ADJUST-MENT AND INVESTIGATION OF CLAIMS AND SUITS WHICH ARE PAID AS A CONSEQUENCE OF ANY OCCURRENCE COVERED HEREUNDER; EXCLUDING ONLY THE SALARIES OF EMPLOYEES AND OFFICE EXPENSE OF THE IN-SURED.

## EXCLUSIONS

THIS POLICY SHALL NOT APPLY:

- (A) UNDER COVERAGE A, TO BODILY INJURY, SICKNESS, DISEASE, OR DEATH SUSTAINED BY ANY PERSON AND ARISING OUT OF THE MAINTENANCE, OPERATION OR USE OF ANY OWNED AIRCRAFT.

- (B) TO BODILY INJURY, SICKNESS, DISEASE, OR DEATH OR PROPERTY DAMAGE SUSTAINED BY ANY PERSON AND ARISING OUT OF THE MAINTENANCE, OPERATION OR USE OF ANY POWERED WATERCRAFT OR OTHER MARINE FLOATING EQUIPMENT BY THE INSURED.

- (C) AS RESPECTS ADVERTISING ACTIVITIES, TO CLAIMS MADE AGAINST THE INSURED ALLEGING PERSONAL IN-JURY:

  - (1) FOR FAILURE OF PERFORMANCE OF CONTRACT.

  - (2) FOR INFRINGEMENT OF TRADE-MARK OR TRADE NAME.

  - (3) FOR INCORRECT DESCRIPTION OF ANY ARTICLE OR COMMODITY.

  - (4) FOR MISTAKE IN ADVERTISING PRICE.

- (D) THE OBLIGATIONS OF THE COMPANY UNDER INSURING AGREEMENT B (11) OF THIS POLICY ARE LIMITED TO THE LIABILITY IMPOSED BY LAW UPON THE INSURED FOR NEGLIGENCE BUT SPECIFICALLY EXCLUDE ANY LIA-BILITY ASSUMED BY THE INSURED UNDER ANY CONTRACT ENTERED INTO WITH ANY OTHER PERSON, ASSOCIATION OR ORGANIZATION.

- (E) AS RESPECTS COVERAGE B - THIS POLICY SHALL NOT APPLY TO FINES, PENALTIES, ADDITIONAL COMPENSA-TION OR OTHER LEVIES AS MAY BE PROVIDED FOR BY ANY LAW AND IMPOSED AGAINST THE INSURED BY REASON OF THE INSURED'S FAILURE TO COMPLY WITH THE PRO-VISIONS OF SUCH LAW OR LAWS.

- (F) AS RESPECTS COVERAGE B (11) TO INJURY TO OR DEATH OF THE MASTER OR A MEMBER OF THE CREW OF ANY VESSEL.

- 6 -

(G)   AS RESPECTS COVERAGE C:

FOR LOSS OF OR DAMAGE TO PROPERTY OF OTHERS
CARRIED IN OR UPON ANY MOTOR VEHICLE OR MOTOR
VEHICLE TRAILER MAINTAINED OR OPERATED BY THE
INSURED.

FOR DAMAGE TO ANY PROPERTY OF OTHERS IN THE
CARE AND CUSTODY OF THE INSURED FOR REPAIR OR
STORAGE, OR FOR SALE.

FOR CLAIMS MADE AGAINST THE INSURED:

1.   FOR REPAIRING OR REPLACING ANY
DEFECTIVE PRODUCT OR PRODUCTS
MANUFACTURED, SOLD OR SUPPLIED
BY THE INSURED OR ANY DEFECTIVE
PART OR PARTS THEREOF NOR FOR
THE COST OF SUCH REPAIR OR RE-
PLACEMENT OR;

2.   FOR THE LOSS OF USE OF ANY SUCH
DEFECTIVE PRODUCT OR PRODUCTS
OR PARTS THEREOF OR;

3.   FOR DAMAGE TO THAT PARTICULAR
PART OF ANY PROPERTY UPON WHICH
THE INSURED IS OR HAS BEEN WORK-
ING CAUSED BY THE FAULTY MANNER
IN WHICH THE WORK HAS BEEN PER-
FORMED.

## CONDITIONS

### I.   QUALIFIED SELF-INSURER

THE INSURED, BY THE ACCEPTANCE OF THIS POLICY, WARRANTS THAT
IT HAS QUALIFIED AS A SELF-INSURER IN THE STATE OF CALIFORNIA
AS PROVIDED IN THE SAID WORKMEN'S COMPENSATION LAWS AND WILL
CONTINUE TO MAINTAIN SUCH QUALIFICATIONS DURING THE PERIOD OF
THIS POLICY.   IN THE EVENT THE INSURED SHOULD AT ANY TIME
WHILE THIS POLICY IS IN FORCE TERMINATE ITS QUALIFICATIONS AS
A SELF-INSURER IN THE SAID STATE OR AS RESPECTS THE SAID UNITED
STATES LONGSHOREMEN'S AND HARBOR WORKERS' COMPENSATION ACT OR
IF SUCH QUALIFICATIONS SHOULD BE CANCELLED OR REVOKED, THIS
POLICY TO THE EXTENT OF SUCH CANCELLATION OR REVOCATION SHALL
AUTOMATICALLY TERMINATE AT THE SAME TIME.

2.   PRIOR INSURANCE AND NON-CUMULATION OF LIABILITY

IT IS AGREED, THAT IF ANY LOSS IS ALSO COVERED IN WHOLE OR
IN PART UNDER ANY OTHER EXCESS POLICY ISSUED TO THE INSURED
PRIOR TO THE INCEPTION DATE HEREOF, THE COMPANY'S LIMIT OF
LIABILITY AS STATED IN ITEM III OF THE DECLARATIONS SHALL
BE REDUCED BY ANY AMOUNTS DUE TO THE INSURED ON ACCOUNT OF
SUCH LOSS UNDER SUCH PRIOR INSURANCE.

3.   SEVERABILITY OF INTEREST

IN THE EVENT OF CLAIMS BEING MADE BY REASON OF PERSONAL
INJURIES AND/OR WORKMEN'S COMPENSATION AND/OR THIRD PARTY
PROPERTY DAMAGE SUFFERED BY ONE INSURED HEREIN FOR WHICH
ANOTHER INSURED HEREIN IS OR MAY BE LIABLE, THIS POLICY
SHALL COVER SUCH INSURED AGAINST WHOM A CLAIM IS MADE OR
MAY BE MADE IN THE SAME MANNER AS IF SEPARATE POLICIES HAD
BEEN ISSUED TO EACH INSURED HEREIN.  NOTHING CONTAINED HERE-
IN SHALL OPERATE TO INCREASE THE COMPANY'S LIMIT OF LIA-
BILITY AS SET FORTH IN INSURING AGREEMENT 2.

4.   NOTICE OF OCCURRENCE

WHENEVER THE INSURED HAS INFORMATION FROM WHICH THE INSURED
MAY REASONABLY CONCLUDE THAT AN OCCURRENCE COVERED HEREUNDER
INVOLVED INJURIES OR DAMAGES WHICH, IN THE EVENT THAT THE
INSURED SHOULD BE HELD LIABLE, IS LIKELY TO INVOLVE THIS
POLICY, NOTICE SHALL BE SENT TO THE COMPANY AS SOON AS
PRACTICABLE, PROVIDED HOWEVER, THAT FAILURE TO NOTIFY THE
COMPANY OF ANY OCCURRENCE WHICH AT THE TIME OF ITS HAPPEN-
ING DID NOT APPEAR TO INVOLVE THIS POLICY, BUT WHICH AT A
LATER DATE WOULD APPEAR TO GIVE RISE TO CLAIMS HEREUNDER,
SHALL NOT PREJUDICE SUCH CLAIMS.

IT SHALL BE CONSIDERED SUFFICIENT COMPLIANCE WITH THIS CON-
DITION IF NOTICE IS GIVEN WITHIN REASONABLE TIME AFTER
KNOWLEDGE OF SUCH OCCURRENCE, CLAIM OR LAW SUIT OR OTHER
CIVIL PROCEEDING HAS BEEN ACQUIRED BY THE INDIVIDUALS
DESIGNATED TO HANDLE SUCH MATTERS BY THE INSURED.

5.   INSPECTION AND AUDIT

THE COMPANY SHALL BE PERMITTED AT ALL REASONABLE TIMES DURING
THE POLICY PERIOD TO INSPECT THE PREMISES, PLANTS, MACHINERY
AND EQUIPMENT USED IN CONNECTION WITH THE INSURED'S BUSINESS,
TRADE OR WORK, AND TO EXAMINE THE INSURED'S BOOKS AND RECORDS

AT ANY TIME DURING THE POLICY PERIOD AND ANY EXTENSION THERE-
OF AND WITHIN THREE YEARS AFTER THE FINAL TERMINATION OF THIS
POLICY, AS FAR AS THEY RELATE TO THE PREMIUM COMPUTATION OR
THE SUBJECT MATTER OF THIS INSURANCE.

6.   CONTROL OF CLAIMS

(1)   THE INSURED SHALL HAVE CONTROL AND CHARGE OF
ANY CLAIMS OR SUIT OR GROUP OF CLAIMS OR SUITS
RESULTING FROM A SINGLE OCCURRENCE INCLUDING
ALL LITIGATION IN RESPECT THERETO INVOLVING
LIABILITY COVERED BY THIS POLICY BUT THE
COMPANY MAY, AT THEIR OPTION AND AT THEIR OWN
COST AND EXPENSE, JOIN IN OR ASSIST IN THE IN-
VESTIGATION OR DEFENSE THEREOF.

(2)   THE INSURED SHALL NOT, WITHOUT THE WRITTEN CON-
SENT OF THE COMPANY, AGREE TO ANY ADJUSTMENTS,
SETTLEMENTS, OR PAYMENTS FOR WHICH THE COMPANY
WOULD BE LIABLE UNDER THIS POLICY.  SHOULD THE
COMPANY REFUSE TO CONSENT TO THE SETTLEMENT OR
PAYMENT OF ANY CLAIM OR GROUP OF CLAIMS IN-
VOLVING LIABILITY UNDER THIS POLICY, THEN THE
COMPANY SHALL, AT THEIR OWN COST AND EXPENSE,
TAKE CHARGE OF ANY FURTHER INVESTIGATION, DEFENSE
OR SETTLEMENT OF SUCH CLAIMS.

(3)   IN THE EVENT THE INSURED ELECTS NOT TO APPEAL
A JUDGMENT IN EXCESS OF THE AMOUNT OF SELF-
INSURED RETENTION, THE COMPANY MAY ELECT TO
CONDUCT SUCH APPEAL AT ITS COST AND EXPENSE
AND SHALL BE LIABLE FOR THE TAXABLE COSTS AND
DISBURSEMENTS AND INTEREST INCIDENTAL THERETO,
BUT IN NO EVENT SHALL THE TOTAL LIABILITY OF THE
COMPANY EXCEED THE AMOUNT SET FORTH IN PARAGRAPH
2 OF THE INSURING AGREEMENTS FOR ANY ONE OCCUR-
RENCE, PLUS THE EXPENSE OF SUCH APPEAL.

7.   DUE DILIGENCE

UPON THE HAPPENING OF ANY OCCURRENCE LIKELY TO GIVE RISE TO
A CLAIM UNDER THIS POLICY, THE ASSURED SHALL USE DUE DILIGENCE
AND DO AND CONCUR IN DOING ALL THINGS REASONABLY PRACTICABLE
TO DIMINISH THE LOSS.

8.   LOSS PAYABLE

LIABILITY UNDER THIS POLICY WITH RESPECT TO ANY OCCURRENCE

- 9 -

SHALL NOT ATTACH UNLESS AND UNTIL THE INSURED SHALL HAVE
PAID THE AMOUNT OF SELF-INSURED RETENTION ON ACCOUNT OF
SUCH OCCURRENCE.  THE INSURED SHALL MAKE A DEFINITE CLAIM
FOR ANY LOSS FOR WHICH THE COMPANY MAY BE LIABLE UNDER
THE POLICY WITHIN TWELVE (12) MONTHS AFTER THE INSURED
SHALL HAVE PAID AN AMOUNT OF ULTIMATE NET LOSS IN EXCESS
OF THE AMOUNT BORNE BY THE INSURED OR AFTER THE INSURED'S
LIABILITY SHALL HAVE BEEN FIXED AND RENDERED CERTAIN EITHER
BY FINAL JUDGMENT AGAINST THE INSURED AFTER ACTUAL TRIAL
OR BY WRITTEN AGREEMENT OF THE INSURED, THE CLAIMANT AND
THE COMPANY.  IF ANY SUBSEQUENT PAYMENTS SHALL BE MADE
SIMILARLY FROM TIME TO TIME, SUCH LOSSES SHALL BE DUE AND
PAYABLE WITHIN THIRTY (30) DAYS AFTER PROOF OF LOSS HAS
BEEN FURNISHED TO THE COMPANY IN A SATISFACTORY FORM.

9.   OTHER INSURANCE

IF OTHER COLLECTIBLE INSURANCE WITH ANY OTHER INSURER IS
AVAILABLE TO THE INSURED COVERING A LOSS ALSO COVERED HERE-
UNDER, THIS INSURANCE SHALL BE IN EXCESS OF, AND SHALL NOT
CONTRIBUTE WITH SUCH OTHER INSURANCE.  EXCESS INSURANCE
OVER THE LIMITS OF LIABILITY EXPRESSED IN THIS POLICY IS
PERMITTED WITHOUT PREJUDICE TO THIS INSURANCE AND THE
EXISTENCE OF SUCH INSURANCE SHALL NOT REDUCE ANY LIABILITY
UNDER THIS POLICY.

10.   APPLICATION OF SALVAGES - SUBROGATION

ALL SALVAGES, RECOVERIES OR PAYMENTS RECOVERED OR RECEIVED
SUBSEQUENT TO A LOSS SETTLEMENT UNDER THIS INSURANCE SHALL
BE APPLIED AS IF RECOVERED OR RECEIVED PRIOR TO SUCH SETTLE-
MENT AND ALL NECESSARY ADJUSTMENTS SHALL THEN BE MADE BETWEEN
THE INSURED AND THE COMPANY, PROVIDED ALWAYS THAT NOTHING IN
THIS CLAUSE SHALL BE CONSTRUED TO MEAN THAT LOSSES UNDER THIS
INSURANCE ARE NOT RECOVERABLE UNTIL THE INSURED'S ULTIMATE
NET LOSS HAS BEEN FINALLY ASCERTAINED.

INASMUCH AS THIS POLICY IS "EXCESS COVERAGE", THE INSURED'S
RIGHT OF RECOVERY AGAINST ANY PERSON OR OTHER ENTITY CANNOT
ALWAYS BE EXCLUSIVELY SUBROGATED TO THE COMPANY.  IT IS
THEREFORE, UNDERSTOOD AND AGREED THAT IN CASE OF ANY PAYMENT
HEREUNDER, THE COMPANY SHALL ACT IN CONCERT WITH ALL OTHER
INTERESTS (INCLUDING THE INSURED) CONCERNED, IN THE EXERCISE
OF SUCH RIGHTS OF RECOVERY, THE APPORTIONING OF ANY AMOUNTS
WHICH MAY BE SO RECOVERED SHALL FOLLOW THE PRINCIPLE THAT
ANY INTERESTS (INCLUDING THE INSURED) THAT SHALL HAVE PAID

- 10 -

AN AMOUNT OVER AND ABOVE ANY PAYMENT HEREUNDER, SHALL FIRST
BE REIMBURSED OUT OF ANY BALANCE THEN REMAINING UP TO THE
AMOUNT PAID BY THEM; THE COMPANY SHALL THEN BE REIMBURSED
UP TO THE AMOUNT PAID HEREUNDER; LASTLY, THE INTERESTS (IN-
CLUDING THE INSURED) OF WHOM THIS COVERAGE IS IN EXCESS ARE
ENTITLED TO CLAIM THE RESIDUE, IF ANY.  EXPENSE NECESSARY
TO THE RECOVERY OF ANY SUCH AMOUNTS SHALL BE APPORTIONED
BETWEEN THE INTERESTS (INCLUDING THE INSURED) CONCERNED,
IN THE RATIO OF THEIR RESPECTIVE RECOVERIES AS FINALLY
SETTLED.

11.  <u>CHANGES</u>

NOTICE TO OR KNOWLEDGE POSSESSED BY ANY PERSON SHALL NOT
EFFECT A WAIVER OR CHANGE IN ANY PART OF THIS POLICY OR
STOP THE COMPANY FROM ASSERTING ANY RIGHTS UNDER THE TERMS
OF THIS POLICY; NOR SHALL THE TERMS OF THIS POLICY BE WAIVED
OR CHANGED, EXCEPT BY ENDORSEMENT ISSUED TO FORM A PART HERE-
OF, SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE COMPANY.

12.  <u>ASSIGNMENT</u>

ASSIGNMENT OF INTEREST UNDER THIS POLICY SHALL NOT BIND THE
COMPANY UNTIL ITS CONSENT IS ENDORSED HEREON; IF, HOWEVER,
THE NAMED INSURED SHALL BE ADJUDGED BANKRUPT OR INSOLVENT,
THIS POLICY SHALL COVER THE NAMED INSURED'S LEGAL REPRESENTA-
TIVE AS NAMED INSURED; PROVIDED THAT NOTICE OF CANCELLATION
ADDRESSED TO THE INSURED NAMED IN THE DECLARATIONS AND MAILED
TO THE ADDRESS SHOWN IN THIS POLICY SHALL BE SUFFICIENT NOTICE
TO EFFECT CANCELLATION OF THIS POLICY.

13.  <u>CANCELLATION</u>

THIS POLICY MAY BE CANCELLED BY EITHER OF THE PARTIES BY MAIL-
ING WRITTEN NOTICE TO THE OTHER PARTY STATING WHEN, NOT LESS
THAN SIXTY (60) DAYS THEREAFTER, CANCELLATION SHALL BE EFFECTIVE.
THE MAILING OF NOTICE AS AFORESAID BY THE COMPANY BY REGISTERED
MAIL TO THE CORPORATE INSURANCE DIRECTOR, SAN DIEGO GAS &
ELECTRIC COMPANY AT THE INSURED'S ADDRESS SHOWN IN THE POLICY
SHALL BE SUFFICIENT PROOF OF NOTICE AND THE INSURANCE UNDER
THIS POLICY SHALL END ON THE EFFECTIVE DATE AND HOUR OF CANCELLA-
TION STATED IN THE NOTICE.

DELIVERY OF SUCH WRITTEN NOTICE WHETHER BY THE INSURED OR BY
THE COMPANY SHALL BE EQUIVALENT TO MAILING.  IF THE COMPANY
CANCELS, EARNED PREMIUM SHALL BE COMPUTED PRO RATE.  IF THE
INSURED CANCELS, EARNED PREMIUM SHALL BE COMPUTED IN ACCORDANCE
WITH THE CUSTOMARY SHORT RATE TABLE AND PROCEDURES.

SDG&E RULE 26 0000124

PREMIUM ADJUSTMENT MAY BE MADE AT THE TIME CANCELLATION IS AFFECTED AND, IF NOT BY THEN MADE, SHALL BE MADE AS SOON AS PRACTICABLE AFTER CANCELLATION.  THE COMPANY'S CHECK OR THE CHECK OF ITS REPRESENTATIVE MAILED OR DELIVERED AS AFORESAID SHALL BE SUFFICIENT TENDER OF ANY REFUND OF PREMIUM DUE TO THE INSURED.

IF THIS POLICY INSURES MORE THAN ONE NAMED INSURED, CANCELLATION MAY BE EFFECTED BY THE FIRST OF SUCH NAMED INSUREDS FOR THE ACCOUNT OF ALL THE NAMED INSUREDS; NOTICE OF CANCELLATION BY THE COMPANY TO SUCH FIRST NAMED INSURED SHALL BE DEEMED TO BE NOTICE TO ALL INSUREDS AND PAYMENT OF ANY UNEARNED PREMIUM TO SUCH FIRST NAMED INSURED SHALL BE FOR THE ACCOUNT OF ALL INTERESTS THEREIN.

14.   BANKRUPTCY AND INSOLVENCY

IN THE EVENT OF THE BANKRUPTCY OR INSOLVENCY OF THE INSURED OR ANY ENTITY COMPRISING THE INSURED, THE COMPANY SHALL NOT BE RELIEVED THEREBY OF THE PAYMENT OF ANY CLAIMS HEREUNDER BECAUSE OF SUCH BANKRUPTCY OR INSOLVENCY.

ATTACHED TO AND FORMING PART OF POLICY NO.   108461

ISSUED TO:   SAN DIEGO GAS & ELECTRIC COMPANY, ET AL

DATED:       JANUARY 1, 1970

HARBOR INSURANCE COMPANY

BY _____
          (AUTHORIZED REPRESENTATIVE)

- 12 -

SDG&E RULE 26 0000125

**THIS ENDORSEMENT DOES NOT APPLY TO EXCESS WORKMEN'S
COMPENSATION OR EMPLOYERS LIABILITY.**

GU 8679a
(Ed. 10-59)

A&G 661a

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
(BROAD FORM)

This endorsement, effective  JANUARY 1, 1970  forms a part of policy No.  108461
(12:01 A. M., standard time)

Issued to   SAN DIEGO GAS & ELECTRIC COMPANY, ET AL

by   HARBOR INSURANCE COMPANY

It is agreed that the policy does not apply:

I.  Under any Liability Coverage, to injury, sickness, disease, death or destruction
   (a) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by
      Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance
      Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its
      limit of liability; or
   (b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization
      is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory
      thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United
      States of America, or any agency thereof, under any agreement entered into by the United States of America, or any
      agency thereof, with any person or organization.

II.  Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to immediate medical or
   surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous
   properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.  Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties
   of nuclear material, if
   (a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been
      discharged or dispersed therefrom;
   (b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, trans-
      ported or disposed of by or on behalf of an insured; or
   (c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts
      or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility,
      but if such facility is located within the United States of America, its territories or possessions or Canada, this
      exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.  As used in this endorsement:
   "hazardous properties" include radioactive, toxic or explosive properties;
   "nuclear material" means source material, special nuclear material or byproduct material;
   "source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic
   Energy Act of 1954 or in any law amendatory thereof;
   "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a
   nuclear reactor;
   "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person
   or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b)
   thereof;
   "nuclear facility" means
   (a) any nuclear reactor,
   (b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing
      or utilizing spent fuel, or (3) handling, processing or packaging waste,
   (c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the
      total amount of such material in the custody of the insured at the premises where such equipment or device is lo-
      cated consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more
      than 250 grams of uranium 235,
   (d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,
   and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises
   used for such operations;
   "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or
   to contain a critical mass of fissionable material;
   With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive
   contamination of property.

                                                    HARBOR INSURANCE COMPANY

AUTHENTIC                          BY _____    _____
                                                         Authorized Representative

**ENDORSEMENT**

NO. ☐ 1

INSURED SAN DIEGO GAS & ELECTRIC COMPANY, ET AL

PRODUCER FRED S. JAMES & CO.

EFFECTIVE DATE OF THIS ENDORSEMENT IS JANUARY 1, 1970

POLICY NO. 108461

TYPE OF COVERAGE PERSONAL INJURY, WORKMEN'S COMPENSATION AND EMPLOYER'S LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY

IT IS UNDERSTOOD AND AGREED THAT THE DEPOSIT PREMIUM FOR THE COVERAGES AFFORDED HEREUNDER FOR THE PERIOD COMMENCING JANUARY 1, 1970 AND ENDING JANUARY 1, 1973 IS $275,001.00 (SUBJECT TO AN ANNUAL MINIMUM PREMIUM OF $91,667.00) AND SHALL BE PAYABLE IN ANNUAL INSTALL-MENTS AS SET FORTH BELOW:

| INSTALLMENT | DUE DATE | PREMIUM |
|---|---|---|
| INITIAL | JANUARY 1, 1970 | $91,667.00 |
| 2ND INSTALL-MENT | JANUARY 1, 1971 | $91,667.00 |
| FINAL | JANUARY 1, 1972 | $91,667.00 |

IT IS AGREED THAT BOTH THE SECOND AND FINAL INSTALLMENTS ARE TENTATIVE ONLY AND SHALL BE ADJUSTED AT A RATE OF $0.115 PER METER IN SERVICE AT THE END OF THE PRECEDING YEAR. THE INSURED AGREES TO KEEP ACCURATE RECORDS OF THE NUMBER OF METERS AND TO REPORT THE NUMBER OF METERS IN SERVICE AT CALENDAR YEAR END WITHIN SIXTY (60) DAYS AFTER EACH ANNIVERSARY OF THIS COVERAGE.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

DATED AT LOS ANGELES, CALIF.   1ST   JAN., 1970
     THIS   DAY OF

HARBOR INSURANCE COMPANY

BY _____
AUTHORIZED REPRESENTATIVE

U 8003-5 (ED. 3-62) 10M (2-69)

ORIGINAL ENDORSEMENT

**ENDORSEMENT**

NO. ☐ 2

INSURED   SAN DIEGO GAS & ELECTRIC COMPANY, ET AL

PRODUCER   FRED S. JAMES & CO.

THE EFFECTIVE DATE OF THIS ENDORSEMENT IS   JANUARY 1, 1970

TYPE OF COVERAGE   PERSONAL INJURY, WORKMEN'S COMPENSATION AND

EMPLOYER'S LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY

POLICY NO.   108461

IT IS UNDERSTOOD AND AGREED THAT AS RESPECTS THE COVERAGES

PROVIDED UNDER COVERAGE B - WORKMEN'S COMPENSATION AND

EMPLOYER'S LIABILITY, THE TERM "SIXTY (60) DAYS" APPEAR-

ING IN THE THIRD LINE OF PARAGRAPH 13, CANCELLATION,

OF THE "CONDITIONS" OF THE POLICY FORM IS AMENDED TO

READ THIRTY (30) DAYS.

...G HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE ... TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

HARBOR INSURANCE COMPANY

BY _____
    AUTHORIZED REPRESENTATIVE

DATED AT LOS ANGELES, CALIF.   THIS   1ST DAY OF   JAN., 1970

## PREMIUM ADJUSTMENT INVOICE

NO. 2-A

INSURED SAN DIEGO GAS AND ELECTRIC COMPANY, ET AL
PRODUCER FRED S. JAMES AND COMPANY

POLICY NO. 108461

POLICY PERIOD 1/1/71 TO 1/1/72          IF CANCELLED, DATE

COVERAGE PERSONAL INJURY, WORKMEN'S COMPENSATION AND EMPLOYER'S LIABILITY
          AND THIRD PARTY PROPERTY DAMAGE LIABILITY

| ADDITIONAL PREMIUM | TOTAL |
|---|---|
| $8,722.00 | $8,722.00 |

| CLASSIFICATION (IF ANY) AND RATING BASIS | AMOUNT | RATE | PREMIUM |
|---|---|---|---|
| NUMBER OF METERS IN SERVICE | 872,946 | .115 | $100,389.00 |

| | |
|---|---|
| TOTAL EARNED PREMIUM DUE INSURER | $100,389.00 |
| DEPOSITS AND VOL. WAGE REPORTS PREVIOUSLY BILLED | $91,667.00 |
| ADDITIONAL PREMIUM DUE INSURER | $8,722.00 |
| RETURN PREMIUM DUE INSURED | |

NOTICE: IF THIS IS A FINAL ADJUSTMENT, IT DOES NOT REFLECT THE ACTUAL PREMIUMS DUE FROM OR TO INSURED UNLESS ALL AMOUNTS PREVI-
OUSLY BILLED HAVE BEEN PAID.

AT LOS ANGELES, CALIF THIS 8TH DAY OF FEBRUARY 1972   **HARBOR INSURANCE COMPANY**

NO. HU 8004-6 (EO-8-69)

ORIGINAL

ENDORSEMENT

SAN DIEGO GAS & ELECTRIC COMPANY, ET AL

FRED.S. JAMES & CO.

EFFECTIVE DATE OF THIS ENDORSEMENT IS   JANUARY 1, 1970

POLICY NO.   108461

OF COVERAGE   PERSONAL INJURY, WORKMEN'S COMPENSATION AND EMPLOYER'S LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY

## CANCELLATION LIMITATION ENDORSEMENT

In the event that the company or its authorized representative has issued or may issue, at the request of the insured, certificates of insurance and/or statutory filings and/or other evidences of insurance (hereinafter referred to as certificates) under this policy which certificates require the company to give advance notice of cancellation to the recipients of such certificates or others, then the insured, if it should elect to cancel this policy, shall give the company not less than the same advance notice of cancellation as is required to be given by the company under such certificates and in doing so shall allow the company not less than three business days for the preparation and mailing of such notices of cancellation to the recipients of such certificates.

...REIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE ...WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

HARBOR INSURANCE COMPANY

BY _____
AUTHORIZED REPRESENTATIVE

...OS ANGELES, CALIF.   THIS 1ST DAY OF JAN., 1970

**ENDORSEMENT**

SAN DIEGO GAS & ELECTRIC COMPANY, ET AL          NO. ☐ 4

PRODUCER FRED S. JAMES & CO.

THE EFFECTIVE DATE OF THIS ENDORSEMENT IS JANUARY 1, 1970          POLICY NO. 108461

TYPE OF COVERAGE PERSONAL INJURY, WORKMEN'S COMPENSATION AND
EMPLOYER'S LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY

REJECTION OF FAMILY PROTECTION

(UNINSURED MOTORISTS) COVERAGE - CALIFORNIA

IT IS UNDERSTOOD AND AGREED THAT THE INSURED AND THE
COMPANY, IN ACCORDANCE WITH THE PROVISION OF SECTION
11580.2(A) OF THE CALIFORNIA INSURANCE CODE WHICH
PERMITS THE INSURED AND THE COMPANY SO TO AGREE, DO
AGREE THAT THE PROVISION OF THIS POLICY COVERING
DAMAGES FOR BODILY INJURY WHICH THE INSURED MAY BE
ENTITLED TO RECOVER FROM THE OWNER OR OPERATOR OF
AN UNINSURED MOTOR VEHICLE IS HEREBY WAIVED AND IS
VOID AND OF NO EFFECT.

_____

SIGNATURE OF INSURED

HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE
TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

HARBOR INSURANCE COMPANY

DATED
AT LOS ANGELES, CALIF. THIS 1ST DAY OF JAN., 1970          BY _____
                                                                 AUTHORIZED REPRESENTATIVE

SDG&E RULE 26 0000131



**ENDORSEMENT**    NO. ⟹ 5

SAN DIEGO GAS & ELECTRIC COMPANY, ET AL

PRODUCER  FRED S. JAMES & CO.

THE EFFECTIVE DATE OF THIS ENDORSEMENT IS  JANUARY 1, 1970

TYPE OF COVERAGE  PERSONAL INJURY, WORKMEN'S COMPENSATION AND
EMPLOYER'S LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY

POLICY
NO.  108461

## ADDITIONAL INSURED ENDORSEMENT

COVERAGE A - PERSONAL INJURY

IT IS UNDERSTOOD AND AGREED THAT SAN DIEGO AND ARIZONA
EASTERN RAILWAY COMPANY IS AN ADDITIONAL INSURED FOR
PERSONAL INJURY COVERAGE PROVIDED UNDER THIS POLICY,
BUT ONLY AS RESPECTS THE INSTALLATION AND MAINTENANCE
OF STEEL TOWERS AND NECESSARY APPURTENANCES BELONGING
TO SAN DIEGO GAS & ELECTRIC COMPANY ON THE RIGHT OF
WAY OF SAN DIEGO AND ARIZONA EASTERN RAILWAY COMPANY.

THE INCLUSION OF SUCH ADDITIONAL INTEREST SHALL NOT
OPERATE TO INCREASE THE LIMITS OF THE COMPANY'S LIA-
BILITY.

IT IS FURTHER UNDERSTOOD AND AGREED THAT THIS POLICY
MAY NOT BE CANCELLED UNTIL TEN (10) DAYS WRITTEN NOTICE
THEREOF, STATING WHEN THEREAFTER CANCELLATION IS
EFFECTIVE, HAS BEEN MAILED TO SAN DIEGO AND ARIZONA
EASTERN RAILWAY COMPANY, AT 42 - 12TH AVENUE, SAN
DIEGO, CALIFORNIA 92102.

NG HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE
CY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

HARBOR INSURANCE COMPANY

DATED
AT LOS ANGELES, CALIF.  THIS  1ST  DAY OF  JAN., 1970    BY

AUTHORIZED REPRESENTATIVE

SDG&E RULE 26 0000132



**ENDORSEMENT**

NO. ☐ 6

INSURED SAN DIEGO GAS & ELECTRIC COMPANY, ET AL

PRODUCER FRED S. JAMES & CO.

THE EFFECTIVE DATE OF THIS ENDORSEMENT IS   JANUARY 1, 1970

TYPE OF COVERAGE   PERSONAL INJURY, WORKMEN'S COMPENSATION AND

EMPLOYER'S LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY

POLICY NO.   108461

IT IS UNDERSTOOD AND AGREED THAT:

COMMONWEALTH PLAN, INC. OF BOSTON
1252 BOYLSTON STREET
BOSTON 15, MASSACHUSETTS

AND

FIRST NATIONAL BANK OF BOSTON
BOSTON, MASSACHUSETTS

ARE NAMED AS ADDITIONAL INSUREDS, BUT SOLELY AS RESPECTS THE
OWNERSHIP, MAINTENANCE OR USE OF AUTOMOBILES LEASED BY THEM
TO THE NAMED INSURED.

IT IS FURTHER AGREED THAT:

THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY
IS ADDED AS AN ADDITIONAL INSURED FOR BODILY IN-
JURY LIABILITY, BUT ONLY AS RESPECTS THE USE OF
A PRIVATE ROAD IN CONNECTION WITH THE STATE OF
CALIFORNIA FREEWAY PROJECT NO. 11-SD-5 AT MILE
POST 263 - 4322.8' AT CUDAHY, CALIFORNIA.

THE COSMODYNE CORPORATION IS ADDED AS AN ADDITIONAL
INSURED UNDER THIS CONTRACT, BUT SOLELY AS RESPECTS
PROPERTY OWNED BY THEM AND LEASED TO THE NAMED IN-
SUREDS.

THE INCLUSION OF SUCH ADDITIONAL INSUREDS SHALL NOT OPERATE TO
INCREASE THE LIMITS OF THE COMPANY'S LIABILITY.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF TH
POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

HARBOR INSURANCE COMPANY

BY _____
AUTHORIZED REPRESENTATIVE

DATED
AT LOS ANGELES, CALIF.   THIS 1ST DAY OF JAN., 1970

ENDORSEMENT NO.

### ADDITIONAL INTEREST ENDORSEMENT

1. It is agreed that the insurance afforded by this Policy applies severally as to each Assured except that the inclusion of more than one Assured shall not operate to increase the limit of the Company liability; and the inclusion here-under of any person or organization as an Assured shall not affect any right which such person or organization would have as a claimant if not so included.

2. It is further agreed that

DEPARTMENT OF THE NAVY
NAVAL FACILITIES ENGINEERING COMMAND
1220 PACIFIC HIGHWAY
SAN DIEGO, CALIFORNIA 92132

(additional interest)

is recognized as additional Assured under the Policy but only as respects claims covered by the Policy, and resulting from operations performed for BY SAN DIEGO GAS & ELECTRIC COMPANY UNDER LICENSE #NF (R)-4861.

(additional interest)

by or for

(named Assured)

The effective date of this Endorsement is JANUARY 1, 1970

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, or limitations of the policy to which this endorsement is attached other than as above stated.

This Endorsement is attached to and made part of Policy No. 108461

Issued to: SAN DIEGO GAS & ELECTRIC COMPANY, ET AL

Broker: FRED S. JAMES & CO.

Date of Issue: JAN. 1, 1970

HARBOR INSURANCE COMPANY

By _____
AUTHORIZED REPRESENTATIVE

HU 6055-CFS (ED.2-65) 15M (11-69)

SDG&E RULE 26 0000134

ENDORSEMENT NO. 8

## ADDITIONAL INTEREST ENDORSEMENT

1. It is agreed that the insurance afforded by this Policy applies severally as to each Assured except that the inclusion of more than one Assured shall not operate to increase the limit of the Company liability; and the inclusion hereunder of any person or organization as an Assured shall not affect any right which such person or organization would have as a claimant if not so included.

2. It is further agreed that

UNITED STATES OF AMERICA
DEPARTMENT OF THE NAVY
NAVAL FACILITIES ENGINEERING COMMAND
1220 PACIFIC HIGHWAY
SAN DIEGO, CALIFORNIA 92132

(additional interest)

is recognized as additional Assured under the Policy but only as respects claims covered by the Policy and resulting from operations performed for BY SAN DIEGO GAS & ELECTRIC COMPANY UNDER LICENSE #NF(R)-7368 -- ACCESS ROAD, NAVAL RECREATION CENTER, MISSION GORGE (NAVAL STATION, SAN DIEGO, CALIFORNIA).

(additional interest)

by or for

(named Assured)

The effective date of this Endorsement is     JANUARY 1, 1970

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, or limitations of the policy to which this endorsement is attached other than as above stated.

This Endorsement is attached to and made part of Policy No.     108461

Issued to: SAN DIEGO GAS & ELECTRIC COMPANY, ET AL

Broker:  FRED S. JAMES & CO.

Date of Issue: JAN. 1, 1970

HARBOR INSURANCE COMPANY

By_____
AUTHORIZED REPRESENTATIVE

HU 6066-CFS (ED.2-65) 15M (11-69)

**ENDORSEMENT**

SAN DIEGO GAS & ELECTRIC COMPANY, ET AL          NO. ▷ 9

PRODUCER          FRED S. JAMES & CO.

THE EFFECTIVE DATE OF THIS ENDORSEMENT IS   JANUARY 1, 1970          POLICY NO.   108461

TYPE OF COVERAGE   PERSONAL INJURY, WORKMEN'S COMPENSATION  AND
MPLOYER'S LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY

IT IS UNDERSTOOD AND AGREED THAT:

THE INSURER WAIVES ANY RIGHT OF SUBROGATION
AGAINST THE UNITED STATES OF AMERICA WHICH
MIGHT ARISE BY REASON OF ANY PAYMENT MADE
UNDER THIS POLICY.

LOSS, IF ANY, UNDER THIS POLICY SHALL BE
ADJUSTED WITH SAN DIEGO GAS & ELECTRIC
COMPANY AND THE PROCEEDS AT THE DIRECTION
OF THE GOVERNMENT SHALL BE PAYABLE TO SAN
DIEGO GAS & ELECTRIC COMPANY AND PROCEEDS
NOT PAID TO SAN DIEGO GAS & ELECTRIC COMPANY
SHALL BE PAYABLE TO THE TREASURER OF THE
UNITED STATES OF AMERICA.

NG HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE
TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

HARBOR INSURANCE COMPANY

DATED AT LOS ANGELES, CALIF.   THIS   1ST   DAY OF   JAN., 1970          BY _____
                                                                        AUTHORIZED REPRESENTATIVE

PAGE 1 OF 2 PAGES

**ENDORSEMENT**

NO. ▷ 10.

SAN DIEGO GAS & ELECTRIC COMPANY, ET AL

PRODUCER FRED S. JAMES & CO.

EFFECTIVE DATE OF THIS ENDORSEMENT IS JANUARY 1, 1970

POLICY NO. 108461

TYPE OF COVERAGE PERSONAL INJURY, WORKMEN'S COMPENSATION AND EMPLOYER'S LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY

KWW/SM/MS

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, IT IS UNDERSTOOD AND AGREED THAT EXCLUSIONS (A) THROUGH (G) APPEARING ON PAGES 6 AND 7 OF THE POLICY FORM ARE HEREBY DELETED AND THE FOLLOWING SUBSTITUTED THEREFOR:

THIS POLICY SHALL NOT APPLY:

(A) UNDER COVERAGES A AND C, TO ANY OCCURRENCE ARISING OUT OF THE MAINTENANCE, OPERATION OR USE OF ANY OWNED AIRCRAFT;

(B) UNDER COVERAGE A, TO BODILY INJURY, DISEASE, OR DEATH SUSTAINED BY ANY EMPLOYEE OF THE NAMED INSURED WHILE ACTING WITHIN THE SCOPE OF HIS EMPLOYMENT;

(C) UNDER COVERAGES A, B AND C, TO BODILY INJURY, SICKNESS, DISEASE, OR DEATH, OR PROPERTY DAMAGE SUSTAINED BY ANY PERSON AND ARISING OUT OF THE MAINTENANCE, OPERATION OR USE OF ANY POWERED WATERCRAFT OR OTHER MARINE FLOATING EQUIPMENT BY THE INSURED BEYOND THE 12 MILE LIMIT OF THE COAST OF CALIFORNIA;

(D) UNDER COVERAGE A, AS RESPECTS ADVERTISING ACTIVITIES, TO CLAIMS MADE AGAINST THE INSURED ALLEGING PERSONAL INJURY:

    (1) FOR FAILURE OF PERFORMANCE OF CONTRACT,

    (2) FOR INFRINGEMENT OF TRADE-MARK OR TRADE NAME,

    (3) FOR INCORRECT DESCRIPTION OF ANY ARTICLE OR COMMODITY,

    (4) FOR MISTAKE IN ADVERTISING PRICE;

(E) UNDER COVERAGE B (II), TO ANY LIABILITY ASSUMED BY THE INSURED UNDER ANY CONTRACT ENTERED INTO WITH ANY OTHER PERSON, ASSOCIATION OR ORGANIZATION;

(F) UNDER COVERAGE B, TO FINES, PENALTIES, ADDITIONAL COMPENSATION OR OTHER LEVIES AS MAY BE PROVIDED FOR BY ANY LAW AND IMPOSED AGAINST THE INSURED BY REASON OF THE INSURED'S FAILURE TO COMPLY WITH THE PROVISIONS OF SUCH LAW OR LAWS;

(G) UNDER COVERAGE C:

NG HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE Y TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

HARBOR INSURANCE COMPANY

BY _____
AUTHORIZED REPRESENTATIVE

DATED AT

THIS     DAY OF



**ENDORSEMENT**

NO. ☐ 10.

ED SAN DIEGO GAS & ELECTRIC COMPANY, ET AL

UCER FRED S. JAMES & CO.

EFFECTIVE DATE OF THIS ENDORSEMENT IS JANUARY 1, 1970

POLICY NO.   108461

TYPE OF COVERAGE PERSONAL INJURY, WORKMEN'S COMPENSATION AND EMPLOYER'S LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY   KWW/SM/MS

(1) FOR LOSS OF OR DAMAGE TO PROPERTY OF OTHERS CARRIED IN OR UPON ANY MOTOR VEHICLE OR MOTOR VEHICLE TRAILER MAINTAINED OR OPERATED BY THE INSURED,

(2) FOR DAMAGE TO ANY PROPERTY OF OTHERS IN THE CARE AND CUSTODY OF THE INSURED FOR REPAIR OR STORAGE, OR FOR SALE;

FOR CLAIMS MADE AGAINST THE INSURED:

A. FOR REPAIRING OR REPLACING ANY DEFECTIVE PRODUCT OR PRODUCTS MANUFACTURED, SOLD OR SUPPLIED BY THE INSURED OR ANY DEFECTIVE PART OR PARTS THEREOF NOR FOR THE COST OF SUCH REPAIR OR REPLACEMENT OR,

B. FOR THE LOSS OF USE OF ANY SUCH DEFECTIVE PRODUCT OR PRODUCTS OR PARTS THEREOF OR,

C. FOR DAMAGE TO THAT PARTICULAR PART OF ANY PROPERTY UPON WHICH THE INSURED IS OR HAS BEEN WORKING CAUSED BY THE FAULTY MANNER IN WHICH THE WORK HAS BEEN PERFORMED.

NG HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE
( TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

HARBOR INSURANCE COMPANY

DATED AT LOS ANGELES, CALIF.   THIS 9TH DAY OF NOVEMBER, 1970 BY _____

AUTHORIZED REPRESENTATIVE

# PREMIUM ADJUSTMENT INVOICE

NO. 11

**INSURED** SAN DIEGO GAS & ELECTRIC CO., ET AL
**PRODUCER** FRED. S. JAMES & CO.

**POLICY NO.** 108461

**INVOICE PERIOD** 1-1-71 TO 1-1-72  IF CANCELLED, DATE
**OF COVERAGE** PERSONAL INJURY, WORKMEN'S COMPENSATION AND EMPLOYER'S LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY

ADDITIONAL **PREMIUM**

$91,667.00

**TOTAL**
$91,667.00

| CLASSIFICATION (IF ANY) AND RATING BASIS | AMOUNT | RATE | PREMIUM |
|---|---|---|---|
| CHARGED HEREON SECOND ANNUAL PREMIUM INSTALLMENT FOR THE PERIOD 1-1-71 TO 1-1-72 | | | $91,667.00 |

| | |
|---|---|
| TOTAL EARNED PREMIUM DUE INSURER | |
| DEPOSITS AND VOL. WAGE REPORTS PREVIOUSLY BILLED | |
| ADDITIONAL PREMIUM DUE INSURER | $91,667.00 |
| RETURN PREMIUM DUE INSURED | |

NOTICE: IF THIS IS A FINAL ADJUSTMENT, IT DOES NOT REFLECT THE ACTUAL PREMIUMS DUE FROM OR TO INSURED UNLESS ALL AMOUNTS PREVIOUSLY BILLED HAVE BEEN PAID.

DATED AT LOS ANGELES, CALIF. THIS 16TH. DAY OF NOVEMBER, 1970. **HARBOR INSURANCE COMPANY**

FORM NO. HU 6004-6 (CO-6-69) 10M (8-69)

ORIGINAL

R/W 6147  —
Southerly of I-8 near Naranca,
El Cajon

Policy No. ___108461___

Named
Insured ___San Diego Gas & Electric Company___

## STATE-OWNED PROPERTY ENDORSEMENT

This endorsement is attached to the policy described herein to assure compliance by the named insured with the terms and provisions of the lease (or rental agreement)

entered into between ___San Diego Gas & Electric Company___
(Name of Insured)
as Lessee, and the STATE OF CALIFORNIA, as Lessor.

The Company amends the policy described herein as follows:

1. If the policy is canceled or changed so as to affect the coverages, at least 15 days' prior written notice of such cancellation or change will be sent to the Lessor State of California at the following address: POST OFFICE BOX 390, SAN DIEGO, CALIFORNIA 92112.

2. If the policy contains any clause excluding coverage as to property in the care, custody or control of the insured, such clause shall not apply with regard to any liability of the State of California, its officers, agents, or employees.

3. The Lessor State of California, its officers, agents, and employees are hereby declared to be additional insureds in the policy described insofar as they may be held liable for injuries, deaths, or damage to property occurring in or about the leased premises, except claims resulting from negligent acts of the State.

This endorsement, countersigned by an authorized representative of the Company, becomes applicable endorsement

Number ___12___ .

Name of Company: ___Harbor Insurance Company___

Effective Date: ___4-15-71___

Countersigned _____
(Authorized Representative)

11-PW-122 (11/67)

SDG&E RULE 26 0000140

**ENDORSEMENT**  NO. ▷ 12

ISSUED  SAN DIEGO GAS AND ELECTRIC COMPANY, ET AL

FRED S. JAMES AND COMPANY  POLICY NO. 108461

THE EFFECTIVE DATE OF THIS ENDORSEMENT IS APRIL 15, 1971

TYPE OF COVERAGE PERSONAL INJURY, WORKMEN'S COMPENSATION AND EMPLOYERS LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY     KWW/SM/VV

## STATE-OWNED PROPERTY ENDORSEMENT

THIS ENDORSEMENT IS ATTACHED TO THE POLICY DESCRIBED HEREIN TO ASSURE COMPLIANCE BY THE NAMED INSURED WITH THE TERMS AND PROVISIONS OF THE LEASE (OR RENTAL AGREEMENT)

ENTERED INTO BETWEEN    SAN DIEGO GAS AND ELECTRIC COMPANY
(NAME OF INSURED)

AS LESSEE, AND THE STATE OF CALIFORNIA, AS LESSOR.

THE COMPANY AMENDS THE POLICY DESCRIBED HEREIN

AS FOLLOWS:

1. IF THE POLICY IS CANCELED OR CHANGED SO AS TO AFFECT THE COVERAGES, AT LEAST 15 DAYS' PRIOR WRITTEN NOTICE OF SUCH CANCELLATION OR CHANGE WILL BE SENT TO THE LESSOR STATE OF CALIFORNIA AT THE FOLLOWING ADDRESS:
POST OFFICE BOX 390, SAN DIEGO, CALIFORNIA 92112.

2. IF THE POLICY CONTAINS ANY CLAUSE EXCLUDING COVERAGE AS TO PROPERTY IN THE CARE, CUSTODY OR CONTROL OF THE INSURED, SUCH CLAUSE SHALL NOT APPLY WITH REGARD TO ANY LIABILITY OF THE STATE OF CALIFORNIA, ITS OFFICERS, AGENTS, OR EMPLOYEES.

3. THE LESSOR STATE OF CALIFORNIA, ITS OFFICERS, AGENTS, AND EMPLOYEES ARE HEREBY DECLARED TO BE ADDITIONAL INSUREDS IN THE POLICY DESCRIBED INSOFAR AS THEY MAY BE HELD LIABLE FOR INJURIES, DEATHS, OR DAMAGE TO PROPERTY OCCURRING IN OR ABOUT THE LEASED PREMISES, EXCEPT CLAIMS RESULTING FROM NEGLIGENT ACTS OF THE STATE.

LOCATION OF PROPERTY: R/W 6147
SOUTHERLY OF I-8 NEAR NARANCA,
EL CAJON

THIS HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

HARBOR INSURANCE COMPANY

TO  LOS ANGELES, CALIF.   14TH   MAY, 1971
THIS   DAY OF

BY  _W. Sillows_  V.V.
AUTHORIZED REPRESENTATIVE

ORIGINAL ENDORSEMENT

SDG&E RULE 26 0000141

**ENDORSEMENT**                                    NO. ☐ 13

INSURED    SAN DIEGO GAS & ELECTRIC COMPANY, ET AL

ODUCER    FRED S. JAMES & CO.                      POLICY
THE EFFECTIVE DATE OF THIS ENDORSEMENT IS  JANUARY 1, 1970    NO.    108461
TYPE OF COVERAGE PERSONAL INJURY, WORKMEN'S COMPENSATION AND EMPLOYER'S
LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY        KWW/SM/VV

IT IS UNDERSTOOD AND AGREED THAT EXCLUSION (B) AS SET FORTH

IN ENDORSEMENT NO. 10 OF THIS POLICY SHALL NOT APPLY TO THE

LIABILITY OF AN EMPLOYEE OF THE NAMED INSURED WITH RESPECT TO

BODILY INJURY, DISEASE OR DEATH SUSTAINED BY ANY OTHER

EMPLOYEE OF THE NAMED INSURED WHILE ACTING WITHIN THE SCOPE

OF HIS EMPLOYMENT.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE
POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

                                              HARBOR INSURANCE COMPANY

DATED LOS ANGELES, CALIF. THIS 17TH DAY OF JUNE, 1971    BY _____
AT                                                          AUTHORIZED REPRESENTATIVE

                                              ORIGINAL ENDORSEMENT

# PREMIUM ADJUSTMENT INVOICE

| | NO. | 14 |
|---|---|---|

INSURED   SAN.DIEGO GAS & ELECTRIC COMPANY, ET AL

PRODUCER   FRED S. JAMES & COMPANY

POLICY NO.   108461

INVOICE PERIOD   1/1/72 TO 1/1/73   IF CANCELLED, DATE

COVERAGE   PERSONAL INJURY, WORKMEN'S COMPENSATION AND EMPLOYER'S LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY

| ADDITIONAL PREMIUM | TOTAL |
|---|---|
| $91,667.00 | $91,667.00 |

| CLASSIFICATION (IF ANY) AND RATING BASIS | AMOUNT | RATE | PREMIUM |
|---|---|---|---|
| CHARGED HEREON FINAL ANNUAL PREMIUM INSTALLMENT FOR THE PERIOD 1/1/72 TO 1/1/73. | | | $91,667.00 |

| | |
|---|---|
| TOTAL EARNED PREMIUM DUE INSURER | |
| DEPOSITS AND VOL. WAGE REPORTS PREVIOUSLY BILLED | |
| ADDITIONAL PREMIUM DUE INSURER | $91,667.00 |
| RETURN PREMIUM DUE INSURED | |

NOTICE: IF THIS IS A FINAL ADJUSTMENT, IT DOES NOT REFLECT THE ACTUAL PREMIUMS DUE FROM OR TO INSURED UNLESS ALL AMOUNTS PREVIOUSLY BILLED HAVE BEEN PAID.

LOS ANGELES, CALIF. THIS 6TH DAY OF DECEMBER 1971

**HARBOR INSURANCE COMPANY**

FORM NO. HU 8004-0 (ED-8-69)

ORIGINAL

ENDORSEMENT

INSURED  SAN DIEGO GAS & ELECTRIC COMPANY, ET AL          NO. ▷  15

PRODUCER  FRED S. JAMES & CO.

EFFECTIVE DATE OF THIS ENDORSEMENT IS   JANUARY 1, 1972          POLICY NO.  108461
OF COVERAGE   PERSONAL INJURY, WORKMEN'S COMPENSATION AND EMPLOYER'S
LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY

## CONTAMINATION OR POLLUTION EXCLUSION

IT IS UNDERSTOOD AND AGREED THAT THIS INSURANCE DOES NOT APPLY
TO PERSONAL INJURY OR PROPERTY DAMAGE ARISING OUT OF THE DIS-
CHARGE, DISPERSAL, RELEASE OR ESCAPE OF:

(1) SMOKE, VAPORS, SOOT, FUMES, ACIDS, ALKALIS, TOXIC CHEMICALS,
LIQUIDS OR GASES, WASTE MATERIALS OR OTHER IRRITANTS,
CONTAMINANTS OR POLLUTANTS INTO OR UPON LAND, THE ATMOSPHERE
OR ANY WATERCOURSE OR BODY OF WATER; BUT THIS EXCLUSION DOES
NOT APPLY IN SUCH DISCHARGE, DISPERSAL, RELEASE OR ESCAPE IS
SUDDEN AND ACCIDENTAL;

(2) OIL OR OTHER PETROLEUM SUBSTANCE OR DERIVATIVE OTHER THAN
NATURAL GAS (INCLUDING ANY OIL REFUSE OR OIL MIXED WITH WASTES)
INTO OR UPON ANY WATERCOURSE OR BODY OF WATER, WHETHER OR NOT
SUCH DISCHARGE, DISPERSAL, RELEASE OR ESCAPE IS SUDDEN AND
ACCIDENTAL.

IT IS FURTHER UNDERSTOOD AND AGREED THAT EXCLUSION (1) ABOVE SHALL
NOT APPLY WITH RESPECT TO PERSONAL INJURY OR PROPERTY DAMAGE ARISING
OUT OF THE DISCHARGE, DISPERSAL, RELEASE OR ESCAPE OF:

(A) NATURAL GAS

(B) CARBON MONOXIDE, OR OTHER PRODUCTS OF COMBUSTION,

PROVIDED SUCH PERSONAL INJURY OR PROPERTY DAMAGE IS AS A RESULT OF
A SUDDEN, UNINTENDED AND UNEXPECTED HAPPENING DURING THE PERIOD OF
THIS INSURANCE.

SAN DIEGO GAS & ELECTRIC COMPANY, ET AL

BY:_____

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE
POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

HARBOR INSURANCE COMPANY

AT  LOS ANGELES, CALIF.  THIS 15TH. DAY OF FEBRUARY, 1972   BY_____
KWW/SM/JL                                                        AUTHORIZED REPRESENTATIVE

HU 8003-8 (ED. 3-62)                                         PRODUCER'S COPY

**ENDORSEMENT**

SAN DIEGO GAS & ELECTRIC COMPANY, ET AL      NO. ⇨   16*

INSURED

PRODUCER   FRED S. JAMES & CO.                          POLICY   108461
                                                        NO.

THE EFFECTIVE DATE OF THIS ENDORSEMENT IS      JANUARY 1, 1972

TYPE OF COVERAGE   PERSONAL INJURY, WORKMEN'S COMPENSATION AND EMPLOYER'S
                   LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY

IT IS UNDERSTOOD AND AGREED THAT PARAGRAPHS (I) AND (II), UNDER
COVERAGE C — THIRD PARTY PROPERTY DAMAGE — OF INSURING AGREE-
MENT I. IS AMENDED TO READ AS FOLLOWS:

    (I)  ANY AND ALL LIABILITY IMPOSED BY LAW AGAINST THE
        INSURED FOR PHYSICAL INJURY TO OR DESTRUCTION OF
        TANGIBLE PROPERTY OF OTHERS (INCLUDING BUT NOT
        LIMITED TO, DAMAGE RESULTING FROM LOSS OF USE OF
        SUCH PROPERTY WHICH HAS BEEN PHYSICALLY INJURED
        OR DESTROYED AND ALL OTHER INDIRECT OR CONSEQUEN-
        TIAL DAMAGE FOR WHICH LEGAL LIABILITY EXISTS IN
        CONNECTION WITH SUCH DAMAGE TO OR DESTRUCTION OF
        PROPERTY OF OTHERS),

    (II)  FOR PHYSICAL INJURY TO OR DESTRUCTION OF TANGIBLE
        PROPERTY OF OTHERS ASSUMED BY THE INSURED UNDER
        CONTRACTS, LEASES OR AGREEMENTS USUAL AND INCI-
        DENTAL TO THE OPERATIONS, ACTIVITIES, WORK AND/OR
        BUSINESS OF THE INSURED,

OCCURRING DURING THE PERIOD OF THIS INSURANCE AND ARISING OUT OF
SUCH HAZARDS AS ARE SET FORTH HEREIN.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE
POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

                                              HARBOR INSURANCE COMPANY

DATED
AT LOS ANGELES, CALIF.   THIS 15TH. DAY OF FEBRUARY, 1972   BY————————————
    KWW/SM/JL                                        AUTHORIZED REPRESENTATIVE

SDG&E RULE 26 0000145

**ENDORSEMENT**                                             NO. ⟶  17

INSURED: SAN DIEGO GAS & ELECTRIC COMPANY, ET AL

PRODUCER FRED S. JAMES & CO.                               POLICY   108461
EFFECTIVE DATE OF THIS ENDORSEMENT IS   JANUARY 1, 1972     NO.
TYPE OF COVERAGE PERSONAL INJURY, WORKMEN'S COMPENSATION AND
EMPLOYER'S LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY        RJW/EB/LK

IT IS UNDERSTOOD AND AGREED THAT ENDORSEMENT #15 OF THIS
POLICY IS HEREBY DELETED IN ITS ENTIRETY AND REPLACED BY
THE FOLLOWING:

IT IS UNDERSTOOD AND AGREED THAT EXCEPT INSOFAR AS COVERAGE
IS AVAILABLE TO THE ASSURED IN THE UNDERLYING INSURANCES
AS SET OUT IN THE SCHEDULE OF UNDERLYING POLICIES, THIS
INSURANCE SHALL NOT APPLY TO ANY LOSS ARISING OUT OF
CONTAMINATION OR POLLUTION.

NOTWITHSTANDING THE FOREGOING, IT IS UNDERSTOOD AND AGREED
THAT THIS INSURANCE DOES NOT APPLY TO BODILY INJURY, PERSONAL
INJURY, OR PROPERTY DAMAGE ARISING OUT OF THE DISCHARGE,
DISPERSAL, RELEASE OR ESCAPE OF:

   (1)  SMOKE, VAPORS, SOOT, FUMES, ACIDS, ALKALIS, TOXIC
       CHEMICALS, LIQUIDS OR GASES, WASTE MATERIALS OR
       OTHER IRRITANTS, CONTAMINANTS OR POLLUTANTS INTO
       OR UPON LAND, THE ATMOSPHERE OR ANY WATERCOURSE OR
       BODY OF WATER; BUT THIS EXCLUSION DOES NOT APPLY
       IF SUCH DISCHARGE, DISPERSAL, RELEASE OR ESCAPE IS
       SUDDEN AND ACCIDENTAL;

   (2)  OIL OR OTHER PETROLEUM SUBSTANCE OR DERIVATIVE
       (INCLUDING ANY OIL REFUSE OR OIL MIXED WITH WASTES)
       INTO OR UPON ANY WATERCOURSE OR BODY OF WATER, BUT
       THIS EXCLUSION DOES NOT APPLY IF SUCH DISCHARGE,
       DISPERSAL, RELEASE OR ESCAPE IS SUDDEN AND ACCIDENTAL.

IT IS FURTHER UNDERSTOOD AND AGREED THAT EXCLUSION (1)
ABOVE SHALL NOT APPLY WITH RESPECT TO PERSONAL INJURY OR
PROPERTY DAMAGE ARISING OUT OF THE DISCHARGE, DISPERSAL,
RELEASE OR ESCAPE OF:

   (A)  NATURAL GAS

   (B)  CARBON MONOXIDE, OR OTHER PRODUCTS OF COMBUSTION,

PROVIDED SUCH PERSONAL INJURY OR PROPERTY DAMAGE IS AS A
RESULT OF A SUDDEN, UNINTENDED AND UNEXPECTED HAPPENING
DURING THE PERIOD OF THIS INSURANCE.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE
POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

                                 HARBOR INSURANCE COMPANY

DATED
AT LOS ANGELES, CALIF.   THIS   12TH DAY OF JANUARY, 1973   BY _____
                                    AUTHORIZED REPRESENTATIVE

                                  ORIGINAL ENDORSEMENT

**ENDORSEMENT**   NO. ▷ 18

SAN DIEGO GAS & ELECTRIC COMPANY, ET AL

PRODUCER  FRED S. JAMES & COMPANY   JANUARY 1, 1972   POLICY NO.  108461

THE EFFECTIVE DATE OF THIS ENDORSEMENT IS

TYPE OF COVERAGE  PERSONAL INJURY, WORKMEN'S COMPENSATION AND EMPLOYER'S LIABILITY AND THIRD PARTY PROPERTY DAMAGE LIABILITY

IT IS UNDERSTOOD AND AGREED THAT ITEM 5 UNDER THE DE-FINITIONS OF THE POLICY ULTIMATE NET LOSS IS HEREBY CORRECTED TO READ AS FOLLOWS:

THE TERM "ULTIMATE NET LOSS" SHALL MEAN THE TOTAL SUM WHICH THE INSURED BECOMES OBLIGATED TO PAY, AFTER MAKING DEDUCTIONS FOR ALL RECOVERIES AND FOR OTHER VALID AND COLLECTIBLE INSURANCE, BY REASON OF PERSONAL INJURY OR WORKMEN'S COMPENSATION OR THIRD PARTY PRO-PERTY DAMAGE CLAIMS, EITHER THROUGH ADJUDICATION OR COMPROMISE, AND ALL SUMS PAID FOR EXPENSE, INCLUDING PREMIUMS FOR ATTACHMENT AND INVESTIGATION OF CLAIMS AND SUITS WHICH ARE PAID AS A CONSEQUENCE OF ANY OCCURRENCE COVERED HEREUNDER, EXCLUDING ONLY THE SALARIES OF EMPLOYEES AND OFFICE EXPENSE OF THE INSURED.

IT IS FURTHER UNDERSTOOD AND AGREED THAT THE SELF-INSURED RETENTION MAY BE WHOLLY OR PARTIALLY INSURED AND SUCH INSURANCE, WHETHER PURCHASED BY AN INSURED HEREUNDER OR BY OTHERS FOR THEIR BENEFIT, SHALL APPLY IN LIEU OF ALL OR PART OF THE SELF-INSURED RETENTION.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

HARBOR INSURANCE COMPANY

DATED AT LOS ANGELES, CALIF.  THIS 13TH. DAY OF OCTOBER, 1972   BY _____
AUTHORIZED REPRESENTATIVE

ORIGINAL ENDORSEMENT

SDG&E RULE 26 0000147

Notwithstanding anything to the contrary contained herein and in consideration of the premium for which this insurance is written, it is understood and agreed that whenever an additional or return premium of $2.00 or less becomes due from or to the Assured on account of the adjustment of a deposit premium, or of an alteration in coverage or rate during the term or for any other reason, the collection of such premium from the Assured will be waived or the return of such premium to the Assured will not be made, as the case may be.

U7166-1 (12-68) 5M

# EXHIBIT C

1/1/81 — 1/1/82

# EXCESS LIABILITY INSURANCE POLICY



**ÆGIS**

ASSOCIATED ELECTRIC & GAS
INSURANCE SERVICES LIMITED

HAMILTON, BERMUDA

**POLICY NUMBER   022A**

## DECLARATIONS

ITEM NO. 1   NAMED INSURED   San Diego Gas & Electric Company
San Diego, California   92112

ITEM NO. 2   POLICY PERIOD From the  1st   day of  January   19 81  until cancelled
both days at                  12:01 A.M.                     at the address of the
NAMED INSURED

ITEM NO. 3   LIMIT OF LIABILITY:  $25,000,000   any one OCCURRENCE or
WRONGFUL ACT

ITEM NO. 4   FLAT PREMIUM $  705,600   one year

ITEM NO. 5   UNDERLYING LIMITS

A.  As per Endorsement No. 2, attached.

B.  $ 250,000   each OCCURRENCE or WRONGFUL ACT not covered by under-
lying insurance nor self-insured retentions shown in A above.

In the event of any loss(es) arising from any single OCCURRENCE or WRONGFUL ACT
which involve(s) two or more UNDERLYING LIMITS, the UNDERLYING LIMITS
shall apply ~~separately/xxxxxxbinatixnk~~ in combination.

Endorsements attached at policy issuance:  1, 2, 3, 4, 5, 6, 7, 8, 9



POLICY OF EXCESS LIABILITY INSURANCE
EFFECTED WITH
ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED
HAMILTON, BERMUDA
(hereinafter called the COMPANY)

INSURING AGREEMENTS

I.  COVERAGE

This POLICY is to indemnify:

(a)  The INSURED for any and all sums which the INSURED shall become legally obligated to pay as ULTIMATE NET LOSS by reason of the liability imposed upon the INSURED by law or liability assumed by the INSURED under CONTRACT, including the IN-SURED's proportionate share of any liability arising in any manner whatsoever out of the operations or existence of any JOINT VENTURE in which the INSURED has an interest, for damages because of BODILY INJURY, PERSONAL INJURY or PROPER-TY DAMAGE caused by an OCCURRENCE;

(b)  The INSURED for any and all sums which the INSURED shall become legally obligated to pay as ULTIMATE NET LOSS arising from any claim or claims first made during the POLICY PERIOD by reason of (1) any WRONGFUL ACT in the ADMINISTRATION of the NAMED INSURED's EMPLOYEE BENEFIT PROGRAMS caused by the INSURED or any other person for whose acts the INSURED is legally liable; or (2) any BREACH OF FIDUCIARY DUTY caused by the INSURED's activity as a fiduciary of any of the NAMED INSURED's EMPLOYEE BENEFIT PROGRAMS;

(c)  (1)  The INSURED for any and all sums which the INSURED shall become legally obli-gated to pay as ULTIMATE NET LOSS arising from any claim or claims first made during the POLICY PERIOD, and for which the NAMED INSURED has not provided reimburse-ment, by reason of any WRONGFUL ACT caused by the INSUREDS while acting in the capacity of Directors or Officers of the NAMED INSURED or of another corporation or organization for which they are serving or have served at the request of the NAMED INSURED as Directors or Officers;

(2)  The NAMED INSURED for any and all sums required to reimburse it for ULTI-MATE NET LOSS it has incurred in indemnifying Directors or Officers for damages, judgments, settlements, and costs, charges and expenses, incurred by them and arising from any claim or claims or threat of same first brought against them during the POLICY PERIOD by reason of any WRONGFUL ACT caused by them while acting in their capacity as Directors or Officers, where said indemnity may be required or permitted according to applicable law, common or statutory, or under provisions of the NAMED INSURED's Charter or Bye Laws effective pursuant to law.

II.  LIMIT OF LIABILITY

(a)  THE COMPANY shall only be liable hereunder for the amount of ULTIMATE NET LOSS in excess of UNDERLYING LIMITS as stated in Item 5 of the Declarations as a result of any OCCURRENCE covered under Insuring Agreement I (a) and then only up to the amount stated in Item 3 of the Declarations. Furthermore, with respect to JOINT VENTURES in which the INSURED has an interest, the liability or the COMPANY under this POLICY shall be limited to the product of

(1)  the percentage interest of the INSURED in the said JOINT VENTURE and

1

(2)   the total limit of liability insurance afforded the INSURED by this POLICY.

The said percentage interest to be applied shall be that which would be imposed by law.

It is further understood and agreed that, where any underlying insurance(s) have been reduced by a clause having the same effect as this section (a), the liability of the COMPANY under this POLICY, as limited by this section (a), shall be excess of the sum of

(1)   such reduced limits of any underlying insurance(s) and

(2)   the limits of any underlying insurance(s) not reduced.

(b)   Except with respect to "Defense Costs, Charges and Expenses", as described in Condition (b), the COMPANY shall only be liable hereunder for the amount of ULTIMATE NET LOSS in excess of UNDERLYING LIMITS as stated in Item 5 of the Declarations as a result of any WRONGFUL ACT covered under Insuring Agreements I (b) and I (c) and then only up to the amount stated in Item 3 of the Declarations. Furthermore, with respect to Insuring Agreements I (b) and I (c), losses arising out of the same act or interrelated acts of one or more INSUREDS shall be considered a single loss and only one retention shall be deducted from the aggregate amount of such losses.

(c)   With respect to any OCCURRENCE covered under Insuring Agreement I (a), in no event shall this POLICY be called upon to pay the first $100,000 or the amount stated in Item 5B of the Declarations, whichever is greater, of any loss covered hereunder, except in the event of the reduction or exhaustion of any applicable underlying aggregate limit by reason of losses paid thereunder. Furthermore, this POLICY shall

(1)   in the event of the reduction of an applicable underlying aggregate limit, pay the excess of the reduced UNDERLYING LIMIT;

(2)   in the event of the exhaustion of an applicable underlying aggregate limit, continue in force as underlying insurance.

(d)   In the event of any loss(es) arising from any single OCCURRENCE or WRONGFUL ACT which involve(s) two or more UNDERLYING LIMITS, the following provision shall apply:

(1)   If Item 5 of the Declarations designates a "Combined UNDERLYING LIMIT", then the UNDERLYING LIMIT shall be determined as follows:

(i)    if no underlying insurance(s) is (are) valid and collectible, then the total of all applicable UNDERLYING LIMITS shall not exceed the largest single applicable UNDERLYING LIMIT;

(ii)   If underlying insurance(s) is (are) valid and collectible, then the total of all applicable UNDERLYING LIMITS shall not exceed the sum of the applicable underlying insured limit(s) and the single largest applicable self insured retention or uninsured limit;

(2)   If Item 5 of the Declarations designates "Separate UNDERLYING LIMITS", then each applicable UNDERLYING LIMIT shall be applied separately without limitation.

(e)   The inclusion herein of more than one INSURED shall not operate to increase the limit of the COMPANY's liability as stated in Item 3 of the Declarations.

2

III. DEFINITIONS

(a) ADMINISTRATION: The term "ADMINISTRATION" includes, but not by way of limitation:

    (1) the giving of counsel with respect to the EMPLOYEE BENEFIT PROGRAMS;

    (2) the interpreting of the EMPLOYEE BENEFIT PROGRAMS;

    (3) the handling of records in connection with the EMPLOYEE BENEFIT PROGRAMS; and

    (4) the effecting of enrollment, termination or cancellation of employees under the EMPLOYEE BENEFIT PROGRAMS;

so long as all such acts are authorized by the NAMED INSURED.

(b) BODILY INJURY: The term "BODILY INJURY" shall mean bodily injury, mental anguish, mental illness, emotional upset, sickness or disease sustained by any person which occurs during the POLICY PERIOD, including death at any time resulting therefrom.

(c) BREACH OF FIDUCIARY DUTY: "BREACH OF FIDUCIARY DUTY" is a WRONGFUL ACT which is the violation of any responsibility, obligation or duty imposed upon fiduciaries by the Employee Retirement Income Act of 1974 or amendments thereto or the common or statutory law of the United States of America or any State or other jurisdiction therein with respect to any of the NAMED INSURED's EMPLOYEE BENEFIT PROGRAM(S).

(d) CONTRACT: The term "CONTRACT" shall mean an agreement to assume liability for BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE which occurs subsequent to the making of the agreement.

(e) EMPLOYEE BENEFIT PROGRAMS: The term "EMPLOYEE BENEFIT PROGRAMS" shall mean group life insurance, group accident or health insurance, pension plans, employee stock subscription plans, worker's compensation, unemployment insurance, social security, disability benefits and any other employee benefit programs.

(f) INSURED: Each of the following is an "INSURED" under this POLICY to the extent set forth below:

    (1) the NAMED INSURED;

    (2) any other person or organization to such extent and for such LIMITS OF LIABILITY as the NAMED INSURED has agreed before loss to provide insurance for such interests except that with respect to JOINT VENTURES such other persons or organizations shall be limited to parties to agreements in which the NAMED INSURED is the operator or managing partner;

    (3) officers, directors, stockholders and employees of the NAMED INSURED while acting within the scope of their duties as such;

    (4) if the NAMED INSURED is a partnership, the partnership and any partner thereof but only with respect to his liability as such;

3

(5)  any other person while using an automobile owned, non-owned or hired by the NAMED INSURED with the permission of the NAMED INSURED provided the use thereof is within the scope of the permission granted;

(6)  officers and employees of the NAMED INSURED while using a personally owned automobile, whether for business or personal use, if such personally owned automobile has been acquired primarily for business use by such officers and employees, or with their permission, provided the use thereof is within the scope of the permission granted; and further provided, the NAMED INSURED has, prior to loss, agreed in writing with such officers and employees to provide such insurance;

(7)  with respect to Insuring Agreement I (b) only:

    (i)  the EMPLOYEE BENEFIT PROGRAMS of the NAMED INSURED;

    (ii)  any officer, director or employee or any other person for whose acts the IN-SURED is legally liable who, pursuant to the Employee Retirement Income Security Act of 1974 or amendments thereto, is a past, present or future fiduciary of any EMPLOYEE BENEFIT PROGRAM(S) of the NAMED IN-SURED and in addition, the estates, heirs or legal representatives of any such individual who is deceased or incompetent;

(8)  with respect to Insuring Agreement I (c) only:

    (i)  any person who was, now is, or shall be a Director or an Officer or any other employee of the NAMED INSURED who may be acting in the capacity of a Director or an Officer within the expressed authorization of a Director or an Officer of the NAMED INSURED;

    (ii)  the estates, heirs, legal representatives or assigns of deceased persons who were Directors or Officers of the NAMED INSURED at the time the acts upon which such claims were based were committed, and the legal representatives or assigns of Directors or Officers in the event of their incompetency, insolvency or bankruptcy.

(g)  JOINT VENTURE: The term "JOINT VENTURE" includes, but not by way of limitation, any joint venture, co-venture, joint lease, joint operating agreement or partnership.

(h)  NAMED INSURED: The term "NAMED INSURED" shall mean the person(s) or organization(s) named in Item 1 of the Declarations and any subsidiary company in line of corporate descent from such organization(s).

(i)  OCCURRENCE: The term "OCCURRENCE" shall mean

    (1)  an accident; or

    (2)  an event; or

    (3)  continuous or repeated exposure to conditions

which results in BODILY INJURY, PERSONAL INJURY OR PROPERTY DAMAGE. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one OCCURRENCE.

An OCCURRENCE shall not include a WRONGFUL ACT which is also covered under Insuring Agreements I (b) and I (c).

4

(j)  PERSONAL INJURY: The term "PERSONAL INJURY" shall mean injury arising out of false arrest, detention or imprisonment or malicious prosecution; wrongful eviction, wrongful entry or other invasion of the right of private occupancy; discrimination; the publication or utterance of a libel or slander or other defamatory or disparaging material; or a publication or utterance in violation of an individual's right of privacy and which occurs during the POLICY PERIOD.

(k)  PROPERTY DAMAGE: The term "PROPERTY DAMAGE" shall mean

   (1)  physical injury to or destruction of tangible property which occurs during the POLICY PERIOD, including the loss of use thereof at any time resulting therefrom; or

   (2)  loss of use at any time of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an accident or an event or continuous or repeated exposure to conditions during the POLICY PERIOD.

(l)  ULTIMATE NET LOSS: The term "ULTIMATE NET LOSS" shall mean the total of the following sums with respect to each OCCURRENCE or WRONGFUL ACT to which this POLICY applies;

   (1)  all sums which the INSURED shall become legally obligated to pay as damages either by adjudication or compromise with the consent of the COMPANY, after making proper deductions for all recoveries and salvages collectible and for other insurance that is in excess of the UNDERLYING LIMITS; and

   (2)  all expenses incurred by the INSURED in the investigation, negotiation, settlement and defense of any claim or suit seeking such damages, excluding all salaries of employees and office expense of the INSURED.

   However, the COMPANY shall not be liable for expenses as aforesaid when such expenses are included in other valid and collectible insurance, except where that insurance is subject to at least 100 percent reimbursement by the INSURED.

(m)  UNDERLYING LIMITS: The term "UNDERLYING LIMITS" shall mean

   (1)  any insured limits; or

   (2)  any uninsured limits; or

   (3)  any self-insured retentions including any insured limits which are subject to at least 100 percent reimbursement by the INSURED.

(n)  WRONGFUL ACT: The term "WRONGFUL ACT" includes, but not by way of limitation, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or attempted or any matter claimed against the INSURED.

IV.  POLICY PERIOD — TERRITORY

This POLICY applies to OCCURRENCES or WRONGFUL ACTS which take place anywhere during the POLICY PERIOD as stated in Item 2 of the Declarations. Furthermore, with respect to Insuring Agreement I (b) and I (c), this POLICY shall apply to WRONGFUL ACTS which occurred prior to the POLICY PERIOD if claim is first made during the POLICY PERIOD, and provided:

5

(a) the INSURED at the effective date of the POLICY had no knowledge or could not have reasonably foreseen any circumstances which might result in the claim; and

(b) there is no other insurance applicable to such WRONGFUL ACT.

## EXCLUSIONS

This POLICY shall not apply:

See Endorsement (a) to liability arising out of the ownership, maintenance, operation, use, loading or unloading of any owned watercraft in excess of 75 feet in length;

(b) to liability arising out of the ownership, maintenance, operation, use, loading or unloading of any owned aircraft;

(c) to BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE caused intentionally by or at the direction of the INSURED, provided this exclusion shall not apply with respect to BODILY INJURY, PERSONAL INJURY OR PROPERTY DAMAGE occurring while safeguarding, preserving, protecting or defending person or property;

(d) to PROPERTY DAMAGE to:

(1) property owned or occupied by or rented to the INSURED; or

(2) property used by the INSURED; or

(3) property in the care, custody or control of the INSURED as to which the INSURED is for any purpose exercising physical control; but parts 2 and 3 of this exclusion do not apply with respect to liability under a written sidetrack agreement and part 3 of this exclusion does not apply with respect to PROPERTY DAMAGE (other than to elevators) arising out of the use of an elevator at premises owned by, rented to or controlled by the NAMED INSURED;

(e) to liability resulting from the failure of the NAMED INSURED's products (for the purpose of this exclusion, electricity, steam and gas are not considered products) or work completed by or for the NAMED INSURED to perform the function or serve the purpose intended by the NAMED INSURED, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any INSURED; but this exclusion does not apply to liability resulting from the active malfunctioning of such product or work;

(f) to any expense incurred by the INSURED in regaining control of any well in which the INSURED has an ownership and/or operating interest and/or contractual responsibility; however, this exclusion shall not apply to the expense to regain control of a well, the property of others, for which the INSURED may become liable arising out of an OCCURRENCE;

(g) to the cost of removal of debris or wreck in which the INSURED has, or had prior to loss, an ownership and/or operating interest and/or contractual responsibility; however, this exclusion shall not apply to the cost of removal of any debris or wreck, the property of others, for which the INSURED may become liable arising out of an OCCURRENCE;

See Endorsement (h) to any obligation for which the INSURED, or any carrier as his Insurer, may be held liable under any worker's compensation, occupational disease, unemployment compensation or disability benefits law, or under any other similar law, including United States

6

Longshoremen's and Harbor Worker's Act; Federal Employers' Liability Act or the Jones Act; or any employers' liability for BODILY INJURY to any employee of the INSURED arising out of or in the course of his employment by the INSURED (hereinafter called "EMPLOYERS' LIABILITY and EMPLOYERS' LIABILITY FOR OCCUPATIONAL DISEASE");

(i)   with respect to Insuring Agreements I (b) and I (c), to any loss arising from any claim brought about or contributed to by the dishonest, fraudulent, criminal or malicious act or omission of the INSURED or his predecessors in business or any person at any time employed by the INSURED or his predecessors in business;

(j)   with respect to Insuring Agreement I (b):

   (1)   to any claim for failure of performance of contract by any insurer;

   (2)   to any claim based upon failure of stock to produce financial gain as represented by the INSURED or any employee thereof;

   (3)   to any loss arising from any claim or claims made against the INSURED with respect to any INSURED adjudged to have participated in, or to have had knowledge of and have failed to take appropriate action with respect to any BREACH OF FIDUCIARY DUTY, knowing such in either case to have been a violation of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974 or amendments thereto. This exclusion shall not exclude coverage for any INSURED in any Civil suit or proceeding merely because such suit is or could have been based upon an allegation of knowledgeable participation in, or inaction with respect to, any BREACH OF FIDUCIARY DUTY as is described in this exclusion;

(k)   with respect to Insuring Agreement I (c) only:

   to any loss arising from any claim made against Directors and Officers:

   (1)   based upon or attributable to their gaining in fact of any personal profit or advantage to which they were not legally entitled;

   (2)   for the return by them of any remuneration paid to them without the previous approval of the stockholders of the NAMED INSURED which payment without such previous approval shall be held by the Courts to have been illegal;

   (3)   for an accounting of profits made from the purchase or sale by them of securities of the NAMED INSURED within the meaning of Section 16 (b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law or common law;

   NOTE:

   The act or omission of any Director and/or Officer shall not be imputed to any other Director and/or Officer for the purpose of determining the applicability of the Exclusions enumerated herein.

(l)   NUCLEAR ENERGY LIABILITY EXCLUSION (BROAD FORM)

   It is agreed that the POLICY does not apply:

I.   Under any Liability Coverage, to BODILY INJURY or PROPERTY DAMAGE

   (a)   with respect to which an INSURED under this POLICY is also an Insured under a nuclear energy liability policy issued by American Nuclear Insurers, Mutual Atomic

7

"nuclear facility" means

(a)  any nuclear reactor;

(b)  any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing fuel, or (3) handling, processing or packing "waste";

(c)  any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the INSURED at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 235;

(d)  any structure basin, excavation, premise or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fusion in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"PROPERTY DAMAGE" includes all forms of radioactive contamination of property.

## CONDITIONS

(a)  CROSS LIABILITY

The Company agrees that, in the event of a claim for damages for BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE being made by any INSURED hereunder against any other INSUREDS hereunder, this POLICY shall cover such other INSUREDS against whom claim is made, in the same manner as if separate policies had been issued to each INSURED; provided, however, that employees of one INSURED shall not be construed as employees of any other INSURED, unless at the time of injury or death, there exists a relationship of master/servant between the employees and such other INSURED.

Nothing contained in the foregoing nor in any subsequent endorsement either naming additional INSUREDS or adding more than one entity as a NAMED IN-SURED shall have the effect of increasing the COMPANY's LIMIT OF LIABILITY in respect to each OCCURRENCE or WRONGFUL ACT beyond that stated in Item 3 of the Declarations.

(b)  DEFENSE COSTS, CHARGES & LEGAL EXPENSES

This POLICY shall indemnify the INSURED for any and all payments made by or on behalf of the INSURED for expenses incurred in the investigation, negotiation, settlement and defense or any claim or suit seeking damages which are payable under the terms of Insuring Agreements I (b) and I (c) even if the allegations of the claim or suit are groundless, false or fraudulent, provided the COMPANY shall not be liable for payments made as salary to employees of the INSURED. It is understood and agreed that any and all such payments shall be included within the LIMITS OF LIABILITY stated in Item 3 of the Declarations.

9

own cost and expense and shall be liable for the taxable court costs and interest incidental thereto, but in no event shall the total liability of the COMPANY exceed its LIMIT OF LIABILITY as provided for herein, plus the expense of such appeal.

(f) BANKRUPTCY OR INSOLVENCY

Bankruptcy or insolvency of the INSURED shall not relieve the COMPANY of any of its obligations hereunder.

(g) OTHER INSURANCE

If other valid and collectible insurance with any other insurer is available to the INSURED covering a loss also covered by this POLICY, other than insurance that is in excess of the insurance afforded by this POLICY, the insurance afforded by this POLICY shall be in excess of and shall not contribute with such other insurance. Nothing herein shall be construed to make this POLICY subject to the terms, conditions and limitations of other insurance.

(h) INSPECTION AND AUDIT

The COMPANY shall be permitted but not obligated to inspect the NAMED INSURED's property and operations at any time. Neither the COMPANY's right to make inspections nor the making thereof nor any report thereof shall constitute an undertaking, on behalf of or for the benefit of the NAMED INSURED or others to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

The COMPANY may examine and audit the NAMED INSURED's books and records at any time during the POLICY PERIOD and extentions thereof and within three years after the final termination of this POLICY, as far as they relate to the subject matter of this insurance.

(i) SUBROGATION

(1) With respect to Insuring Agreement I (a):

Inasmuch as this POLICY is "Excess Coverage", the INSURED's right of recovery against any person or other entity cannot be exclusively subrogated to the COMPANY. It is, therefore, understood and agreed that in case of any payment hereunder, the COMPANY will act in concert with all other interests (including the INSURED) concerned, in the exercise of such rights of recovery. The apportioning of any amount which may be so recovered shall follow the principle that any interests (including the INSURED) that shall have paid an amount over and above any payment hereunder, shall first be reimbursed up to the amount paid by them; the COMPANY is then to be reimbursed out of any balance then remaining up to the amount paid hereunder; lastly, the interest (including the INSURED) of whom this coverage is in excess are entitled to claim the residue, if any. Expenses necessary to the recovery of any such amounts shall be apportioned between the interests (including the INSURED) concerned, in the ratio of their respective recoveries as finally settled.

(2) With respect to Insuring Agreements I (b) and I (c):

In the event of any payment under this POLICY, the COMPANY shall be subrogated to the extent of such payment to all the INSURED's rights of recovery thereof, and the INSURED shall execute all papers required and shall do

11

(2) by the COMPANY by mailing written notice to the NAMED INSURED stating when, not less than ninety (90) days thereafter, cancellation shall be effective.

The mailing of notice at the address shown in this POLICY shall be sufficient proof of notice, and the insurance under this POLICY shall end on the effective date and hour of cancellation stated in the notice. Delivery of such notice either by the INSURED or by the COMPANY shall be equivalent to mailing.

(q) SERVICE OF SUIT CLAUSE

In the event of failure of the COMPANY to pay any amount claimed to be due hereunder, the COMPANY at the request of the INSURED, will submit to the jurisdiction of any Court of competent jurisdiction within the United States of America, and will comply with all requirements necessary to give such Court jurisdiction, and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

Service of process in such suit may be made upon Messrs. LeBoeuf, Lamb, Leiby & MacRae, 140 Broadway, New York, N.Y. 10005, and in any suit instituted against it under this POLICY, the COMPANY will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Messrs. LeBoeuf, Lamb, Leiby & MacRae are authorized and directed to accept service of process on behalf of the COMPANY in any such suit and, upon the INSURED's request, to give a written undertaking to the INSURED that they will enter a general appearance upon the COMPANY's behalf in the event such suit shall be instituted.

In witness whereof, ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED has caused this POLICY to be signed at Hamilton, Bermuda.

By: _____

Assistant Treasurer

Date: _____

ASSOCIATED ELECTRIC & GAS INSURANCE LIMITED

Endorsement Number 1 (second revision) Effective Date of Endorsement January 1, 1983

Attached to and forming part of POLICY number 022A

NAMED INSURED San Diego Gas & Electric Company

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

## EXTENSION OF COVERAGE ENDORSEMENT

(a) It is hereby understood and agreed that the following coverage(s) is (are) (1) specifically deleted from Exclusion (h) and (2) included under Insuring Agreement I (a) of this POLICY:

Workers' Compensation, Employers' Liability, Employers' Liability for Occupational Disease, U.S. Longshoremen's and Harbor Worker's Act and Jones Act.

With respect to Workers' Compensation, Employers' Liability and Employers' Liability for Occupational Disease this extension, however, shall exclude and this policy shall not cover liability for Pneumoconiosis or Black Lung as provided by the Black Lung Benefits Act which arises out of coal mine employment. Coal mine employment shall mean any person employed in or around a mine site, whose tasks are performed prior to the entry of coal into the stream of commerce, such tasks being the subterranean or surface extraction of coal, the preparation of coal, the transportation of coal and coal mine maintenance and construction.

(b) In addition to the terms and conditions as set forth in this POLICY, the coverages provided by this endorsement are also subject to the terms and conditions stated hereunder:

(1) This POLICY shall apply to injuries sustained by an employee of the INSURED arising out of and in the course of his employment to the INSURED and caused by (i) an accident occurring during the POLICY PERIOD, or (ii) disease caused or aggravated by exposure of which the last day of the last exposure, in the employment of the INSURED, to conditions causing the disease occurs during the POLICY PERIOD. However, this clause shall not act as a limitation to any liability imposed upon the INSURED by any United States Federal or State Worker's Compensation and/or Occupational Disease law(s) or act(s), or any other similar law(s) to which this Endorsement applies;

(2) All injuries sustained by one or more employees as a result of (i) a single accident or (ii) caused or aggravated by exposure to the same conditions causing disease, shall be considered a single OCCURRENCE and only one UNDERLYING LIMIT shall be deducted from the aggregate amount of the resulting ULTIMATE NET LOSS;

## ASSOCIATED ELECTRIC & GAS INSURANCE LIMITED

Endorsement Number _____1_____ Effective Date of Endorsement January 1, 1981

Attached to and forming part of POLICY number___022A_____

NAMED INSURED__San Diego Gas & Electric Company_____

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

### EXTENSION OF COVERAGE ENDORSEMENT

(a)  It is hereby understood and agreed that the following coverage(s) is (are) (1) specifically deleted from Exclusion (h) and (2) included under Insuring Agreement I (a) of this POLICY:

Workers' Compensation, Employers' Liability and Employers' Liability for Occupational Disease, excluding Liability for Pneumoconiosis (Black Lung Disease), imposed upon the Insured as a result of any State or Federal Act.

(b)  In addition to the terms and conditions as set forth in this POLICY, the coverages provided by this endorsement are also subject to the terms and conditions stated hereunder:

(1)  This POLICY shall apply to injuries sustained by an employee of the INSURED arising out of and in the course of his employment to the INSURED and caused by (i) an accident occurring during the POLICY PERIOD, or (ii) disease caused or aggravated by exposure of which the last day of the last exposure, in the employment of the INSURED, to conditions causing the disease occurs during the POLICY PERIOD. However, this clause shall not act as a limitation to any liability imposed upon the INSURED by any United States Federal or State Worker's Compensation and/or Occupational Disease law(s) or act(s), or any other similar law(s) to which this Endorsement applies;

(2)  All injuries sustained by one or more employees as a result of (i) a single accident or (ii) caused or aggravated by exposure to the same conditions causing disease, shall be considered a single OCCURRENCE and only one UNDERLYING LIMIT shall be deducted from the aggregate amount of the resulting ULTIMATE NET LOSS;

8001 (AEGIS) 2-80

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ___2___ Effective Date of Endorsement January 1, 1981

Attached to and forming part of Policy Number __022A__

Named Insured _San Diego Gas & Electric Company_

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Item No. 5(A) of the policy Declarations, "Underlying Limits," is amended to read as follows:

Insured or Uninsured

$   250,000  any one occurrence -- General Liability, Automobile Liability, Automobile Liability, Workers' Compensation, Employers' Liability and Employers' Liability for Occupational Disease, excluding Liability for Pneumoconiosis (Black Lung Disease), imposed upon the Insured as a result of any State or Federal Act.

$  . 1,000  any one wrongful act -- Fiduciary Liability

$40,000,000  any one wrongful act -- Directors & Officers Liability

_____
Signature of Authorized Representative

5604 (GAS) 3-78

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ___2___ (second revision) ___ Effective Date of Endorsement ___January 1, 1983___

Attached to and forming part of Policy Number ____022A_____

Named Insured ____San Diego Gas & Electric Company_____

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Item No. 5(A) of the policy Declarations, "Underlying Limits," is amended to read as follows:

Insured or Uninsured

$    250,000   any one occurrence -- General Liability, Automobile Liability, Workers' Compensation, Employers' Liability, Employers, Liability for Occupational Disease, U.S. Longshoremen's and Harbor Worker's Act and Jones Act.

$     1,000   any one wrongful act -- Fiduciary Liability

$40,000,000   any one wrongful act -- Directors & Officers Liability

_____
**Signature of Authorized Representative**

### ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ___2 (revised)___ Effective Date of Endorsement _January 1, 1981_

Attached to and forming part of Policy Number____022A____

Named Insured __San Diego Gas & Electric Company____

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Item No. 5(A) of the policy Declarations, "Underlying Limits," is amended to read as follows:

Insured or Uninsured

$  250,000  any one occurrence -- General Liability, Automobile Liability, Workers' Compensation, Employers' Liability and Employers' Liability for Occupational Disease, excluding Liability for Pneumoconiosis (Black Lung Disease), imposed upon the Insured as a result of any State or Federal Act, Longshoremen's and Harbor Worker's Act and Jones Act.

$    1,000  any one wrongful act -- Fiduciary Liability

$40,000,000  any one wrongful act -- Directors & Officers Liability

_____
**Signature of Authorized Representative**

5604 (GAS) 3-78
3/27/81:ro

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number___3 (revised)___Effective Date of Endorsement __January 1, 1981_____

Attached to and forming part of Policy Number_____022A_____

Named Insured ___San Diego Gas & Electric Company_____

    It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

It is understood and agreed that Security Pacific National Bank, Security Pacific National Leasing, Inc. and Security Pacific Equipment Leasing, Inc. are included as additional named insureds with respect to the ownership, maintenance or existence of certain personal property leased to the named insured by Security Pacific National Bank, Security Pacific National Leasing, Inc., or Security Pacific Equipment Leasing, Inc. and the Company shall be liable under this policy for the full amount of the loss up to and including the total limits of liability as set forth in the declarations without right of contribution from any contingent insurance which may be effected by either Security Pacific National Bank, Security Pacific National Leasing, Inc. or Security Pacific Equipment Leasing, Inc.

It is understood and agreed that this policy shall not be cancelled nor any reduction or restriction of coverage be effected until at least ten (10) days after notice of such cancellation, restriction or reduction of coverage has been mailed to Security Pacific Equipment Leasing, Inc., P.O. Box 3219, Terminal Annex, Los Angeles, California 90051. It is further understood and agreed that any cancellation notices shall be mailed to the above by Certified Mail, Return Receipt Requested.

_____
Signature of Authorized Representative

5604 (AEGIS) 11-81
2/2/83:rg

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number __3__ Effective Date of Endorsement __January 1, 1981__

Attached to and forming part of Policy Number __022A__

Named Insured __San Diego Gas & Electric Company__

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Endorsement No. 10 is amended to read as follows:

It is understood and agreed that Security Pacific National Bank, Security Pacific National Leasing, Inc. and Security Pacific Equipment Leasing, Inc. are included as additional named insureds with respect to the ownership, maintenance or existence of certain personal property leased to the named insured by Security Pacific National Bank, Security Pacific National Leasing, Inc., or Security Pacific Equipment Leasing, Inc. and the Company shall be liable under this policy for the full amount of the loss up to and including the total limits of liability as set forth in the declarations without right of contribution from any contingent insurance which may be effected by either Security Pacific National Bank, Security Pacific National Leasing, Inc. or Security Pacific Equipment Leasing, Inc.

It is understood and agreed that this policy shall not be cancelled nor any reduction or restriction of coverage be effected until at least ten (10) days after notice of such cancellation, restriction or reduction of coverage has been mailed to Security Pacific Equipment Leasing, Inc., P.O. Box 3219, Terminal Annex, Los Angeles, California 90051. It is further understood and agreed that any cancellation notices shall be mailed to the above by Certified Mail, Return Receipt Requested.

_____
Signature of Authorized Representative

5604 (GAS) 3-78

ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____4_____ Effective Date of Endorsement __January 1, 1981__

Attached to and forming part of Policy Number ____022A_____

Named Insured ___San Diego Gas & Electric Company_____

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

The following terms and conditions are hereby made a part of this policy and are applicable only to Encina Power Plant Unit 5, Carlsbad, California in accordance with Lease Agreement E-12292 between San Diego Gas & Electric Company, as Lessee and Lloyds Bank California, as Owner Trustee and Lessor:

1. The following interests are additional insureds as their respective interests may appear:

   a. Lloyds Bank California, Lessor
   b. BameriLease, Inc., Owner Participant
   c. United California Bank, Indenture Trustee
   d. Each holder of a Loan Certificate under Financing Agreement A-12292.

2. All claims for insurance premiums against Lessor, Owner Participant, Indenture Trustee and each holder of a Loan Certificate are waived.

3. Losses, if any, shall be payable notwithstanding:

   a. any act or negligence, including any breach of any condition or warranty in any policy of insurance, by Lessee, Lessor, the Owner Participant, the Indenture Trustee or any holder of a Loan Certificate,
   b. the occupation or use of the Equipment for purposes mor hazardous than permitted by the terms of the policy,
   c. any foreclosure of other proceeding or notice of sale relating to the Equipment, or
   d. any change in the title to or ownership of any of the Equipment.

4. This insurance shall be excess of the retention stipulated under Item 5 of the Policy Declarations and without right of contribution from any other insurance coverage effected by Lessor or Owner Participant.

5. No cancellation or material change in this policy shall be effective until at least 20 days after receipt by Lessor and the Indentured Trustee of written notice thereof.

6. Any right of subrogation is waived against Lessor, Owner Participant, Indenture Trustee or any holder of a Loan Certificate.

_____
Signature of Authorized Representative

5604 (GAS) 3-78

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____5_____ Effective Date of Endorsement _January 1, 1981_

Attached to and forming part of Policy Number_____022A_____

Named Insured _____San Diego Gas & Electric Company_____

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

The following interests are added as additional Insureds but only as respects the ownership, maintenance or existence of personal property leased to the Named Insured by them;

        Security Pacific Commercial Leasing, Inc.
        Security Pacific Equipment Leasing, Inc.
P.O. Address - Box 7722, San Francisco, California    94120

It is further agreed that 10 days notice will be furnished to the foregoing additional Insureds by registered mail in the event this policy is cancelled or materially altered.

_____Signature of Authorized Representative_____

5604 (GAS) 3-78

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ___6___     Effective Date of Endorsement January 1, 1981

Attached to and forming part of Policy Number ___022A___

Named Insured ___San Diego Gas & Electric Company___

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Exclusion (a) is deleted as regards a dredge located at or near the ENCINA Power Plant.

It is agreed that sums paid by the Insured or by others on behalf of the Insured will be allowed in computing the deductible above which this insurance applies.

It is agreed that such insurance as is afforded by this policy shall not apply to San Onofre Nuclear Generating Stations, but only to the extent that such coverage is provided under AEGIS' Policy No. 164A issued to Southern California Edison Company covering such project.

It is further agreed that the definition of Named Insured as respects Directors & Officers Liability is extended to include the following individuals:

Alan N. Stewart            Division Manager - Gas

Guilbert W. Courtemanche   Director - Internal Auditing

_____
Signature of Authorized Representative

5604 (GAS) 3-78

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____7_____ Effective Date of Endorsement __January 1, 1981__

Attached to and forming part of POLICY number ___022A___

NAMED INSURED __San Diego Gas & Electric Company__

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

It is understood and agreed that Limit of Liability II (a) is amended in its entirety to read:

"(a) THE COMPANY shall only be liable hereunder for the amount of ULTIMATE NET LOSS in excess of UNDERLYING LIMITS as stated in Item 5 of the Declarations as a result of any OCCURRENCE covered under Insuring Agreement I (a) and then only up to the amount stated in Item 3 of the Declarations. Furthermore, with respect to JOINT VENTURES in which the INSURED has an interest and which involve more than one insured of the COMPANY, the liability of the COMPANY shall be limited to the product of

(1) the percentage interest of the INSURED in the said JOINT VENTURE divided by the percentage interest of the INSURED plus the percentage interest of all other insureds of the COMPANY in the said JOINT VENTURE and

(2) the total limit of liability insurance afforded by this POLICY.

The said percentage interest to be applied shall be that which would be imposed by law.

It is further understood and agreed that, where any underlying insurance(s) have been reduced by a clause having the same effect as this section (a), the liability of the COMPANY under this POLICY, as limited by this section (a), shall be excess of the sum of

(1) such reduced limits of any underlying insurance(s) and

(2) the limits of any underlying insurance(s) not reduced."

_____
Signature of Authorized Representative

8007 (AEGIS) 2-80

ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ____8____ Effective Date of Endorsement January 1, 1981

Attached to and forming part of POLICY number ___022A___

NAMED INSURED ___San Diego Gas & Electric Company___

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

## RETROSPECTIVE PREMIUM ENDORSEMENT

In addition to the FLAT PREMIUM stated in Item No. 4 of the Declarations or any endorsement thereof, the INSURED agrees to pay premium in accordance with the Company Experience Retrospective Provision below. The retrospective premium adjustment as calculated hereunder shall not exceed 100 percent of the INSURED's FLAT PREMIUM.

### Company Experience Retrospective Premium

If the COMPANY sustains INCURRED LOSSES, under policies which have POLICY YEARS ending during the same calendar year as the INSURED's POLICY YEAR, in excess of the total premiums earned under such policies, the INSURED will pay to the COMPANY additional premium equivalent to the product of the amount of such excess and the fraction developed with the INSURED's FLAT PREMIUM as the numerator and the FLAT PREMIUM of all policyholders for such POLICY YEARS as the denominator.

The amount of premium adjustment to be paid by the INSURED hereunder shall not exceed 100 percent of the INSURED's FLAT PREMIUM.

### General Conditions

This Retrospective Premium Endorsement shall apply to each POLICY YEAR in which this POLICY is in force. Each POLICY YEAR shall be independent of all other POLICY YEARS.

A computation of the retrospective premium based upon the COMPANY's INCURRED LOSSES valued as of a date thirty-six months after the termination of the POLICY YEAR, or sooner if deemed necessary by the COMPANY shall be made by the COMPANY as soon as practicable after such valuation date.

Any additional premium owing shall be due and payable within 30 days after the INSURED is notified by the COMPANY that such additional premium is due. At the option of the INSURED the additional premium may be paid in three equal annual installments with an annual interest penalty to be added to unpaid balances. The interest rate shall be the prime interest rate plus 2 percent as determined by the COMPANY when payments are due.

8005 (AEGIS) 2-80

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____9_____ Effective Date of Endorsement January 1, 1981

Attached to and forming part of Policy Number _____022A_____

Named Insured __San Diego Gas & Electric Company__

   It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Condition (p) of the policy is hereby deleted in its entirety and replaced with the following:

### Cancellation Provision

(p)  CANCELLATION

This Policy may be cancelled on a pro-rata basis:

(1)  At any anniversary date of this Policy by the Named Insured by mailing written notice to the Company, or

(2)  At any time, other than the anniversary date of this Policy, by the Named Insured by mailing written notice to the Company stating when, not less than thirty (30) days from the date notice was mailed, cancellation shall be effective, or

(3)  At any time by the Company by mailing written notice to the Named Insured stating when, not less than nintey (90) days from the date notice was mailed, cancellation shall be effective. The mailing of notice at the address in this Policy shall be sufficient proof of notice and the insurance under this Policy shall end on the effective date and hour of cancellation stated in the notice. Delivery of such notice either by the Insured or by the Company shall be equivalent to mailing.

_____
Signature of Authorized Representative

5604 (GAS) 3-78

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____10_____ Effective Date of Endorsement ___October 1, 1981___

Attached to and forming part of Policy Number _____022A_____

Named Insured ___San Diego Gas & Electric Company___

　　　It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

As respects Directors & Officers Liability the following changes are applicable:

　　　Delete:　Alan N. Stewart - Division Manager-Gas

　　　Add:　　Donald E. Felsinger - Division Manager-Gas
　　　　　　　R. Bruce Liska - Division Manager-Customer Service Administrator

_____
Signature of Authorized Representative

5604 (AEGIS) 11-81

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ____11____ Effective Date of Endorsement __November 10, 1981__

Attached to and forming part of Policy Number ____022A____

Named Insured __San Diego Gas & Electric Company__

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

As respects Directors & Officers Liability the following changes are applicable:

Delete:  Guilbert W. Courtemanche - Director-Internal Auditing

Add:  Frank H. Ault - Director-Internal Auditing

_____
Signature of Authorized Representative

5604 (AEGIS) 11-81

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ____12____    Effective Date of Endorsement __January 1, 1982__

Attached to and forming part of Policy Number ____022A____

Named Insured ___San Diego Gas & Electric Company___

   It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

   It is agreed that the definition of Named Insured as respects Directors & Officers Liability is extended to include the following individual:

        James C. Holcombe - Manager-Power Supply



_____
Signature of Authorized Representative

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____ 13 _____ Effective Date of Endorsement ___ January 1, 1982 _____

Attached to and forming part of Policy Number ___ 022A _____

Named Insured _____ San Diego Gas & Electric Company _____

    It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

It is agreed that such coverage as is afforded by this policy for Property Damage shall apply also as respects any occurrence(s), damage(s), claim(s) or suit(s) brought about as a result of Forest Fire Fighting expense, Fire Suppression expense or cost of bringing any Forest Fire under control.

Such expense or cost shall not include salaries of employees of the Insured nor Property Damage to their equipment used in bringing such Forest Fire under control.

_____
Signature of Authorized Representative

5604 (AEGIS) 11-81

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ____14____ Effective Date of Endorsement __January 1, 1983__

Attached to and forming part of Policy Number ____022A____

Named Insured __San Diego Gas & Electric Company__

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Condition (C)(1) is amended in part to read as follows:

Upon the happening of an OCCURRENCE that appears likely to involve liability on the part of the COMPANY, written notice shall be given by or on behalf of the INSURED to the COMPANY as soon as practicable after notice of OCCURRENCE is received by Manager, Risk Management Division.

_Sigla L. Bailey_

**Signature of Authorized Representative**

5604 (AEGIS) 11-81
12/22/82 rp

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ____15____ Effective Date of Endorsement _January 1, 1983_

Attached to and forming part of Policy Number ____022A____

Named Insured __San Diego Gas & Electric Company__

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Exclusion (c) is amended to read as follows:

(c) to liability of any INSURED for BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE caused intentionally by or at the direction of such INSURED, provided this exclusion shall not apply with respect to BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE occurring while safeguarding, preserving, protecting or defending person or property;

_Linda L. Bailey_
_____
**Signature of Authorized Representative**

5604 (AEGIS) 11-81

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____ 16 _____ Effective Date of Endorsement _ January 1, 1983 _____

Attached to and forming part of Policy Number ___ 022A _____

Named Insured __ San Diego Gas & Electric Company _____

    It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

### Waiver of Right of Subrogation

It is agreed that the COMPANY shall have no right of recovery against
any person with respect to an OCCURRENCE or WRONGFUL ACT to the extent
that the INSURED has agreed with such person before the OCCURRENCE or
WRONGFUL ACT (i) to waive its right of recovery against such person or
(ii) to reimburse such person for the cost attributable to such person's
liability for any OCCURRENCE or WRONGFUL ACT caused in whole or in part
by such person.

_____
     **Signature of Authorized Representative**

5604 (AEGIS) 11-81

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ___17___   Effective Date of Endorsement __January 1, 1983__

Attached to and forming part of Policy Number___022A___

Named Insured __San Diego Gas & Electric Company__

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Definition III (j), PERSONAL INJURY is hereby deleted and amended to read as follows:

(j)  PERSONAL INJURY:  The term "PERSONAL INJURY" shall mean injury (other than BODILY INJURY or PROPERTY DAMAGE) arising out of one or more of the following acts committed during the POLICY PERIOD:

1.  false arrest, detention, imprisonment or malicious prosecution;

2.  wrongful entry or eviction or other invasion of the right of private occupancy;

3.  discrimination;

4.  a publication or utterance

    (a)  of a libel or slander or other defamatory or disparaging material; or

    (b)  in violation of an individual's right of privacy;

5.  piracy, plagiarism, unfair competition, idea misappropriation under implied contract, infringement of copyright, title or slogan arising out of the NAMED INSURED'S advertising activities.

_____
Signature of Authorized Representative

5604 (AEGIS) 11-81

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ___18___ Effective Date of Endorsement ___January 1, 1983___

Attached to and forming part of Policy Number ___022A___

Named Insured __San Diego Gas & Electric Company__

    It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Insuring Agreement III, Definition (b), "Bodily Injury," is amended to read as follows:

    The term "BODILY INJURY" shall mean bodily injury, physical impairment, shock, disability, mental anguish, mental illness, emotional upset, outrage, sickness or disease sustained by any person which occurs during the POLICY PERIOD, including death at anytime resulting therefrom.

Signature of Authorized Representative

5604 (AEGIS) 11-81

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ___19___ Effective Date of Endorsement __January 1, 1981__

Attached to and forming part of Policy Number___022A_____

Named Insured ___San Diego Gas & Electric Company_____

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Endorsements No. 6, 10, 11 and 12 are hereby cancelled.

Exclusion (a) is deleted as regards a dredge located at or near the ENCINA Power Plant.

It is agreed that sums paid by the Insured or by others on behalf of the Insured will be allowed in computing the deductible above which this insurance applies.

It is agreed that such insurance as is afforded by this policy shall not apply to San Onofre Nuclear Generating Stations, but only to the extent that such coverage is provided under AEGIS' Policy No. 164A issued to Southern California Edison Company covering such project.

It is further agreed that the definition of Named Insured as respects Directors & Officers Liability is extended to include the following positions:

> Division Manager - Gas
> Director - Internal Auditing
> Division Manager - Customer Service Administrator
> Division Manager - Power Supply

_____
Signature of Authorized Representative

5604 (AEGIS) 11-81

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____ 20 _____ Effective Date of Endorsement _July 1, 1983_

Attached to and forming part of Policy Number __022A__

Named Insured ___ San Diego Gas & Electric Company

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.


This policy is cancelled as of 12:01 A.M. July 1, 1983 at the request of the Company.


Signature of Authorized Representative

# EXHIBIT D

7/1/83 - 1/1/84

# EXCESS LIABILITY INSURANCE POLICY



**ÆGIS**

ASSOCIATED ELECTRIC & GAS
INSURANCE SERVICES LIMITED

POLICY NUMBER 022 NJ

**HAMILTON, BERMUDA**

## DECLARATIONS

ITEM NO. 1    NAMED INSURED    San Diego Gas & Electric Company
San Diego, California  92112

ITEM NO. 2    POLICY PERIOD From the 1st    day of    July    19 83 until cancelled
both days at 12:01 A.M.                                        at the address of the
NAMED INSURED

ITEM NO. 3    LIMIT OF LIABILITY: $25,000,000    any one OCCURRENCE or
WRONGFUL ACT

ITEM NO. 4    FLAT PREMIUM $    one year

ITEM NO. 5    UNDERLYING LIMITS

A.    As per Endorsement No. 2, attached.

B.    $ 250,000    each OCCURRENCE or WRONGFUL ACT not covered by under-
lying insurance nor self-insured retentions shown in A above.

In the event of any loss(es) arising from any single OCCURRENCE or WRONGFUL ACT
which involve(s) two or more UNDERLYING LIMITS, the UNDERLYING LIMITS
shall apply separately/in combination).

Endorsements attached at policy issuance:    1-15 inclusive

**AEGIS INSURANCE SERVICES, INC.**

San Diego Gas & Electric Company
Binder XL 022 A87
December 4, 1987
Page Two

   UNDERLYING LIMITS (cont.)

   B.   $ 1,000,000. each OCCURRENCE not covered by underlying
            insurance.

   C.   In the event of any CLAIM(s) arising from any single
        OCCURRENCE which involve(s) two or more UNDERLYING
        LIMITS, the UNDERLYING LIMITS shall apply in combination.

5)   EXCLUSIONS:  As per AEGIS policy form.

Attached is an invoice for the PREMIUM listed above, which is
payable within 23 days of the date hereof.

A policy reflecting the above terms will be prepared and sent
to you shortly.  The policy provides coverage which is different
from that provided by most other policies.  A specimen policy is
attached hereto.  Please read this policy carefully.

                    _Sandra J. Johnson_
              Aegis Insurance Services, Inc.

**POLICY OF EXCESS LIABILITY INSURANCE
EFFECTED WITH
ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED
HAMILTON, BERMUDA
(hereinafter called the COMPANY)**

**INSURING AGREEMENTS**

I.   COVERAGE

This POLICY is to indemnify:

(a)   The INSURED for any and all sums which the INSURED shall become legally obligated to pay as ULTIMATE NET LOSS by reason of the liability imposed upon the INSURED by law or liability assumed by the INSURED under CONTRACT, including the INSURED's proportionate share of any liability arising in any manner whatsoever out of the operations or existence of any JOINT VENTURE in which the INSURED has an interest, for damages because of BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE caused by an OCCURRENCE;

(b)   The INSURED for any and all sums which the INSURED shall become legally obligated to pay as ULTIMATE NET LOSS arising from any claim or claims first made during the POLICY PERIOD by reason of (1) any WRONGFUL ACT in the ADMINISTRATION of the NAMED INSURED's EMPLOYEE BENEFIT PROGRAMS caused by the INSURED or any other person for whose acts the INSURED is legally liable; or (2) any BREACH OF FIDUCIARY DUTY caused by the INSURED's activity as a fiduciary of any of the NAMED INSURED's EMPLOYEE BENEFIT PROGRAMS;

(c)   (1)  The INSURED for any and all sums which the INSURED shall become legally obligated to pay as ULTIMATE NET LOSS arising from any claim or claims first made during the POLICY PERIOD, and for which the NAMED INSURED has not provided reimbursement, by reason of any WRONGFUL ACT caused by the INSUREDS while acting in the capacity of Directors or Officers of the NAMED INSURED or of another corporation or organization for which they are serving or have served at the request of the NAMED INSURED as Directors or Officers;

(2)  The NAMED INSURED for any and all sums required to reimburse it for ULTIMATE NET LOSS it has incurred in indemnifying Directors or Officers for damages, judgments, settlements, and costs, charges and expenses, incurred by them and arising from any claim or claims or threat of same first brought against them during the POLICY PERIOD by reason of any WRONGFUL ACT caused by them while acting in their capacity as Directors or Officers, where said indemnity may be required or permitted according to applicable law, common or statutory, or under provisions of the NAMED INSURED's Charter or Bye Laws effective pursuant to law.

II.   LIMIT OF LIABILITY

(a)   THE COMPANY shall only be liable hereunder for the amount of ULTIMATE NET LOSS in excess of UNDERLYING LIMITS as stated in Item 5 of the Declarations as a result of any OCCURRENCE covered under Insuring Agreement I (a) and then only up to the amount stated in Item 3 of the Declarations. Furthermore, with respect to JOINT VENTURES in which the INSURED has an interest, the liability or the COMPANY under this POLICY shall be limited to the product of

(1)   the percentage interest of the INSURED in the said JOINT VENTURE and

III. DEFINITIONS

   (a)  ADMINISTRATION: The term "ADMINISTRATION" includes, but not by way of limitation:

     (1)  the giving of counsel with respect to the EMPLOYEE BENEFIT PROGRAMS;

     (2)  the interpreting of the EMPLOYEE BENEFIT PROGRAMS;

     (3)  the handling of records in connection with the EMPLOYEE BENEFIT PROGRAMS; and

     (4)  the effecting of enrollment, termination or cancellation of employees under the EMPLOYEE BENEFIT PROGRAMS;

     so long as all such acts are authorized by the NAMED INSURED.

   (b)  BODILY INJURY: The term "BODILY INJURY" shall mean bodily injury, mental anguish, mental illness, emotional upset, sickness or disease sustained by any person which occurs during the POLICY PERIOD, including death at any time resulting therefrom.

   (c)  BREACH OF FIDUCIARY DUTY: "BREACH OF FIDUCIARY DUTY" is a WRONGFUL ACT which is the violation of any responsibility, obligation or duty imposed upon fiduciaries by the Employee Retirement Income Act of 1974 or amendments thereto or the common or statutory law of the United States of America or any State or other jurisdiction therein with respect to any of the NAMED INSURED's EMPLOYEE BENEFIT PROGRAM(S).

   (d)  CONTRACT: The term "CONTRACT" shall mean an agreement to assume liability for BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE which occurs subsequent to the making of the agreement.

   (e)  EMPLOYEE BENEFIT PROGRAMS: The term "EMPLOYEE BENEFIT PROGRAMS" shall mean group life insurance, group accident or health insurance, pension plans, employee stock subscription plans, worker's compensation, unemployment insurance, social security, disability benefits and any other employee benefit programs.

   (f)  INSURED: Each of the following is an "INSURED" under this POLICY to the extent set forth below:

     (1)  the NAMED INSURED;

     (2)  any other person or organization to such extent and for such LIMITS OF LIABILITY as the NAMED INSURED has agreed before loss to provide insurance for such interests except that with respect to JOINT VENTURES such other persons or organizations shall be limited to parties to agreements in which the NAMED INSURED is the operator or managing partner;

     (3)  officers, directors, stockholders and employees of the NAMED INSURED while acting within the scope of their duties as such;

     (4)  if the NAMED INSURED is a partnership, the partnership and any partner thereof but only with respect to his liability as such;

(j)  PERSONAL INJURY: The term "PERSONAL INJURY" shall mean injury arising out of false arrest, detention or imprisonment or malicious prosecution; wrongful eviction, wrongful entry or other invasion of the right of private occupancy; discrimination; the publication or utterance of a libel or slander or other defamatory or disparaging material; or a publication or utterance in violation of an individual's right of privacy and which occurs during the POLICY PERIOD.

(k)  PROPERTY DAMAGE: The term "PROPERTY DAMAGE" shall mean

(1)  physical injury to or destruction of tangible property which occurs during the POLICY PERIOD, including the loss of use thereof at any time resulting therefrom; or

(2)  loss of use at any time of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an accident or an event or continuous or repeated exposure to conditions during the POLICY PERIOD.

(l)  ULTIMATE NET LOSS: The term "ULTIMATE NET LOSS" shall mean the total of the following sums with respect to each OCCURRENCE or WRONGFUL ACT to which this POLICY applies;

(1)  all sums which the INSURED shall become legally obligated to pay as damages either by adjudication or compromise with the consent of the COMPANY, after making proper deductions for all recoveries and salvages collectible and for other insurance that is in excess of the UNDERLYING LIMITS; and

(2)  all expenses incurred by the INSURED in the investigation, negotiation, settlement and defense of any claim or suit seeking such damages, excluding all salaries of employees and office expense of the INSURED.

However, the COMPANY shall not be liable for expenses as aforesaid when such expenses are included in other valid and collectible insurance, except where that insurance is subject to at least 100 percent reimbursement by the INSURED.

(m)  UNDERLYING LIMITS: The term "UNDERLYING LIMITS" shall mean

(1)  any insured limits; or

(2)  any uninsured limits; or

(3)  any self-insured retentions including any insured limits which are subject to at least 100 percent reimbursement by the INSURED.

(n)  WRONGFUL ACT: The term "WRONGFUL ACT" includes, but not by way of limitation, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or attempted or any matter claimed against the INSURED.

## IV. POLICY PERIOD — TERRITORY

This POLICY applies to OCCURRENCES or WRONGFUL ACTS which take place anywhere during the POLICY PERIOD as stated in Item 2 of the Declarations. Furthermore, with respect to Insuring Agreement I (b) and I (c), this POLICY shall apply to WRONGFUL ACTS which occurred prior to the POLICY PERIOD if claim is first made during the POLICY PERIOD, and provided:

Longshoremen's and Harbor Worker's Act, Federal Employers' Liability Act or the Jones Act; or any employers' liability for BODILY INJURY to any employee of the INSURED arising out of or in the course of his employment by the INSURED (hereinafter called "EMPLOYERS' LIABILITY and EMPLOYERS' LIABILITY FOR OCCUPATIONAL DISEASE");

(i) with respect to Insuring Agreements I (b) and I (c), to any loss arising from any claim brought about or contributed to by the dishonest, fraudulent, criminal or malicious act or omission of the INSURED or his predecessors in business or any person at any time employed by the INSURED or his predecessors in business;

(j) with respect to Insuring Agreement I (b):

    (1) to any claim for failure of performance of contract by any insurer;

    (2) to any claim based upon failure of stock to produce financial gain as represented by the INSURED or any employee thereof;

    (3) to any loss arising from any claim or claims made against the INSURED with respect to any INSURED adjudged to have participated in, or to have had knowledge of and have failed to take appropriate action with respect to any BREACH OF FIDUCIARY DUTY, knowing such in either case to have been a violation of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974 or amendments thereto. This exclusion shall not exclude coverage for any IN-SURED in any Civil suit or proceeding merely because such suit is or could have been based upon an allegation of knowledgeable participation in, or inaction with respect to, any BREACH OF FIDUCIARY DUTY as is described in this exclusion;

(k) with respect to Insuring Agreement I (c) only:

    to any loss arising from any claim made against Directors and Officers:

    (1) based upon or attributable to their gaining in fact of any personal profit or advantage to which they were not legally entitled;

    (2) for the return by them of any remuneration paid to them without the previous approval of the stockholders of the NAMED INSURED which payment without such previous approval shall be held by the Courts to have been illegal;

    (3) for an accounting of profits made from the purchase or sale by them of securities of the NAMED INSURED within the meaning of Section 16 (b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law or common law;

**NOTE:**

The act or omission of any Director and/or Officer shall not be imputed to any other Director and/or Officer for the purpose of determining the applicability of the Exclusions enumerated herein.

(l) NUCLEAR ENERGY LIABILITY EXCLUSION (BROAD FORM)

    It is agreed that the POLICY does not apply:

I. Under any Liability Coverage, to BODILY INJURY or PROPERTY DAMAGE

    (a) with respect to which an INSURED under this POLICY is also an Insured under a nuclear energy liability policy issued by American Nuclear Insurers, Mutual Atomic

"nuclear facility" means

(a) any nuclear reactor;

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing fuel, or (3) handling, processing or packing "waste";

(c) any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the INSURED at the premises where such equipment or device is located consists of, or contains more than 25 grams of plutonium or uranium 235;

(d) any structure basin, excavation, premise or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fusion in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"PROPERTY DAMAGE" includes all forms of radioactive contamination of property.

## CONDITIONS

(a) CROSS LIABILITY

The Company agrees that, in the event of a claim for damages for BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE being made by any INSURED hereunder against any other INSUREDS hereunder, this POLICY shall cover such other INSUREDS against whom claim is made, in the same manner as if separate policies had been issued to each INSURED; provided, however, that employees of one INSURED shall not be construed as employees of any other INSURED, unless at the time of injury or death, there exists a relationship of master/servant between the employees and such other INSURED.

Nothing contained in the foregoing nor in any subsequent endorsement either naming additional INSUREDS or adding more than one entity as a NAMED IN-SURED shall have the effect of increasing the COMPANY's LIMIT OF LIABILITY in respect to each OCCURRENCE or WRONGFUL ACT beyond that stated in Item 3 of the Declarations.

(b) DEFENSE COSTS, CHARGES & LEGAL EXPENSES

This POLICY shall indemnify the INSURED for any and all payments made by or on behalf of the INSURED for expenses incurred in the investigation, negotiation, settlement and defense or any claim or suit seeking damages which are payable under the terms of Insuring Agreements I (b) and I (c) even if the allegations of the claim or suit are groundless, false or fraudulent, provided the COMPANY shall not be liable for payments made as salary to employees of the INSURED. It is understood and agreed that any and all such payments shall be included within the LIMITS OF LIABILITY stated in Item 3 of the Declarations.

own cost and expense and shall be liable for the taxable court costs and interest incidental thereto, but in no event shall the total liability of the COMPANY exceed its LIMIT OF LIABILITY as provided for herein, plus the expense of such appeal.

(f)  BANKRUPTCY OR INSOLVENCY

Bankruptcy or insolvency of the INSURED shall not relieve the COMPANY of any of its obligations hereunder.

(g)  OTHER INSURANCE

If other valid and collectible insurance with any other insurer is available to the INSURED covering a loss also covered by this POLICY, other than insurance that is in excess of the insurance afforded by this POLICY, the insurance afforded by this POLICY shall be in excess of and shall not contribute with such other insurance. Nothing herein shall be construed to make this POLICY subject to the terms, conditions and limitations of other insurance.

(h)  INSPECTION AND AUDIT

The COMPANY shall be permitted but not obligated to inspect the NAMED IN-SURED's property and operations at any time. Neither the COMPANY's right to make inspections nor the making thereof nor any report thereof shall constitute an undertaking, on behalf of or for the benefit of the NAMED INSURED or others to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

The COMPANY may examine and audit the NAMED INSURED's books and records at any time during the POLICY PERIOD and extentions thereof and within three years after the final termination of this POLICY, as far as they relate to the subject matter of this insurance.

(i)  SUBROGATION

(1)  With respect to Insuring Agreement I (a):

Inasmuch as this POLICY is "Excess Coverage", the INSURED's right of recovery against any person or other entity cannot be exclusively subrogated to the COMPANY. It is, therefore, understood and agreed that in case of any payment hereunder, the COMPANY will act in concert with all other interests (including the INSURED) concerned, in the exercise of such rights of recovery. The apportioning of any amount which may be so recovered shall follow the principle that any interests (including the INSURED) that shall have paid an amount over and above any payment hereunder, shall first be reimbursed up to the amount paid by them; the COMPANY is then to be reimbursed out of any balance then remaining up to the amount paid hereunder; lastly, the interest (including the INSURED) of whom this coverage is in excess are entitled to claim the residue, if any. Expenses necessary to the recovery of any such amounts shall be apportioned between the interests (including the INSURED) concerned, in the ratio of their respective recoveries as finally settled.

(2)  With respect to Insuring Agreements I (b) and I (c):

In the event of any payment under this POLICY, the COMPANY shall be sub-rogated to the extent of such payment to all the INSURED's rights of recovery thereof, and the INSURED shall execute all papers required and shall do

(2) by the COMPANY by mailing written notice to the NAMED INSURED stating when, not less than ninety (90) days thereafter, cancellation shall be effective.

The mailing of notice at the address shown in this POLICY shall be sufficient proof of notice, and the insurance under this POLICY shall end on the effective date and hour of cancellation stated in the notice. Delivery of such notice either by the INSURED or by the COMPANY shall be equivalent to mailing.

(q) SERVICE OF SUIT CLAUSE

In the event of failure of the COMPANY to pay any amount claimed to be due hereunder, the COMPANY at the request of the INSURED, will submit to the jurisdiction of any Court of competent jurisdiction within the United States of America, and will comply with all requirements necessary to give such Court jurisdiction, and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

Service of process in such suit may be made upon Messrs. LeBoeuf, Lamb, Leiby & MacRae, 140 Broadway, New York, N.Y. 10005, and in any suit instituted against it under this POLICY, the COMPANY will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Messrs. LeBoeuf, Lamb, Leiby & MacRae are authorized and directed to accept service of process on behalf of the COMPANY in any such suit and, upon the INSURED's request, to give a written undertaking to the INSURED that they will enter a general appearance upon the COMPANY's behalf in the event such suit shall be instituted.

In witness whereof, ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED has caused this POLICY to be signed by its President at Hamilton, Bermuda, but this POLICY shall not be binding upon the COMPANY unless countersigned hereunder by a duly authorized representative of the COMPANY.

AEGIS Insurance Services, Inc.
Managing General Agency
34 Exchange Place, Harborside Plaza Two
Jersey City, New Jersey 07302

J.W. Heiney, President

By: _Sandra A. Olson_
Authorized Representative

Date: _September 1, 1983_

## ASSOCIATED ELECTRIC & GAS INSURANCE LIMITED

Endorsement Number _____1_____ Effective Date of Endorsement __July 1, 1983__

Attached to and forming part of POLICY number __022N.1__

NAMED INSURED ___San Diego Gas & Electric Company___

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

### EXTENSION OF COVERAGE ENDORSEMENT

(a) It is hereby understood and agreed that the following coverage(s) is (are) (1) specifically deleted from Exclusion (h) and (2) included under Insuring Agreement I (a) of this POLICY:

> Workers' Compensation, Employers' Liability, Employers' Liability for Occupational Disease, U.S. Longshoremen's and Harbor Worker's Act and Jones Act.

With respect to Workers' Compensation, Employers' Liability and Employers' Liability for Occupational Disease this extension, however, shall exclude and this policy shall not cover liability for Pneumoconiosis or Black Lung as provided by the Black Lung Benefits Act which arises out of coal mine employment. Coal mine employment shall mean any person employed in or around a mine site, whose tasks are performed prior to the entry of coal into the stream of commerce, such tasks being the subterranean or surface extraction of coal, the preparation of coal, the transportation of coal and coal mine maintenance and construction.

(b) In addition to the terms and conditions as set forth in this POLICY, the coverages provided by this endorsement are also subject to the terms and conditions stated hereunder:

   (1) This POLICY shall apply to injuries sustained by an employee of the INSURED arising out of and in the course of his employment to the INSURED and caused by (i) an accident occurring during the POLICY PERIOD, or (ii) disease caused or aggravated by exposure of which the last day of the last exposure, in the employment of the INSURED, to conditions causing the disease occurs during the POLICY PERIOD. However, this clause shall not act as a limitation to any liability imposed upon the INSURED by any United States Federal or State Worker's Compensation and/or Occupational Disease law(s) or act(s), or any other similar law(s) to which this Endorsement applies;

   (2) All injuries sustained by one or more employees as a result of (i) a single accident or (ii) caused or aggravated by exposure to the same conditions causing disease, shall be considered a single OCCURRENCE and only one UNDERLYING LIMIT shall be deducted from the aggregate amount of the resulting ULTIMATE NET LOSS;

8001 (AEGIS) 280

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____2_____ Effective Date of Endorsement _July 1, 1983_

Attached to and forming part of Policy Number ___022NJ___

Named Insured _San Diego Gas & Electric Company_

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Item No. 5(A) of the policy Declarations, "Underlying Limits," is amended to read as follows:

Insured or Uninsured

$   250,000  any one occurrence -- General Liability, Automobile Liability, Workers' Compensation, Employers' Liability, Employers Liability for Occupational Disease, U.S. Longshoremen's and Harbor Worker's Act and Jones Act.

$     1,000  any one wrongful act -- Fiduciary Liability

$40,000,000  any one wrongful act -- Directors & Officers Liability

_Sandra d. Johnson_
Signature of Authorized Representative

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ___3___ Effective Date of Endorsement __July 1, 1983__

Attached to and forming part of Policy Number_____022 NJ_____

Named Insured __San Diego Gas & Electric Company___

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

It is understood and agreed that Security Pacific National Bank, Security Pacific National Leasing, Inc. and Security Pacific Equipment Leasing, Inc. are included as additional named insureds with respect to the ownership, maintenance or existence of certain personal property leased to the named insured by Security Pacific National Bank, Security Pacific National Leasing, Inc., or Security Pacific Equipment Leasing, Inc. and the Company shall be liable under this policy for the full amount of the loss up to and including the total limits of liability as set forth in the declarations without right of contribution from any contingent insurance which may be effected by either Security Pacific National Bank, Security Pacific National Leasing, Inc. or Security Pacific Equipment Leasing, Inc.

It is understood and agreed that this policy shall not be cancelled nor any reduction or restriction of coverage be effected until at least ten (10) days after notice of such cancellation, restriction or reduction of coverage has been mailed to Security Pacific Equipment Leasing, Inc., P.O. Box 3219, Terminal Annex, Los Angeles, California 90051. It is further understood and agreed that any cancellation notices shall be mailed to the above by Certified Mail, Return Receipt Requested.

Sandra d. Olison

Signature of Authorized Representative

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____4_____ Effective Date of Endorsement _July 1, 1983_____

Attached to and forming part of Policy Number _____022NJ_____

Named Insured ___San Diego Gas & Electric Company_____

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

The following terms and conditions are hereby made a part of this policy and are applicable only to Encina Power Plant Unit 5, Carlsbad, California in accordance with Lease Agreement E-12292 between San Diego Gas & Electric Company, as Lessee and Lloyds Bank California, as Owner Trustee and Lessor:

1. The following interests are additional insureds as their respective interests may appear:

   a. Lloyds Bank California, Lessor
   b. BameriLease, Inc., Owner Participant
   c. United California Bank, Indenture Trustee
   d. Each holder of a Loan Certificate under Financing Agreement A-12292.

2. All claims for insurance premiums against Lessor, Owner Participant, Indenture Trustee and each holder of a Loan Certificate are waived.

3. Losses, if any, shall be payable notwithstanding:

   a. any act or negligence, including any breach of any condition or warranty in any policy of insurance, by Lessee, Lessor, the Owner Participant, the Indenture Trustee or any holder of a Loan Certificate,
   b. the occupation or use of the Equipment for purposes mor hazardous than permitted by the terms of the policy,
   c. any foreclosure of other proceeding or notice of sale relating to the Equipment, or
   d. any change in the title to or ownership of any of the Equipment.

4. This insurance shall be excess of the retention stipulated under Item 5 of the Policy Declarations and without right of contribution from any other insurance coverage effected by Lessor or Owner Participant.

5. No cancellation or material change in this policy shall be effective until at least 20 days after receipt by Lessor and the Indentured Trustee of written notice thereof.

6. Any right of subrogation is waived against Lessor, Owner Participant, Indenture Trustee or any holder of a Loan Certificate.

_Sandra A. Johnson_
Signature of Authorized Representative

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ___ 5 _____ Effective Date of Endorsement __July 1, 1983____

Attached to and forming part of Policy Number____ 022 NJ _____

Named Insured ___ San Diego Gas & Electric Company _____

    It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

The following interests are added as additional Insureds but only as respects the ownership, maintenance or existence of personal property leased to the Named Insured by them;

        Security Pacific Commercial Leasing, Inc.
        Security Pacific Equipment Leasing, Inc.
P.O. Address-Box 7722, San Francisco, California  94120

It is further agreed that 10 days notice will be furnished to the foregoing additional Insureds by registered mail in the event this policy is cancelled or materially altered.

_Sandra A. Johnson_
Signature of Authorized Representative

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____ 6 _____     Effective Date of Endorsement __July 1, 1983__

Attached to and forming part of POLICY number __022 NJ__

NAMED INSURED __San Diego Gas & Electric Company__

    It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

    It is understood and agreed that Limit of Liability II (a) is amended in its entirety to read:

"(a)  THE COMPANY shall only be liable hereunder for the amount of ULTIMATE NET LOSS in excess of UNDERLYING LIMITS as stated in Item 5 of the Declarations as a result of any OCCURRENCE covered under Insuring Agreement I (a) and then only up to the amount stated in Item 3 of the Declarations. Furthermore, with respect to JOINT VENTURES in which the INSURED has an interest and which involve more than one insured of the COMPANY, the liability of the COMPANY shall be limited to the product of

(1)  the percentage interest of the INSURED in the said JOINT VENTURE divided by the percentage interest of the INSURED plus the percentage interest of all other insureds of the COMPANY in the said JOINT VENTURE and

(2)  the total limit of liability insurance afforded by this POLICY.

The said percentage interest to be applied shall be that which would be imposed by law.

It is further understood and agreed that, where any underlying insurance(s) have been reduced by a clause having the same effect as this section (a), the liability of the COMPANY under this POLICY, as limited by this section (a), shall be excess of the sum of

(1)  such reduced limits of any underlying insurance(s) and

(2)  the limits of any underlying insurance(s) not reduced."

_Sandra A. Johnson_
SIGNATURE OF AUTHORIZED REPRESENTATIVE

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number_____7_____Effective Date of Endorsement _July 1, 1983_

Attached to and forming part of POLICY number _022N.1_

NAMED INSURED _San Diego Gas & Electric Company_

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

### RETROSPECTIVE PREMIUM ENDORSEMENT

In addition to the FLAT PREMIUM stated in Item No. 4 of the Declarations or any endorsement thereof, the INSURED agrees to pay premium in accordance with the Company Experience Retrospective Provision below. The retrospective premium adjustment as calculated hereunder shall not exceed 100 percent of the INSURED's FLAT PREMIUM.

#### Company Experience Retrospective Premium

If the COMPANY sustains INCURRED LOSSES, under policies which have POLICY YEARS ending during the same calendar year as the INSURED's POLICY YEAR, in excess of the total premiums earned under such policies, the INSURED will pay to the COMPANY additional premium equivalent to the product of the amount of such excess and the fraction developed with the INSURED's FLAT PREMIUM as the numerator and the FLAT PREMIUM of all policyholders for such POLICY YEARS as the denominator.

The amount of premium adjustment to be paid by the INSURED hereunder shall not exceed 100 percent of the INSURED's FLAT PREMIUM.

#### General Conditions

This Retrospective Premium Endorsement shall apply to each POLICY YEAR in which this POLICY is in force. Each POLICY YEAR shall be independent of all other POLICY YEARS.

A computation of the retrospective premium based upon the COMPANY's INCURRED LOSSES valued as of a date thirty-six months after the termination of the POLICY YEAR, or sooner if deemed necessary by the COMPANY shall be made by the COMPANY as soon as practicable after such valuation date.

Any additional premium owing shall be due and payable within 30 days after the INSURED is notified by the COMPANY that such additional premium is due. At the option of the INSURED the additional premium may be paid in three equal annual installments with an annual interest penalty to be added to unpaid balances. The interest rate shall be the prime interest rate plus 2 percent as determined by the COMPANY when payments are due.

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____ 8 _____ Effective Date of Endorsement _____ July 1, 1983 _____

Attached to and forming part of Policy Number _____ 022 NJ _____

Named Insured _____ San Diego Electric & Gas Company _____

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Condition (p) of the policy is hereby deleted in its entirety and replaced with the following:

### Cancellation Provision

(p)  CANCELLATION

This Policy may be cancelled on a pro-rata basis:

(1)  At any anniversary date of this Policy by the Named Insured by mailing written notice to the Company, or

(2)  At any time, other than the anniversary date of this Policy, by the Named Insured by mailing written notice to the Company stating when, not less than thirty (30) days from the date notice was mailed, cancellation shall be effective, or

(3)  At any time by the Company by mailing written notice to the Named Insured stating when, not less than ninety (90) days from the date notice was mailed, cancellation shall be effective. The mailing of notice at the address in this Policy shall be sufficient proof of notice and the insurance under this Policy shall end on the effective date and hour of cancellation stated in the notice. Delivery of such notice either by the Insured or by the Company shall be equivalent to mailing.

_Sandra A. Johnson_
Signature of Authorized Representative

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ____9____ Effective Date of Endorsement __July 1, 1983__

Attached to and forming part of Policy Number____022 NJ____

Named Insured ____San Diego Electric & Gas Company____

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

It is agreed that such coverage as is afforded by this policy for Property Damage shall apply also as respects any occurrence(s), damage(s), claim(s) or suit(s) brought about as a result of Forest Fire Fighting expense, Fire Suppression expense or cost of bringing any Forest Fire under control.

Such expense or cost shall not include salaries of employees of the Insured nor Property Damage to their equipment used in bringing such Forest Fire under control.

_Sandra A. Johnson_
Signature of Authorized Representative

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number __10_____Effective Date of Endorsement __July 1, 1983_____

Attached to and forming part of Policy Number_____022 NJ_____

Named Insured _____San Diego Gas & Electric Company_____

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Exclusion (c) is amended to read as follows:

(c) to liability of any INSURED for BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE caused intentionally by or at the direction of such INSURED, provided this exclusion shall not apply with respect to BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE occurring while safeguarding, preserving, protecting or defending person or property;

_Sandra A. Johnson_

**Signature of Authorized Representative**

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____11_____ Effective Date of Endorsement ___July 1, 1983___

Attached to and forming part of Policy Number_____022 N.I_____

Named Insured _____San Diego Gas & Electric Company_____

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

### Waiver of Right of Subrogation

It is agreed that the COMPANY shall have no right of recovery against any person with respect to an OCCURRENCE or WRONGFUL ACT to the extent that the INSURED has agreed with such person before the OCCURRENCE or WRONGFUL ACT (i) to waive its right of recovery against such person or (ii) to reimburse such person for the cost attributable to such person's liability for any OCCURRENCE or WRONGFUL ACT caused in whole or in part by such person.

_Sandra A. Johson_
Signature of Authorized Representative

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____ 13 _____ Effective Date of Endorsement _ July 1, 1983 _

Attached to and forming part of Policy Number _ 022 NJ _

Named Insured ___ San Diego Gas & Electric Company _

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Insuring Agreement III, Definition (b), "Bodily Injury," is amended to read as follows:

The term "BODILY INJURY" shall mean bodily injury, physical impairment, shock, disability, mental anguish, mental illness, emotional upset, outrage, sickness or disease sustained by any person which occurs during the POLICY PERIOD, including death at anytime resulting therefrom.

_Sandra A. Johnson_
**Signature of Authorized Representative**

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ____12____ Effective Date of Endorsement __July 1, 1983__

Attached to and forming part of Policy Number ___022NJ___

Named Insured ___San Diego Gas & Electric Company___

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Definition III (j), PERSONAL INJURY is hereby deleted and amended to read as follows:

(j) PERSONAL INJURY: The term "PERSONAL INJURY" shall mean injury (other than BODILY INJURY or PROPERTY DAMAGE) arising out of one or more of the following acts committed during the POLICY PERIOD:

1. false arrest, detention, imprisonment or malicious prosecution;

2. wrongful entry or eviction or other invasion of the right of private occupancy;

3. discrimination;

4. a publication or utterance

   (a) of a libel or slander or other defamatory or disparaging material; or

   (b) in violation of an individual's right of privacy;

5. piracy, plagiarism, unfair competition, idea misappropriation under implied contract, infringement of copyright, title or slogan arising out of the NAMED INSURED'S advertising activities.

*Sandra A. Johnson*

Signature of Authorized Representative

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____14_____ Effective Date of Endorsement ___July 1, 1983___

Attached to and forming part of Policy Number_____022 NJ_____

Named Insured ___San Diego Gas & Electric Company___

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Exclusion (a) is deleted as regards a dredge located at or near the ENCINA Power Plant.

It is agreed that sums paid by the Insured or by others on behalf of the Insured will be allowed in computing the deductible above which this insurance applies.

It is agreed that such insurance as is afforded by this policy shall not apply to San Anofre Nuclear Generating Stations, but only to the extent that such coverage is provided Under AEGIS' Policy No. 164A issued to Southern California Edison Company covering such project.

It is further agreed that the definition of Named Insured as respects Directors & Officers Liability is extended to include the following positions:

       Division Manager - Gas
       Director - Internal Auditing
       Division Manager - Customer Service Administrator
       Division Manager - Power Supply

_Sandra d. Johnson_
Signature of Authorized Representative

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number __15_____ Effective Date of Endorsement __July 1, 1983_____

Attached to and forming part of Policy Number ___022 NJ_____

Named Insured __San Diego Gas & Electric Company_____

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Item No. 4 of the policy Declarations, "Flat Premium" is amended to read as follows:

329,365      for the period      July 1, 1983   to   January 1, 1984

This premium represents the pro-rata portion of a flat one year premium of 653,500      which has been promulgated by the company in accordance with its current rules and rating procedures.

It is further agreed that the anniversary date of this policy shall be January 1, 1984      and each consecutive period of one year thereafter.

_Sandra d. Johnson_
**Signature of Authorized Representative**

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____ 16 _____ Effective Date of Endorsement _January 1, 1984_

Attached to and forming part of Policy Number _____ 022 NJ _____

Named Insured _____ San Diego Gas & Electric Company _____

    It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

    This policy is cancelled effective 12:01 A.M. January 1, 1984.

_Sandra A. Johnson_

**Signature of Authorized Representative**

12/29/83  111

5604 (AEGIS) 11-81

BILLING LIST TO GIVE TO

**MIKE**

Douglas Bagby
Gibson Rivera & Toms
Gordon & Rees
LeClairRyan
Littler Mendelson
Milstein Adelman
Nagelberg
Ryan Law Firm
Robinson Di Lando
Stone Busailah
Thompson Vella

**EMIR**

DLA Piper
Dickstein Shapiro
Kulik Gottesman
Latham Watkins
Monteleon McCrory
Squire Patton

# EXHIBIT E



**ÆGIS INSURANCE SERVICES, INC.**

*EXPIRED  11-84 TO 12-1-85*

DIRECT LINE: *(201) 451-8228*

Date of Mailing: _August 30, 1985_

Mr. Craig Hubble, Risk Manager
San Diego Gas & Electric Company
P. O. Box 1831
San Diego, California 92112

Re:   Excess Liability Insurance
       Policy Number _022 ANJ_
       _Associated Electric & Gas Insurance Services Limited_

Gentlemen:

In accordance with Condition (p)—Cancellation of the captioned policy, you are hereby notified that such policy is cancelled effective as of _December 1, 1985_ at 12:01 AM Standard Time at the address of the Named Insured.

By: _Sandra A. Johnson_

Title: _Assistant Secretary_

SAJ:lll




# EXCESS LIABILITY INSURANCE POLICY



**ÆGIS**
ASSOCIATED ELECTRIC & GAS
INSURANCE SERVICES LIMITED

**HAMILTON, BERMUDA**

POLICY NUMBER 022 ANJ

DECLARATIONS NO. 1

## DECLARATIONS

**ITEM NO. 1**  NAMED INSURED    San Diego Gas & Electric Company
San Diego, California  92112

**ITEM NO. 2**  POLICY PERIOD from the  1st  day of  January  19 84  until cancelled both days at 12:01 A.M. Standard Time at the address of the NAMED INSURED.

**ITEM NO. 3**  PREMIUM PERIOD from the  1st  day of  January  19 84  until the  1st  day of  January  19 85 , both days at 12:01 A.M. Standard Time at the address of the NAMED INSURED.

**ITEM NO. 4**  FLAT PREMIUM $ 729,400    for the PREMIUM PERIOD.

**ITEM NO. 5**  LIMIT OF LIABILITY $ 25,000,000    any one OCCURRENCE with respect to Insuring Agreement I (a) or any one claim with respect to Insuring Agreements I (b) and I (c).

**ITEM NO. 6**  UNDERLYING LIMITS
$ 250,000    each OCCURRENCE with respect to Insuring Agreement I (a) or each claim with respect to Insuring Agreements I (b) and I (c) not covered by underlying insurance nor self-insured retention shown in UNDERLYING LIMITS SCHEDULE.

In the event of any loss(es) arising from any single OCCURRENCE with respect to Insuring Agreement I (a) or any claim(s) arising from any WRONGFUL ACT with respect to Insuring Agreements I (b) and I (c) which involve(s) two or more UNDERLYING LIMITS, the UNDERLYING LIMITS shall apply           .in combination).

*Sandra A. Johnson*
Signature of Authorized Representative

PO-1 (12/83)

# EXCESS LIABILITY INSURANCE POLICY



**ÆGIS**

ASSOCIATED ELECTRIC & GAS
INSURANCE SERVICES LIMITED

**HAMILTON, BERMUDA**

**POLICY NUMBER** *022 ANJ*

**DECLARATIONS NO.** *2*

## DECLARATIONS

**ITEM NO. 1**   NAMED INSURED   *San Diego Gas & Electric Company*
*San Diego, California  92112*

**ITEM NO. 2**   POLICY PERIOD from the *1st* day of *December* 19 *84* until cancelled both days at 12:01 A.M. Standard Time at the address of the NAMED INSURED.

**ITEM NO. 3**   PREMIUM PERIOD from the *1st* day of *December* 19*84* until the *1st* day of *December* 19 *85*, both days at 12:01 A.M. Standard Time at the address of the NAMED INSURED.

**ITEM NO. 4**   FLAT PREMIUM $               for the PREMIUM PERIOD.

**ITEM NO. 5**   LIMIT OF LIABILITY $ *25,000,000*           any one OCCURRENCE with respect to Insuring Agreement I (a) or any one claim with respect to Insuring Agreements I (b) and I (c).

**ITEM NO. 6**   UNDERLYING LIMITS
$               each OCCURRENCE with respect to Insuring Agreement I (a) or each claim with respect to Insuring Agreements I (b) and I (c) not covered by underlying insurance nor self-insured retention shown in UNDERLYING LIMITS SCHEDULE.

In the event of any loss(es) arising from any single OCCURRENCE with respect to Insuring Agreement I (a) or any claim(s) arising from any WRONGFUL ACT with respect to Insuring Agreements I (b) and I (c) which involve(s) two or more UNDERLYING LIMITS, the UNDERLYING LIMITS shall apply         in combination .

**ITEM NO. 7**   This Declarations No. *2*        replaces Declarations No. *1*        effective *December 1,* 19*84* at 12:01 A.M. Standard Time at the address of the NAMED INSURED.

*Sandra A. Johnson*
Signature of Authorized Representative

PD-2 (12/83)

**ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED**

UNDERLYING LIMITS SCHEDULE NO. 1

Replacing Underlying Limits Schedule No.

This schedule is attached to and forms a part of ITEM NO. 6 of the Declarations of POLICY Number 022 ANJ   and lists all underlying insurance or self-insured retentions maintained by the NAMED INSURED effective   January 1,      19 84   at 12:01 A.M. Standard time at the address of the NAMED INSURED.

Insured or Uninsured

$    250,000   any one occurrence -- General Liability, Automobile Liability, Workers' Compensation, Employers' Liability, Employers' Liability for Occupational Disease, U. S. Longshoremen's and Harbor Worker's Act and Jones Act.

$      1,000   any one wrongful act -- Fiduciary Liability

$40,000,000   any one wrongful act -- Directors & Officers Liability

_Sandra A. Olson_
Signature of Authorized Representative

_December 29, 1983_
Dated

8101 (12/83)

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

UNDERLYING LIMITS SCHEDULE NO. 2

Replacing Underlying Limits Schedule No. 1

This schedule is attached to and forms a part of ITEM NO. 6 of the Declarations of POLICY Number 022 ANU and lists all underlying insurance or self-insured retentions maintained by the NAMED INSURED effective     January 1,     19 84     at 12:01 A.M. Standard time at the address of the NAMED INSURED.

*Insured or Uninsured*

$   250,000   *any one occurrence — General Liability, Automobile Liability, Workers' Compensation,*
              *Employers' Liability, Employers' Liability for Occupational Disease, U. S. Longshoremen's*
              *and Harbor Worker's Act and Jones Act.*

$     1,000   *any one wrongful act — Insuring Agreement I (b)*

$40,000,000   *any one wrongful act — Directors & Officers Liability*

*Sandra A. Johnson*
Signature of Authorized Representative

*August 28, 1984*
Dated

8101 (12/83)

**POLICY OF EXCESS LIABILITY INSURANCE**
**EFFECTED WITH**
**ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED**
**HAMILTON, BERMUDA**
**(hereinafter called the COMPANY)**

I.   **INSURING AGREEMENTS**

This POLICY is to indemnify:

(a)   The INSURED for any and all sums which the INSURED shall become legally obligated to pay as ULTIMATE NET LOSS by reason of the liability imposed upon the INSURED by law or liability assumed by the INSURED under CONTRACT, including the INSURED'S proportionate share of any liability arising in any manner whatsoever out of the operations or existence of any JOINT VENTURE in which the INSURED has an interest, for damages because of BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE caused by an OCCURRENCE;

(b)   The INSURED for any and all sums which the INSURED shall become legally obligated to pay as ULTIMATE NET LOSS arising from any claim or claims first made against the INSURED during the POLICY PERIOD by reason of (1) any WRONGFUL ACT in the ADMINISTRATION of the NAMED INSURED'S EMPLOYEE BENEFIT PROGRAMS caused by the INSURED or any other person for whose acts the INSURED is legally liable; or (2) any BREACH OF FIDUCIARY DUTY caused by the INSURED's activity as a fiduciary of any of the NAMED INSURED's EMPLOYEE BENEFIT PROGRAMS;

(c)   (1) The INSURED for any and all sums which the INSURED shall become legally obligated to pay as ULTIMATE NET LOSS arising from any claim or claims first made against the INSURED during the POLICY PERIOD and for which the NAMED INSURED has not provided reimbursement, by reason of any WRONGFUL ACT caused by the INSUREDS while acting in the capacity of Directors or Officers of the NAMED INSURED or of another corporation or organization for which they are serving or have served at the request of the NAMED INSURED as Directors or Officers;

(2) The NAMED INSURED for any and all sums required to reimburse it for ULTIMATE NET LOSS it has incurred in indemnifying Directors or Officers for damages, judgments, settlements, and costs, charges and expenses, incurred by them and arising from any claim or claims first made against them during the POLICY PERIOD by reason of any WRONGFUL ACT caused by them while acting in their capacity as Directors or Officers, where said indemnity may be required or permitted according to applicable law, common or statutory, or under provisions of the NAMED INSURED's Charter or By Laws effective pursuant to law.

II.   **LIMIT OF LIABILITY**

(a)   THE COMPANY shall only be liable hereunder for the amount of ULTIMATE NET LOSS in excess of UNDERLYING LIMITS as stated in Item 6 of the Declarations as a result of any OCCURRENCE covered under Insuring Agreement I (a) and then only up to the amount stated in Item 5 of the Declarations. Furthermore, with respect to JOINT VENTURES in which the INSURED has an interest and which involve more than one insured of the COMPANY, the liability of the COMPANY shall be limited to the product of

(1)   the percentage interest of the INSURED in the said JOINT VENTURE divided by the percentage interest of the INSURED plus the percentage interest of all

1

insureds of the COMPANY in the said JOINT VENTURE and

(2)   the total limit of liability insurance afforded by this POLICY.

The said percentage interest to be applied shall be that which would be imposed by law.

It is further understood and agreed that, where any underlying insurance(s) have been reduced by a clause having the same effect as this section (a), the liability of the COMPANY under this POLICY, as limited by this section (a), shall be excess of the sum of

(1)   such reduced limits of any underlying insurance(s) and

(2)   the limits of any underlying insurance(s) not reduced.

(b)   With respect to any OCCURRENCE covered under Insuring Agreement I (a), in order to avoid the duplication of the Company's Limit of Liability applying to any one OCCURRENCE, the INSURED agrees that:

   (1)   in the event the COMPANY provides indemnity or defense costs, charges and expenses for an OCCURRENCE covered during a PREMIUM PERIOD of this POLICY, the INSURED acknowledges it has no right to additional indemnity or defense costs, charges and expenses for such OCCURRENCE under any other PREMIUM PERIOD of this POLICY or any other POLICY issued by the COMPANY to the NAMED INSURED, and the Limit of Liability shall apply only once to such OCCURRENCE regardless of the number of other PREMIUM PERIODS or POLICIES which otherwise could apply to such OCCURRENCE.

   (2)   in the event the COMPANY shall provide indemnity or defense costs, charges and expenses for an OCCURRENCE covered during a PREMIUM PERIOD of any other POLICY issued by this COMPANY to the NAMED INSURED, the INSURED acknowledges it has no right to additional indemnity or defense costs, charges and expenses for such OCCURRENCE under this POLICY.

(c)   With respect to any OCCURRENCE covered under Insuring Agreement I (a), in no event shall this POLICY be called upon to pay the first $100,000 or the amount stated in Item 6 of the Declarations, whichever is greater, of any ULTIMATE NET LOSS covered hereunder, except in the event of the reduction or exhaustion of any applicable underlying aggregate limit by reason of losses paid thereunder. Furthermore, this POLICY shall

   (1)   in the event of the reduction of an applicable underlying aggregate limit, pay the excess of the reduced UNDERLYING LIMIT;

   (2)   in the event of the exhaustion of an applicable underlying aggregate limit, continue in force as underlying insurance.

(d)   Except with respect to "Defense Costs, Charges and Legal Expenses", as described in Condition (b), the COMPANY shall only be liable hereunder for the amount of ULTIMATE NET LOSS in excess of UNDERLYING LIMITS as stated in Item 6 of the Declarations as a result of any one claim covered under Insuring Agreements I (b) or I (c) and then only up to the amount stated in Item 5 of the Declarations. Furthermore, with respect to Insuring Agreements I (b) and I (c), claims arising out of the same WRONGFUL ACT or interrelated WRONGFUL ACTS of one or more INSUREDS shall be considered a single claim and only one UNDERLYING LIMIT shall be deducted from the aggregate amount of ULTIMATE NET LOSS arising from such claim. The Limit of Liability and the UNDERLYING LIMIT applicable to the ULTIMATE NET LOSS arising from such claim shall be that of the PREMIUM PERIOD during which the first claim was made.

2

(e) In the event of any claim(s) arising from any single OCCURRENCE or WRONGFUL ACT which involve(s) two or more UNDERLYING LIMITS, the following provision shall apply:

(1) if Item 6 of the Declarations designates a "Combined UNDERLYING LIMIT", then the UNDERLYING LIMIT shall be determined as follows:

(i) if no underlying insurance(s) is (are) valid and collectible then the total of all applicable UNDERLYING LIMITS shall not exceed the largest single applicable UNDERLYING LIMIT;

(ii) if underlying insurance(s) is (are) valid and collectible, then the total of all applicable UNDERLYING LIMITS shall not exceed the sum of the applicable underlying insured limit(s) and the single largest applicable self-insured retention or uninsured limit;

(2) if Item 6 of the Declarations designates "Separate UNDERLYING LIMITS", then each applicable UNDERLYING LIMIT shall be applied separately without limitation.

(f) The inclusion herein of more than one INSURED shall not operate to increase the limit of the COMPANY's liability as stated in Item 5 of the Declarations.

## III. DEFINITIONS

(a) ADMINISTRATION: The term "ADMINISTRATION" includes, but not by way of limitation:

(1) the giving of counsel with respect to the EMPLOYEE BENEFIT PROGRAMS:

(2) the interpreting of the EMPLOYEE BENEFIT PROGRAMS;

(3) the handling of records in connection with the EMPLOYEE BENEFIT PROGRAMS; and

(4) the effecting of enrollment, termination or cancellation of employees under the EMPLOYEE BENEFIT PROGRAMS;

so long as all such acts are authorized by the NAMED INSURED.

(b) BODILY INJURY: The term "BODILY INJURY" shall mean bodily injury, mental anguish, mental illness, emotional upset, sickness or disease sustained by any person which occurs during the POLICY PERIOD, including death at any time resulting therefrom.

(c) BREACH OF FIDUCIARY DUTY: "BREACH OF FIDUCIARY DUTY" is a WRONGFUL ACT which is the violation of any responsibility, obligation or duty imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 or amendments thereto or the common or statutory law of the United States of America or any State or other jurisdiction therein with respect to any of the NAMED INSURED's EMPLOYEE BENEFIT PROGRAM(S).

(d) CONTRACT: The term "CONTRACT" shall mean an agreement to assume liability for BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE which occurs subsequent to the making of the agreement.

(e) EMPLOYEE BENEFIT PROGRAMS: The term "EMPLOYEE BENEFIT PROGRAMS" shall mean group life insurance, group accident or health insurance, pension plans, employee stock subscription plans, worker's compensation, unemployment insurance, social security, disability benefits and any other employee benefit programs.

3

(f)   INSURED: Each of the following is an "INSURED" under this POLICY to the extent set forth below:

(1)   with respect to Insuring Agreement I (a) only:

(i)   the NAMED INSURED;

(ii)   any other person or organization to such extent and for such Limits of Liability as the NAMED INSURED has agreed before loss to provide insurance for such interests except that with respect to JOINT VENTURES such other persons or organizations shall be limited to parties to agreements in which the NAMED IN-SURED is the operator or managing partner;

(iii)   officers, directors, stockholders and employees of the NAMED INSURED while acting within the scope of their duties as such;

(iv)   if the NAMED INSURED is a partnership, the partnership and any partner thereof but only with respect to the partner's liability as such;

(v)   any other person while using an automobile owned, non-owned or hired by the NAMED INSURED with the permission of the NAMED INSURED provided the use thereof is within the scope of the permission granted;

(vi)   officers and employees of the NAMED INSURED while using a personally owned automobile, whether for business or personal use, if such personally owned automobile has been acquired primarily for business use by such officers and employees, or with their permission, provided the use thereof is within the scope of the permission granted; and further provided, the NAMED INSURED has, prior to loss, agreed in writing with such officers and employees to provide such insurance;

(2)   with respect to Insuring Agreement I (b) only:

(i)   the EMPLOYEE BENEFIT PROGRAMS of the NAMED INSURED;

(ii)   any officer, director or employee or any other person for whose acts the NAMED INSURED is legally liable who, pursuant to the Employee Retirement Income Security Act of 1974 or amendments thereto, is a past, present or future fiduciary of any EMPLOYEE BENEFIT PROGRAM(S) of the NAMED INSURED and in addition, the estates, heirs or legal representatives of any such individual who is deceased or incompetent;

(3)   with respect to Insuring Agreement I (c) only:

(i)   any person who was, now is, or shall be a Director or an Officer or any other employee of the NAMED INSURED who may be acting in the capacity of a Director or an Officer within the expressed authorization of a Director or an Officer of the NAMED INSURED;

(ii)   the estates, heirs, legal representatives or assigns of deceased persons who were Directors or Officers of the NAMED INSURED at the time the acts upon which such claims were based were committed, and the legal representatives or assigns of Directors or Officers in the event of their incompetency, insolvency or bankruptcy.

4

(g)  JOINT VENTURE: The term "JOINT VENTURE" includes, but not by way of limitation, any joint venture, co-venture, joint lease, joint operating agreement or partnership.

(h)  NAMED INSURED: The term "NAMED INSURED" shall mean the person(s) or organization(s) named in Item 1 of the Declarations and any subsidiary company in line of corporate descent from such organization(s).

(i)  OCCURRENCE: The term "OCCURRENCE" shall mean an accident, event or continuous or repeated exposure to conditions which result in BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE, subject to the following clarifications:

(1)  all injury, damage or loss of use and all claims for injury, damage or loss of use arising out of the same accident, the same event or exposure to substantially the same general conditions shall be considered as arising out of and comprising a single OCCURRENCE;

(2)  each OCCURRENCE shall be deemed to occur during the PREMIUM PERIOD in which BODILY INJURY, PROPERTY DAMAGE or an act causing PERSONAL INJURY takes place and not during any other PREMIUM PERIOD of this POLICY or any other POLICY issued by the COMPANY to the NAMED INSURED;

(3)  if an act, injury or damage takes place during more than one PREMIUM PERIOD of this POLICY or any other POLICY issued by the COMPANY to the NAMED INSURED, the act, injury or damage shall be deemed to have occurred during the earliest of the following PREMIUM PERIODS:

(a)  the PREMIUM PERIOD when a claim is first made against the INSURED; or

(b)  the PREMIUM PERIOD when the INSURED first receives notice that an OCCURRENCE has taken place; or

(c)  the last PREMIUM PERIOD of the last POLICY issued by the COMPANY to the NAMED INSURED;

(4)  an OCCURRENCE shall not include a WRONGFUL ACT which is covered under Insuring Agreements I (b) and I (c).

(j)  PERSONAL INJURY: The term "PERSONAL INJURY" shall mean any injury (other than BODILY INJURY or PROPERTY DAMAGE) arising out of one or more of the following acts committed during the POLICY PERIOD:

(1)  false or wrongful arrest, detention or imprisonment or malicious prosecution;

(2)  wrongful entry or eviction or other invasion of the right of private occupancy;

(3)  discrimination or sexual harassment;

(4)  a publication or utterance

(a)  of a libel or slander or other defamatory or disparaging material; or

(b)  in violation of an individual's right of privacy;

(5)  piracy, plagiarism, unfair competition, idea misappropriation under implied contract, infringement of copyright, title or slogan arising out of the NAMED INSURED's advertising activities.

5

(k) POLICY PERIOD: The term "POLICY PERIOD" shall mean the duration of time stated in Item 2 of the Declarations.

(l) PREMIUM PERIOD: The term "PREMIUM PERIOD" shall mean the duration of time stated in Item 3 of the Declarations.

(m) PROPERTY DAMAGE: The term "PROPERTY DAMAGE" shall mean

    (1) physical injury to or destruction of tangible property which occurs during the POLICY PERIOD, including the loss of use thereof at any time resulting therefrom; or

    (2) loss of use at any time of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an accident or an event or continuous or repeated exposure to conditions during the POLICY PERIOD.

(n) ULTIMATE NET LOSS: The term "ULTIMATE NET LOSS" shall mean the total of the following sums with respect to each OCCURRENCE or WRONGFUL ACT to which this POLICY applies;

    (1) all sums which the INSURED shall become legally obligated to pay as damages either by adjudication or compromise with the consent of the COMPANY, after making proper deductions for all recoveries and salvages collectible and for other insurance that is in excess of the UNDERLYING LIMITS; and

    (2) all expenses incurred by the INSURED in the investigation, negotiation, settlement and defense of any claim or suit seeking such damages, excluding all salaries of employees and office expense of the INSURED.

However, the COMPANY shall not be liable for expenses as aforesaid when such expenses are included in other valid and collectible insurance, except where that insurance is subject to at least 100 percent reimbursement by the INSURED.

(o) UNDERLYING LIMIT: The term "UNDERLYING LIMIT" shall mean

    (1) any insured limit; or

    (2) any uninsured limit; or

    (3) any self-insured retention including any insured limit which is subject to at least 100 percent reimbursement by the INSURED.

(p) WRONGFUL ACT: The term "WRONGFUL ACT" includes, but not by way of limitation, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or attempted or allegedly done or attempted by the INSURED.

IV. POLICY TERRITORY

This POLICY applies to OCCURRENCES or WRONGFUL ACTS which take place anywhere.

EXCLUSIONS

This POLICY shall not apply:

(a) to liability arising out of the ownership, maintenance, operations, use, loading or unloading of any owned watercraft in excess of 75 feet in length;

(b)   to liability arising out of the ownership, maintenance, operation, use, loading or unloading of any owned aircraft;

(c)   to liability of any INSURED for BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE caused intentionally by or at the direction of such INSURED, provided this exclusion shall not apply with respect to BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE occurring while safeguarding, preserving, protecting or defending person or property;

(d)   to PROPERTY DAMAGE to:

    (1)   property owned or occupied by or rented to the INSURED; or

    (2)   property used by the INSURED; or

    (3)   property in the care, custody or control of the INSURED as to which the INSURED is for any purpose exercising physical control; but parts 2 and 3 of this exclusion do not apply with respect to liability under a written sidetrack agreement and part 3 of this exclusion does not apply with respect to PROPERTY DAMAGE (other than to elevators) arising out of the use of an elevator at premises owned by, rented to or controlled by the NAMED INSURED;

(e)   to liability resulting from the failure of the INSURED's products (for the purpose of this exclusion, electricity, steam and gas are not considered products) or work completed by or for the INSURED to perform the function or serve the purpose intended by the INSURED, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any INSURED; but this exclusion does not apply to liability resulting from the active malfunctioning of such product or work;

(f)   to any expense incurred by the INSURED in regaining control of any well in which the INSURED has an ownership and/or operating interest and/or contractual responsibility; however, this exclusion shall not apply to the expense to regain control of a well, the property of others, for which the INSURED may become liable arising out of an OCCURRENCE;

(g)   to the cost of removal of debris or wreck in which the INSURED has, or had prior to loss, an ownership and/or operating interest and/or contractual responsibility; however, this exclusion shall not apply to the cost of removal of any debris or wreck the property of others, for which the INSURED may become liable arising out of an OCCURRENCE;

(h)   to any obligation for which the INSURED, or any carrier as his insurer, may be held liable under any worker's compensation, occupational disease, unemployment compensation or disability benefits law, or under any other similar law, including United States Longshoremen's and Harbor Worker's Act, Federal Employers' Liability Act or the Jones Act; or any employers' liability for BODILY INJURY to any employee of the INSURED arising out of or in the course of his employment by the INSURED;

(j)   with respect to Insuring Agreements I (b) and I (c):

    (1)   to any loss arising from any claim brought about or contributed to by the dishonest, fraudulent, criminal or malicious act or omission of the INSURED or his predecessors in business or any person at any time employed by the INSURED or his predecessors in business if a judgment or other final adjudication establishes that acts of active and deliberate dishonesty were committed or attempted with actual dishonest purpose and intent and were material to the cause of action so adjudicated;

7

(2) to any claim arising from a WRONGFUL ACT which occurred prior to the POLICY PERIOD unless:

(a) the claim is first made against the INSURED during the POLICY PERIOD; and

(b) the INSURED at the effective date of the POLICY PERIOD had no knowledge of the WRONGFUL ACT or could not reasonably foresee any circumstances which might result in a claim; and

(c) there is no other insurance applicable to such WRONGFUL ACT;

(j) with respect to Insuring Agreement I (b):

(1) to any claim for failure of performance of contract by any insurer;

(2) to any claim based upon failure of stock to produce financial gain as represented by the INSURED or any employee thereof;

(3) to any loss arising from any claim or claims made against the INSURED with respect to any INSURED adjudged to have participated in, or to have had knowledge of and have failed to take appropriate action with respect to any BREACH OF FIDUCIARY DUTY, knowing such in either case to have been a violation of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security act of 1974 or amendments thereto. This exclusion shall not exclude coverage for any INSURED in any Civil suit or proceeding merely because such suit is or could have been based upon an allegation of knowledgeable participation in, or inaction with respect to, any BREACH OF FIDUCIARY DUTY as is described in this exclusion;

(k) with respect to Insuring Agreement I(c) only, to any loss arising from any claim made against Directors and Officers:

(1) based upon or attributable to their gaining in fact of any personal profit or advantage to which they were not legally entitled;

(2) for the return by them of any remuneration paid to them without the previous approval of the stockholders of the NAMED INSURED which payment without such previous approval shall be held by the Courts to have been illegal;

(3) for an accounting of profits made from the purchase or sale by them of securities of the NAMED INSURED within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law or common law;

NOTE:

The act or omission of any Director and/or Officer shall not be imputed to any other Director and/or Officer for the purpose of determining the applicability of the Exclusions enumerated herein.

(l) NUCLEAR ENERGY LIABILITY EXCLUSION (BROAD FORM)

It is agreed that the POLICY does not apply:

I. Under any Liability Coverage, to BODILY INJURY or PROPERTY DAMAGE

(a) with respect to which an INSURED under this POLICY is also an Insured under a

8

nuclear energy liability policy issued by American Nuclear Insurers, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b) resulting from "hazardous properties" of "nuclear material" and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the INSURED is, or had this POLICY not been issued would be, entitled to indemnity from the United States of America , or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization;

II. Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to immediate medical or surgical relief, to expenses incurred with respect to BODILY INJURY resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization;

III. Under any Liability Coverage to BODILY INJURY or PROPERTY DAMAGE resulting from the "hazardous properties" of "nuclear material", if

(a) the "nuclear material" (1) is at any "nuclear facility" owned by, or operated by or on behalf of an INSURED or (2) has been discharged or dispersed therefrom;

(b) the "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, sorted, transported or disposed of by or on behalf of an INSURED; or

(c) the BODILY INJURY or PROPERTY DAMAGE arises out of the furnishing by an INSURED of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to PROPERTY DAMAGE to such "nuclear facility" and any property thereat;

IV. As used in this exclusion (I):

"hazardous properties" include radioactive, toxic or explosive material;

"nuclear material" means "source material", "special nuclear material" or "by-product material";

"source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

"waste" means any waste material (1) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uraniun or thorium from any ore processed primarily for its source material content, and (2) resulting from the operation by any person or organization of any "nuclear facility" included within the definition of "nuclear facility" under paragraph (a) and (b) thereof;

"nuclear facility" means

a) any nuclear reactor;

9

(b)   any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing fuel, or (3) handling, processing or packing "waste";

(c)   any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the INSURED at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 235;

(d)   any structure basin, excavation, premise or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fusion in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"PROPERTY DAMAGE" includes all forms of radioactive contamination of property.

## CONDITIONS

(a)   <u>CROSS LIABILITY</u>

The Company agrees that, in the event of a claim for damages for BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE being made by any INSURED hereunder against any other INSUREDS hereunder, this POLICY shall cover such other INSUREDS against whom claim is made, in the same manner as if separate policies had been issued to each INSURED; provided, however, that employees of one INSURED shall not be construed as employees of any other INSURED, unless at the time of injury or death, there exists a relationship of master/servant between the employees and such other INSURED.

Nothing contained in the foregoing nor in any subsequent endorsement either naming additional INSUREDS or adding more than one entity as a NAMED INSURED shall have the effect of increasing the COMPANY's Limit of Liability in respect to each OCCURRENCE or WRONGFUL ACT beyond that stated in Item 5 of the Declarations.

(b)   <u>DEFENSE COSTS, CHARGES & LEGAL EXPENSES</u>

This POLICY shall indemnify the INSURED for any and all payments made by or on behalf of the INSURED, without deducting UNDERLYING LIMITS, for expenses incurred in the investigation, negotiation, settlement and defense or any claim or suit seeking damages which are payable under the terms of Insuring Agreements I(b) and I(c) even if the allegations of the claim or suit are groundless, false or fraudulent, provided the COMPANY shall not be liable for payments made as salary to employees of the INSURED. It is understood and agreed that any and all such payments shall be included within the Limit of Liability stated in Item 5 of the Declarations.

(c)   <u>NOTICE OF OCCURRENCE or WRONGFUL ACT</u>

(1)   With respect to Insuring Agreement I (a):

Upon the happening of an OCCURRENCE that appears likely to involve liability on the part of the COMPANY, written notice shall be given by or on behalf of the INSURED to the COMPANY as soon as practicable.

The INSURED shall give notice with full particulars, of any claim made on account of such OCCURRENCE. If thereafter suit or other proceeding is instituted against the INSURED to enforce such claim, the INSURED shall, upon request, forward to the COMPANY every demand, notice, summons or other process or true copies thereof, received by the INSURED or the INSURED's representative, together with a summary of factual data with respect to such claim, suit or other proceeding.

Failure to notify the COMPANY shall not prejudice the INSURED's right hereunder, if the INSURED in the exercise of reasonable judgment, shall be of the opinion that liability appears unlikely to exceed the UNDERLYING LIMITS in any one OCCURRENCE.

(2)  With respect to Insuring Agreements I (b) and I (c):

The INSURED shall, as a condition precedent to his rights under this POLICY, give to the COMPANY notice as soon as practicable in writing of any claim made.

If the INSURED shall become aware of any circumstances which may subsequently give rise to a claim being made against the INSURED and shall, during the POLICY PERIOD or during the DISCOVERY PERIOD, give written notice to the COMPANY of same, then such notice shall be treated as a claim made within the POLICY PERIOD.

(d)  COOPERATION AND SETTLEMENTS

In the event of an OCCURRENCE or WRONGFUL ACT which may involve this POLICY, the NAMED INSURED may, without prejudice as to liability, proceed immediately with set-tlements which in their aggregate do not exceed the UNDERLYING LIMITS. The NAMED INSURED shall advise the representatives of the COMPANY of any such settlements made.

The COMPANY shall not be called upon to assume charge of the settlement or defense of any claim, suit or proceeding, but the COMPANY shall have the right and shall be given the opportunity to associate with the INSURED or the INSURED's underlying insurer, or both, in the defense and control of any claim, suit or proceeding relative to an OCCUR-RENCE or WRONGFUL ACT where the claim, suit or proceeding involves or may involve the COMPANY. At all times, the INSURED and the COMPANY shall cooperate in the defense of such claim, suit or proceeding.

(e)  APPEALS

In the event that the INSURED elects not to appeal a judgment in excess of the UNDERLY-ING LIMITS, the COMPANY may elect to conduct such appeal at its own cost and expense and shall be liable for the taxable court costs and interest incidental thereto, but in no event shall the total liability of the COMPANY exceed its Limit of Liability as provided for herein, plus the expense of such appeal.

(f)  BANKRUPTCY OR INSOLVENCY

Bankruptcy or insolvency of the INSURED shall not relieve the COMPANY of any of its obligations hereunder.

(g)  OTHER INSURANCE

If other valid and collectible insurance with any other insurer is available to the INSURED covering a loss also covered by this POLICY, other than insurance that is in excess of the insurance afforded by this POLICY, the insurance afforded by this POLICY shall be in excess of and shall not contribute with such other insurance. Nothing herein shall be construed

to make this POLICY subject to the terms, conditions and limitations of other insurance.

(h)  **INSPECTION AND AUDIT**

The COMPANY shall be permitted but not obligated to inspect the NAMED INSURED's property and operations at any time. Neither the COMPANY's right to make inspections nor the making thereof nor any report thereof shall constitute an undertaking, on behalf of or for the benefit of the NAMED INSURED or others to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

The COMPANY may examine and audit the NAMED INSURED's books and records at any time during the POLICY PERIOD and extensions thereof and within three years after the final termination of this POLICY, as far as such books and records relate to the subject matter of this insurance.

(i)  **SUBROGATION**

(1)  The Company shall have no right of recovery against any person with respect to an OCCURRENCE or WRONGFUL ACT to the extent that the INSURED has agreed with such person before the OCCURRENCE or WRONGFUL ACT to:

(a)  waive its right of recovery against such person, or

(b)  reimburse such person for the cost attributable to such person's liability for any OCCURRENCE or WRONGFUL ACT caused in whole or in part by such person.

(2)  With respect to Insuring Agreement I (a)

Inasmuch as this POLICY is "Excess Coverage", the INSURED's right of recovery against any person or other entity cannot be exclusively subrogated to the COMPANY. It is, therefore, understood and agreed that in case of any payment hereunder, the COMPANY will act in concert with all other interests (including the INSURED) concerned, in the exercise of such rights of recovery. The apportioning of any amount which may be so recovered shall follow the principle that any interests (including the INSURED) that shall have paid an amount over and above any payment hereunder, shall first be reimbursed up to the amount paid by them; the COMPANY is then to be reimbursed out of any balance then remaining up to the amount paid hereunder; lastly, the interests (including the INSURED) of whom this coverage is in excess are entitled to claim the residue, if any. Expenses necessary to the recovery of any such amounts shall be apportioned between the interests (including the INSURED) concerned, in the ratio of their respective recoveries as finally settled.

(3)  With respect to Insuring Agreements I (b) and I (c):

In the event of any payment under this POLICY, the COMPANY shall be subrogated to the extent of such payment to all the INSURED's rights of recovery thereof, and the INSURED shall execute all papers required and shall do everything that may be necessary to enable the COMPANY effectively to bring suit in the name of the INSURED, provided, however, with respect to Insuring Agreement (I) (b), that no subrogation shall be had against any INSURED unless such INSURED is excluded from coverage by reason of the exclusions hereunder.

(j)  **CHANGES**

The terms of this POLICY shall not be waived or changed unless such waiver or changes have been submitted to the COMPANY and its written approval obtained.

(k) MAINTENANCE OF UNDERLYING LIMITS

It is a condition of this POLICY that the policy or policies referred to in Item 6 of the Declarations shall be maintained in full effect during the currency of this POLICY. Failure of the NAMED INSURED to comply with the foregoing shall not invalidate this POLICY but in the event of such failure, without notification to the COMPANY, the COMPANY shall only be liable to the same extent as it would have been had the NAMED INSURED complied with this condition.

(l) DISCOVERY PERIOD

With respect to Insuring Agreements I (b) and I (c):

In the event of cancellation of this POLICY, the NAMED INSURED shall have the right, upon payment of an additional premium to be determined at the time of cancellation, to an extension of the coverage granted by this POLICY in respect to any claim or claims first made against an INSURED during the period of twelve (12) months after the effective date of such cancellation but only in respect to any WRONGFUL ACT covered by this POLICY committed before the effective date of cancellation. This right of extension shall terminate unless written notice of such election is received by the COMPANY within thirty (30) days after the effective date of cancellation.

(m) ASSIGNMENT

No assignment of interest under this POLICY shall bind the COMPANY until consent is endorsed hereon.

(n) CURRENCY
Premium and claims hereunder are payable in United States Dollars.

(o) SOLE AGENT

The NAMED INSURED first named in Item No. 1 of the Declarations shall be deemed the sole agent of each INSURED hereunder for the purpose of issuing instructions for any alteration of this POLICY, making premium payments and adjustments, receipting for payments of claims or receiving notices including notice of cancellation from the COMPANY.

(p) CANCELLATION

This POLICY may be cancelled on a pro rata basis:

(1)   at any anniversary date of this POLICY by the NAMED INSURED by mailing written notice to the COMPANY, or

(2)   At any time, other than the anniversary date of this POLICY, by the NAMED INSURED by mailing written notice to the COMPANY stating when, not less than thirty (30) days from the date notice was mailed, cancellation shall be effective, or

(3)   At any time by the COMPANY by mailing written notice to the NAMED INSURED stating when, not less than ninety (90) days from the date notice was mailed, cancellation shall be effective.

The mailing of notice at the address in this POLICY shall be sufficient proof of notice and the insurance under this POLICY shall end on the effective date and hour of cancellation stated in the notice. Delivery of such notice either by the NAMED INSURED or by the COMPANY shall be equivalent to mailing.

13

(q) <u>SERVICE OF SUIT CLAUSE</u>

In the event of failure of the COMPANY to pay any amount claimed to be due hereunder, the COMPANY at the request of the INSURED, will submit to the jurisdiction of any Court of competent jurisdiction within the United States of America, and will comply with all requirements necessary to give such Court jurisdiction, and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

Service of process in such suit may be made upon Messrs. Le Boeuf, Lamb, Leiby and MacRae, 520 Madison Avenue, New York, NY 10022, and in any suit instituted against it under this POLICY, the COMPANY will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Messrs. LeBoeuf, Lamb, Leiby and MacRae are authorized and directed to accept service of process on behalf of the COMPANY in any such suit and, upon the INSURED's request, to give a written undertaking to the INSURED that they will enter a general appearance upon the COMPANY's behalf in the event such suit shall be instituted.

In witness whereof, ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED has caused this POLICY to be signed by its President at Hamilton, Bermuda, but this POLICY shall not be binding upon the COMPANY unless countersigned hereunder by a duly authorized representative of the COMPANY.

J. W. Heiney, President

AEGIS INSURANCE SERVICES, INC.
34 EXCHANGE PLACE, HARBORSIDE PLAZA TWO
JERSEY CITY, NEW JERSEY 07302

By: _Sandra A. Johnson_
(Authorized Representative)

Date: _December 29, 1983_

14

## ASSOCIATED ELECTRIC & GAS INSURANCE LIMITED

Endorsement Number _____1_____ Effective Date of Endorsement January 1, 1984

Attached to and forming part of POLICY number _____ 022 ANJ _____

NAMED INSURED_____ San Diego Gas & Electric Company _____

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

### EXTENSION OF COVERAGE ENDORSEMENT

(a) It is hereby understood and agreed that the following coverage(s) is (are) (1) specifically deleted from Exclusion (h) and (2) included under Insuring Agreement I (a) of this POLICY:

> Workers' Compensation, Employers' Liability, Employers' Liability for Occupational Disease, U. S. Longshoremen's and Harbor Worker's Act and Jones Act.

With respect to Workers' Compensation, Employers' Liability and Employers' Liability for Occupational Disease this extension, however, shall exclude and this policy shall not cover liability for Pneumoconiosis or Black Lung as provided by the Black Lung Benefits Act which arises out of coal mine employment. Coal mine employment shall mean any person employed in or around a mine site, whose tasks are performed prior to the entry of coal into the stream of commerce, such tasks being the subterranean or surface extraction of coal, the preparation of coal, the transportation of coal and coal mine maintenance and construction.

(b) In addition to the terms and conditions as set forth in this POLICY, the coverages provided by this endorsement are also subject to the terms and conditions stated hereunder:

(1) This POLICY shall apply to injuries sustained by an employee of the INSURED arising out of and in the course of his employment to the INSURED and caused by (i) an accident occurring during the POLICY PERIOD, or (ii) disease caused or aggravated by exposure of which the last day of the last exposure, in the employment of the INSURED, to conditions causing the disease occurs during the POLICY PERIOD. However, this clause shall not act as a limitation to any liability imposed upon the INSURED by any United States Federal or State Worker's Compensation and/or Occupational Disease law(s) or act(s), or any other similar law(s) to which this Endorsement applies;

(2) All injuries sustained by one or more employees as a result of (i) a single accident or (ii) caused or aggravated by exposure to the same conditions causing disease, shall be considered a single OCCURRENCE and only one UNDERLYING LIMIT shall be deducted from the aggregate amount of the resulting ULTIMATE NET LOSS;

## EXTENSION OF COVERAGE ENDORSEMENT
### Continued — Page 2

(3) Not later than twenty-four months from the date of Cancellation of this POLICY, the INSURED shall advise the COMPANY of all claims not finally settled which are likely to result in claims under this POLICY. The COMPANY may then or at any time thereafter inform the employer of its desire to be released from liability in respect of any one or more of such claims. In such event, the INSURED and the COMPANY shall mutually appoint an actuary or appraiser to investigate, determine and capitalize such claim or claims and the payment by the COMPANY of its portion of the amount so ascertained to be the capitalized value of such claim or claims shall constitute a complete and final release of the COMPANY; and

(4) It is agreed that Exclusion (I), Nuclear Energy Liability Exclusion, of this POLICY shall not apply to the coverage provided under this Endorsement.

(c) It is agreed that as respects the coverage provided by this endorsement, the following UNDERLYING LIMITS are included under Item 5A of the Declarations:

| UNDERLYING LIMITS | COVERAGE |
|---|---|
| As per Underlying Limit Schedule | As per paragraph (a) hereof |

(d) $ Incl. in Item No. 4      FLAT PREMIUM one year

Nothing contained in the foregoing nor in any subsequent endorsement shall have the effect of increasing the COMPANY's LIMIT OF LIABILITY in respect to each OCCURRENCE beyond that stated in Item 3 of the Declarations.


*Sandra A. Johnson*

Signature of Authorized Representative

12/29/83  111

8001 (AEGIS) 2-80

**ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED**

Endorsement Number _____2_____ Effective Date of Endorsement January 1, 1984

Attached to and forming part of Policy Number _____022 ANJ_____

Named Insured _____ San Diego Gas & Electric Company _____

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

It is understood and agreed that Security Pacific National Bank, Security Pacific National Leasing, Inc. and Security Pacific Equipment Leasing, Inc. are included as additional named insureds with respect to the ownership, maintenance or existence of certain personal property leased to the named insured by Security Pacific National Bank, Security Pacific National Leasing, Inc., or Security Pacific Equipment Leasing, Inc. and the Company shall be liable under this policy for the full amount of the loss up to and including the total limits of liability as set forth in the declarations without right of contribution from any contingent insurance which may be effected by either Security Pacific National Bank, Security Pacific National Leasing, Inc. or Security Pacific Equipment Leasing, Inc.

It is understood and agreed that this policy shall not be cancelled nor any reduction or restriction of coverage be effected until at least ten (10) days after notice of such cancellation, restriction or reduction of coverage has been mailed to Security Pacific Equipment Leasing, Inc., P. O. Box 3219, Terminal Annex, Los Angeles, California 90051. It is further understood and agreed that any cancellation notices shall be mailed to the above by Certified Mail, Return Receipt Requested.

_Sandra A. Johnson_
Signature of Authorized Representative

12/29/83  111

5604 (AEGIS) 11-81

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____3_____ Effective Date of Endorsement __January 1, 1984_____

Attached to and forming part of Policy Number_____022 ANJ_____

Named Insured _____San Diego Gas & Electric Company_____

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

The following terms and conditions are hereby made a part of this policy and are applicable only to Encina Power Plant Unit 5, Carlsbad, California in accordance with Lease Agreement E-12292 between San Diego Gas & Electric Company, as Lessee and Lloyds Bank California, as Owner Trustee and Lessor:

1. The following interests are additional insureds as their respective interests may appear:

    a. Lloyds Bank California, Lessor
    b. BameriLease, Inc., Owner Participant
    c. United California Bank, Indenture Trustee
    d. Each holder of a Loan Certificate under Financing Agreement A-12292,

2. All claims for insurance premiums against Lessor, Owner Participant, Indenture Trustee and each holder of a Loan Certificate are waived.

3. Losses, if any, shall be payable notwithstanding:

    a. any act or negligence, including any breach of any condition or warranty in any policy of insurance, by Lessee, Lessor, the Owner Participant, the Indenture Trustee or any holder of a Loan Certificate,
    b. the occupation or use of the Equipment for purposes more hazardous than permitted by the terms of the policy,
    c. any foreclosure of other proceeding or notice of sale relating to the Equipment, or
    d. any change in the title to or ownership of any of the Equipment.

4. This insurance shall be excess of the retention stipulated under Item 5 of the Policy Declarations and without right of contribution from any other insurance coverage effected by Lessor or Owner Participant.

5. No cancellation or material change in this policy shall be effective until at least 20 days after receipt by Lessor and the Indentured Trustee of written notice thereof.

6. Any right of subrogation is waived against Lessor, Owner Participant, Indenture Trustee or any holder of a Loan Certificate.

_Sandra A. Johnson_
Signature of Authorized Representative

12/29/83 111

5604 (AEGIS) 11-81

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____4_____ Effective Date of Endorsement _January 1, 1984_____

Attached to and forming part of Policy Number _____022 ANJ_____

Named Insured _San Diego Gas & Electric Company_____

   It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

   The following interests are added as additional Insureds but only as respects the ownership, maintenance or existence of personal property leased to the Named Insured by them;

                    Security Pacific Commercial Leasing, Inc.
                    Security Pacific Equipment Leasing, Inc.
   P. O. Address-Box 7722, San Francisco, California  94120

   It is further agreed that 10 days notice will be furnished to the foregoing additional Insureds by registered mail in the event this policy is cancelled or materially altered.


_Sandra A. Johnson_
_____
   12/29/83 111    Signature of Authorized Representative

5604 (AEGIS) 11-81

## Cancellation

In the event of cancellation by the INSURED the retrospective premium percentages as described above will be applied to the FLAT PREMIUM.

In the event of cancellation by the COMPANY, the retrospective premium percentages as described above will be applied to the portion of FLAT PREMIUM, computed pro rate, for the period that coverage was in force.

## Definitions

The term INCURRED LOSSES means the sum of:

(1)   All losses, including medical, actually paid;

(2)   Reserves for reported but unpaid losses as estimated by the COMPANY;

(3)   Premiums on bonds paid for by the COMPANY in accordance with the provisions of the POLICY;

(4)   Interest accruing after entry of a judgment against the INSURED;

(5)   Allocated loss adjustment expenses; and

(6)   Expenses incurred in seeking recovery against a third party;

less recoveries received from third parties.

The term FLAT PREMIUM shall mean the premiums for a POLICY YEAR stated in Item No. 4 of the Declarations of this POLICY or any endorsements thereof.

The term POLICY YEAR used under this endorsement shall mean the period of one year following the effective date and hour of this POLICY as stated in Item No. 2 of the Declarations or anniversary thereof.

Accepted by Policyholder

### SPECIAL NOTICE

ALL THE TERMS AND CONDITIONS OF THIS ENDORSEMENT ARE HEREBY SUS-PENDED AND WILL REMAIN SUSPENDED UNLESS SPECIFICALLY REINSTATED BY ENDORSEMENT TO THIS POLICY.

By _____

Title _____

*Sandra d. Johnson*

Signature of Authorized Representative

8005 (AEGIS) 2-80
12/29/83 111

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number_____5_____Effective Date of Endorsement January 1, 1984

Attached to and forming part of POLICY number _____022 ANJ_____

NAMED INSURED _____San Diego Gas & Electric Company_____

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

### RETROSPECTIVE PREMIUM ENDORSEMENT

In addition to the FLAT PREMIUM stated in Item No. 4 of the Declarations or any endorsement thereof, the INSURED agrees to pay premium in accordance with the Company Experience Retrospective Provision below. The retrospective premium adjustment as calculated hereunder shall not exceed 100 percent of the INSURED's FLAT PREMIUM.

#### Company Experience Retrospective Premium

If the COMPANY sustains INCURRED LOSSES, under policies which have POLICY YEARS ending during the same calendar year as the INSURED's POLICY YEAR, in excess of the total premiums earned under such policies, the INSURED will pay to the COMPANY additional premium equivalent to the product of the amount of such excess and the fraction developed with the INSURED's FLAT PREMIUM as the numerator and the FLAT PREMIUM of all policyholders for such POLICY YEARS as the denominator.

The amount of premium adjustment to be paid by the INSURED hereunder shall not exceed 100 percent of the INSURED's FLAT PREMIUM.

#### General Conditions

This Retrospective Premium Endorsement shall apply to each POLICY YEAR in which this POLICY is in force. Each POLICY YEAR shall be independent of all other POLICY YEARS.

A computation of the retrospective premium based upon the COMPANY's INCURRED LOSSES valued as of a date thirty-six months after the termination of the POLICY YEAR, or sooner if deemed necessary by the COMPANY shall be made by the COMPANY as soon as practicable after such valuation date.

Any additional premium owing shall be due and payable within 30 days after the INSURED is notified by the COMPANY that such additional premium is due. At the option of the INSURED the additional premium may be paid in three equal annual installments with an annual interest penalty to be added to unpaid balances. The interest rate shall be the prime interest rate plus 2 percent as determined by the COMPANY when payments are due.

8005 (AEGIS) 2-80

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____6_____ Effective Date of Endorsement _January 1, 1984_

Attached to and forming part of Policy Number_____022 ANJ_____

Named Insured _____San Diego Electric & Gas Company_____

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

It is agreed that such coverage as is afforded by this policy for Property Damage shall apply also as respects any occurrenc(s), damage(s), claim(s) or suit(s) brought about as a result of Forest Fire Fighting expense, Fire Suppression expense or cost of bringing any Forest Fire under control.

Such expense or cost shall not include salaries of employees of the Insured nor Property Damage to their equipment used in bringing such Forest Fire under control.

_Sandra A. Johnson_
**Signature of Authorized Representative**
12/29/83  111

5604 (AEGIS) 11-81

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ____7____ Effective Date of Endorsement __January 1, 1984__

Attached to and forming part of Policy Number____ 022 ANJ _____

Named Insured _____ San Diego Gas & Electric Company _____

    It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

    Insuring Agreement III, Definition (b), "Bodily Injury," is amended to read as follows:

        The term "BODILY INJURY" shall mean bodily injury, physical impairment, shock, disability, mental anguish, mental illness, emotional upset, outrage, sickness or disease sustained by any person which occurs during the POLICY PERIOD, including death at anytime resulting therefrom.

_Sandra d. Johnson_
_____
Signature of Authorized Representative
12/29/83  lll

S604 (AEGIS) 11-81

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____8_____ Effective Date of Endorsement _January 1, 1984_

Attached to and forming part of Policy Number _____022 ANJ_____

Named Insured _____San Diego Gas & Electric Company_____

 It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Exclusion (a) is deleted as regards a dredge located at or near the ENCINA Power Plant.

It is agreed that sums paid by the Insured or by others on behalf of the Insured will be allowed in computing the deductible above which this insurance applies.

It is agreed that such insurance as is afforded by this policy shall not apply to San Anofre Nuclear Generating Stations, but only to the extent that such coverage is provided Under AEGIS' Policy No. 164A issued to Southern California Edison Company covering such project.

It is further agreed that the definition of Named Insured as respects Directors & Officers Liability is extended to include the following positions:

<div align="center">

Division Manager - Gas ✓
Director - Internal Auditing
Division Manager - Customer Service Administrator ✓
Division Manager - Power Supply ✓

</div>

_Sandra A. Johnson_
**Signature of Authorized Representative**
12/29/83 lll

5604 (AEGIS) 11-81

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____ *9* _____ Effective Date of Endorsement __*April 25, 1984*_____

Attached to and forming part of Policy Number _____ *022 ANJ* _____

Named Insured _____ *San Diego Gas & Electric Company* _____

　　It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

　　　*Exclusion (d)(3) is hereby deleted.*

R E C E I V E D
San Diego Gas & Electric

MAY 0 7 1984

RISK MANAGEMENT

*Sandra A. Johnson*
Signature of Authorized Representative

5604 (AEGIS) 11-81

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____10_____ Effective Date of Endorsement _____June 1, 1984_____

Attached to and forming part of Policy Number_____022 ANJ_____

Named Insured _____San Diego Gas & Electric Company_____

    It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

*The Employees Association of San Diego Gas & Electric is hereby added to this policy as an additional insured.*

_Sandra d. Johnson_
Signature of Authorized Representative

5604 (AEGIS) 11-81

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____ *11* _____ Effective Date of Endorsement _____ *December 1, 1984*

Attached to and forming part of Policy Number _____ *022 ANJ* _____

Named Insured _____ *San Diego Gas & Electric Company* _____

    It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

Item No. 4 of the policy Declarations, "Flat Premium" is amended to read as follows:

   *$668,640*        for the period    *January 1, 1984*  to *December 1, 1984*

This premium represents the pro-rata portion of a flat one year premium of
   *$729,400*        which has been promulgated by the company in
accordance with its current rules and rating procedures.

It is further agreed that the anniversary date of this policy shall be
   *December 1, 1984*    and each consecutive period of one year thereafter.

_Sandra d. Johnson_
Signature of Authorized Representative

5604 (AEGIS) 11-81

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _12 (Page 1 of 4)_    Effective Date of Endorsement ____ _December 1, 1984_

Attached to and forming part of Policy Number_____ _022 ANJ_

Named Insured _____ _San Diego Gas & Electric Company_

Subject to all of the provisions of the policy not expressly modified by this endorsement, it is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

The following Insuring Agreement is added to and made part of this POLICY:

(d)   The INSURED, except with respect to claims for which coverage is afforded hereunder by Insuring Agreements I(a), (b) or (c), for any and all sums which the INSURED shall become legally obligated to pay as ULTIMATE NET LOSS arising from any claim or claims first made against the INSURED during the POLICY PERIOD by reason of a WRONGFUL ACT caused by an employee of the NAMED INSURED and arising out of the employee's activity for a non-profit organization where such activity is undertaken at the request of the NAMED INSURED and where such activity earns no compensation other than reimbursement of expenses and nominal per diem allowances (honorariums).

ITEM NO. 5 of the Declarations is amended to read as follows:

ITEM NO. 5 LIMIT OF LIABILITY $ _25,000,000_____ any one OCCURRENCE with respect to Insuring Agreement 1 (a) or any one claim with respect to Insuring Agreements 1 (b), 1 (c), and 1 (d).

ITEM NO. 6 of the Declarations is amended to read as follows:

UNDERLYING LIMITS
$ _250,000_____ each OCCURRENCE with respect to Insuring Agreement 1 (a) or each claim with respect to Insuring Agreements 1 (b), 1 (c), and 1 (d) not covered by underlying insurance nor self-insured retention shown in UNDERLYING LIMITS SCHEDULE.

In the event of any loss(es) arising from any single OCCURRENCE with respect to Insuring Agreement 1(a) or any claim(s) arising from any WRONGFUL ACT with respect to Insuring Agreements 1 (b), 1 (c), and 1 (d) which involve(s) two or more UNDERLYING LIMITS, the UNDERLYING LIMITS shall apply (separately/in combination).

The UNDERLYING LIMITS Schedule which is attached to and forms part of ITEM NO. 6 of the Declarations of this POLICY is amended to include the following:

$ _1,000_____ any one WRONGFUL ACT with respect to Insuring Agreement 1 (d)

Paragraph (d) of the LIMIT OF LIABILITY section of the POLICY is amended to read as follows:

04 (AISI) 8-84

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number  _12_   (Page 2 of 4)  Effective Date of Endorsement _____ _December 1, 1984_ _____

Attached to and forming part of Policy Number _____ _022 ANJ_ _____

Named Insured _____ _San Diego Gas & Electric Company_ _____

(d) Except with respect to "Defense Costs, Charges and Legal Expenses", as described in Condition (b), the COMPANY shall only be liable hereunder for the amount of ULTIMATE NET LOSS in excess of UNDERLYING LIMITS as stated in Item 6 of the Declarations as a result of any one claim covered under Insuring Agreements 1 (b), 1 (c), or 1 (d) and then only up to the amount stated in Item 5 of the Declarations. Furthermore, with respect to Insuring Agreements 1 (b), 1 (c) and 1 (d), claims arising out of the same WRONGFUL ACT or interrelated WRONGFUL ACTS of one or more INSUREDS shall be considered a single claim and only one UNDERLYING LIMIT shall be deducted from the aggregate amount of ULTIMATE NET LOSS arising from such claim. The Limit of Liability and the UNDERLYING LIMIT applicable to the ULTIMATE LOSS arising from such claim shall be that of the PREMIUM PERIOD during which the first claim was made.

Definition (f) "INSURED" is amended to include the following:

Each of the following is an "INSURED under the POLICY to the extent set forth below:

* * *

(4) with respect to Insuring Agreement 1 (d) only:
   (i) the NAMED INSURED;
   (ii) any employee of the NAMED INSURED who may be acting at the request of the NAMED INSURED for a non-profit organization.

Clarification number (4) of Definition (i) "OCCURRENCE" is amended to read as follows:

(4) any OCCURRENCE shall not include a WRONGFUL ACT which is covered under Insuring Agreements 1 (b), 1 (c) or 1 (d).

Exclusion (j) is amended to read as follows:

(j) with respect to Insuring Agreements 1 (b), 1 (c) and 1 (d)

   (1) To any loss arising from any claim brought about or contributed to by the dishonest, fraudulent, criminal or malicious act or omission of the INSURED or his predecessors in business or any person at any time employed by the INSURED or his predecessors in business if a judgment or other final adjudication establishes that acts of active and deliberate dishonesty were committed or attempted with actual dishonest purpose and intent and were material to the cause of action so adjudicated;

   (2) to any claim arising from a WRONGFUL ACT which occurred prior to the POLICY PERIOD unless:

      (a) the claim is first made against the INSURED during the POLICY PERIOD; and

04 (AISI) 8-84

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number: _12_ _(Page 3 of 4)_ Effective Date of Endorsement _____December 1, 1984_____

Attached to and forming part of Policy Number_____022 ANJ_____

Named Insured _____San Diego Gas & Electric Company_____

> (b) the INSURED at the effective date of the POLICY PERIOD had no knowledge of the WRONGFUL ACT or could not reasonably forsee any circumstances which might result in a claim; and
>
> (c) there is no other insurance applicable to such WRONGFUL ACT.

Condition (b) is amended to read as follows:

(b) *DEFENSE COSTS, CHARGES & LEGAL EXPENSES*

> This POLICY shall indemnify the INSURED for any and all payments made by or on behalf of the INSURED, without deducting UNDERLYING LIMITS, for expenses incurred in the investigation, negotiation, settlement and defense or any claim or suit seeking damages which are payable under the terms of Insuring Agreements 1 (b); 1 (c) and 1 (d) even if the allegations of the claim or suit are groundless, false or fraudulent, provided the COMPANY shall not be liable for payments made as salary to employees of the INSURED. It is understood and agreed that any and all such payments shall be included within the Limit of Liability stated in Item 5 of the Declarations.

Paragraph (2) of Condition (c)NOTICE OF OCCURRENCE or WRONGFUL ACT is amended to read as follows:

(2) With respect to Insuring Agreements 1 (b), 1 (c) and 1 (d):

> The INSURED shall, as a condition precedent to his rights under this POLICY, give to the COMPANY notice as soon as practicable in writing of any claims made.
>
> If the INSURED shall become aware of any circumstances which may subsequently give rise to a claim being made against the INSURED and shall, during the POLICY PERIOD or during the DISCOVERY PERIOD, give written notice to the COMPANY of same, then such notice shall be treated as a claim made within the POLICY PERIOD.

Paragraph 3 of Condition (i) SUBROGATION is amended to read as follows:

(3) With respect to Insuring Agreements 1 (b), 1 (c) and 1 (d):

> In the event of any payment under this POLICY, the COMPANY shall be subrogated to the extent of such payment to all the INSURED'S rights of recovery thereof, and the INSURED shall execute all papers required and shall do everything that may be necessary to enable the COMPANY effectively to bring suit in the name of the INSURED, provided, however, with respect to Insuring Agreement (1) (b), that no subrogation shall be had against any INSURED unless such INSURED is excluded from coverage by reason of the exclusions hereunder.

4 (AISI) 8-84

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number ___12___ *(Page 4 of 4)* Effective Date of Endorsement _____ *December 1, 1984* _____

Attached to and forming part of Policy Number _____ *022 ANJ* _____

Named Insured _____ *San Diego Gas & Electric Company* _____

*Condition (1) is amended to read as follows:*

### (1) DISCOVERY PERIOD

*With respect to Insuring Agreements 1 (b), 1 (c) and 1 (d):*

*In the event of cancellation of this POLICY, the NAMED INSURED shall have the right, upon payment of an additional premium to be determined at the time of cancellation, to an extension of the coverage granted by this POLICY in respect to any claims or claims first made against an INSURED during the period of twelve (12) months after the effective date of such cancellation but only in respect to any WRONGFUL ACT covered by this POLICY committed before the effective date of cancellation. This right of extension shall terminate unless written notice of such election is received by the COMPANY within thirty (3) days after the effective date cancellation.*

_____

Signature of Authorized Representative

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____13_____ Effective Date of Endorsement _____December 1, 1984_____

Attached to and forming part of Policy Number_____022 ANJ_____

Named Insured _____San Diego Gas & Electric Company_____

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

### EMERGENCY ASSISTANCE AGREEMENT ENDORSEMENT

*Definition (m) "PROPERTY DAMAGE" is amended to include the following: The term "PROPERTY DAMAGE" shall also mean any increase in cost of workers' compensation or employers' liability insurance or self-insurance to a responding company where liability for such increased cost is assumed by the NAMED INSURED pursuant to an EMERGENCY ASSISTANCE CONTRACT for injury to or destruction of property owned by a responding public utility company and occurring during an emergency assistance situation.*

*For the purposes of this endorsement, the term"EMERGENCY ASSISTANCE CONTRACT" means a contract or agreement expressed or implied whereby one or more utility companies ("a responding company") agrees to provide emergency assistance to the NAMED INSURED in the form of per- sonnel or equipment to aid in maintaining or restoring utility service when such service has been disrupted by acts of the elements, equipment malfunctions, accidents, sabotage or any other event where the parties deem emergency assistance to be necessary or advisable.*

*This endorsement is issued in consideration of an additional premium of (incl. in policy premium)*

_____Sandra L. Johnson_____
Signature of Authorized Representative

## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement Number _____ *14* _____ Effective Date of Endorsement ___ *December 1, 1985* ___

Attached to and forming part of Policy Number _____ *022ANJ* _____

Named Insured _____ *San Diego Gas & Electric Company* _____

It is understood and agreed that this policy is hereby amended as indicated. All other terms and conditions of this policy remain unchanged.

*This policy is hereby cancelled effective December 1, 1985 12:01 A.M. Standard Time. New coverage to be written under Policy No. 022CNJ.*

_____
**Signature of Authorized Representative**

7300 (AISI 8/85)

# EXHIBIT F

1   BRIAN M. LEDGER (SBN: 156942)
    KRISTIN REYNA (SBN: 211075)
2   GORDON & REES LLP
    101 West Broadway, Suite 2000
3   San Diego, CA. 92101
    Telephone: (619) 696-6700
4   Fax: (619) 696-7124

5   JAN GOLDSMITH (SBN: 70988)
    FREDERICK M. ORTLIEB (SBN: 131751)
6   DAVID J. KARLIN (SBN: 156178)
    OFFICE OF THE CITY ATTORNEY
7   1200 Third Avenue, Suite 1100
    San Diego, CA. 92101
8   Telephone: (619) 533-5800
    Fax: (619) 533-5856

9
    Attorneys for CITY OF SAN DIEGO
10

**FILED**

OCT 1 4 2009

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

11              UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14  CITY OF SAN DIEGO                  )   Case No. **09 CV 2 2 7 5  W  CAB**
                                       )
15                     Plaintiff,      )   **COMPLAINT FOR ENVIRONMENTAL**
                                       )   **COST RECOVERY AND**
16        vs.                          )   **CONTRIBUTION, INJUNCTIVE**
                                       )   **RELIEF, DECLARATORY RELIEF,**
17  NATIONAL STEEL & SHIPBUILDING      )   **AND DAMAGES**
    COMPANY; NATIONAL STEEL &          )
18  SHIPBUILDING CORPORATION;          )   **Demand For Jury Trial**
    NATIONAL IRON WORKS; MARTINOLICH   )
19  SHIP BUILDING COMPANY; SOUTHWEST   )
    MARINE, INC.; BAE SYSTEMS SAN DIEGO)
20  SHIP REPAIR, INC.; SAN DIEGO MARINE)
    CONSTRUCTION COMPANY; STAR AND     )
21  CRESCENT BOAT COMPANY, a division of)
    SAN DIEGO MARINE CONSTRUCTION      )
22  COMPANY; STAR AND CRESCENT BOAT    )
    COMPANY; STAR AND CRESCENT         )
23  INVESTMENT COMPANY; STAR AND       )
    CRESCENT FERRY COMPANY; SAN        )
24  DIEGO MARINE CONSTRUCTION          )
    CORPORATION; MCCSD; CAMPBELL       )
25  INDUSTRIES; SAN DIEGO GAS &        )
    ELECTRIC; UNITED STATES NAVY; SAN  )
26  DIEGO UNIFIED PORT DISTRICT; and   )
    DOES 1-100, inclusive,             )
27                                     )
                                       )
28                     Defendants.     )

- 1 -
COMPLAINT

Plaintiff City of San Diego ("Plaintiff") complains and alleges as follows:

**PARTIES**

1. Plaintiff is, and at all times material to this complaint has been, a municipal corporation in the County of San Diego, State of California.

2. Plaintiff is informed and believes, and on that basis alleges, that defendant NATIONAL STEEL & SHIPBUILDING COMPANY ("NAASCO") is a corporation organized and existing under the laws of the State of Nevada and is authorized to do business and is doing business in the State of California. Upon information and belief, NAASCO is a successor in interest to defendants National Steel and Shipbuilding Corporation and National Iron Works.

3. Plaintiff is informed and believes that defendant NATIONAL STEEL & SHIPBUILDING CORPORATION is a former corporation that was organized and existed under the laws of the State of California and was authorized to do business and did business in the State of California.

4. Plaintiff is informed and believes that defendant NATIONAL IRON WORKS is a former corporation that was organized and existed under the laws of the State of California and was authorized to do business and did business in the State of California.

5. Plaintiff is informed and believes that defendant MARTINOLICH SHIP BUILDING COMPANY is former corporation that was organized and existed under the laws of the State of California and was authorized to do business and did business in the State of California.

6. Plaintiff is informed and believes, and on that basis alleges, that defendant SOUTHWEST MARINE, INC. is a corporation organized and existing under the laws of the State of California and was authorized to do business and did business in the State of California.

7. Plaintiff is informed and believes, and on that basis alleges, that defendant BAE SYSTEMS SAN DIEGO SHIP REPAIR, INC. is the successor to SOUTHWEST MARINE, INC. ("BAE SYSTEMS")[1], and is a corporation organized and existing under the laws of the

---

[1] The term "BAE SYSTEMS" will be used to refer to BAE SYSTEMS SAN DIEGO SHIP REPAIR, INC. and/or SOUTHWEST MARINE, INC.

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1  State of California, doing business in California.

2      8.    Plaintiff is informed and believes, and on that basis alleges, that defendant SAN

3  DIEGO MARINE CONSTRUCTION COMPANY is a former corporation that was organized

4  and existed under the laws of the State of California and was authorized to do business and did

5  business in the State of California.

6      9.    Plaintiff is informed and believes, and on that basis alleges, that defendant STAR

7  AND CRESCENT BOAT COMPANY, A DIVISION OF SAN DIEGO MARINE

8  CONSTRUCTION COMPANY[2] is a former corporation that was organized and existed under

9  the laws of the State of California and was authorized to do business and did business in the State

10  of California.

11      10.    Plaintiff is informed and believes, and on that basis alleges, that defendant STAR

12  AND CRESCENT BOAT COMPANY is a former corporation that was organized and existed

13  under the laws of the State of California and was authorized to do business and did business in

14  the State of California.

15      11.    Plaintiff is informed and believes, and on that basis alleges, that defendant STAR

16  AND CRESCENT INVESTMENT COMPANY is a former corporation that was organized and

17  existed under the laws of the State of California and was authorized to do business and did

18  business in the State of California.

19      12.    Plaintiff is informed and believes, and on that basis alleges, that defendant STAR

20  AND CRESCENT FERRY COMPANY is a former corporation that was organized and existed

21  under the laws of the State of California and was authorized to do business and did business in

22  the State of California.

23      13.    Plaintiff is informed and believes, and on that basis alleges, that defendant

24  CAMPBELL INDUSTRIES is a corporation organized and existing under the laws of the State

25  of California, authorized to do business in the State of California and did business in the State of

26

27  [2]    The term "SDMCC DEFENDANTS" will be used to refer to SAN DIEGO MARINE CONSTRUCTION
COMPANY; STAR AND CRESCENT BOAT COMPANY, a division of SAN DIEGO MARINE
CONSTRUCTION COMPANY; STAR AND CRESCENT BOAT COMPANY; STAR AND CRESCENT

28  INVESTMENT COMPANY; and STAR AND CRESCENT FERRY COMPANY.

1  California.

2      14.    Plaintiff is informed and believes, and on that basis alleges, that defendant
3  MCCSD is a former corporation that organized and existed under the laws of the State of
4  California and was authorized to do business and did business in the State of California.  On
5  information and belief, MCCSD was a wholly owned subsidiary of CAMPBELL INDUSTRIES
6  and changed its name to defendant SAN DIEGO MARINE CONSTRUCTION
7  CORPORATION.

8      15.    Plaintiff is informed and believes, and on that basis alleges, that defendant SAN
9  DIEGO MARINE CONSTRUCTION CORPORATION is a former corporation that was
10  organized and existed under the laws of the State of California and formerly did business in the
11  State of California.[3]

12      16.    Plaintiff is informed and believes, and on that basis alleges, that defendant SAN
13  DIEGO GAS & ELECTRIC is a corporation organized and existing under the laws of the State
14  of California and is authorized to do business and does business in the State of California.

15      17.    Plaintiff is informed and believes, and on that basis alleges, that defendant
16  UNITED STATES NAVY ("NAVY") is a branch of the United States military organized and
17  existing under federal law, and authorized to do business and does business in the State of
18  California.  Plaintiff has submitted or is in the process of submitting a claim against NAVY
19  under the Federal Tort Claims Act for the tort claims Plaintiff has against NAVY related to the
20  Shipyard Sediment Site.  Should NAVY deny Plaintiff's administrative claim as to the tort
21  claims, Plaintiff will seek leave of court to amend this complaint to name NAVY as a defendant
22  to each of the tort claims herein.

23      18.    Plaintiff is informed and believes, and on that basis alleges, that defendant SAN
24  DIEGO UNIFIED PORT DISTRICT ("PORT DISTRICT") is a special governmental entity,
25  created in 1962 by the San Diego Unified Port District Act and California Harbors and
26  Navigation Code in order to manage San Diego Harbor, and administer certain public lands

27  _____
28  [3]  The term "CAMPBELL DEFENDANTS" will be used to refer to CAMPBELL INDUSTRIES, MCCSD, and/or SAN DIEGO MARINE CONSTRUCTION CORPORATION.

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1  along the San Diego Bay and is authorized to do business and does business in the State of

2  California. Government Code section 905(i) authorizes Plaintiff, a local public entity, to bring

3  these claims against Defendant PORT DISTRICT, another local public entity, without any prior

4  administrative claims procedure.

5        19.    Plaintiff is ignorant of the true names or capacities of the defendants sued herein

6  under the fictitious names DOES 1 through 100, inclusive, and therefore sues these defendants

7  by such fictitious names. Plaintiff will amend this complaint to allege their true names and

8  capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of

9  said fictitiously named defendants are, through their negligence, intentional torts, and/or conduct

10  giving rise to said liability, responsible or liable in some manner for the occurrences herein

11  alleged, and that the damages alleged herein were the direct and legal result of said actions or

12  omissions.

### NATURE OF ACTION

14        20.    Plaintiff and Defendants NASSCO, BAE SYSTEMS, CAMPBELL

15  INDUSTRIES, SDG&E, and NAVY have all been named as "Dischargers" or "Persons

16  Responsible" for alleged environmental contamination at the property known as the "Shipyard

17  Sediment Site" by the California Regional Water Quality Control Board, San Diego Region ("the

18  Regional Board"), in Tentative Clean Up & Abatement Order No. R9-2005-0126 (the "Tentative

19  Order"). A copy of the Tentative Order is attached to this Complaint as Exhibit "A" and is

20  incorporated by reference herein.

21        21.    The Shipyard Sediment Site is a portion of San Diego Bay along the eastern shore

22  of the Bay in an area extending from approximately the Sampson Street Extension to the north

23  and Chollas Creek to the south, and from the NASSCO shipyard facility and BAE SYSTEMS

24  shipyard facility shoreline out to the San Diego main shipping channel to the west.

25        22.    The Regional Board contends that Plaintiff and defendants are jointly and

26  severally responsible for alleged property damage, including, but not limited to alleged damage

27  to aquatic life, at and beyond leaseholds at the Shipyard Sediment Site once and/or currently

28  occupied by Defendants and other entities. The Regional Board contends that such property

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1    damage and injury was proximately caused by historical contamination of the Bay by the alleged

2    Dischargers and various other entities.  Upon information and belief, based on the Tentative

3    Order and historical records, the alleged property damage and injury at issue began in the early

4    twentieth century and has continued to the present.

5        23.    The Regional Board contends that environmental investigations conducted at a

6    Shipyard Sediment Site revealed the presence of elevated levels of pollutants in the San Diego

7    Bay bottom marine sediment.  The Regional Board has concluded that the contaminated marine

8    sediment has caused conditions of contamination in the San Diego Bay that adversely affects

9    aquatic life, aquatic-dependent wildlife, human health, and San Diego Bay beneficial uses.  The

10   following hazardous substances have been detected in the sediment at the Shipyards Sediment

11   Site: Arsenic, Cadmium, Copper, Lead, Mercury, Zinc, Tributyltin ("TBT"), High Molecular

12   Weight Polynuclear Aromatic Hydrocarbons ("HPAHs"), and Polychlorinated Biphenyls

13   ("PCBs")[4].

14                                    **JURISDICTION**

15       24.    This Court has jurisdiction over the subject matter of this action pursuant to the

16   Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42

17   U.S.C. §§ 9613(b) and (f), and 42 U.S.C. § 9607; pursuant to the Oil Pollution Act, 33 U.S.C.

18   § 2709; pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201; and pursuant to 28 U.S.C.

19   § 1331.

20       25.    This Court also has subject matter jurisdiction over Plaintiff's claims brought

21   under state law by virtue of the supplemental jurisdiction provided in 28 U.S.C. § 1367, and

22   under the doctrine of pendent jurisdiction set forth in *United Mine Workers v. Gibbs*, 383 U.S.

23   715 (1966).  Plaintiff's claims under state law arise from the same nucleus of operative facts as

24   the claims under federal law.

25                                       **VENUE**

26       26.    Pursuant to 42 U.S.C. § 9613(b), venue is proper in any district in which the

27

28   _____
     [4]    The hazardous substances identified in this sentence will be referred to as the constituents of concern
     ("COCs").

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1  release or damages occurred.  The releases of hazardous substances and damages occurred in San

2  Diego, California, which is in the Southern District of California.

3  ### GENERAL ALLEGATIONS/ BACKGROUND

4  **A.    PLAINTIFF**

5  27.    Plaintiff City of San Diego owns and operates a municipal storm water system

6  (MS4) through which it discharges urban runoff to San Diego Bay subject to the terms and

7  conditions of its National Pollution Discharge Elimination System ("NPDES") permit under

8  section 402 of the Clean Water Act.

9  28.    From approximately 1914-1962, Plaintiff served as the designated public trustee,

10  via an Act of the Legislature of the State of California approved May 1, 1911, for the tidelands

11  property on which Defendants NASSCO and BAE SYSTEMS presently operate (the NAASCO

12  and BAE SYSTEMS leaseholds, respectively).  From 1914-1962, Plaintiff did not conduct any

13  operations on the property at any time; Plaintiff did not discharge any hazardous substances from

14  these properties; nor did Plaintiff cause or permit any hazardous substances to be discharged

15  from these properties.  The Regional Board did not find Plaintiff's past role of public trustee of

16  this property to be a basis for naming Plaintiff a "Discharger" or "Responsible Party" under its

17  Tentative Order.

18  **B.    NASSCO**

19  29.    Upon information and belief, from approximately 1945 to present, NASSCO

20  and/or its predecessors in interest have owned and operated a full service ship construction,

21  modification, repair, and maintenance facility located at 2798 Harbor Drive (28th Street and

22  Harbor Drive) in San Diego, California.  Upon information and belief, NASSCO leases the land

23  on which its facility operates from the PORT DISTRICT, the designated public trustee of the

24  property since assuming that function from Plaintiff in 1962 ("the NAASCO Leasehold").

25  30.    NASSCO's primary business has historically been ship repair, construction, and

26  maintenance for the NAVY and commercial customers.  Current site features include offices,

27  shops, warehouses, concrete platens for steel fabrication, a floating dry dock, a graving dock,

28  two shipbuilding ways, and five piers, which provide 12 berthing spaces.

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 7 -

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

31.     Upon information and belief, the primary industrial processes which NASSCO has historically conducted include: surface preparation and paint removal; paint application; tank cleaning; mechanical repair/maintenance/installation; structural repair/alteration/assembly; integrity/hydrostatic testing; paint equipment cleaning; engine repair/maintenance/installation; steel fabrication and machining; electrical repair/maintenance/installation; hydraulic repair/maintenance/installation; tank emptying; fueling; shipfitting; carpentry; and refurbishing/modernization/cleaning.

32.     Upon information and belief, the primary materials used by NASSCO in its operations have historically included 1) abrasive grit (sometimes consisting of slag from coal-fired boilers and often containing iron, aluminum, silicon, calcium oxides, copper, zinc and titanium; also sand, cast iron or steel shot is used; enormous amounts are needed to remove paint and it is needed in both wet and dry blasting); 2) paint (containing copper, zinc, chromium, lead, and hydrocarbons; anticorrosive paint often containing lead and zinc; antifouling paint often containing copper and tributyltin); 3) miscellaneous, including oils, grease, fuels, weld, detergents, cleaners, rust inhibitors, paint thinners, hydrocarbon and chlorinated solvents, degreasers, acids, caustics, resins, adhesives/cement/sealants and chlorine.

33.     Upon information and belief, the wastes commonly generated by NASSCO historically in its operations have been abrasive blast waste (with the largest concern being spent paint containing, among other substances, copper, tributyltin, lead, chromium and zinc); fresh paint; bilge waste/oily wastewater; blast wastewater; oils; waste paints; construction repair wastes and trash; and miscellaneous wastes consisting of lubricants, grease, fuels, sewage, boiler blowdown, condensate, discard, acid wastes, caustic wastes, and aqueous wastes.

34.     In 1972, the Regional Board initiated an investigation to determine the amount of and kinds of pollutants that entered San Diego Bay from shipbuilding and repair facilities, and the possible effects that pollution could have on beneficial uses of the Bay. All shipbuilding and repair facilities were inspected. The report noted, *inter alia,* the following:

a.     It was estimated by workers and managers at all San Diego Bay shipyards that 5-10 percent of the sand blasted waste and other waste was either intentionally or

1  accidentally discharged into the Bay. The Regional Board estimated that this resulted in 335

2  tons of sand, 27 tons of copper oxide, 3 tons of lead oxide and 1 ton of zinc chromate being

3  discharged to the Bay from shipyard operations for 1971 alone;

4         b.     The Regional Board collected bay sediment core samples from 11 sites in

5  the Bay in March 1972. The results of the sampling indicated that heavy metal concentrations

6  were higher near shipbuilding and repair facilities than other locations.

7        35.    Based on the data available for the years 1987-1991, NASSCO generates an

8  average of 198 tons of abrasive blast waste alone per month.

9        36.    Prior to the early 1990s, when a storm water first-flush capture system was

10  installed for portions of the facility, all surface water runoff from NASSCO's operations was

11  intentionally or accidentally discharged directly into San Diego Bay.

12        37.    During numerous inspections starting in the late 1980s, the Regional Board would

13  observe abrasive blast wastes at NASSCO's facility deposited in areas where it would probably

14  be discharged to the Bay via stormwater runoff. Samples of abrasive blast waste and other

15  wastes were collected in the vicinity of storm drains or other areas susceptible to being

16  transported to the Bay. For example:

17        a.     During inspections by the Regional Board in August 1989, the inspector

18  reported that "…the sandblast pit is a major problem. Sandblast waste is everywhere w/o runoff

19  controls.";

20        b.     During an inspection on October 16, 1991, the Regional Board inspector

21  reported "a threatened discharge to the storm drains from blasting, painting and dust collection

22  activities in the yard."

23        c.     During an inspection on February 27, 1992, the Regional Board inspector

24  noted spent abrasive blast waste on storm drain surfaces.

25        38.    The Regional Board has previously issued Administrative Civil Liability Orders

26  against NASSCO for discharges to the Bay, including:

27        a.     On May 22, 1989, the Regional Board issued Complaint No. 89-42 to

28  NASSCO for discharge of spent abrasive waste from a floating dry dock to San Diego Bay and

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

-9-

COMPLAINT

1   for operating its graving dock in a manner in violation of a past order. NASSCO waived a

2   hearing and accepted liability for discharge of contaminated cooling water from the hull and

3   freeboard abrasive blast operations to the Bay, failing to prevent water flows from coming in

4   contact with sand blast residue in the graving dock, and discharge of slurry blast to the Bay.

5           b.      On January 30, 2001, the Regional Board issued Complaint No. 2001-24

6   to NASSCO for violations of storm water runoff requirements of its NPDES permit. NASSCO

7   sampled 21 discharge points and all failed the discharge requirements.

8       39.     The Regional Board has alleged in Tentative Order R9-2005-0126 that NASSCO

9   has caused or permitted waste from its shipyard operations to be discharged into the Bay in

10  violation of waste discharge requirements, and discharged or deposited waste where it was

11  discharged into the Bay creating, or threatening to create, a condition of pollution or nuisance.

12  The Regional Board has alleged that NASSCO violated Water Code section 13304 and violated

13  its NPDES permit requirements under the Clean Water Act section 402.

14      40.     Upon information and belief, NAASCO has discharged the COCs from its

15  leasehold and these discharges have resulted in the contamination of the sediment at the

16  Shipyards Sediment Site.

17  **C.     NATIONAL STEEL & SHIPBUILDING CORPORATION**

18      41.     Upon information and belief, from approximately 1950 to 1960, defendant

19  NATIONAL STEEL & SHIPBUILDING CORPORATION and/or its predecessors in interest

20  owned and operated a full service ship construction, modification, repair, and maintenance

21  facility located at 2798 Harbor Drive (28th Street and Harbor Drive) in San Diego, California.

22  NATIONAL STEEL & SHIPBUILDING CORPORATION leased the land on which its facility

23  operated from Plaintiff.

24      42.     Upon information and belief, NATIONAL STEEL & SHIPBUILDING

25  CORPORATION's primary business was ship repair, construction, and maintenance for the

26  NAVY and commercial customers. Site features are believed to have included offices, shops,

27  warehouses, concrete platens for steel fabrication, a floating dry dock, a graving dock, two

28  shipbuilding ways, and piers providing numerous berthing spaces.

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

43. Upon information and belief, the primary industrial processes which NATIONAL STEEL & SHIPBUILDING CORPORATION conducted included: surface preparation and paint removal; paint application; tank cleaning; mechanical repair/maintenance/installation; structural repair/alteration/assembly; integrity/hydrostatic testing; paint equipment cleaning; engine repair/maintenance/installation; steel fabrication and machining; electrical repair/maintenance/installation; hydraulic repair/maintenance/installation; tank emptying; fueling; shipfitting; carpentry; and refurbishing/modernization/cleaning.

44. Upon information and belief, the primary materials used by NATIONAL STEEL & SHIPBUILDING CORPORATION in its operations included 1) abrasive grit (sometimes consisting of slag from coal-fired boilers and often containing iron, aluminum, silicon, calcium oxides, copper, zinc and titanium; also sand, cast iron or steel shot is used; enormous amounts are needed to remove paint and it is needed in both wet and dry blasting); 2) paint (containing copper, zinc, chromium, lead, and hydrocarbons; anticorrosive paint often containing lead and zinc; antifouling paint often containing copper and tributyltin); 3) miscellaneous, including oils, grease, fuels, weld, detergents, cleaners, rust inhibitors, paint thinners, hydrocarbon and chlorinated solvents, degreasers, acids, caustics, resins, adhesives/cement/sealants and chlorine.

45. Upon information and belief, the wastes commonly generated by NATIONAL STEEL & SHIPBUILDING CORPORATION in its operations were abrasive blast waste (with the largest concern being spent paint containing, among other substances, copper, tributyltin, lead, chromium and zinc); fresh paint; bilge waste/oily wastewater; blast wastewater; oils; waste paints; construction repair wastes and trash; and miscellaneous wastes consisting of lubricants, grease, fuels, sewage, boiler blowdown, condensate, discard, acid wastes, caustic wastes, and aqueous wastes.

46. Upon information and belief, NATIONAL STEEL & SHIPBUILDING CORPORATION discharged the COCs from its leasehold and these discharges have resulted in the contamination of the sediment at the Shipyards Sediment Site.

C. **NATIONAL IRON WORKS**

47. Upon information and belief, from approximately 1945 to 1960, defendant

- 11 -

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

NATIONAL IRON WORKS owned and operated a full service ship construction, modification,
repair, and maintenance facility located at 2798 Harbor Drive (28th Street and Harbor Drive) in
San Diego, California. NATIONAL IRON WORKS leased the land on which its facility
operated from Plaintiff.

48.     Upon information and belief, NATIONAL IRON WORKS's primary business
was ship repair, construction, and maintenance for the NAVY and commercial customers. Site
features are believed to have included offices, shops, warehouses, concrete platens for steel
fabrication, a floating dry dock, a graving dock, two shipbuilding ways, and piers providing
numerous berthing spaces.

49.     Upon information and belief, the primary industrial processes which NATIONAL
IRON WORKS conducted included: surface preparation and paint removal; paint application;
tank cleaning; mechanical repair/maintenance/installation; structural repair/alteration/assembly;
integrity/hydrostatic testing; paint equipment cleaning; engine repair/maintenance/installation;
steel fabrication and machining; electrical repair/maintenance/installation; hydraulic
repair/maintenance/installation; tank emptying; fueling; shipfitting; carpentry; and
refurbishing/modernization/cleaning.

50.     Upon information and belief, the primary materials used by NATIONAL IRON
WORKS in its operations included 1) abrasive grit (sometimes consisting of slag from coal-fired
boilers and often containing iron, aluminum, silicon, calcium oxides, copper, zinc and titanium;
also sand, cast iron or steel shot is used; enormous amounts are needed to remove paint and it is
needed in both wet and dry blasting); 2) paint (containing copper, zinc, chromium, lead, and
hydrocarbons; anticorrosive paint often containing lead and zinc; antifouling paint often
containing copper and tributyltin); 3) miscellaneous, including oils, grease, fuels, weld,
detergents, cleaners, rust inhibitors, paint thinners, hydrocarbon and chlorinated solvents,
degreasers, acids, caustics, resins, adhesives/cement/sealants and chlorine.

51.     Upon information and belief, the wastes commonly generated by NATIONAL
IRON WORKS in its operations were abrasive blast waste (with the largest concern being spent
paint containing, among other substances, copper, tributyltin, lead, chromium and zinc); fresh

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1  paint; bilge waste/oily wastewater; blast wastewater; oils; waste paints; construction repair

2  wastes and trash; and miscellaneous wastes consisting of lubricants, grease, fuels, sewage, boiler

3  blowdown, condensate, discard, acid wastes, caustic wastes, and aqueous wastes.

4      52.    Upon information and belief, NATIONAL IRON WORKS discharged the COCs

5  from its leasehold and these discharges have resulted in the contamination of the sediment at the

6  Shipyards Sediment Site.

7  **D.    MARTINOLICH SHIP BUILDING COMPANY**

8      53.    Upon information and belief, from approximately 1940 to 1960, defendant

9  MARTINOLICH SHIP BUILDING COMPANY ("MARTINOLICH") owned and operated a

10  full service ship construction, modification, repair, and maintenance facility located at 2798

11  Harbor Drive (28th Street and Harbor Drive) in San Diego, California. MARTINOLICH leased

12  the land on which its facility operated from Plaintiff.

13      54.    Upon information and belief, MARTINOLICH's primary business was ship

14  repair, construction, and maintenance for the NAVY and commercial customers. Site features

15  are believed to have included offices, shops, warehouses, concrete platens for steel fabrication, a

16  floating dry dock, a graving dock, two shipbuilding ways, and piers providing numerous berthing

17  spaces.

18      55.    Upon information and belief, the primary industrial processes which

19  MARTINOLICH conducted included: surface preparation and paint removal; paint application;

20  tank cleaning; mechanical repair/maintenance/installation; structural repair/alteration/assembly;

21  integrity/hydrostatic testing; paint equipment cleaning; engine repair/maintenance/installation;

22  steel fabrication and machining; electrical repair/maintenance/installation; hydraulic

23  repair/maintenance/installation; tank emptying; fueling; shipfitting; carpentry; and

24  refurbishing/modernization/cleaning.

25      56.    Upon information and belief, the primary materials used by MARTINOLICH in

26  its operations included 1) abrasive grit (sometimes consisting of slag from coal-fired boilers and

27  often containing iron, aluminum, silicon, calcium oxides, copper, zinc and titanium; also sand,

28  cast iron or steel shot is used; enormous amounts are needed to remove paint and it is needed in

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 13 -

1 both wet and dry blasting); 2) paint (containing copper, zinc, chromium, lead, and hydrocarbons;

2 anticorrosive paint often containing lead and zinc; antifouling paint often containing copper and

3 tributyltin); 3) miscellaneous, including oils, grease, fuels, weld, detergents, cleaners, rust

4 inhibitors, paint thinners, hydrocarbon and chlorinated solvents, degreasers, acids, caustics,

5 resins, adhesives/cement/sealants and chlorine.

6      57.    Upon information and belief, the wastes commonly generated by

7 MARTINOLICH in its operations were abrasive blast waste (with the largest concern being

8 spent paint containing, among other substances, copper, tributyltin, lead, chromium and zinc);

9 fresh paint; bilge waste/oily wastewater; blast wastewater; oils; waste paints; construction repair

10 wastes and trash; and miscellaneous wastes consisting of lubricants, grease, fuels, sewage, boiler

11 blowdown, condensate, discard, acid wastes, caustic wastes, and aqueous wastes.

12      58.    Upon information and belief, MARTINOLICH discharged the COCs from its

13 leasehold and these discharges have resulted in the contamination of the sediment at the

14 Shipyards Sediment Site.

15 **E.**    **BAE SYSTEMS**

16      59.    Since 1979, BAE SYSTEMS has owned and operated a ship repair, alteration,

17 and overhaul facility on approximately 40 acres of tidelands property located at 2205 East Belt

18 Street, Foot of Sampson Street, in San Diego, California ("the BAE Leasehold").

19      60.    Since 1979, BAE SYSTEMS has leased the land on which its facility operates

20 from the PORT DISTRICT.

21      61.    BAE SYSTEMS' business historically has been ship repair and maintenance for

22 NAVY and commercial customers. The facilities at BAE SYSTEMS have historically included

23 5 piers, 2 floating dry docks and 2 marine railways, which, together with cranes, enable ships to

24 be launched or repaired. On-shore facilities have included an abrasive blasting building and a

25 paint spray booth. There is an area for steam cleaning/pressure washing vehicles and equipment,

26 which includes a sump where effluent is collected and drained to a clarifier that is connected to

27 the sewer system. There are also manufacturing and storage areas. BAE SYSTEMS also

28 presently manages a solid waste reclamation and recycling area and a hazardous waste

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 14 -

COMPLAINT

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1  reclamation facility on the property.

2    62.    Upon information and belief, the primary industrial processes which BAE

3  SYSTEMS has historically conducted include: surface preparation and paint removal; paint

4  application; tank cleaning; mechanical repair/maintenance/installation; structural

5  repair/alteration/assembly; integrity/hydrostatic testing; paint equipment cleaning; engine

6  repair/maintenance/installation; steel fabrication and machining; electrical

7  repair/maintenance/installation; hydraulic repair/maintenance/installation; tank emptying;

8  fueling; shipfitting; carpentry; and refurbishing/modernization/cleaning.

9    63.    Upon information and belief, the primary materials used by BAE SYSTEMS in

10 its operations have historically been 1) abrasive grit (sometimes consisting of slag from coal-

11 fired boilers and often containing iron, aluminum, silicon, calcium oxides, copper, zinc and

12 titanium; also sand, cast iron or steel shot is used; enormous amounts are needed to remove paint

13 and it is needed in both wet and dry blasting); 2) paint (containing copper, zinc, chromium, lead,

14 and hydrocarbons; anticorrosive paint often containing lead and zinc; antifouling paint often

15 containing copper and tributyltin); 3) miscellaneous, including oils, grease, fuels, weld,

16 detergents, cleaners, rust inhibitors, paint thinners, hydrocarbon and chlorinated solvents,

17 degreasers, acids, caustics, resins, adhesives/cement/sealants and chlorine.

18    64.    Upon information and belief, the wastes commonly generated by BAE SYSTEMS

19 historically in its operations have been abrasive blast waste (with the largest concern being spent

20 paint containing copper, tributyltin, lead, chromium and zinc); fresh paint; bilge waste/oily

21 wastewater; blast wastewater; oils; waste paints; construction repair wastes and trash; and

22 miscellaneous wastes consisting of lubricants, grease, fuels, sewage, boiler blowdown,

23 condensate, discard, acid wastes, caustic wastes, and aqueous wastes.

24    65.    Based on the data available for the years 1987-1991, BAE SYSTEMS generated

25 an average of 178 tons of abrasive blast waste alone per month.

26    66.    During numerous inspections starting in the late 1980s, the Regional Board

27 observed abrasive blast wastes at BAE SYSTEMS' facility deposited in areas where it would

28 probably be discharged to the Bay via stormwater runoff. Samples of abrasive blast waste and

1 | other wastes were collected in the vicinity of storm drains or other areas susceptible to being
2 | transported to the Bay.  For example:

3 |      a.      During an inspection on March 3, 1987, the Regional Board inspector
4 | reported that "…this facility discharged water from the dry dock to the San Diego Bay";

5 |      b.      During an inspection on November 9, 1988, the Regional Board inspector
6 | reported that "Sand blast waste and sewage are being discharged to San Diego Bay".

7 |      67.      The Regional Board has previously issued Administrative Civil Liability Orders
8 | against BAE SYSTEMS for discharges to the Bay, including:

9 |      a.      The Regional Board issued Complaint 89-02 against BAE SYSTEMS for
10 | discharge of abrasive grit waste and raw sewage to San Diego Bay.  The abrasive grit waste
11 | contained elevated levels of arsenic, chromium, lead, and zinc and hazardous levels of copper.

12 |      b.      The Regional Board issued Complaint 2001-138 to BAE SYSTEMS for
13 | violation of storm water runoff requirements of its NPDES permit.  Storm water samples
14 | exceeded the permitted levels for copper and zinc.

15 |      68.      On April 30, 1996, the Natural Resources Defense Counsel, Inc., San Diego
16 | Baykeeper, and Kenneth J. Moser brought Clean Water Act legal action in this Court against
17 | BAE SYSTEMS for, *inter alia,* violating its NPDES permit requirements by discharging
18 | unlawful amounts of pollutants into San Diego Bay.

19 |      69.      On September 7, 1999, this Court issued its findings of fact and conclusions of
20 | law, finding that convincing evidence showed, *inter alia,* that BAE SYSTEMS' reports
21 | demonstrated a pattern of poor housekeeping and showed that violations, when reported, were
22 | not remedied timely; that BAE SYSTEMS' implementation of its plans had led to significant
23 | contributions of pollutants to BAE SYSTEMS' leasehold; that substantial quantities of pollutants
24 | from BAE SYSTEMS' paint-blasting operations had entered San Diego Bay in BAE SYSTEMS'
25 | storm water discharges; and that BAE SYSTEMS' failure to implement its storm water plans
26 | adequately was contributing to and perpetuating the contamination of its leasehold.  The findings
27 | and ruling was appealed to the Ninth Circuit Court of Appeals, which did not overturn any of the
28 | rulings of this Court.  The United States Supreme Court denied the appeal.

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

70.     The Regional Board has alleged in Tentative Order R9-2005-0126 that BAE

SYSTEMS has caused or permitted waste from its shipyard operations to be discharged into the

Bay in violation of waste discharge requirements, and discharged or deposited waste where it

was discharged into the Bay creating, or threatening to create, a condition of pollution or

nuisance.  The Regional Board has alleged that BAE SYSTEMS has violated Water Code

section 13304 and violated its NPDES permit requirements under the Clean Water Act section

402.

71.     Upon information and belief, BAE SYSTEMS has intentionally or accidentally

discharged the COCs from its leasehold and these discharges have resulted in the contamination

of the sediment at the Shipyards Sediment Site.

**F.      SAN DIEGO MARINE CONSTRUCTION COMPANY & THE STAR AND
CRESCENT COMPANIES**

72.     Plaintiff leased to the SDMCC DEFENDANTS certain property at the foot of

Sampson street from 1914 to 1962.

73.     From 1962 to July 1972, the PORT DISTRICT leased this property to the

SDMCC DEFENDANTS.

74.     Upon information and belief, the facility owned and operated by the SDMCC

DEFENDANTS was historically a ship repair and construction facility for NAVY and

commercial customers.  The facility included 2 floating dry docks and 3 marine railways, which,

together with cranes, enabled ships to be launched or repaired.

75.     Upon information and belief, the primary industrial processes which the SDMCC

DEFENDANTS likely conducted include: surface preparation and paint removal; paint

application; tank cleaning; mechanical repair/maintenance/installation; structural

repair/alteration/assembly; integrity/hydrostatic testing; paint equipment cleaning; engine

repair/maintenance/installation; steel fabrication and machining; electrical

repair/maintenance/installation; hydraulic repair/maintenance/installation; tank emptying;

fueling; shipfitting; carpentry; and refurbishing/modernization/cleaning.

76.     Upon information and belief, the primary materials believed to have been used by

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 17 -
COMPLAINT

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1  the SDMCC DEFENDANTS in their operations, based on typical materials used in the industry,

2  are 1) abrasive grit (sometimes consisting of slag from coal-fired boilers and often containing

3  iron, aluminum, silicon, calcium oxides, copper, zinc and titanium; also sand, cast iron or steel

4  shot is used; enormous amounts are needed to remove paint and it is needed in both wet and dry

5  blasting); 2) paint (containing copper, zinc, chromium, lead, and hydrocarbons; anticorrosive

6  paint often containing lead and zinc; antifouling paint often containing copper and tributyltin); 3)

7  miscellaneous, including oils, grease, fuels, weld, detergents, cleaners, rust inhibitors, paint

8  thinners, hydrocarbon and chlorinated solvents, degreasers, acids, caustics, resins,

9  adhesives/cement/sealants and chlorine.

10      77.      Upon information and belief, the wastes believed to have been generated by the

11  SDMCC DEFENDANTS in their operations, based on those generated by the above-listed

12  shipyard activities, are abrasive blast waste (with the largest concern being spent paint containing

13  copper, tributyltin, lead, chromium and zinc); fresh paint; bilge waste/oily wastewater; blast

14  wastewater; oils; waste paints; construction repair wastes and trash; and miscellaneous wastes

15  consisting of lubricants, grease, fuels, sewage, boiler blowdown, condensate, discard, acid

16  wastes, caustic wastes, and aqueous wastes.

17      78.      In March 1972, the Regional Board initiated an investigation to determine the

18  amount of and kinds of pollutants that entered San Diego Bay from shipbuilding and repair

19  facilities, and the possible effects that pollution could have on beneficial uses of the Bay. All

20  shipbuilding and repair facilities were inspected, including SDMCC. The report noted, *inter*

21  *alia,* the following conditions from the year 1971:

22          a.      SDMCC constructed 6 new ships and refinished 70 ships in 1971.

23  Approximately 20-50% of the ships were sandblasted. Approximately 8,000 gallons of paint and

24  primer containing copper and tributyltin were used. Air sand blasting with black sand was used

25  to strip vessels to bare metal in the dry docks and on the railways;

26          b.      The SDMCC DEFENDANTS' facility was located immediately adjacent

27  to the Bay, and wastes from the facility were conveyed to the Bay by water flows, by becoming

28  airborne, or by falling directly into the Bay;

79.     The Regional Board has alleged in Tentative Order R9-2005-0126 that SDMCC caused or permitted waste from its shipyard operations to be discharged into the Bay creating, or threatening to create, a condition of pollution or nuisance.   The Regional Board has alleged that SDMCC has violated Water Code section 13304.

80.     Upon information and belief, SDMCC has intentionally or accidentally discharged the COCs from its leasehold and these discharges have resulted in the contamination of the sediment at the Shipyards Sediment Site.

G.      **CAMPBELL INDUSTRIES, MCCSD, AND SAN DIEGO MARINE CORPORATION**

81.     Upon information and belief, from at least 1972 (if not earlier) to 1979, the CAMPBELL DEFENDANTS owned and operated a ship repair, alteration, and overhaul facility on approximately 40 acres of tidelands property on or about 2205 East Belt Street, Foot of Sampson Street, in San Diego, California, within or adjacent to the BAE Leasehold.   The CAMPBELL DEFENDANTS leased this property from the PORT DISTRICT.

82.     Upon information and belief, the CAMPBELL DEFENDANTS' facility included 2 floating dry docks and 3 marine railways, which, together with cranes, enable ships to be launched or repaired.

83.     Upon information and belief, the primary industrial processes which the CAMPBELL DEFENDANTS likely conducted, based upon typical ship construction and repair industry activities, include: surface preparation and paint removal; paint application; tank cleaning; mechanical repair/maintenance/installation; structural repair/alteration/assembly; integrity/hydrostatic testing; paint equipment cleaning; engine repair/maintenance/installation; steel fabrication and machining; electrical repair/maintenance/installation; hydraulic repair/maintenance/installation; tank emptying; fueling; shipfitting; carpentry; and refurbishing/modernization/cleaning.

84.     Upon information and belief, the primary materials believed to have been used by the CAMPBELL DEFENDANTS in its operations, based on typical materials used in the industry, are 1) abrasive grit (sometimes consisting of slag from coal-fired boilers and often

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 19 -

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1   containing iron, aluminum, silicon, calcium oxides, copper, zinc and titanium; also sand, cast

2   iron or steel shot is used; enormous amounts are needed to remove paint and it is needed in both

3   wet and dry blasting); 2) paint (containing copper, zinc, chromium, lead, and hydrocarbons;

4   anticorrosive paint often contains lead and zinc; antifouling paint often contains copper and

5   tributyltin); 3) miscellaneous, including oils, grease, fuels, weld, detergents, cleaners, rust

6   inhibitors, paint thinners, hydrocarbon and chlorinated solvents, degreasers, acids, caustics,

7   resins, adhesives/cement/sealants and chlorine.

8       85.     Upon information and belief, the wastes believed to have been generated by the

9   CAMPBELL DEFENDANTS in its operations, based on those generated by the above-listed

10   shipyard activities, are abrasive blast waste (with the largest concern being spent paint containing

11   copper, tributyltin, lead, chromium and zinc); fresh paint; bilge waste/oily wastewater; blast

12   wastewater; oils; waste paints; construction repair wastes and trash; and miscellaneous wastes

13   consisting of lubricants, grease, fuels, sewage, boiler blowdown, condensate, discard, acid

14   wastes, caustic wastes, and aqueous wastes.

15       86.     Data from the PORT DISTRICT indicate that historical operations at the

16   CAMPBELL DEFENDANTS' facility included:

17           a.     Use of formaldehyde and arsenic in pretreated wood at the wood shop;

18           b.     Performance of blasting, welding and painting activities for Navy contract

19   work in the blasting area;

20           c.     Use of a dust suppression system for the blasting house, which consisted

21   of blowers directed to the Bay with a water spray to cause blast dust to settle in the water;

22           d.     Discharge of all wastes generated on the dry dock to the Bay, including

23   blast grit and paint.

24       87.     In 1973, an undetermined amount of fuel was released to the Bay from the

25   CAMPBELL DEFENDANTS' leasehold, resulting in temporary site closure.

26       88.     The Regional Board has alleged in Tentative Order R9-2005-0126 that the entities

27   operating at the CAMPBELL DEFENDANTS' facility caused or permitted waste from its

28   shipyard operations to be discharged into the Bay in violation of waste discharge requirements,

- 20 -

COMPLAINT

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1  and discharged or deposited waste where it was discharged into the Bay creating, or threatening

2  to create, a condition of pollution or nuisance.  The Regional Board has alleged that

3  CAMPBELL violated Water Code section 13304 and violated its NPDES permit requirements

4  under the Clean Water Act section 402.

5       89.  Upon information and belief, the CAMPBELL DEFENDANTS have intentionally

6  or accidentally discharged the COCs from its leasehold and these discharges have resulted in the

7  contamination of the sediment at the Shipyards Sediment Site.

8  **H.  SDG&E**

9       90.  Defendant SDG&E, a subsidiary of Sempra Energy Company, owned and

10  operated the Silvergate Power Plant along the north side of the BAE Leasehold from

11  approximately 1943 to the 1990s.  The plant ceased active operations in approximately 1984 and

12  was decommissioned in 2004.

13       91.  Upon information and belief, the Silvergate Power Plant included 4 steam turbine

14  electrical generators.  The boilers initially burned fuel oil, and in later years were converted to

15  burn both natural gas and fuel oil.  There was also an electrical switchyard adjacent to the plant

16  itself.  The facility had transformers onsite.

17       92.  Upon information and belief, as part of the plant's operations, SDG&E

18  maintained an easement to San Diego Bay for cooling water discharge tunnels ("CW tunnels") to

19  deliver and remove water used for cooling the turbines.  The turbine sump pumps discharged to

20  the CW tunnels.  Bilge water was also piped to the CW tunnels.  The CW tunnels had flow rates

21  of 120-180 million gallons per day.  The discharge CW tunnel was located in close proximity to

22  the property line with the BAE Leasehold.

23       93.  Upon information and belief, there were also at least 2 wastewater

24  settling/evaporation ponds and 2 subgrade oil separators on the SDG&E easement, within close

25  proximity to the Bay.  Basement bilge water from the boiler side of the plant was pumped to a

26  pond(s) for settling and evaporation, and some of that water was discharged to the Bay.

27  Historical photographs indicate a surface spill at "Pond A" occurred on or about 1952 when a

28  plug in piping led to overflow of liquid onto the adjacent ground, which photographs indicate

1  flowed to the Bay. "Pond B" was used from at least 1966-1973 as an oil-water settling pond.

2  There was also an area referred to as "Nobel's Lake," which may have been "Pond B," which

3  received discharges from all sources in the north side of the plant, including the fuel oil pump

4  room sump pump, and possibly the turbine room sump pumps, control rooms, generator vaults in

5  the switchyard, electrical repair, maintenance and machining areas, and rinsewater from cleaning

6  out drums containing PCBs. As of 1974, "Nobel's Lake" was filled to the brim and contained an

7  11 foot deep mixture of oil and earth.

8       94.    Upon information and belief, the Silvergate Power Plant's switchyard and plant

9  itself were sources of PCBs:

10       a.    In the switchyard, the following equipment likely contained PCB fluids:

11  75 oil circuit breaker tanks, 4 transformers, and the main and auxiliary transformers for

12  Generator Units 1-4. The presence of PCBs at the site was documented during the Underground

13  Tank Storage program on or about 2006.

14       b.    In the power plant itself, the following equipment in the turbine room and

15  on the cooling water deck likely contained PCB fluids:  4 Steam Turbine Generator Sets, 8

16  (2500-3000 gallon) Turbine Lubricating Oil tanks, 2 power and 2 lighting transformers near each

17  of Generator Units 1 and 2 on the cooling water deck. Shop areas conducting electrical repairs,

18  maintenance and machining also could have been PCB sources. Capacitors, switches, reclosers,

19  wiring insulation, lube oil coolers, condensate pumps, overhead cranes and hoists are also

20  potential sources.

21       95.    Upon information and belief, Studies indicate that steam turbine

22  hydraulic/lubricating oil loss from power plants on an annual basis ranges from 5-30%, with the

23  average annual loss in the United States 7-10%.

24       96.    Upon information and belief, Case studies indicate that PCBs are most commonly

25  found on and around the oil lubrication systems, former station transformer areas and power-

26  generation equipment at plants, and that PCBs were found in turbine generator lubrication oil

27  because of the use of the same as a lubricant throughout plants.

28       97.    Upon information and belief, there were multiple transport pathways for PCBs to

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 22 -

1   be discharged from the Silvergate Power Plant to San Diego Bay:

2           a.    CW Tunnel System: The turbine sump pumps discharged to the CW

3   Tunnel, which discharged to the Bay immediately north of the current BAE SYSTEMS

4   leasehold. The turbine sump pumps were likely recipients of discharges from turbine generator

5   lubrication/hydraulic systems, overhead crane hydraulic system, or electrical gear (capacitors,

6   transformers, reclosers, switchers), which contained PCBs. Bilge water was also piped to the

7   CW tunnels. The CW tunnel system was not a closed system.

8           b.    Ponds, including "Nobel's Lake": "Pond A" had a documented overflow

9   in 1952 which reached the Bay near the property line with the current BAE SYSTEMS

10   leasehold. This overflow likely contained PCBs, given that PCB containing oils were used at

11   power plants on a widespread basis in this time frame. "Pond B" was used from at least 1966-

12   1973 as an oil-water settling pond, located a few hundred feet from the Bay, also near the

13   property line with the BAE Leasehold. "Nobel's Lake," which may have been "Pond B,"

14   received discharges from all sources in the north side of the plant, including the fuel oil pump

15   room sump pump, and possibly the turbine room sump pumps, control rooms, generator vaults in

16   the switchyard, electrical repair, maintenance and machining areas, and rinsewater from cleaning

17   out drums containing PCBs. Photographs indicate surface drainage around the Nobel's Lake

18   area in the 1950s and document removals of "sludge" and "muck" from it which was simply

19   placed in a hole nearby, all in very close proximity to the Bay. As of 1974, "Nobel's Lake" was

20   filled to the brim and contained an 11 foot deep mixture of "oil and earth." Photographs and

21   plant diagrams indicate that Nobel's Lake itself drained into the CW discharge tunnel or directly

22   into the Bay through an outlet pipe. Soil samples taken in the vicinity of Pond B/Nobel's Lake

23   in 1995 indicate elevated levels of PCBs, chromium, copper, lead, nickel and zinc.

24           c.    Floor drains: An undated SDG&E training manual states that "… floor

25   drains are in areas where large amounts of oil may be spilled."

26           d.    Surface runoff from switchyard: There was the potential for runoff of

27   sediments containing PCBs during precipitation events, directly to the Bay or to the Bay through

28   one of Plaintiff's MS4 outfalls. On information and belief, transformers in the switchyard were

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

COMPLAINT

not contained within concrete sumps and there were not secondary containment measures for oil storage units until the 1970s.

98.    Upon information and belief, in 2006, during closure of SDG&E's underground storage tanks, PCBs were detected in the soil in all 18 samples taken around at the facility. Eleven of the samples had PCBs above 1000 ug/kg. The 3 highest samples had concentrations of 125,000 ug/kg, 14,700 ug/kg and 34,700 ug/kg. Copper, lead and zinc were also detected. The Regional Board found in its Tentative Order R9-205-0126 that the PCBs and metals deposited in the soil by SDG&E were such that they were, or probably would be, discharged to the Bay via storm water runoff.

99.    In 2005, Plaintiff observed an illegal discharge into its MS4 catch basin on the north side of Sampson Street, immediately to the east of BAE SYSTEMS' parking lot and the SDG&E Silvergate Power Plant. Plaintiff took sampling of the inside and base of the six inch lateral entering the basin from the former plant leasehold, the base of the 12 inch lateral entering the basin from an area draining water from the facility, and from the 18 inch pipe exiting the basin and conveying to the Bay at the Shipyard Sediment Site. The results indicated the presence of PCBs and PAHs entering the storm water system from the former plant leasehold, and exiting the storm drain system to the Bay. Plaintiff issued a Notice of Violation to SDG&E.

100.    The Regional Board has alleged in Tentative Order R9-2005-0126 that SDG&E caused or permitted waste from its power plant operations to be discharged into the Bay in violation of waste discharge requirements, and discharged or deposited waste where it was discharged into the Bay creating, or threatening to create, a condition of pollution or nuisance. The Regional Board has alleged that SDG&E has violated Water Code section 13304 and violated its NPDES permit requirements under the Clean Water Act section 402.

101.    Upon information and belief, SDG&E has intentionally or accidentally discharged the COCs from its leasehold and these discharges have resulted in the contamination of the sediment at the Shipyards Sediment Site.

I.    **UNITED STATES NAVY**

102.    From 1921 to present, NAVY has provided shore support and pier-side berthing

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 24 -

1  services to U.S. Pacific fleet vessels at Naval Station San Diego ("NAVSTA"), which it owns

2  and operates, located at 3445 Surface Navy Boulevard.

3      103.    NAVSTA currently occupies 1,029 acres of land and 326 water acres adjacent to

4  San Diego Bay to the west, and Chollas Creek north near Pier 1. It is immediately south of and

5  adjacent to the Shipyard Sediment Site. NAVSTA's present leasehold includes a 24,653 square

6  foot parcel north of and immediately adjacent to Chollas Creek, at the south end of 28th Street.

7      104.    Between 1938 and 1956, NAVSTA's leasehold also included the 28th Street

8  Shore Boat Landing Station, located at the south end of the present day NASSCO leasehold at

9  the foot of 28th Street, including the 28th Street Pier. Upon information and belief, at this

10  location, NAVY conducted operations similar to a small boatyard, including solvent cleaning

11  and degreasing of vessel parts and surfaces, abrasive blasting and scraping for paint removal and

12  surface preparations, metal plating, and surface finishing and painting.

13      105.    Upon information and belief, NAVSTA historically has provided supply and

14  maintenance logistical support to numerous U.S. Navy vessels. NAVSTA was used extensively

15  in the 1920s and 1930s for repair and maintenance of U.S. Navy Destroyer vessels. The base was

16  rapidly expanded in the 1930s and 1940s. From 1943 to 1945, more than 5,000 ships were sent

17  to the base for conversion, overhaul, battle damage, repair, or maintenance. Almost half of these

18  ships were dry docked. In the mid-1940s, the base added another 823 acres, 200 buildings, a

19  1,700 marine railway, a cruiser graving dry dock, five large repair piers, a quay wall totally

20  28,000 feet of berthing space, and extensive industrial repair facilities. NAVSTA is currently

21  home port for approximately 60 naval vessels and 50 separate commands.

22      106.    Upon information and belief, a number of historical activities at NAVSTA

23  resulted in the discharge of hazardous substances to the San Diego Bay, including:

24          a.    Former ship repair basins: Many ship repair operations were conducted in

25  4 basins used as ship repair wet docks between 1943-1945, when over 5,000 ships were sent

26  there for conversion, overhaul and repair. Thereafter, until 1972, at least 2 basins were used as

27  informal disposal sites for hazardous and non-hazardous solid waste. Chemical constituents

28  identified in these basins in the 1990s included lubricants, oils, and PCBs. In 1998, 16 tons of

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 25 -

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1    PCB and PAH impacted soil was removed as part of an initial cleanup action.

2        b.    Mole pier:  Constructed in 1942, materials such as creosote-coated pier

3    pilings, lumber, refuse concrete, waste paints, gasoline, oil and diesel fuel were burned at the site

4    between 1945 and 1972.  Trucks and heavy equipment were decontaminated here by spraying

5    them with diesel fuel and dunking them in Paleta Creek, which flows to the Bay.  It is estimated

6    that approximately 500,000 gallons of fuel was sprayed, burned or buried in this area

7    historically.

8        c.    Salvage Yard:  Materials handled by this yard between 1943 and

9    approximately 1975 include transformers containing PCBs, mercury, electrolytes from old

10   batteries, drummed petroleum wastes, solvents and thinners, and demolition debris.  It is

11   estimated that 100-200 drums of waste lubricating oils, lubricants and solvents were transported

12   here for handling.  Liquids were incinerated, poured onto the ground, or recycled.  Pollutants

13   could have migrated to the Bay via Paleta Creek or surface water runoff.

14       d.    Defense Property Disposal Office Storage Yard:  Used between 1943

15   through 1981, this site was routinely oiled as a dust control measure prior to 1975, with some

16   35,000 to 75,000 gallons of waste petroleum, oils and lubricants.  Chemical constituents

17   identified here in the 1990s include petroleum, PCBs and metals.  Hazardous substances

18   migrated to the Bay via Paleta Creek or surface water runoff.

19       e.    Firefighting training facility:  Between 1945 and 1995, NAVY operated

20   this facility near its Pier 8.  Training fires were lit regularly using petroleum hydrocarbons,

21   including approximately 3500 gallons per week of jet propellant grade 5 and gasoline.  Prior to

22   1972, there was no pollution control equipment and chemicals could have migrated to the Bay.

23   Contamination was identified at the site in the early 1990s and extraction systems have

24   reportedly removed some 15,000 gallons of free product.

25       f.    PCB Storage Facility Electrical Storage Yard:   From 1981 through 1994,

26   NAVY operated a PCB storage facility near Paleta Creek, approximately 1000 feet from the Bay.

27   The area was used primarily for maintenance of electrical equipment, including draining of

28   transformer fluids and storage of fluids containing PCBs.  PCBs were not segregated from other

COMPLAINT

1   fluids until the late 1980s. Waste oil likely containing PCBs was applied to the ground for dust

2   and weed suppression. PCB impacted soil was removed from the site and a nearby storm drain

3   in the mid-1990s.

4          g.     Material Storage Yard: The site was used between 1939 and 1995 as an

5   unpaved storage yard for metal finishing, preservation and packaging at Building 321. In the

6   1990s, metals, PAHs and PCBs were identified in soil at the site.

7          h.     Brinser Street parking area: NAVY constructed floating dry docks and

8   barges here near its Pier 7 between 1941 and 1945. Facilities included 2 shallow creosote dip

9   ponds used to treat lumber on the site. Soil investigations have revealed presence of petroleum

10   products, PAHs and metals, among others. Surface water run off could have transported

11   pollutants to the Bay.

12          i.     Drydock sandblast area: The drydock sandblast grit area is located

13   immediately east of Piers 5 and 6. The site has been used for overhaul and maintenance of ships,

14   repair of ship components and contractor equipment since 1942. Operations here, which

15   continue to present, include sandblasting and painting. Copper abrasive blast material was used

16   to remove anticorrosive and antifouling paint from ship hulls. A railcar and silo transported and

17   stored the sandblast grit. Open air sandblasting took place until 1993. In October 1992, visible

18   surface contamination was removed, and the elevated levels of arsenic, iron, lead, manganese,

19   copper, and nickel, among others, were detected.

20          j.     Historic operations at present NASSCO leasehold: Between 1938 and

21   1956, NAVY operated the 28th Street Shore Boat Landing Station, currently part of the NASSCO

22   leasehold, consisting of a finger pier and various machine and electrical shops and stores. On

23   information and belief, the activities conducted were most likely similar to those at a small boat

24   yard. Typically, such activities include scrubbing boat hulls, blasting, and painting. Paints used

25   typically include copper, arsenic, and mercury. Activities historically occur outside, close to

26   receiving waters. In its 1970s investigation of shipyards, the Regional Board concluded that in

27   San Diego Bay, heavy metal concentrations were higher in sediment near boatyards and

28   shipyards. Core sampling in the area of these former NAVY operations indicates that there are

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1    metals, tributyltin and PCBs likely attributable to NAVY's operations.

2       107.    Upon information and belief, current NAVY operations on the wetside also likely

3    discharge pollutants into San Diego Bay from in and around NAVSTA's 13 piers berth ships,

4    barges and support vessels. Berth-side repair and maintenance conducted is believed to include

5    abrasive blasting, hydro-blasting, metal grinding, painting, tank cleaning, removal of bilge and

6    ballast water, removal of anti-fouling paint, sheet metal work, electrical work, mechanical repair,

7    engine repair, hull repair and sewage disposal. More complex similar activities are typically

8    conducted at the graving dock or floating dry dock. Discharges include industrial process water

9    or stormwater contaminated with abrasive blast material, paint, oils, lubricants, fuels and

10   solvents. NAVY ship movements and tidal flows work to distribute pollutants from NAVSTA to

11   the Shipyard Sediment Site.

12      108.    On information and belief, additionally, NAVY currently and historically has

13   many of its ships and other vessels serviced at the NASSCO leasehold operations and the BAE

14   SYSTEMS leasehold operations. On information and belief, NAVY would provide detailed

15   specifications for all repair, overhaul, construction and maintenance work on its ships to

16   NASSCO, NATIONAL STEEL & SHIPBUILDING CORPORATION, NATIONAL IRON

17   WORKS, MARTINOLICH SHIP BUILDING COMPANY, BAE SYSTEMS, the SDMCC

18   DEFENDANTS, and the CAMPBELL DEFENDANTS. Upon information and belief, this

19   included, but was not limited to, what type of antifouling and marine paints to use on NAVY

20   ships, which were NAVY or U.S. Military formulations; other painting specifications for NAVY

21   ships; how to conduct abrasive blasting and scraping on ships; and how to conduct hull cleaning

22   on ships. On information and belief, NAVY has and had its own offices and/or conference

23   rooms and/or NAVY operated facilities at the current NASSCO and BAE SYSTEMS leaseholds,

24   both presently and historically. On information and belief, NAVY personnel on the ships and

25   vessels also themselves conducted such repair, overhaul, construction and maintenance work on

26   NAVY ships while those ships were docked at the facilities owned and operated by NASSCO,

27   NATIONAL STEEL & SHIPBUILDING CORPORATION, NATIONAL IRON WORKS,

28   MARTINOLICH SHIP BUILDING COMPANY, BAE SYSTEMS, the SDMCC

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 28 -
COMPLAINT

1    DEFENDANTS and the CAMPBELL DEFENDANTS.  Discharges from this work on NAVY

2    ships and vessels from this work, which NAVY was aware of and intended via its issuance of

3    detailed specifications for this work, and which NAVY itself caused from its own work on these

4    ships and vessels while docked at these shipyards, likely contributed to the discharge of

5    hazardous substances into the Shipyard Sediment Site, including metals (arsenic, cadmium,

6    copper, lead, mercury, zinc), tributyltins, PAHs, and PCBs.

7         109.    Upon information and belief, NAVSTA's dryside consists of facilities east of

8    Harbor Drive, and contains at least 8 of its own MS4 storm drains.  NAVY owns and operates its

9    own MS4 storm water conveyance system.  Some 266 acres of NAVSTA drain directly to

10   Chollas Creek.

11        110.    The Regional Board has alleged in Tentative Order R9-2005-0126 that NAVY

12   has caused or permitted the discharge of pollutants to the San Diego Bay in violation of its

13   NPDES permit, including excessive concentrations of copper, lead and zinc.

14        111.    The Regional Board has further alleged in Tentative Order R9-2005-0126 that

15   NAVY caused or permitted waste from its NAVSTA operations to be discharged into the Bay,

16   via storm water, tides and ship movement, and discharged directly into the Shipyard Sediment

17   Site through its prior operations at the 28th Street Shore Boat Landing Station, in violation of

18   waste discharge requirements, and discharged or deposited waste where it was discharged into

19   the Bay creating, or threatening to create, a condition of pollution or nuisance.  The Regional

20   Board has alleged that NAVY has violated Water Code section 13304 and violated its NPDES

21   permit requirements under the Clean Water Act section 402.

22        112.    NAVY's own studies suggest that a chronic substantial source of PAHs to San

23   Diego Bay is from creosote treated pilings, like those on NAVY's Mole pier.

24        113.    Upon information and belief, the NAVY has intentionally or accidentally

25   discharged the COCs from its operations and these discharges have resulted in the contamination

26   of the sediment at the Shipyards Sediment Site.

27   **J.        PORT DISTRICT**

28        114.    Since 1962, the PORT DISTRICT has had an ownership interest, as a public

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 29 -

1   trustee and landlord, in the NASSCO and BAE Leaseholds, and in the property formerly leased

2   to the SDMCC DEFENDANTS and the CAMPBELL DEFENDANTS, as well as in an easement

3   for the cooling water tunnels from SDG&E's Silvergate Powerplant.

4        115.   The State of California holds title to the navigable waterways and the land

5   beneath them as a trustee for the public. The State's power to control, regulate and utilize the

6   navigable waterways within the terms of the trust is absolute except as limited by the supervisory

7   power of the federal government. Under the San Diego Unified Port District Act ("the Act"), the

8   state of California delegated its authority to manage and control San Diego Bay to the PORT

9   DISTRICT. The Act authorizes the PORT DISTRICT to make and enforce all necessary rules

10  and regulations regarding the tidelands within its jurisdiction. Accordingly, the PORT

11  DISTRICT had regulatory land use authority over the property it held in trust and leased to

12  NAASCO, BAE SYSTEMS, the SDMCC DEFENDANTS, the CAMPBELL DEFENDANTS,

13  and SDG&E.

14       116.   Upon information and belief, the PORT DISTRICT had, through its interactions

15  with the Regional Board over the years, known of the likelihood of intentional and/or accidental

16  discharges of hazardous substances from NASSCO, BAE SYSTEMS, the SDMCC

17  DEFENDANTS, the CAMPBELL DEFENDANTS, and SDG&E contributing to the

18  accumulations of hazardous substances in the Shipyards Sediment Site area. Despite this

19  knowledge, the PORT DISTRICT did not exercise its regulatory land use authority to prevent the

20  discharges of hazardous substances.

21       117.   Upon information and belief, the PORT DISTRICT has had the legal authority

22  under its lease agreements with its lessees, including Defendants discussed above, to impose

23  controls that could prevent or reduce the Defendant lessees' discharges of hazardous substances:

24       a.   Lease agreements between PORT DISTRICT and its tenants typically

25  contained terms that obligated its tenants to "abide by and conform to . . . any applicable laws of

26  the State of California and Federal Government."

27       b.   Defendant PORT DISTRICT's leases also required that its tenants keep

28  the leased premises in a clean and sanitary condition, free and clear of waste.

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

c.      The leases also authorized PORT DISTRICT to enter and inspect the premises at any time during normal business hours.

d.      The leases authorized PORT DISTRICT to terminate the lease after 60 days written notice if the tenant defaulted in performance of the lease provisions.

118.    The Regional Board alleged, in Tentative Order R9-2005-0126, that the above cited lease terms would be sufficient to base a finding that the PORT DISTRICT had the requisite degree of control over its tenants' activities to show that PORT DISTRICT caused or permitted waste to be discharged into San Diego Bay, creating a condition of pollution at the Shipyard Sediment Site.

119.    Upon information and belief, the PORT DISTRICT's tenants at the NAASCO and BAE Leaseholds have intentionally and/or accidentally discharged the COCs from their operations and these discharges have resulted in the contamination of the sediment at the Shipyards Sediment Site.

## FIRST CAUSE OF ACTION

### (Cost Recovery Under CERCLA against all Defendants)

120.    Plaintiff realleges all prior paragraphs and incorporates them by reference.

121.    The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), CERCLA Section 107(a), 42 U.S.C. § 9607(a), provides as follows:

(1) the owner or operator of a . . . facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, [or]

(3) any person who . . . arranged for disposal or treatment . . . of hazardous substances . . . at any facility...

(4) .... from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for –

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan.

122.    As detailed in the general allegations above, each Defendant qualifies as a "covered person" as defined by Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

123.    The chemicals and substances which Defendants used, stored, disposed of, discharged and released into the Shipyard Sediment Site were "hazardous substances" within the meaning of CERCLA Section 101(14), 42 U.S.C. §9601(14).  Such hazardous substances included the COCs.

124.    A "release" or "threatened release" of hazardous substances within the meaning of CERCLA Section 101(22), 42 U.S.C. § 9601(22), has occurred at the Shipyard Sediment Site from each of Defendants' ownership, operations or arrangements for disposal of hazardous substances at facilities at or adjacent to the Shipyard Sediment Site.  Defendants, and each of them, conducted themselves in their ownership and/or operations and/or disposal arrangement activities at or around the Shipyard Sediment Site so as to directly, proximately and/or causally contribute to the damages as alleged herein.

125.    The release(s) or threatened release(s) have occurred from a "facility" or facilities into the Shipyard Sediment Site within the meaning of CERCLA Section 101(9), 42 U.S.C. § 9601(9).

126.    As a result of the "release(s)" and/or threatened "releases(s)" of "hazardous substances," by Defendants, Plaintiff has conducted and is conducting a "response" within the meaning of CERCLA Section 101(25), 42 U.S.C. § 9601(25), and has incurred and will incur response costs.

127.    Plaintiff has incurred, and will continue to incur, substantial costs consistent with the National Contingency Plan to investigate and remediate releases and/or threatened releases of hazardous substances in the environment at and around the Site.

128.    Plaintiff requests that judgment be entered in its favor and against Defendants pursuant to 42 U.S.C. § 9607(a) for all response costs that Plaintiff has incurred and will in the

COMPLAINT

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1  future incur to investigate, remove or remediate hazardous substances, and alleged property

2  damage, including but not limited to alleged damage to aquatic life, at the Site.

3  <div align="center">**SECOND CAUSE OF ACTION**</div>

4  <div align="center">**(Contribution Under CERCLA against all Defendants)**</div>

5      129.   Plaintiff realleges all prior paragraphs and incorporate them by reference.

6      130.   Each Defendant is a "covered person" as defined by Section 107(a) of CERCLA,

7  42 U.S.C. § 9607(a). Each Defendant therefore is a "covered person," liable for contribution and

8  other relief to Plaintiff under 42 U.S.C. § 9613(f).

9      131.   As responsible parties under section 9607(a) of CERCLA, Defendants, and each

10  of them, are liable to Plaintiff for contribution toward any costs it incurs in responding to and/or

11  reimbursing Plaintiff for the alleged release and/or threatened release of hazardous substances at

12  or into the Shipyard Sediment Site as alleged in herein, including without limitation, the costs of

13  investigation, clean-up, removal of contaminated sediments and soils, and completing any

14  additional investigation, monitoring, and remediation at the Shipyard Sediment Site, in amounts

15  to be determined at the trial of this matter.

16      132.   Plaintiff requests that judgment be entered in its favor and against Defendants

17  pursuant to 42 U.S.C. § 9613 for contribution to the response costs that Plaintiff has incurred,

18  and will incur in the future, to investigate and/or remediate hazardous substances, and alleged

19  property damage, including but not limited to alleged damage to aquatic life, at the Site.

20  <div align="center">**THIRD CAUSE OF ACTION**</div>

21  <div align="center">**(Declaratory Judgment Under CERCLA against all Defendants)**</div>

22      133.   Plaintiff realleges all prior paragraphs and incorporates them by reference.

23      134.   CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), provides that in an action to

24  recover costs, "the court shall enter a declaratory judgment on liability for response costs or

25  damages that will be binding on any subsequent action or actions to recover further response

26  costs or damages."

27      135.   This action is an action of the type described in CERCLA Section 113(g)(2), 42

28  U.S.C. § 9613(g)(2).

136.   An actual controversy has arisen and now exists among Plaintiff and Defendants in that Plaintiff contends, and Defendants deny, that Defendants are liable under CERCLA for the costs incurred and to be incurred by Plaintiff to investigate, remove or remediate hazardous substances at the Site.

137.   Unless all of the rights, duties and obligations of Plaintiff and each Defendant are determined in this action, there will be a multiplicity of actions.  Judicial determination of the liability of each party is necessary and appropriate in order that Plaintiff may ascertain its rights as against each Defendant.

138.   Pursuant to 28 U.S.C. § 2201(a) and 42 U.S.C. § 9613(g)(2), this Court has jurisdiction to award declaratory relief.  Plaintiff, therefore, request a judicial determination of its rights, and the duties and obligations of each Defendant, and all others, with respect to the alleged release and/or threatened release of hazardous substances at the Shipyard Sediment Site and the alleged property damage, including but not limited to alleged damage to aquatic life resulting therefrom.  Plaintiff further requests that this Court apply all equitable factors and principles in determining the fault and liability of each party in making an allocation and apportionment for contributions by, between and among the parties.

## FOURTH CAUSE OF ACTION

**(Contribution Under Hazardous Substance Account Act against all Defendants)**

139.   Plaintiff realleges all prior paragraphs and incorporates them by reference.

140.   The California Hazardous Substance Account Act ("HSAA") codified at California Health & Safety Code §§ 25300 through 25395,45, states at § 25363(e):

Any person who has incurred removal or remedial action costs in accordance with this chapter or the federal act [defined as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §§9601, et seq.)] may seek contribution or indemnity from any person who is liable pursuant to this chapter.

141.   Plaintiff is a "person" who has incurred or will incur removal and remedial action costs in accordance with Chapter 6.8 of the HSAA and with the federal act, within the meaning of HSAA § 25319.

*Gordon & Rees LLP*
*101 West Broadway*
*Suite 1600*
*San Diego, CA 92101*

142. Each Defendant is a "person who is liable" for removal and remedial action costs incurred by Plaintiff within the meaning of HSAA §§ 25319 and 25323.5.

143. The contaminants released or discharged by Defendants are "hazardous substances" within the meaning of HSAA § 25316, and the federal act.

144. The Shipyard Sediment Site is a "site" within the meaning of HSAA § 25323.9.

145. The costs incurred by Plaintiff to investigate and remediate hazardous substances, alleged property damage, and alleged injury at the Shipyard Sediment Site have been incurred for "removal" or "remedial" actions within the meaning of HSAA §§ 25322 and 25323.

146. All removal and remedial costs incurred, and to be incurred, by Plaintiff at the Shipyard Sediment Site are necessary costs of response that are consistent with HSAA § 25356.1.

147. Plaintiff has given or will give written notice of this action to the Regional Board pursuant to HSAA § 25363(e).

148. Defendants are liable to Plaintiff for all removal and remedial costs incurred to remedy the alleged effects of hazardous substances that Defendants have released or disposed at the Site.

149. Plaintiff is entitled to contribution from Defendants for all response costs under California Health & Safety Code Section 25363(e). Accordingly, Plaintiff requests that judgment be entered in favor of Plaintiff and against Defendants as set forth below.

## FIFTH CAUSE OF ACTION

### (Declaratory Relief Under California Hazardous Substance Account Act against all Defendants)

150. Plaintiff realleges all prior paragraphs and incorporates them by reference.

151. Plaintiff has incurred costs in connection with its investigation of contamination at the Shipyard Sediment Site in accordance with the HSAA, California Health & Safety Code §25300, et seq.

152. An actual controversy has arisen and now exists among Plaintiff and Defendants in that Plaintiff contends, and Defendants deny, that Defendants are liable under the HSAA for

- 35 -

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1   the costs incurred and to be incurred by Plaintiff to investigate, remove or remediate hazardous

2   substances, and alleged property damage, including but not limited to alleged damage to aquatic

3   life, at the Site.

4       153.    Because the alleged contamination has not been fully mitigated according to

5   regulatory agencies, Plaintiff will incur necessary response costs under the HSAA in the future.

6       154.    Pursuant to California Health and Safety Code § 25363, Plaintiff is entitled to a

7   declaratory judgment establishing Defendants' liability for such response costs for the purposes

8   of this and any subsequent action or actions to recover further response costs. Accordingly,

9   Plaintiff requests that judgment be entered in favor of Plaintiff and against Defendants as set

10  forth below.

11                              **SIXTH CAUSE OF ACTION**

12          **(Contribution under State law against all Defendants except NAVY)**

13      155.    Plaintiff incorporates the prior allegations by this reference as though fully set

14  forth herein.

15      156.    As a direct and proximate result of the releases and/or threatened releases of

16  hazardous substances into the environment, as alleged above, Plaintiff has incurred and will

17  incur response costs, beyond its share, for investigation and cleanup of the alleged

18  contamination.

19      157.    Plaintiff is informed and believes, and on that basis alleges, that the conduct of

20  Defendants was the proximate cause of the damages which Plaintiff has incurred because of

21  claims from third parties such as the Regional Board.

22      158.    Under Section 1432 of the California Civil Code, which states that "a party to a

23  joint, or joint and several obligation, who satisfies more than his share of the claim against all,

24  may require a proportionate contribution from all the parties joined with him," and under general

25  equitable principles and rules governing this action, Plaintiff is entitled to contribution from

26  Defendants for their share of the response costs and damages paid and to be paid by Plaintiff.

27

28

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

## SEVENTH CAUSE OF ACTION

### (Cost Recovery Pursuant to California Water Code

### Section 13304 against all Defendants)

159.   Plaintiff incorporates the prior allegations by this reference as though fully set forth herein.

160.   California Water Code section 13304(a) states in relevant part:

> Any person who has discharged or discharges waste into the waters of this state in violation of any waste discharge requirement or other order or prohibition issued by a regional board or state board, or who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall upon order of the regional board, clean up the waste, or, in the case of threatened pollution or nuisance, take other necessary remedial action, including, but not limited to, overseeing clean up and abatement efforts.

161.   California Water Code section 13304(c)(1) states in relevant part:

> If the waste is cleaned up or the effects of the waste are abated, or, in the case of threatened pollution or nuisance, other necessary remedial action is taken by any governmental agency, the person or persons who discharged the waste, discharges the waste, or threatened to cause or permit the discharge of the waste within the meaning of subdivision (a), are liable to that governmental agency to the extent of the reasonable costs actually incurred in cleaning up the waste, abating the effects of the waste, supervising cleanup or abatement activities, or taking other remedial action.  The amount of the costs is recoverable in a civil action by, and paid to, the governmental agency . . .

162.   Defendants, and each of them, through their operations at or adjacent to the Shipyard Sediment Site, discharged waste into the waters of the State in violation of their NPDES permits and the San Diego Basin Plan.  The discharges of waste by Defendants have caused a condition of pollution and nuisance.

163.   The waste discharged by Defendants, and each of them, and the alleged damage therefrom, have been and/or will be cleaned up and abated by Plaintiff, a governmental agency. Plaintiff has incurred, and will continue to incur, reasonable costs to investigate, clean up and abate the Shipyard Sediment Site.

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

164.   Pursuant to Water Code section 13304(c)(1), Defendants, and each of them, are liable to Plaintiff for the costs it has and will incur in investigating, cleaning up and abating the waste discharged into the Shipyard Sediment Site by Defendants.

## EIGHTH CAUSE OF ACTION

### (Breach of Contract/Breach of Lease)

### (against NASSCO, NATIONAL STEEL & SHIPBUILDING CORPORATION & SDMCC DEFENDANTS)

165.   Plaintiff incorporates the prior allegations by this reference as though fully set forth herein.

166.   Plaintiff is informed and believes and, upon such information and belief, alleges that Defendants NASSCO, NATIONAL STEEL & SHIPBUILDING CORPORATION and the SDMCC DEFENDANTS entered into contracts and leases with Plaintiff to lease the land on which they conducted business operations on or in the vicinity of the Shipyard Sediment Site. Said leases were entered into pursuant to Plaintiff's role as the designated public trustee for the tidelands area prior to Plaintiff transferring that authority to Defendant PORT DISTRICT in or about February 1963.

167.   NASSCO and/or its predecessors leased the NAASCO Leasehold from Plaintiff for its operations from on or about 1945 to 1962.

168.   NATIONAL STEEL & SHIPBUILDING CORPORATION leased land within the NASSCO Leasehold from Plaintiff for its operations from on or about 1950 to 1960.

169.   The SDMCC DEFENDANTS leased land within the BAE Leasehold from Plaintiff for its operations from on or about 1915 to 1962.

170.   Plaintiff was a non-operating trustee as to each parcel of property leased to these Defendants. Plaintiff did not conduct any operations on these parcels of property at any time; Plaintiff did not discharge any hazardous substances from these leaseholds; nor did Plaintiff cause or permit any hazardous substances to be discharged from these leaseholds. All operations on the parcels of property leased to these Defendants were conducted by Defendants.

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

171.  In its leases with Plaintiff, NASSCO agreed to provide proper containers for trash and garbage and keep the demised premises free and clear of rubbish, debris and litter at all time, and, upon the expiration of the lease, to leave the premises in as good a condition as when first occupied by it.  Defendant NASSCO further agreed to be responsible for all repairs and alterations upon the leased premises.

172.  In its leases with Plaintiff, NATIONAL STEEL & SHIPBUILDING CORPORATION agreed to provide proper containers for trash and garbage and keep the demised premises free and clear of rubbish, debris and litter at all time, and, upon the expiration of the lease, to leave the premises in as good a condition as when first occupied by it.  Defendant NATIONAL STEEL & SHIPBUILDING CORPORATION further agreed to be responsible for all repairs and alterations upon the leased premises.

173.  In its leases with Plaintiff, the SDMCC DEFENDANTS agreed to do no work upon the premises that would materially decrease the amount of tidal waters in the San Diego Bay and to be responsible for all work or "change" upon the leased premises.

174.  Plaintiff performed all of its obligations in these leases.

175.  Defendants NASSCO and NATIONAL STEEL & SHIPBUILDING CORPORATION, and the SDMCC DEFENDANTS, have not performed their contractual obligations and duties expressly identified in their contracts with Plaintiff, as discussed above, given their respective releases of hazardous substances into the Shipyard Sediment Site during their historic operations thereat or in the vicinity thereof.

176.  As a direct and proximate result of the breach of these contractual duties by these Defendants, Plaintiff has sustained damages in a sum presently unascertained, but in an amount to be shown according to proof at trial.

177.  Plaintiff is informed and believes, and on such basis alleges, that these damages include, but are not limited to, costs incurred by Plaintiff to respond to the claims of regulatory agencies, including the Regional Board, and to investigate environmental contamination at the Shipyard Sediment Site, including at and about the parcels of property previously leased by Defendants from Plaintiff.  Plaintiff is continuing to be damaged, and will have to spend

- 39 -

1   additional sums for further investigation and remedial activity.

2         178.   Plaintiff is informed and believes, and on such basis alleges that Plaintiff's

3   damages are directly and proximately caused and contributed to by the sole fault and/or

4   negligence and/or strict liability or other actionable conduct of Defendants via their operations at

5   the parcels of property leased from Plaintiff.

6         179.   Plaintiff prays for judgment as hereinafter set forth.

7                              **NINTH CAUSE OF ACTION**

8   **(Express Indemnity Against NASSCO, NATIONAL STEEL & SHIPBUILDING**
    **CORPORATION and SDMCC DEFENDANTS)**
9

10        180.   Plaintiff incorporates the prior allegations by this reference as though fully set

11  forth herein.

        181.   Defendants NASSCO, NATIONAL STEEL & SHIPBUILDING
12
    CORPORATION and the SDMCC DEFENDANTS entered into written contracts and leases
13
    with Plaintiff for the lease of property held in public trust by Plaintiff, as discussed above.
14
        182.   Plaintiff's lease agreements with NASSCO contain indemnity provisions, which
15
    require NASSCO to indemnify Plaintiff for costs incurred, or to be incurred, for cleaning up
16
    alleged environmental contamination at the Shipyard Sediment Site from its activities thereat.
17
    Defendant NASSCO expressly agreed to "save Lessor free and harmless and indemnify it against
18
    all claims for labor or materials for or in connection with any and all work, change or
19
    improvements in or upon the leased premises, and the costs of defending such claims, including
20
    reasonable attorney fees." Defendant NASSCO also agreed to take out public liability insurance
21
    to "protect against liability imposed by law or damages to any property or person caused directly
22
    or indirectly by or from the acts or activities of the Lessee or any person acting for it or under its
23
    control or direction...."
24
        183.   Plaintiff's lease agreements with NATIONAL STEEL & SHIPBUILDING
25
    CORPORATION contain indemnity provisions, which require NATIONAL STEEL &
26
    SHIPBUILDING CORPORATION to indemnify Plaintiff for costs incurred, or to be incurred,
27
    for cleaning up alleged environmental contamination at the Shipyard Sediment Site from its
28

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1  activities there.  Defendant NATIONAL STEEL & SHIPBUILDING CORPORATION

2  expressly agreed to "save Lessor free and harmless and indemnify it against all claims for labor

3  or materials for or in connection with any and all work, change or improvements in or upon the

4  leased premises, and the costs of defending such claims, including attorney fees."  Defendant

5  NATIONAL STEEL & SHIPBUILDING CORPORATION also agreed to take out public

6  liability insurance to "protect against liability imposed by law or damages to any property or

7  person caused directly or indirectly by or from the acts or activities of the Lessee or any person

8  acting for it or under its control or direction...."

9        184.   Plaintiff's lease agreements with the SDMCC DEFENDANTS contain indemnity

10  provisions, which require the SDMCC DEFENDANTS to indemnify Plaintiff for costs incurred,

11  or to be incurred, for removing and abating the alleged environmental contamination at the

12  Shipyard Sediment Site from its activities there.  The SDMCC DEFENDANTS expressly agreed

13  to "save Lessor free and harmless and indemnify it against all claims for labor and materials in

14  connection with improvements, repairs and alterations in or upon the leased premises."

15        185.   Plaintiff has performed and satisfied all the conditions precedent to the

16  obligations of the Leases.

17        186.   None of the above-named Defendants have, to date, indemnified or held Plaintiff

18  free and harmless from the alleged property damage and alleged injury at issue resulting from

19  their acts, omissions and operations at or near the Site, and their changes and alterations to the

20  property leased from Plaintiff, as agreed in their Leases with Plaintiff.  Nor have any of the

21  above-named Defendants, to date, acknowledged a duty to do so.

22        187.   Plaintiff is informed and believes and, upon such information and belief, alleges

23  that Plaintiff's damages are directly and proximately caused and contributed to by the sole fault,

24  and/or negligence, and/or strict liability and/or other actionable conduct of Defendants in their

25  operations at or in the vicinity of the Shipyard Sediment Site.

26        188.   Plaintiff is entitled to indemnity from Defendants as expressly provided by

27  contract for all costs incurred, and to be incurred, by Plaintiff in connection with the

28  contamination at the Shipyard Sediment Site, including attorneys' fees where provided for by

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1    contract.

2                        **TENTH CAUSE OF ACTION**

3              **(Negligence against all Defendants except NAVY)**

4              189.    Plaintiff realleges and incorporates the prior allegations by this reference as

5    though fully set forth herein.

6              190.    Defendants had a duty of care with respect to their operations and actions at or

7    near the Shipyard Sediment Site and/or their ownership of and management of and authority over

8    property on which defendants operated and acted.

9              191.    Plaintiff is informed and believes, and on that basis alleges, that Defendants, and

10   each of them, breached their duty of care in connection with their operation of or activities at or

11   near the Shipyard Sediment Site by virtue of their actions as alleged herein.

12             192.    These breaches of duty by Defendants proximately caused the accidental releases

13   and/or threatened releases of hazardous substances at the Shipyard Sediment Site.  Plaintiff has

14   incurred costs in responding to those releases and expects to incur additional costs in the future

15   as a result of this negligence on the part of Defendants.

16             193.    Consequently, Plaintiff is entitled to damages according to proof at trial.

17                      **ELEVENTH CAUSE OF ACTION**

18             **(Negligence Per Se against all Defendants except NAVY))**

19             194.    Plaintiff realleges and incorporates the prior allegations by this reference as

20   though fully set forth herein.

21             195.    Plaintiff is informed and believes, and on that basis alleges, that Defendants'

22   conduct, as detailed herein, leading to the release and/or threatened accidental releases of

23   hazardous substances at the Site violated applicable legal requirements governing the transport,

24   handling, storage, treatment, use and disposal of hazardous substances. Such releases or

25   threatened releases are the type of occurrences which the aforementioned legal requirements are

26   designed to prevent.

27             196.    Plaintiff is informed and believes, and on that basis alleges, that Defendants had

28   knowledge or reasonable cause to believe that releases and/or threatened releases of hazardous

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 42 -
COMPLAINT

1 | substances by Defendants have come or will come to be located on or about the Shipyard

2 | Sediment Site in amounts required to be reported to a state or local agency pursuant to law, and

3 | Defendants did not give Plaintiff timely and adequate written notice, if any, of the releases or

4 | threatened releases or of that condition to Plaintiff.

5 |     197.   Plaintiff is among the class of persons which such legal requirements were

6 | designed and intended to protect.

7 |     198.   The violations by Defendants of those legal requirements proximately caused

8 | harm to Plaintiff, who has been required to respond to said releases and/or threatened releases of

9 | hazardous substances at the Shipyard Sediment Site, and who will be required to continue to

10 | respond to them in the foreseeable future. As a result of Defendants' actions, Plaintiff is entitled

11 | to damages according to proof at trial.

12 |     199.   The foregoing acts and omissions of Defendants, as detailed in the general

13 | allegations herein, violate various statutory provisions, including but not limited to, California

14 | Health and Safety Code §§ 25359, et. seq.; California Health and Safety Code §§ 25249.5 et

15 | seq.; California Health and Safety Code §§ 25100 et seq.; Health & Safety Code §§ 25189(c)-

16 | (d); California Water Code §§ 13000 et. seq. (including § 13400); and Fish & Game Code §§

17 | 5650, et. seq.

18 |     200.   Defendants failed to comply with the state law as detailed above. Plaintiff has

19 | sustained injury as a result of Defendants' negligent conduct, including investigative costs,

20 | removal and remedial costs, attorney's fees and expert costs, and other costs, as described herein.

21 | As a further direct and proximate cause of the negligence per se by Defendants, Plaintiff has

22 | suffered damages as previously described herein, including other consequential, incidental, and

23 | general damages to be proven at trial.

24 |     201.   As a result of Defendants' statutory violations, Plaintiff prays for damages and

25 | any other relief appropriate under the law as set forth below.

26 | ### TWELFTH CAUSE OF ACTION

27 | **(Private Nuisance against all Defendants except NAVY)**

28 |     202.   Plaintiff realleges and incorporates the prior allegations by this reference as

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 43 -

COMPLAINT

1   though fully set forth herein.

2       203.    Plaintiff is informed and believes, and on that basis alleges, that Defendants

3   released and/or discharged hazardous substances into the Shipyard Sediment Site in violation of

4   the law and public and private safety by improperly releasing, discharging, handling, and

5   disposing of hazardous substances, resulting in contamination of the Site, as discussed in detail

6   herein.

7       204.    Plaintiff is informed and believes, and on that basis alleges, that the contamination

8   at the Site constitutes a nuisance under California Civil Code sections 3479 and 3481, because it

9   is injurious to health and interferes with the customary use of the Shipyard Sediment Site and

10  surrounding area.

11      205.    Plaintiff has sustained injury as a result of this nuisance, including investigative

12  costs, removal and remedial costs, attorney's fees and expert costs, and other costs, as described

13  herein. Plaintiff has and will continue to suffer economic damages as previously described

14  herein, including other consequential, incidental, and general damages in an amount to be proven

15  at trial for investigating and responding to this nuisance.

16  **THIRTEENTH CAUSE OF ACTION**

17  **(Public Nuisance against all Defendants except NAVY)**

18      206.    Plaintiff realleges and incorporates the prior allegations by this reference as

19  though fully set forth herein.

20      207.    Defendants' discharge, deposit, disposal and release of hazardous substances at

21  the Shipyard Sediment Site has resulted in conditions that are injurious to health, offensive to the

22  senses, and an interference with the free use of property so as to interfere with the comfortable

23  enjoyment of life and property.  The conditions caused by Defendants constitute a nuisance

24  within the meaning of California Civil Code § 3479.

25      208.    The nuisance caused by Defendants is a public nuisance because it affects an

26  entire area or neighborhood and a considerable number of persons within the meaning of

27  California Civil Code § 3480.

28      209.    Plaintiff has standing to bring this action to abate the public nuisance because it

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1   has been specially injurious to Plaintiff within the meaning of California Civil Code § 3495.

2   210.   The public nuisance is continuing because, among other things, it can be abated

3   and it varies over time.

4   211.   As a direct and proximate result of the public nuisance caused by Defendants,

5   Plaintiff has been damaged as alleged herein. In accordance with California Code of Civil

6   Procedure § 731, Plaintiff is entitled to damages as well as injunctive relief requiring Defendants

7   to abate the continuing public nuisance.

8   212.   As a result of the public nuisance, Plaintiff prays for injunctive relief and damages

9   as set forth below.

10              **FOURTEENTH CAUSE OF ACTION**

11              **(Trespass against all Defendants except NAVY)**

12   213.   Plaintiff realleges and incorporates the prior allegations by this reference as

13   though fully set forth herein.

14   214.   From on or about 1914 to 1962, Plaintiff served as the trustee of the NASSCO

15   and BAE SYSTEMS' leaseholds on behalf of the People of the State of California.  Furthermore,

16   from on or about 1914 to present, Plaintiff has been in lawful possession of its MS4 storm water

17   system which is located at and about the Shipyard Sediment Site, including its SW4 outfall at the

18   BAE SYSTEMS leasehold.

19   215.   Defendants caused hazardous substances to intrude on the above-described

20   property that was lawfully in the possession of Plaintiff.  Such intrusion was not permitted.

21   216.   Plaintiff is informed and believes, and on that basis alleges, that this intrusion was

22   intentional or negligent or resulted from ultra hazardous conduct.

23   217.   Defendants' trespass directly and proximately caused damages that have been,

24   and will continue to be, sustained by Plaintiff.

25   218.   Consequently, Plaintiff is entitled to damages according to proof at trial.

26              **FIFTEENTH CAUSE OF ACTION**

27              **(Declaratory Relief Under State Law against all Defendants except NAVY)**

28   219.   Plaintiff realleges and incorporates the prior allegations by this reference as

- 45 -

COMPLAINT

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

though fully set forth herein.

220. An actual controversy exists between Plaintiff and Defendants with respect to their respective rights and obligations under federal and state laws. Plaintiff seeks a judicial determination of the respective rights and duties of the parties with respect to the rights, claims and damages alleged herein.

221. Plaintiff also seeks a declaration by this court that Defendant NASSCO and the SDMCC DEFENDANTS are obligated contractually to investigate and clean up the contamination at issue, and to indemnify and hold Plaintiff harmless; that Plaintiff complied with all conditions and obligations under the leases at issue; and that because of Defendants' breach of lease, negligence, nuisance, trespass, and statutory violations, Plaintiff has been damaged according to proof.

222. The requested declaration is necessary and appropriate at this time to allow Plaintiff to ascertain its rights and duties with respect to the claims at issue in this action.

223. As a result, Plaintiff prays for declaratory relief as set forth below.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants as follows:

1. For recovery of costs from Defendants for costs which Plaintiff has incurred and expects to incur in responding to releases of hazardous substances at the Shipyard Sediment Site including without limitation, the costs of investigation, clean-up, removal of contaminated soils, and completing any additional investigation, monitoring, and remediation at the Shipyard Sediment Site, in amounts to be determined at the trial of this matter;

2. For contribution toward any costs which Plaintiff has incurred or will incur in responding to the releases of hazardous substances at the Shipyard Sediment Site as alleged in Plaintiffs' complaint, including without limitation, the costs of investigation, clean-up, dredging of contaminated sediments, and completing any additional investigation, monitoring, and remediation at the Shipyard Sediment Site, in amounts to be determined at the trial of this matter;

2. For indemnification and/or contribution in full or in part to any costs, damages and liabilities arising from the alleged contamination of the Shipyard Sediment Site which

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA. 92101

- 46 -
COMPLAINT

Plaintiff incurs in responding to the releases and/or threatened releases of hazardous substances at the Shipyard Sediment Site including without limitation, the costs of investigation, clean-up, dredging of contaminated sediments, monitoring, and completing any additional investigation and remediation at the Property, in amounts to be determined at the trial of this matter;

3.      For a declaration determining of the rights of Plaintiff, and the duties and obligations of each Defendant, and all others, with respect to the releases and/or threatened releases of hazardous substances at and into the Shipyard Sediment Site and the alleged damages resulting therefrom;

4.      For a declaration that Defendant NASSCO and the SDMCC DEFENDANTS are obligated to indemnify and hold Plaintiff harmless from and against any and all claims arising out of their alleged contamination at or into the Shipyard Sediment Site;

5.      For an order directing Defendants to cease any ongoing unlawful releases and/or threatened releases of hazardous substances at the Shipyard Sediment Site;

6.      For damages according to proof at trial, including but not limited to all costs and expenses paid and to be paid in complying with the Regional Board's claims relating to investigation and cleanup of the Site;

7.      For an award of the costs of this litigation including but not limited to costs that Plaintiff has incurred and will continue to incur to defend against claims relating to the investigation and cleanup of alleged contamination on the Site, reasonable attorneys' fees and experts' fees;

8.      For any and all remedies authorized under section California Health and Safety Code §§ 25359, et. seq.; California Health and Safety Code §§ 25249.5 et seq.; California Health and Safety Code §§ 25100 et seq.; Health & Safety Code §§ 25189(c)(d); California Water Code §§ 13000 et. seq.; and Fish & Game Code §§ 5650, et. seq.;

9.      For prejudgment interest at the maximum rate permitted by law;

10.     For such other and further relief as the Court may deem appropriate.

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 47 -

COMPLAINT

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues triable by jury.

Dated: _October 13_, 2009

GORDON & REES, LLP

By: _____
Brian M. Ledger
Kristin N. Reyna
Attorneys for City of San Diego

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 48 -
COMPLAINT

# EXHIBIT "A"

# TENTATIVE

## CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
## SAN DIEGO REGION

### TENTATIVE CLEANUP AND ABATEMENT ORDER
### NO. R9-2005-0126

NATIONAL STEEL AND SHIPBUILDING COMPANY

BAE SYSTEMS SAN DIEGO SHIP REPAIR, INC.
(FORMERLY SOUTHWEST MARINE, INC.)

CITY OF SAN DIEGO

MARINE CONSTRUCTION AND DESIGN COMPANY
AND CAMPBELL INDUSTRIES, INC.

SAN DIEGO GAS AND ELECTRIC,
A SUBSIDIARY OF SEMPRA ENERGY COMPANY

UNITED STATES NAVY

### SHIPYARD SEDIMENT SITE
### SAN DIEGO BAY
### SAN DIEGO, CALIFORNIA

The California Regional Water Quality Control Board, San Diego Region (hereinafter Regional Board), finds that:

### *JURISDICTION*

1. **WASTE DISCHARGE.** Elevated levels of pollutants above San Diego Bay background conditions exist in the San Diego Bay bottom marine sediment along the eastern shore of central San Diego Bay in an area extending approximately from the Sampson Street Extension to the north and Chollas Creek to the south and from the National Steel and Shipbuilding Company Shipyard facility (hereinafter "NASSCO") and the BAE Systems San Diego Ship Repair Facility (hereinafter "BAE Systems") shoreline out to the San Diego Bay

main shipping channel to the west. This area is hereinafter collectively referred to as the "Shipyard Sediment Site". NASSCO; BAE Systems San Diego Ship Repair, Inc.; City of San Diego; Marine Construction and Design Company and Campbell Industries, Inc.; San Diego Gas and Electric, a subsidiary of Sempra Energy Company; and the United States Navy have each caused or permitted the discharge of waste to the Shipyard Sediment Site resulting in the accumulation of waste in the marine sediment. The contaminated marine sediment has caused conditions of contamination or nuisance in San Diego Bay that adversely affects aquatic life, aquatic-dependent wildlife, human health, and San Diego Bay beneficial uses. A map of the Shipyard Sediment Site region is provided in Attachment 1 to this Order.

## PERSONS RESPONSIBLE

2. **NATIONAL STEEL AND SHIPBUILDING COMPANY (NASSCO), A SUBSIDIARY OF GENERAL DYNAMICS COMPANY.** The National Steel and Shipbuilding Company, (hereinafter NASSCO) has (1) discharged waste from its shipyard operations into San Diego Bay in violation of waste discharge requirements; and (2) caused or permitted waste to be discharged or deposited where it was discharged into San Diego Bay and created, or threatens to create, a condition of pollution or nuisance. These wastes contained metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), butyl tin species, polychlorinated biphenyls (PCBs), polychlorinated terphenyls (PCTs), polynuclear aromatic hydrocarbons (PAHs), and total petroleum hydrocarbons (TPH). Based on these considerations NASSCO is referred to as "Discharger(s)" in this Cleanup and Abatement Order.

NASSCO, a subsidiary of General Dynamics Company, owns and operates a full service ship construction, modification, repair, and maintenance facility on 126 acres of tidelands property leased from the San Diego Unified Port District (SDUPD) on the eastern waterfront of central San Diego Bay at 2798 Harbor Drive in San Diego. Shipyard operations have been conducted at this site by NASSCO over San Diego Bay waters or very close to the waterfront since 1945. Shipyard facilities operated by NASSCO over the years at the Site have included concrete platens used for steel fabrication, a graving dock, shipbuilding ways, and berths on piers or land to accommodate the berthing of ships. An assortment of waste is generated at the facility including spent abrasive, paint, rust, petroleum products, marine growth, sanitary waste, and general refuse.

3. **BAE SYSTEMS SAN DIEGO SHIP REPAIR, INC., FORMERLY SOUTHWEST MARINE, INC.** BAE Systems San Diego Ship Repair, Inc. has (1) discharged waste from its shipyard operations into San Diego Bay in violation of waste discharge requirements; and (2) caused or permitted waste to be discharged or deposited where it was discharged into San Diego Bay and created, or threatens to create, a condition of pollution or nuisance. These wastes contained metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), butyl tin species, polychlorinated biphenyls (PCBs), polychlorinated terphenyls (PCTs), polynuclear aromatic hydrocarbons (PAHs), and total petroleum hydrocarbons (TPH). Based on these considerations BAE Systems San Diego Ship Repair, Inc. is referred to as "Discharger(s)" in this Cleanup and Abatement Order.

From 1979 to the present, Southwest Marine, Inc. and its successor BAE Systems San Diego Ship Repair, Inc., hereinafter collectively referred to as BAE Systems, have owned and operated a ship repair, alteration, and overhaul facility on approximately 39.6 acres of tidelands property on the eastern waterfront of central San Diego Bay. The facility, currently referred to as BAE Systems San Diego Ship Repair, is located on land leased from the San Diego Unified Port District (SDUPD) at 2205 East Belt Street, foot of Sampson Street in San Diego, San Diego County, California. Shipyard facilities operated by BAE Systems over the years have included concrete platens used for steel fabrication, two floating dry docks, five piers, and two marine railways. An assortment of waste has been generated at the facility including spent abrasive, paint, rust, petroleum products, marine growth, sanitary waste, and general refuse.

4. **CITY OF SAN DIEGO.** The City of San Diego owns and operates a municipal separate storm sewer system (MS4) through which it discharges waste commonly found in urban runoff to San Diego Bay subject to the terms and conditions of a NPDES Storm Water Permit. The City of San Diego has discharged urban storm water containing waste directly to San Diego Bay at the Shipyard Sediment Site in violation of waste discharge requirements. The waste includes metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), total suspended solids, sediment (due to anthropogenic activities), petroleum products, and synthetic organics (pesticides, herbicides, and PCBs) through its SW4 (located on the BAE Systems leasehold) and SW9 (located on the NASSCO leasehold) MS4 conduit pipes.

The City of San Diego has also discharged urban storm water containing waste in violation of waste discharge requirements, through its MS4 to Chollas Creek resulting in the exceedances of chronic and acute California Toxics Rule copper, lead, and zinc criteria for the protection of aquatic life, in violation of waste discharge requirements prescribed by the Regional Board. Studies indicate that during storm events, storm water plumes toxic to marine life emanate from Chollas Creek up to 1.2 kilometers into San Diego Bay, and contribute to pollutant levels at the Shipyard Sediment Site. The urban storm water containing waste that has discharged from the on-site and off-site MS4 has contributed to the accumulation of pollutants in the marine sediments at the Shipyard Sediment Site to levels, that cause, and threaten to cause, conditions of pollution, contamination, and nuisance by exceeding applicable water quality objectives for toxic pollutants in San Diego Bay. Based

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                    April 4, 2008
Shipyard Sediment Site

on these considerations the City of San Diego is referred to as "Discharger(s)" in this
Cleanup and Abatement Order.

5. **MARINE CONSTRUCTION AND DESIGN COMPANY AND CAMPBELL
   INDUSTRIES, INC.** Marine Construction and Design Company and Campbell Industries,
   Inc. (hereinafter collectively referred to as "SDMC") has (1) discharged pollutants from its
   shipyard operations into San Diego Bay in violation of waste discharge requirements; and (2)
   caused or permitted waste to be discharged or deposited where it was discharged into San
   Diego Bay and created, or threatens to create, a condition of pollution or nuisance. These
   wastes contained metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver,
   and zinc), butyl tin species, polychlorinated biphenyls (PCBs), polychlorinated terphenyls
   (PCTs), polynuclear aromatic hydrocarbons (PAHs), and total petroleum hydrocarbons
   (TPH). Based on these considerations, Marine Construction and Design Company and
   Campbell Industries, Inc. are referred to as "Discharger(s)" in this Cleanup and Abatement
   Order.

   Between 1914 and 1979, San Diego Marine Construction Company and its successor San
   Diego Marine Construction Corporation, a wholly owned subsidiary of Campbell Industries,
   Inc., a wholly owned subsidiary of Marine Construction and Design Company (MARCO),
   collectively referred to as SDMC, operated a ship repair, alteration, and overhaul facility on
   what is now the BAE Systems leasehold at the foot of Sampson Street in San Diego.
   Shipyard operations were conducted at this site by SDMC over San Diego Bay waters or
   very close to the waterfront. An assortment of waste was generated at the facility including
   spent abrasive blast waste, paint, rust, petroleum products, marine growth, sanitary waste,
   and general refuse.

6. **CHEVRON, A SUBSIDIARY OF CHEVRONTEXACO.** Chevron owns and operates the
   Chevron Terminal, a bulk fuel storage facility currently located at 2351 East Harbor Drive in
   the City of San Diego adjacent to the NASSCO and BAE Systems leaseholds. Fuel products
   containing petroleum hydrocarbons have been stored at the Chevron Terminal since the early
   1900s at both the currently operating 7 million gallon product capacity upper tank farm and
   the closed 5 million gallon capacity lower tank farm. Based on the information that the
   Regional Board has reviewed to date, there is insufficient evidence to find that discharges
   from the Chevron Terminal contributed to the accumulation of pollutants in the marine
   sediments at the Shipyard Sediment Site to levels, which create, or threaten to create,
   conditions of pollution or nuisance. Accordingly, Chevron is not referred to as
   "Discharger(s)" in this Cleanup and Abatement Order.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                April 4, 2008
Shipyard Sediment Site

7. **BP AS THE PARENT COMPANY AND SUCCESSOR TO ATLANTIC RICHFIELD.**
   BP owns and operates the Atlantic Richfield Company (ARCO) Terminal, a bulk fuel storage
   facility with approximately 9 million gallons of capacity located at 2295 East Harbor Drive
   in the City of San Diego. Fuel products containing petroleum hydrocarbons and related
   constituents such as polynuclear aromatic hydrocarbons (PAHs) have been stored at ARCO
   Terminal since the early 1900s. ARCO owned and operated ancillary facilities include a
   wharf, fuel pier (currently BAE Systems Pier 4), and a marine fueling station used for
   loading and unloading petroleum products and fueling from 1925 to 1978, and five pipelines
   connecting the terminal to the pier and wharf in use from 1925 to 1978. Storm water flows
   from ARCO Terminal enter a City of San Diego MS4 storm drain that terminates in San
   Diego Bay in the Shipyard Sediment Site approximately 300 feet south of the Sampson Street
   extension. Based on the information that the Regional Board has reviewed to date, there is
   insufficient evidence to find that discharges from the ARCO Terminal contributed to the
   accumulation of pollutants in the marine sediments at the Shipyard Sediment Site to levels,
   which create, or threaten to create, conditions of pollution or nuisance. Accordingly, BP and
   ARCO are not referred to as "Discharger(s)" in this Cleanup and Abatement Order.

8. **SAN DIEGO GAS AND ELECTRIC, A SUBSIDIARY OF SEMPRA ENERGY.**
   SDG&E (1) has discharged waste from its power plant operations, including metals (copper,
   nickel, and zinc) into San Diego Bay in violation of waste discharge requirements; and (2)
   caused or permitted waste (including metals [chromium, copper, lead, nickel, and zinc],
   polychlorinated biphenyls [PCBs], polynuclear aromatic hydrocarbons [PAHs], and total
   petroleum hydrocarbons [TPH-d and TPH-h]) to be discharged or deposited where it was
   discharged into San Diego Bay and created, or threatens to create, a condition of pollution or
   nuisance. Based on these considerations SDG&E is referred to as "Discharger(s)" in this
   Cleanup and Abatement Order.

   San Diego Gas and Electric, a subsidiary of Sempra Energy Company (hereinafter SDG&E)
   owned and operated the Silver Gate Power Plant along the north side of the BAE Systems
   leasehold from approximately 1943 to the 1990s. SDG&E utilized an easement to San Diego
   Bay along BAE Systems' north property boundary for the intake and discharge of cooling
   water via concrete tunnels at flow rates ranging from 120 to 180 million gallons per day.
   SDG&E operations included discharging waste to holding ponds above the tunnels near the
   Shipyard Sediment Sites.

9.  **UNITED STATES NAVY.** The U.S. Navy owns and operates a municipal separate storm
sewer system (MS4) at NAVSTA San Diego through which it has caused or permitted the
discharge of waste commonly found in urban runoff to Chollas Creek and San Diego Bay,
including excessive concentrations of copper, lead, and zinc in violation of waste discharge
requirements. Technical reports by the U.S. Navy and others indicate that Chollas Creek
outflows during storm events convey elevated sediment and urban runoff chemical pollutant
loading and its associated toxicity up to 1.2 kilometers into San Diego Bay over an area
including the Shipyard Sediment Site. The U.S. Navy has caused or permitted marine
sediment and associated waste to be resuspended into the water column as a result of shear
forces generated by the thrust of propellers during ship movements at NAVSTA San Diego.
The resuspended sediment and pollutants can be transported by tidal currents and deposited
in other parts of San Diego Bay, including the Shipyard Sediment Site. The above
discharges have contributed to the accumulation of pollutants in marine sediment at the
Shipyard Sediment Site to levels that cause, and threaten to cause, conditions of pollution,
contamination, and nuisance by exceeding applicable water quality objectives for toxic
pollutants in San Diego Bay. Based on the preceding considerations, the U.S. Navy is
referred to as "Discharger(s)" in this Cleanup and Abatement Order.

From the year 1921 to the present, the U.S. Navy has provided shore support and pier-side
berthing services to U.S. Pacific fleet vessels at Naval Station San Diego (NAVSTA San
Diego) located at 3445 Surface Navy Boulevard in the City of San Diego. NAVSTA San
Diego currently occupies 1,029 acres of land and 326 water acres adjacent to San Diego Bay
to the west, and Chollas Creek to the north near Pier 1. Between the years 1938 and 1956 the
NAVSTA San Diego leasehold included a parcel of land, referred to as the 28th Street Shore
Boat Landing Station, located at the south end of the present day NASSCO leasehold at the
foot of 28th Street and including the 28th Street Pier. At this location, the U.S. Navy
conducted operations similar in scope to a small boatyard including solvent cleaning and
degreasing of vessel parts and surfaces, abrasive blasting and scraping for paint removal and
surface preparations, metal plating, and surface finishing and painting. Prevailing industry-
wide boatyard operational practices employed during the 1930s through the 1980s were often
not sufficient to adequately control or prevent pollutant discharges and often led to excessive
discharges of pollutants and accumulation of pollutants in marine sediment in San Diego
Bay. The types of pollutants found in elevated concentrations at the Shipyard Sediment Site
(metals, butyltin species, polychlorinated biphenyls (PCBs), polychlorinated terphenyls
(PCTs), polynuclear aromatic hydrocarbons (PAHs), and total petroleum hydrocarbons
(TPH)) are associated with the characteristics of the waste the U.S. Navy operations
generated at the 28th Street Shore Boat Landing Station site.

## FACTUAL BACKGROUND

10. **CLEAN WATER ACT SECTION 303(d) LIST.** Approximately 55 acres of San Diego Bay shoreline between Sampson and 28th Streets is listed on the Clean Water Act Section 303(d) list of water quality limited segments for elevated levels of copper, mercury, zinc, PAHs, and PCBs in the marine sediment. These pollutants are impairing the aquatic life, aquatic-dependent wildlife, and human health beneficial uses designated for San Diego Bay. The Shipyard Sediment Site occupies this shoreline. The Regional Board has determined that issuance of a cleanup and abatement order (in lieu of a Total Maximum Daily Load program) is the appropriate regulatory tool to use for correcting the impairment at the Shipyard Sediment Site.

11. **SEDIMENT QUALITY INVESTIGATION.** NASSCO and BAE Systems (formerly Southwest Marine) conducted a detailed sediment investigation at the Shipyard Sediment Site in San Diego Bay within and adjacent to the NASSCO and BAE Systems leaseholds. Two phases of fieldwork were conducted, Phase I in 2001 and Phase II in 2002. The results of the investigation are provided in the Exponent report *NASSCO and Southwest Marine Detailed Sediment Investigation, September 2003* (Shipyard Report). Unless otherwise explicitly stated, the Regional Board's finding and conclusions in this Cleanup and Abatement Order are based on the data and other technical information contained in the Shipyard Report prepared by NASSCO's and BAE Systems' consultant, Exponent.

## AQUATIC LIFE BENEFICIAL USE IMPAIRMENT

12. **AQUATIC LIFE IMPAIRMENT.** Aquatic life beneficial uses designated for San Diego Bay are impaired due to the elevated levels of pollutants present in the marine sediment at the Shipyard Sediment Site. Aquatic life beneficial uses include: Estuarine Habitat (EST), Marine Habitat (MAR), and Migration of Aquatic Organisms (MIGR). This finding is based on the considerations described below in this *Impairment of Aquatic Life Beneficial Uses* section of the Cleanup and Abatement Order.

13. **WEIGHT-OF-EVIDENCE APPROACH.** The Regional Board used a weight-of-evidence approach based upon multiple lines of evidence to evaluate the potential risks to aquatic life beneficial uses from pollutants at the Shipyard Sediment Site. The approach focused on measuring and evaluating exposure and adverse effects to the benthic macroinvertebrate community and to fish using data from multiple lines of evidence and best professional judgment. Pollutant exposure and adverse effects to the benthic macroinvertebrate community were evaluated using sediment quality triad measurements, bioaccumulation analyses, and interstitial water (i.e., pore water) analyses. The Regional Board evaluated pollutant exposure and adverse effects to fish using fish histopathology analyses and analyses of PAH breakdown products in fish bile.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                    April 4, 2008
Shipyard Sediment Site

14. **SEDIMENT QUALITY TRIAD MEASURES.** The Regional Board used lines of evidence organized into a sediment quality triad, to evaluate potential risks to the benthic community from pollutants present in the Shipyard Sediment Site. The sediment quality triad provides a "weight-of-evidence" approach to sediment quality assessment by integrating synoptic measures of sediment chemistry, toxicity, and benthic community composition. All three measures provide a framework of complementary evidence for assessing the degree of pollutant-induced degradation in the benthic community.

15. **REFERENCE SEDIMENT QUALITY CONDITIONS.** The Regional Board selected a group of reference stations from three independent sediment quality investigations to contrast pollution conditions at the Shipyard Sediment Site with conditions found in other relatively cleaner areas of San Diego Bay not affected by the Shipyard Sediment Site: (1) Southern California Bight 1998 Regional Monitoring Program (Bight 98), (2) 2001 Mouth of Chollas Creek and Mouth of Paleta Creek TMDL studies, and (3) 2001 NASSCO and Southwest Marine (now BAE Systems) Detailed Sediment Investigation. Stations from these studies were selected to represent selected physical, chemical, and biological characteristics of San Diego Bay. Criteria for selecting acceptable reference stations included low levels of anthropogenic pollutant concentrations, locations remote from pollution sources, similar biological habitat to the Shipyard Sediment Site, sediment total organic carbon (TOC) and grain size profiles similar to the Shipyard Sediment Site, adequate sample size for statistical analysis, and sediment quality data comparability. The reference stations selected for the Reference Sediment Quality Conditions are identified below.

**Reference Stations Used To Establish Reference Sediment Quality Conditions**

| 2001 Chollas/Paleta Reference Station Identification Number | 2001 NASSCO/BAE Systems Reference Station Identification Number | 1998 Bight'98 Reference Station Identification Number |
|---|---|---|
| 2231 | 2231 | 2235 |
| 2243 | 2243 | 2241 |
| 2433 | 2433 | 2242 |
| 2441 | 2441 | 2243 |
| 2238 | | 2256 |
| | | 2257 |
| | | 2258 |
| | | 2260 |
| | | 2265 |

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                    April 4, 2008
Shipyard Sediment Site

16. **SEDIMENT QUALITY TRIAD RESULTS.** The Regional Board categorized 14 of 30 Sediment Quality Triad sampling stations at the Shipyard Sediment Site as having sediment pollutant levels "likely" to adversely affect the health of the benthic community. These results are based on the synoptic measures of sediment chemistry, toxicity, and benthic community structure at the Shipyard Sediment Site. In addition, an evaluation of 27 of the sampling stations utilizing the State Water Resources Control Board's Draft Sediment Quality Objectives categorizes 20 of 27 stations as not protective of aquatic life.

17. **BIOACCUMULATION.** The Regional Board evaluated initial laboratory bioaccumulation test data to ascertain the bioaccumulation potential of the sediment chemical pollutants at the Shipyard Sediment Site. Examination of laboratory test data on the chemical pollutant concentrations in tissue of the clam (*Macoma nasuta*) relative to the pollutant concentrations in sediment indicates that bioaccumulation of chemical pollutants is occurring at the Shipyard Sediment Site. The data indicates for several chemical pollutants that concentrations in *Macoma nasuta* tissue increase in proportion to as chemical pollutant concentrations in sediment increase. Statistically significant relationships were found for arsenic, copper, lead, mercury, zinc, TBT, total PCBs, and high molecular weight polynuclear aromatic hydrocarbons (HPAHs). These chemical pollutants have a bioaccumulation potential at the Shipyard Sediment Site and are therefore considered bioavailable to benthic organisms. No statistically significant relationships were found for cadmium, chromium, nickel, selenium, silver, or PCTs.

18. **PORE WATER.** The Regional Board evaluated the chemistry of pore water, the water occupying the spaces between sediment particles, at the Shipyard Sediment Site to determine compliance with California Toxics Rule (CTR) water quality criteria and the potential risks to the benthic community from chemical pollutants present in the sediment. Comparisons were made to the CTR saltwater quality criterion continuous concentration, which is the highest concentration of a pollutant to which marine aquatic life can be exposed for an extended period of time without deleterious effects. Of the 12 site stations sampled for pore water (SW02 was excluded due to the presence of some suspended material remaining after centrifugation), 12 stations exceeded the copper CTR value, 6 stations exceeded the lead CTR value, and 12 stations exceeded the total PCBs CTR value. Although the comparisons to the CTR criteria identified several pollutants for which measured pore water concentrations are above levels of concern, the measured pore water concentrations may be biased high due to the possible presence of very fine suspended or colloidal material in the pore water samples that could not be removed by centrifugation.

19. **FISH HISTOPATHOLOGY.** The Regional Board evaluated fish histopathology data to determine the potential exposure and associated adverse effects on fish from chemical pollutants present within and adjacent to the Shipyard Sediment Site. A total of 253 spotted sand bass were examined for various histopathological lesions. These spotted sand bass were collected from four discrete assessment units at the Shipyard Sediment Site and at a reference area located across San Diego Bay near Reference Station 2240. The fish histopathology data indicates a total of 70 types of histopathological lesions were found in the spotted sand bass. Of the 70 types of lesions found, five lesions exhibited statistically significant elevations relative to reference conditions. The five lesions are abundant lipofuscin in liver,

9 of 28

abundant hemosiderin in liver, cholangitis/biliary hyperplasia (CBH) in liver, nephritis in kidney, and shiny gill foci. A sixth lesion (i.e., foci of cellular alteration in livers) was considered important even though no statistical differences were found because the existence of these lesions indicates a harmful effect strongly linked to PAH exposure. Of the six lesions identified as significantly elevated with respect to reference conditions, two, CBH and foci of cellular alteration, have been identified as being associated with contaminant exposure. Scientific literature describing lesions that are potential biomarkers of environmental stressors in fish does not attribute causation of lipofuscin, hemosiderin, nephritis, and shiny gill foci to pollution-related factors. It is plausible that the lesions could have been caused by naturally occurring environmental factors such as infectious parasites. Based on these considerations the fish histopathology data does not indicate that the fish lesions observed in the data set can be conclusively attributed to contaminant exposure at the Shipyard Sediment Site.

20. **FISH BILE.** The Regional Board evaluated fish bile sampling results to determine the potential exposure of fish to polynuclear aromatic hydrocarbon (PAH) compounds within and adjacent to the Shipyard Sediment Site. The bile samples were analyzed for fluorescent aromatic compounds (FACs) and total proteins. Three groups of FACs were measured that correspond to metabolites (PAH breakdown products) from naphthalene, phenanthrene, and benzo[a]pyrene. Metabolites were detected in bile of spotted sand bass captured inside and outside of the Shipyard Sediment Site and within a reference area located across the bay from the shipyard sites near Reference Station 2240. Metabolites of two contaminants exhibited elevated levels relative to reference conditions in spotted sand bass collected immediately outside of the Shipyard Sediment Site when their mean concentrations were compared against reference data. No metabolites were significantly elevated relative to reference conditions in spotted sand bass collected inside of the Shipyard Sediment Sites.

The upper prediction limit (UPL) at the 95 percent confidence interval was also calculated for the metabolites of the reference area fish and compared to replicate fish bile samples from the four areas of the Shipyard Sediment Site (i.e., inside and outside of both NASSCO and BAE Systems leaseholds). The inside and outside areas of NASSCO had samples that exceeded the UPL. Inside NASSCO accounted for six of the 19 UPL exceedances. Two fish bile samples from inside NASSCO exceeded the UPL for naphthalene, phenanthrene, and benzo[a]pyrene metabolites. From Outside NASSCO, 12 of the 13 UPL exceedances came from phenanthrene and benzo[a]pyrene metabolite samples.

For BAE Systems, all exceedances came from outside BAE Systems of which nine of 11 exceedances were for the benzo [a] pyrene metabolite samples. The remaining two exceedances were for the phenanthrene metabolite samples. No exceedances were found from inside BAE Systems; however, the PAH sediment chemistry data from inside BAE Systems showed the highest levels of sediment contamination.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                    April 4, 2008
Shipyard Sediment Site

The inconsistent relationship between the levels of FACs in fish and PAH contaminated
sediment indicates that this data is inconclusive and the FAC concentrations observed in the
fish cannot be exclusively attributed to contaminant exposure at the Shipyard Sediment Site.
The variable nature of the sediment contamination found in bays and the mobility of the fish
are confounding factors when attempting to correlate fish sampling results with sediment
contamination.

21. **INDICATOR SEDIMENT CHEMICALS.** The Regional Board evaluated the
relationships between sediment chemical pollutants and biological responses to identify
indicator chemical pollutants that may be impacting aquatic life and would therefore be
candidates for assignment of cleanup levels or remediation goals. A two-step process was
conducted. The first step in the selection of indicator chemicals was to identify chemicals
representative of the major classes of sediment pollutants: metals, butyltins, PCBs and PCTs,
PAHs, and petroleum hydrocarbons. The second step was the evaluation of relationships
between these chemicals and biological responses. Results of the three toxicity tests, benthic
community assessment, and bioaccumulation testing conducted in Phase 1 of the Shipyard
study were all used to evaluate the potential of such relationships. Chemical pollutants were
selected as indicator chemicals if they had any statistically significant relationship with
amphipod mortality, echinoderm fertilization, bivalve development, total benthic
macroinvertebrate abundance, total benthic macroinvertebrate richness, or tissue chemical
concentrations in *Macoma nasuta*. Chemical pollutants selected as indicator chemicals
include arsenic, copper, lead, mercury, zinc, TBT, total PCB homologs, diesel range organics
(DRO), and residual range organics (RRO).

*AQUATIC-DEPENDENT WILDLIFE BENEFICIAL USES IMPAIRMENT*

22. **AQUATIC-DEPENDENT WILDLIFE IMPAIRMENT.** Aquatic-dependent wildlife
beneficial uses designated for San Diego Bay are impaired due to the elevated levels of
pollutants present in the marine sediment at the Shipyard Sediment Site. Aquatic-dependent
wildlife beneficial uses include: Wildlife Habitat (WILD), Preservation of Biological
Habitats of Special Significance (BIOL), and Rare, Threatened, or Endangered Species
(RARE). This finding is based on the considerations described below in the *Impairment of
Aquatic-Dependent Wildlife Beneficial Uses* section of the Cleanup and Abatement Order.

23. **RISK ASSESSMENT APPROACH FOR AQUATIC-DEPENDENT WILDLIFE.** The
Regional Board evaluated potential risks to aquatic-dependent wildlife from chemical
pollutants present in the sediment at the Shipyard Sediment Site based on a two-tier
approach. The Tier I screening level risk assessment was based on tissue data derived from
the exposure of the clam *Macoma nasuta* to site sediments for 28 days using the protocols
specified by American Society of Testing Material (ASTM). The Tier II comprehensive risk
assessment was based on tissue data derived from resident fish and shellfish caught within
and adjacent to the Shipyard Sediment Site.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                    April 4, 2008
Shipyard Sediment Site

24. **TIER I SCREENING LEVEL RISK ASSESSMENT FOR AQUATIC-DEPENDENT WILDLIFE.** The Tier I risk assessment objectives were to determine whether or not Shipyard Sediment Site conditions pose a potential unacceptable risk to aquatic-dependent wildlife receptors of concern and to identify whether a comprehensive, site-specific risk assessment was warranted (i.e., Tier II baseline risk assessment). The receptors of concern selected for the assessment include: California least tern (*Sterna antillarum brownie*), California brown pelican *(Pelecanus occidentalis californicus),* Western grebe *(Aechmophorus occidentalis),* Surf scoter (*Melanitta perspicillata*), California sea lion (*Zalophus californianus*), and East Pacific green turtle (*Chelonia mydas agassizii*). Chemical pollutant concentrations measured in clam tissue derived from laboratory bioaccumulation tests were used to estimate chemical exposure to these receptors of concern. Based on the Tier I screening level risk assessment results, there is a potential risk to all receptors of concern ingesting prey caught at the Shipyard Sediment Site. The chemical pollutants in *Macoma* tissue posing a potential risk include arsenic, copper, lead, zinc, benzo[a]pyrene, and total PCBs.

25. **TIER II BASELINE RISK ASSESSMENT FOR AQUATIC-DEPENDENT WILDLIFE.** The Tier II risk assessment objective was to more conclusively determine whether or not Shipyard Sediment Site conditions pose an unacceptable risk to aquatic-dependent wildlife receptors of concern. The receptors of concern selected for the assessment include: California least tern (*Sterna antillarum brownie*), California brown pelican *(Pelecanus occidentalis californicus),* Western grebe (*Aechmophorus occidentalis*), Surf scoter (*Melanitta perspicillata*), California sea lion (*Zalophus californianus*), and East Pacific green turtle (*Chelonia mydas agassizii*). To focus the risk assessment, prey items were collected within four assessment units at the Shipyard Sediment Site and from a reference area located across the bay from the site. Chemical concentrations measured in fish were used to estimate chemical exposure for the least tern, western grebe, brown pelican, and sea lion and chemical concentrations in benthic mussels and eelgrass were used to estimate chemical pollutant exposure for the surf scoter and green turtle, respectively. Based on the Tier II risk assessment results, ingestion of prey items caught within all four assessment units at the Shipyard Sediment Site poses a risk to all receptors of concern (excluding the sea lion). The chemical in prey tissue posing a risk include benzo[a]pyrene, total PCBs, copper, lead, mercury, and zinc.

*HUMAN HEALTH BENEFICIAL USES IMPAIRMENT*

26. **HUMAN HEALTH IMPAIRMENT.** Human health beneficial uses designated for San Diego Bay are impaired due to the elevated levels of pollutants present in the marine sediment at the Shipyard Sediment Site. Human health beneficial uses include: Contact Water Recreation (REC-1), Non-contact Water Recreation (REC-2), Shellfish Harvesting (SHELL), and Commercial and Sport Fishing (COMM). This finding is based on the considerations described below in this *Impairment of Human Health Beneficial Uses* section of the Cleanup and Abatement Order.

27. **RISK ASSESSMENT APPROACH FOR HUMAN HEALTH**. The Regional Board evaluated potential risks to human health from chemical pollutants present in the sediment at the Shipyard Sediment Site based on a two-tier approach. The Tier I screening level risk assessment was based on tissue data derived from the exposure of the clam *Macoma nasuta* to site sediments for 28 days using American Society of Testing Material (ASTM) protocols. The Tier II comprehensive risk assessment was based on tissue data derived from resident fish and shellfish caught within and adjacent to the Shipyard Sediment Site. Two types of receptors (i.e., members of the population or individuals at risk) were evaluated:

    a.  Recreational Anglers – Persons who eat the fish and/or shellfish they catch recreationally; and

    b.  Subsistence Anglers – Persons who fish for food, for economic and/or cultural reasons, and for whom the fish and/or shellfish caught is a major source of protein in their diet.

28. **TIER I SCREENING LEVEL RISK ASSESSMENT FOR HUMAN HEALTH**. The Tier I risk assessment objectives were to determine whether or not Shipyard Sediment Site conditions potentially pose an unacceptable risk to human health and to identify if a comprehensive, site-specific risk assessment was warranted (i.e., Tier II baseline risk assessment). The receptors of concern identified for Tier I are recreational anglers and subsistence anglers. Recreational anglers represent those who eat the fish and/or shellfish they catch recreationally and subsistence anglers represent those who fish for food, for economic and/or cultural reasons, and for whom the fish and/or shellfish caught is a major source of protein in the diet. Chemical concentrations measured in *Macoma nasuta* tissue derived from laboratory bioaccumulation tests were used to estimate chemical exposure for these receptors of concern. Based on the Tier I screening level risk assessment results, there is a potential risk to recreational and subsistence anglers ingesting fish and shellfish caught at the Shipyard Sediment Site. The chemicals in *Macoma* tissue posing a potential risk include arsenic, BAP, PCBs, and TBT.

29. **TIER II BASELINE RISK ASSESSMENT FOR HUMAN HEALTH**. The Tier II risk assessment objective was to more conclusively determine whether Shipyard Sediment Site conditions pose unacceptable cancer and non-cancer health risks to recreational and subsistence anglers. Fish and shellfish were collected within four assessment units at the Shipyard Sediment Site and from two reference areas located across the bay from the Shipyard Site. Chemical concentrations measured in fish fillets and edible shellfish tissue were used to estimate chemical exposure for recreational anglers and chemical concentrations in fish whole bodies and shellfish whole bodies were used to estimate chemical exposure for subsistence anglers. Based on the Tier II risk assessment results, ingestion of fish and shellfish caught within all four assessment units at the Shipyard Sediment Site poses a theoretical increased cancer and non-cancer risk to recreational and subsistence anglers. The chemicals posing cancer risks include inorganic arsenic and PCBs. The chemicals posing non-cancer risks include cadmium, copper, mercury, and total PCBs.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                    April 4, 2008
Shipyard Sediment Site

## CLEANUP TO BACKGROUND SEDIMENT QUALITY CONDITIONS

**30. BACKGROUND SEDIMENT QUALITY.** The Regional Board derived sediment
chemistry levels for use in evaluating the feasibility of cleanup to background sediment
quality conditions from the pool of San Diego Bay reference stations described in Finding
15. The background sediment chemistry levels based on these reference stations are as
follows:

### Background Sediment Chemistry Levels

| Chemical | Units (dry weight) | Background Sediment Chemistry Levels [1] |
|---|---|---|
| **Metals** | | |
| Arsenic | mg/kg | 7.5 |
| Cadmium | mg/kg | 0.33 |
| Chromium | mg/kg | 57 |
| Copper | mg/kg | 121 |
| Lead | mg/kg | 53 |
| Mercury | mg/kg | 0.57 |
| Nickel | mg/kg | 15 |
| Silver | mg/kg | 1.1 |
| Zinc | mg/kg | 192 |
| **Organics** | | |
| Dibutyltin | µg/kg | 21 |
| Monobutyltin | µg/kg | 14 |
| Tributyltin | µg/kg | 22 |
| Tetrabutyltin | µg/kg | (1.4) |
| HPAH [2] | µg/kg | 673 |
| PPPAH [3] | µg/kg | 1,234 |
| Benzo[a]pyrene | µg/kg | 202 |
| Total PCB Congeners [4] | µg/kg | 84 |
| Polychlorinated terphenyls | µg/kg | (142) |

(1) Based on the 95 percent upper prediction limit calculated from a pool of reference stations in San Diego
Bay. Parentheses ( ) indicates non-detects accounted for more than or equal to half the values.
(2) HPAH = High Molecular Weight Polynuclear Aromatic Hydrocarbons
(3) PPPAH = Priority Pollutant Polynuclear Aromatic Hydrocarbons
(4) PCB = Polychlorinated Biphenyls
Note: A regression analysis of the grain size:metals relationship is used in establishing background sediment
chemistry levels. The background metals concentration is based on the 95% UPL using 50% fine grain
sediment. These values are conservative concentrations because the mean fine grain sediment at the Shipyard
Investigation Site is 70% fine grain sediment. See Appendix for Section 15 of the Draft Technical Report for
Tentative Cleanup and Abatement Order No. R9-2005-0126 for further details on the regression analysis.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126          April 4, 2008
Shipyard Sediment Site

31. **TECHNOLOGICAL FEASIBILITY CONSIDERATIONS.** It is technologically feasible to cleanup to background sediment quality levels at the Shipyard Sediment Site. The Regional Board considered three remedial technologies for the cleanup to background evaluation: (1) Natural Recovery, (2) Subaqueous Capping, and (3) Dredging. Based on current site use, natural recovery is considered to be technologically infeasible due to sediment disturbance from normal shipyard activities (e.g., vessel propeller wash, ship traffic, dry dock movements, maintenance/navigational dredging, engine tests, construction, etc.). Subaqueous capping is also considered to be technologically infeasible based on current site use because of the ever-larger ships being serviced at the shipyards, the associated navigational requirements, and the likelihood of cap disturbance resulting from normal shipyard activities (e.g., vessel propeller wash). Dredging, although difficult to implement because the Shipyard Sediment Site is currently a working shipyard, is considered to be technologically feasible. Dredging is a proven technology and it has been used not only in San Diego Bay but also throughout the United States for remediation of contaminated sediment.

32. **ECONOMIC FEASIBILITY CONSIDERATIONS.** The Regional Board evaluated a number of criteria to determine tradeoffs in risks, costs, and benefits associated with cleanups to background sediment chemistry levels and six alternative cleanup levels greater than background. The criteria included factors such as total cost, volume of sediment dredged, short- and long-term effects on beneficial uses (aquatic life, aquatic-dependent wildlife, and human health), effects on shipyards and associated economic activities, effects on local businesses and neighborhood quality of life, and effects on recreational, commercial, or industrial uses of aquatic resources. Based on these considerations, the Regional Board concludes that it is not economically feasible to cleanup to the background sediment chemistry levels.

*ALTERNATIVE SEDIMENT CLEANUP LEVELS*

33. **ALTERNATIVE CLEANUP LEVELS.** The Regional Board has selected the alternative cleanup levels presented below for the Shipyard Sediment Site. In approving alternative cleanup levels less stringent than background the Regional Board has considered the factors contained in Resolution 92-49 and the California Code of Regulations, Title 23, section 2550.4, subdivision (d)[1].

   a. *Alternative Cleanup Levels are Appropriate.* The Regional Board has determined that it is economically infeasible to cleanup to background sediment quality levels at the Shipyard Sediment Site. The overall benefit of remediating the site to the alternative cleanup levels is approximately equal to the overall benefit of cleaning up to background for considerably less cost.

---

[1] Resolution 92-49 provides that in approving any alternative cleanup levels less stringent than background sediment quality the Regional Board must consider the conditions described in California Code of Regulations, Title 23, section 2550.4. Resolution 92-49 further requires that any alternative cleanup levels shall (1) be consistent with maximum benefit to the people of the state; (2) not unreasonably affect present and anticipated beneficial use of such water; and (3) not result in water quality less than that prescribed in the Water Quality Control Plans and Policies adopted by the State and Regional Water Boards.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                    April 4, 2008
Shipyard Sediment Site

b. ***Alternative Cleanup Levels Are Consistent With Water Quality Control Plans And Policies.*** The alternative cleanup levels will not result in water quality less than prescribed in water quality control plans and policies adopted by the State Water Resources Control Board and the Regional Board[2]. The alternative sediment quality levels are well below levels expected to cause toxicity to aquatic life and will substantially reduce existing risks to aquatic dependent wildlife and human health.

c. ***Alternative Cleanup Levels Are Consistent With The Maximum Benefit To The People Of The State.*** The level of water quality that will be attained upon implementation of the alternative cleanup levels at the Shipyard Sediment Site is consistent with the maximum benefit to the people of the state. The San Diego Bay shoreline between Sampson and 28th Streets is listed on the Clean Water Act 303(d) list for elevated levels of copper, mercury, PAHs, and PCBs at the Shipyard Sediment Site. While it is impossible to determine the precise level of water quality that will be attained given the residual sediment pollutants constituents that will remain at the site, compliance with the alternative cleanup levels will markedly improve water quality conditions in the Shipyard Sediment Site and result in attainment of water quality standards at the site.

---

2 Applicable numerical and narrative water quality objectives for San Diego Bay Waters include the Regional Board's Toxicity Objective, the California Toxics Rule Water Quality Criteria and the State Water Board Policy for Implementation of Toxics Standards (the SIP) which provides that mixing zones shall not result in "objectionable bottom deposits." This term is defined as "an accumulation of materials on or near the bottom of a water body which creates conditions that adversely impact aquatic life, human health, beneficial uses, or aesthetics. These conditions include, but are not limited to, the accumulation of pollutants in the sediments (SWRCB, 2005).

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126          April 4, 2008
Shipyard Sediment Site

## Alternative Sediment Cleanup Levels

| Chemical | Units (dry weight) | Alternative Sediment Cleanup Levels (1) |
|---|---|---|
| **Metals** | | |
| Arsenic | mg/kg | 10 |
| Cadmium | mg/kg | 1.0 |
| Chromium | mg/kg | 81 |
| Copper | mg/kg | 200 |
| Lead | mg/kg | 90 |
| Mercury | mg/kg | 0.7 |
| Nickel | mg/kg | 20 |
| Silver | mg/kg | 1.5 |
| Zinc | mg/kg | 300 |
| **Organics** | | |
| Tributyltin | µg/kg | 110 |
| Benzo[a]pyrene | µg/kg | 1,010 |
| Total PCB Congeners [2] | µg/kg | 420 |

1) Cleanup levels for tributyltin, benzo[a]pyrene, and total PCB congeners are based on 5 times background, constituents which, at 5 times background, determine the largest cleanup footprint. The other chemical concentrations are based on an evaluation of that cleanup footprint.

2) PCB = polychlorinated biphenyl

34. **LEGAL AND REGULATORY AUTHORITY.** This Order is based on (1) section 13267 and Chapter 5, Enforcement, of the Porter-Cologne Water Quality Control Act (Division 7 of the Water Code, commencing with section 13000), commencing with section 13300; (2) applicable state and federal regulations; (3) all applicable provisions of statewide Water Quality Control Plans adopted by the State Water Resources Control Board and the *Water Quality Control Plan for the San Diego Basin* (Basin Plan) adopted by the Regional Board including beneficial uses, water quality objectives, and implementation plans; (4) State Water Board policies for water quality control, including State Water Board Resolution No. 68-16 (*Statement of Policy with Respect to Maintaining High Quality of Waters in California*) and Resolution No. 92-49 (*Policies and Procedures for Investigation and Cleanup and Abatement of Discharges Under Water Code section 13304*); and (5) relevant standards, criteria, and advisories adopted by other state and federal agencies.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                    April 4, 2008
Shipyard Sediment Site

35. **CEQA EXEMPTION.** This enforcement action is exempt from the provisions of the
    California Environmental Quality Act (CEQA) because it falls within Classes 7, 8, and 21 of
    the categorical exemptions for projects that have been determined not to have a significant
    effect on the environment under section 21084 of CEQA. [14 CCR 15307, 15308, and
    15321.] The Regional Board will not undertake any construction activity as a result of this
    Order, nor will the issuance of this Order allow environmental degradation.

36. **PUBLIC NOTICE.** The Regional Board has notified all known interested persons and the
    public of its intent to adopt this Cleanup and Abatement Order and has provided them with
    an opportunity to submit written comments and recommendations.

37. **PUBLIC HEARING.** The Regional Board has considered all comments pertaining to this
    Cleanup and Abatement Order submitted to the Regional Board in writing, or by oral
    presentations at the public hearing held on [date(s) to be inserted]. Detailed responses to
    relevant comments have been incorporated into the final Technical Report for the Cleanup
    and Abatement Order adopted by this Order.

38. **TECHNICAL REPORT.** The attached "Draft Technical Report for Tentative Cleanup and
    Abatement Order No. R9-2005-0126" is hereby incorporated as a finding in support of this
    Cleanup and Abatement Order as if fully set forth here verbatim.

*ORDER DIRECTIVES*

**IT IS HEREBY ORDERED** *that, pursuant to sections 13267 and 13304 of the Water Code,
National Steel and Shipbuilding Company; BAE Systems San Diego Ship Repair Inc.
(formerly Southwest Marine, Inc.); City of San Diego; Marine Construction and Design
Company and Campbell Industries, Inc; San Diego Gas and Electric, a subsidiary of Sempra
Energy Company; and the United States Navy (hereinafter Discharger(s)), shall comply with
the following directives:*

**A. CLEANUP AND ABATE**

1. **Terminate Illicit Discharges.** The Discharger(s) shall terminate all illicit discharges to
   San Diego Bay in violation of waste discharge requirements or other order or prohibition
   issued by the Regional Board.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                    April 4, 2008
Shipyard Sediment Site

2. **Corrective Actions.** The Discharger(s) shall take all corrective actions[3] necessary to cleanup contaminated marine bay sediment at the Shipyard Sediment Site to attain the sediment quality levels specified below:

| Chemical | Units (dry weight) | Sediment Quality Levels |
|---|---|---|
| **Metals** | | |
| Arsenic | mg/kg | 10 |
| Cadmium | mg/kg | 1.0 |
| Chromium | mg/kg | 81 |
| Copper | mg/kg | 200 |
| Lead | mg/kg | 90 |
| Mercury | mg/kg | 0.7 |
| Nickel | mg/kg | 20 |
| Silver | mg/kg | 1.5 |
| Zinc | mg/kg | 300 |
| **Organics** | | |
| Tributyltin | µg/kg | 110 |
| Benzo[a]pyrene | µg/kg | 1,010 |
| Total PCB Congeners [1] | µg/kg | 420 |

(1) PCB = polychlorinated biphenyl

3. **Site Investigation.** San Diego Gas and Electric, a subsidiary of Sempra Energy Company, (SDG&E) shall prepare and submit a Site Investigation Report (Report) by [date based on 45 days after adoption to be inserted] containing the following information:

   a. *Site Conceptual Model.* The Report shall contain a site conceptual model showing all the current and former potential pathways for pollutants to potentially discharge from the SDG&E property to the Shipyard Sediment Site, including all elements of the Storm Water Conveyance System (SWCS) between the SDG&E property and San Diego Bay.

   b. *Source Characterization.* The Report shall describe the results of an investigation of all potential sources of waste discharges to surface soils and storm water conveyance systems based on historical records of operation, site reconnaissance, and previous sampling studies. Potential sources that should be investigated include current or

---

[3] Corrective Actions include the phases of cleanup and abatement described in Directives A through D of this Cleanup and Abatement order.

former locations of tanks, drains, sumps, areas of stained soil, container storage areas, transformers, and other areas where waste constituents were handled, stored, or used. All current or former locations of sources of waste constituents shall be located on a site map at a scale of 1 inch = 200 feet or larger, with graphics indicating surface water drainage directions on and adjacent to the SDG&E property.

c. *Storm Water Conveyance System (SWCS) Characterization.* The Report shall characterize the presence of waste constituents in loose and cemented sediment found in the SWCS, including catch basins tributary to the SWCS on and adjacent to the SDG&E property, and between the SDG&E property and San Diego Bay.

d. *Extent of Waste Constituent Characterization.* The Report shall characterize the lateral and vertical extent of each waste constituent above the background[4] value for that waste constituent.

e. *Chemical Analyses.* The report shall describe the laboratory analytical methods and protocols used for each sample analysis. The suite of chemical analyses must be adequate to identify the full range of site-specific waste constituents including, at a minimum, polychlorinated biphenyls, copper, lead, zinc, total petroleum hydrocarbons (TPH), and benzo(a)pyrene.[5]

f. *Sample Locations and Number.* The locations, type, and number of samples shall be identified and shown on a site map and cross sections. The number of samples and suite of chemical analyses must be sufficient to identify the nature of waste constituent sources, to define the distribution of waste constituents on the ground surface and in the SWCS on the SDG&E property and between the SDG&E property and San Diego Bay.

## B. REMEDIAL ACTION PLAN AND IMPLEMENTATION

1. *Remedial Action Plan (RAP).* The Discharger(s) shall submit a Remedial Action Plan (RAP) to the Regional Board by [date based on 90 days after adoption to be inserted]. The RAP shall contain the following information:

   a. *Implementation Activities.* A detailed description of all activities planned to implement the corrective actions necessary to comply with all the directives herein;

   b. *Shipyard Sediment Site* Map. A map(s), using an appropriate modeling program, illustrating the horizontal and vertical distribution of pollutants within the remediation area defined by the sediment quality cleanup levels described in Directive A.1;

   c. *Schedule.* A schedule detailing the sequence of events and time frame for each activity; and

---

[4] "Background" is defined as the concentration or mesures of constituents or indicator parameters in soil that have not been affected by waste constituents released from the SDG&E property.

[5] These waste constituents, except for benzo(a)pyrene, were reported in elevated concentrations in surface soil samples from the SDG&E property [see Section 8.9 of the Draft Technical Report]. Benzo(a)pyrene is a component of the TPH reported in elevated concentrations in the surface soil samples from the SDG&E property.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                         April 4, 2008
Shipyard Sediment Site

     d. *Short-Term Effectiveness Monitoring Activities*. A monitoring program as described in Directive C, Cleanup and Abatement Verification, to demonstrate the effectiveness of the RAP. The monitoring program shall be effective in determining compliance with the cleanup levels and in determining the success of the remedial action measures.

2. ***Remedial Action Plan (RAP) Implementation***. In the interest of promoting prompt cleanup, the Discharger(s) may begin implementation of the RAP sixty (60) calendar days after submittal to the Regional Board, unless otherwise directed in writing by the Regional Board. Before beginning RAP implementation activities, the Discharger(s) shall:

     a. Notify the Regional Board of its intention to begin cleanup; and

     b. Comply with any conditions set by the Regional Board, including mitigation of adverse consequences from cleanup activities.

3. ***Remedial Action Zone***. The Discharger(s) shall implement remedial action measures that ensure that marine sediment pollutants attain their respective cleanup levels at all monitoring points and throughout the Shipyard Sediment Site.

4. ***Implementation Schedule***. Implementation of the RAP shall be completed on a schedule to be established by the Regional Board in a subsequent amendment to this Cleanup and Abatement Order.

5. ***Monitoring, Evaluation, and Reporting***. The Discharger(s) shall monitor, evaluate, and report the results of implementation of the RAP on a schedule to be established by the Regional Board in a subsequent amendment to this Cleanup and Abatement Order.

6. ***Modify or Suspend Cleanup Activities***. The Discharger(s) shall modify or suspend cleanup activities when directed to do so by the Regional Board.

## C. CLEANUP AND ABATEMENT COMPLETION VERIFICATION

1. ***Cleanup and Abatement Completion Report***. The Discharger(s) shall submit a final Cleanup and Abatement Completion Report verifying completion of the Remedial Action Plan (RAP) for the Shipyard Sediment Site. The report shall provide a demonstration, based on a sound technical analysis that marine sediment quality cleanup levels specified in Directive A.1. for all pollutants are attained at all monitoring points and throughout the Shipyard Sediment Site.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                     April 4, 2008
Shipyard Sediment Site

## D. POST CLEANUP MONITORING

1.  ***Post Cleanup Monitoring Plan.*** The Discharger(s) shall submit a Post Cleanup
    Monitoring Plan to the Regional Board by [Insert Date]. The Post Cleanup Monitoring
    Plan shall be designed to confirm the short-term and long-term effectiveness of the
    cleanup. The Post Cleanup Monitoring Plan shall contain the following information:

    a.  *Monitoring Activities.* A detailed description of monitoring and sampling activities
        designed to assess the site conditions, including the benthic community health, after
        the RAP is completed. The monitoring activities shall include sampling for a period
        of not less than five years; and

    b.  *Schedule.* A schedule detailing the sequence of events and time frame for each
        activity. The schedule shall also include the dates for submittal of the Post-Cleanup
        Monitoring annual progress reports and final report as detailed in Section D.2. below.

2.  ***Post Cleanup Monitoring Report.*** The Discharger shall submit annual progress reports
    and a final Post Cleanup Monitoring Report, on a schedule to be established by the
    Regional Board in a subsequent amendment to this Cleanup and Abatement Order,
    containing the following information:

    a.  *Monitoring Activities.* A detailed description of the post cleanup monitoring activities
        performed; and

    b.  *Interpretations and Conclusions.* Interpretations and conclusions regarding the
        potential presence and chemical characteristics of any newly deposited sediment
        within the cleanup areas, and interpretations and conclusions regarding the health and
        recovery of the benthic communities.

## E. REGIONAL BOARD CONCURRENCE

1.  ***Regional Board Concurrence.*** Upon concurrence with the findings of the Cleanup and
    Abatement Completion Report (Directive C.1) and the Post Cleanup Monitoring Report
    (Directive D.2) that remedial actions and monitoring are complete and that compliance
    with this Cleanup and Abatement Order is achieved, the Regional Board will inform the
    Discharger(s) and other interested persons in writing that no further remedial work is
    required at this time, based on available information. This written notice shall constitute
    Regional Board concurrence with the completed remedial actions.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                    April 4, 2008
Shipyard Sediment Site

## F. PROVISIONS

1. *Cost Recovery*. The Discharger(s) shall reimburse the State of California for all reasonable costs actually incurred by the Regional Board to investigate, oversee, and monitor cleanup and abatement actions required by this Cleanup and Abatement Order, according to billing statements prepared from time to time by the State Water Resources Control Board. If the Discharger(s) is enrolled in a reimbursement program managed by the State Water Resources Control Board for the discharge addressed by this Cleanup and Abatement Order, reimbursement shall be made pursuant to the procedures established in that program.

2. *Waste Management*. The Discharger(s) shall properly manage, store, treat, and dispose of contaminated soils and ground water in accordance with applicable federal, state, and local laws and regulations. The storage, handling, treatment, or disposal of contaminated marine sediment and associated waste shall not create conditions of pollution, contamination or nuisance as defined in Water Code section 13050. The Discharger(s) shall, as required by the Regional Board, obtain, or apply for coverage under, waste discharge requirements or a conditional waiver of waste discharge requirements for the removal of waste from the immediate place of release and discharge of the waste to (a) land for treatment, storage, or disposal or (b) waters of the state.

3. *Request to Provide Information*. The Discharger(s) may present characterization data, preliminary interpretations and conclusions as they become available, rather than waiting until a final report is prepared. This type of on-going reporting can facilitate a consensus being reached between the Discharger(s) and the Regional Board and may result in overall reduction of the time necessary for regulatory approval.

4. *Waste Constituent Analysis*. Unless otherwise permitted by the Regional Board, all analyses shall be conducted at a laboratory certified for such analyses by the State Department of Health Services. Specific methods of analysis must be identified. If the Discharger(s) proposes to use methods or test procedures other than those included in the most current version of *"Test Methods for Evaluating Solid Waste, Physical/Chemical Methods, SW-846"* (U.S. Environmental Protection Agency) or 40 CFR 136, *"Guidelines Establishing Test Procedures for the Analysis of Pollutants; Procedures for Detection and Quantification "*, the exact methodology must be submitted for review and must be approved by the Regional Board prior to use. The director of the laboratory whose name appears on the certification shall supervise all analytical work in his/her laboratory and shall sign all reports submitted to the Regional Board.

5. *Duty to Operate and Maintain*. The Discharger(s) shall, at all times, properly operate and maintain all facilities and systems of treatment, control, storage, disposal and monitoring (and related appurtenances) which are installed or used by the Discharger(s) to achieve compliance with this Cleanup and Abatement Order. Proper operation and maintenance also includes adequate laboratory controls and appropriate quality assurance procedures. This provision requires the operation of back-up or auxiliary facilities, which are installed by the Discharger(s) only when the operation is necessary to achieve compliance the conditions of this Cleanup and Abatement Order.

6. **Duty to Use Registered Professionals.** The Discharger(s) shall provide documentation that plans and reports required under this Cleanup and Abatement Order are prepared under the direction of appropriately qualified professionals. California Business and Professions Code sections 6735, 7835 and 7835.1 require that engineering and geologic evaluations and judgments be performed by or under the direction of registered professionals. A statement of qualifications and registration numbers of the responsible lead professionals shall be included in all plans and reports submitted by the Discharger(s). The lead professional shall sign and affix their registration stamp to the report, plan or document.

7. **Corporate Signatory Requirements.** All reports required under this Order shall be signed and certified by a responsible corporate officer(s) of the Discharger(s) described in paragraph 5.a. of this provision or by a duly authorized representative of that person as described in paragraph 5.b. of this provision.

   a. *Responsible Corporate Officer(s).* For the purposes of this provision, a responsible corporate officer means: (i) A president, secretary, treasurer, or vice-president of the corporation in charge of a principal business function, or any other person who performs similar policy - or decision-making functions for the corporation, or (ii) the manager of one or more manufacturing, production, or operating facilities, provided, the manager is authorized to make management decisions which govern the operation of the regulated facility including having the explicit or implicit duty of making major capital investment recommendations, and initiating and directing other comprehensive measures to assure long term environmental compliance with environmental laws and regulations; the manager can ensure that the necessary systems are established or actions taken to gather complete and accurate information for permit application requirements; and where authority to sign documents has been assigned or delegated to the manager in accordance with corporate procedures.

   b. *Duly Authorized Representative.* A person is a duly authorized representative only if:

      (1) The authorization is made in writing by a person described in paragraph (a) of this provision;

      (2) The authorization specifies either an individual or a position having responsibility for the overall operation of the regulated facility or activity such as the position of plant manager, operator of a well or a well field, superintendent, position of equivalent responsibility, or an individual (A duly authorized representative may thus be either a named individual or any individual occupying a named position.); and

      (3) The written authorization is submitted to the Regional Board.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                    April 4, 2008
Shipyard Sediment Site

    c. *Changes to Authorization.* If an authorization under paragraph (b) of this provision is no longer accurate because a different individual or position has responsibility for the overall operation of the facility, a new authorization satisfying the requirements of paragraph (b) of this provision must be submitted to the Regional Board prior to or together with any reports or information to be signed by an authorized representative.

    d. *Certification Statement.* Any person signing a document under paragraph a. or b. of this provision shall make the following certification:

    "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

8. ***Duty to Submit Other Information.*** When the Discharger(s) becomes aware that it failed to submit any relevant facts in any report required under this Cleanup and Abatement Order, or submitted incorrect information in any such report, the Discharger(s) shall promptly submit such facts or information to the Regional Board.

9. ***Electronic and Paper Media Reporting Requirements.*** The Discharger(s) shall submit both electronic and paper copies of all reports required under this Cleanup and Abatement Order including work plans, technical reports, and monitoring reports.

10. ***Report Submittals.*** All monitoring and technical reports required under this Cleanup and Abatement Order shall be submitted to:

    Executive Officer
    California Regional Water Quality Control Board
    San Diego Region
    9174 Sky Park Court, Suite 100
    San Diego, CA 92123-4340

11. ***Identify Documents Using Code Number.*** In order to assist the Regional Board in the processing of correspondence and reports submitted in compliance with this Cleanup and Abatement Order, the Discharger(s) shall include the following code number in the header or subject line portion of all correspondence or reports submitted to the Regional Board:

    For all correspondences: **Shipyards CAO: 03-0284.05**
    For all reports: **Shipyards CAO: 03-0284.051**

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                                  April 4, 2008
Shipyard Sediment Site

12. **Amendment.** This Cleanup and Abatement Order in no way limits the authority of this Regional Board to institute additional enforcement actions or to require additional investigation and cleanup consistent with the California Water Code. This Cleanup and Abatement Order may be revised by the Regional Board as additional information becomes available.

13. **Time Extensions.** If, for any reason, the Dischargers are unable to perform any activity or submit any documentation in compliance with requirements in this Cleanup and Abatement Order, including the RAP, or in compliance with associated implementation schedules, including the RAP implementation schedule, the Dischargers may request, in writing, an extension of time. The written extension request shall include justification for the delay and shall be received by the Regional Board reasonably (but not less than 15 calendar days) in advance of the deadline sought to be extended. An extension may be granted for good cause, in which case this Cleanup and Abatement Order will be accordingly amended.

## G. NOTIFICATIONS

1. **Enforcement Discretion.** The Regional Board reserves its right to take any enforcement action authorized by law for violations of the terms and conditions of this Cleanup and Abatement Order.

2. **Enforcement Notification.** The Porter-Cologne Water Quality Control Act commencing with Chapter 5, Enforcement and Implementation, section 13308, provides that if there is a threatened or continuing violation of a cleanup and abatement order, the Regional Board may issue a Time Schedule Order prescribing a civil penalty in an amount not to exceed $10,000 per day for each day compliance is not achieved in accordance with that time schedule. Section 13350 provides that any person may be assessed administrative civil liability by the Regional Board for violating a cleanup and abatement order in an amount not to exceed $5,000 for each day the violation occurs, or on a per gallon basis, not to exceed $10 for each gallon of waste discharged. Alternatively the court may impose civil liability in an amount not to exceed $15,000 for each day the violation occurs, or on a per gallon basis, not to exceed $20 for each gallon of waste discharged. Section 13385 provides that any person may be assessed administrative civil liability by the Regional Board for violating a cleanup and abatement order for an activity subject to regulation under Division 7, Chapter 5.5 of the Water Code, in an amount not to exceed the sum of both of the following: (1) $10,000 for each day in which the violation occurs; and (2) where there is a discharge, any portion of which is not susceptible to cleanup or is not cleaned up, and the volume discharged but not cleaned up exceeds 1,000 gallons, an additional liability not to exceed $10 multiplied by the number of gallons by which the volume discharged but not cleaned up exceeds 1,000 gallons. Alternatively the civil liability may be imposed by the court in an amount not to exceed the sum of both of the following: (1) $25,000 for each day in which the violation occurs; and (2) where there is a discharge, any portion of which is not susceptible to cleanup or is not cleaned up, and the volume discharged but not cleaned up exceeds 1,000 gallons, an additional liability not to exceed $25 multiplied by the number of gallons by which the volume discharged but not cleaned up exceeds 1,000 gallons.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126          April 4, 2008
Shipyard Sediment Site

I, John H. Robertus, Executive Officer, do hereby certify the forgoing is a full, true, and correct
copy of a Cleanup and Abatement Order issued on [Insert Date].

_____

John H. Robertus
Executive Officer

Attachment 1. Map of Shipyard Sediment Site (Exponent, 2003)



JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| CITY OF SAN DIEGO | NATIONAL STEEL & SHIPBUILDING COMPANY, PLEASE SEE ATTACHMENT "A" |

**09 OCT 14 PM 12:29**

| (b) County of Residence of First Listed Plaintiff SAN DIEGO | County of Residence of First Listed Defendant |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: ___ DEPUTY

(c) Attorney's (Firm Name, Address, and Telephone Number)
Brian M. Ledger
GORDON & REES LLP
101 W. Broadway, Ste. 1600
San Diego, CA 92101
Tel. (619) 696-6700 / Fax (619) 696-7124

Attorneys (If Known)

**'09 CV 2275 W     CAB**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**FAXED**

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | ☐ 368 Asbestos Personal Injury Product | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | Liability | Liability | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 480 Consumer Credit |
| | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☒ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. Section 9607 Et Seq.

Brief description of cause:
Environmental Cost Recovery Action

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE ___ DOCKET NUMBER ___

DATE October 13, 2009     BRIAN M. LEDGER

SIGNATURE OF ATTORNEY OF RECORD
Brian M. Ledger

FOR OFFICE USE ONLY
RECEIPT # 6252     AMOUNT 350.00     APPLYING IFP ___     JUDGE ___     MAG. JUDGE ___

NS 10/14/09

American LegalNet, Inc.
www.FormsWorkflow.com



JS 44 Reverse (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.      (a) Plaintiffs-Defendants. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.      Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.      Residence (citizenship) of Principal Parties. This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.      Nature of Suit. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.      Origin. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.      Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless diversity.                    Example:      U.S. Civil Statute: 47 USC 553
                                        Brief Description: Unauthorized reception of cable service

VII.      Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.      Related Cases. This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.
Date and Attorney Signature. Date and sign the civil cover sheet.

COSD/1043756/7134387v 1

American LegalNet, Inc
www.FormsWorkflow.com

_City of San Diego vs. National Steel & Shipbuilding Company, et al._

1

2

3

**ATTACHMENT "A"**
**TO**
**CIVIL COVER SHEET**

4   NATIONAL STEEL & SHIPBUILDING CORPORATION; NATIONAL IRON
    WORKS; MARTINOLICH SHIP BUILDING COMPANY; SOUTHWEST MARINE,
5   INC.; BAE SYSTEMS SAN DIEGO SHIP REPAIR, INC.; SAN DIEGO MARINE
    CONSTRUCTION COMPANY; STAR AND CRESCENT BOAT COMPANY, a
6   division of SAN DIEGO MARINE CONSTRUCTION COMPANY; STAR AND
7   CRESCENT BOAT COMPANY; STAR AND CRESCENT INVESTMENT
    COMPANY; STAR AND CRESCENT FERRY COMPANY; SAN DIEGO MARINE
8   CONSTRUCTION CORPORATION; MCCSD; CAMPBELL INDUSTRIES; SAN
    DIEGO GAS & ELECTRIC; UNITED STATES NAVY; SAN DIEGO UNIFIED PORT
9   DISTRICT; AND DOES 1-100, inclusive.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COSD/1043756/71347374

101 W. Broadway
Suite 2000
San Diego, CA 92101

1

Attachment "A" to Civil Cover Sheet

Court Name: USDC California Southern
Division: 3
Receipt Number: CAS006252
Cashier ID: msweaney
Transaction Date: 10/14/2009
Payer Name: SAN DIEGO LEGAL SUPPORT SVCS
----------------------------------
CIVIL FILING FEE
 For: CITY OF SD V NATIONAL STEEL
 Case/Party: D-CAS-3-09-CV-002275-001
 Amount:        $350.00
----------------------------------
CHECK
 Check/Money Order Num: 83231
 Amt Tendered: $350.00
----------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


 There will be a fee of $45.00
 charged for any returned check.

# EXHIBIT G

# CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
## SAN DIEGO REGION

## CLEANUP AND ABATEMENT ORDER
## NO. R9-2012-0024

NATIONAL STEEL AND SHIPBUILDING COMPANY

BAE SYSTEMS SAN DIEGO SHIP REPAIR, INC.

CITY OF SAN DIEGO

CAMPBELL INDUSTRIES

SAN DIEGO GAS AND ELECTRIC

UNITED STATES NAVY

SAN DIEGO UNIFIED PORT DISTRICT

**SHIPYARD SEDIMENT SITE**
**SAN DIEGO BAY**
**SAN DIEGO, CALIFORNIA**

Cleanup and Abatement Order                                    March 14, 2012
No. R9-2012-0024

The California Regional Water Quality Control Board, San Diego Region (hereinafter San Diego Water Board), finds as follows, based upon the weight of the evidence in this matter:

## *JURISDICTION*

1.  **WASTE DISCHARGE.** Elevated levels of pollutants above San Diego Bay background conditions exist in the San Diego Bay bottom marine sediment along the eastern shore of central San Diego Bay extending approximately from the Sampson Street Extension to the northwest and Chollas Creek to the southeast, and from the shoreline out to the San Diego Bay main shipping channel to the west. This area is hereinafter collectively referred to as the "Shipyard Sediment Site." The National Steel and Shipbuilding Company Shipyard facility (NASSCO), the BAE Systems San Diego Ship Repair Facility (BAE Systems), the City of San Diego, San Diego Marine Construction Company,[1] Campbell Industries (Campbell), San Diego Gas and Electric (SDG&E), the United States Navy, and the San Diego Unified Port District (Port District) have each caused or permitted the discharge of waste to the Shipyard Sediment Site resulting in the accumulation of waste in the marine sediment. The contaminated marine sediment has caused conditions of pollution, contamination or nuisance in San Diego Bay that adversely affect aquatic life, aquatic-dependent wildlife, and human health San Diego Bay beneficial uses. A map of the Shipyard Sediment Area is provided in Attachment 1 to this Order (referred to interchangeably as CAO or Order).

## *RESPONSIBLE PERSON/DISCHARGER DETERMINATIONS*

2.  **NATIONAL STEEL AND SHIPBUILDING COMPANY (NASSCO), A SUBSIDIARY OF GENERAL DYNAMICS COMPANY**. The San Diego Water Board finds that NASSCO has caused or permitted wastes to be discharged or to be deposited where they were discharged into San Diego Bay and created, or threatened to create, a condition of pollution or nuisance. These wastes contained metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), butyl tin species, polychlorinated biphenyls (PCBs), polychlorinated terphenyls (PCTs), polynuclear aromatic hydrocarbons (PAHs), and total petroleum hydrocarbons (TPH).

    NASSCO, a subsidiary of General Dynamics Company, owns and operates a full service ship construction, modification, repair, and maintenance facility on 126 acres of tidelands property leased from the Port District on the eastern waterfront of central San Diego Bay at 2798 Harbor Drive in San Diego. Shipyard operations have been conducted at this site by NASSCO over San Diego Bay waters or very close to the waterfront since at least 1960. Shipyard facilities operated by NASSCO over the years at the Site have included concrete platens used for steel fabrication, a graving dock, shipbuilding ways, and berths on piers or

---

[1] San Diego Marine Construction Company is not identified as a discharger with responsibility for compliance with this Order because San Diego Marine Construction Company no longer exists and no corporate successor with legal responsibility for San Diego Marine Construction Company's liabilities has been identified. See Finding No. 5 and the Technical Report Section 5.

Cleanup and Abatement Order                                            March 14, 2012
No. R9-2012-0024

land to accommodate the berthing of ships. An assortment of waste is generated at the facility including spent abrasive, paint, rust, petroleum products, marine growth, sanitary waste, and general refuse. Based on these considerations NASSCO is referred to as "Discharger(s)" in this Cleanup and Abatement Order (CAO).

3.  **BAE SYSTEMS SAN DIEGO SHIP REPAIR, INC., FORMERLY SOUTHWEST MARINE, INC.** The San Diego Water Board finds that BAE Systems caused or permitted wastes to be discharged or to be deposited where they were discharged into San Diego Bay and created, or threatened to create, a condition of pollution or nuisance. These wastes contained metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), butyl tin species, PCBs, PCTs, PAHs, and TPH.

    From 1979 to the present, Southwest Marine, Inc. and its successor BAE Systems have owned and operated a ship repair, alteration, and overhaul facility on approximately 39.6 acres of tidelands property on the eastern waterfront of central San Diego Bay. The facility, currently referred to as BAE Systems San Diego Ship Repair, is located on land leased from the Port District at 2205 East Belt Street, foot of Sampson Street in San Diego, San Diego County, California. Shipyard facilities operated by BAE Systems over the years have included concrete platens used for steel fabrication, two floating dry docks, five piers, and two marine railways. An assortment of waste has been generated at the facility including spent abrasive, paint, rust, petroleum products, marine growth, sanitary waste, and general refuse. Based on these considerations BAE Systems is referred to as "Discharger(s)" in this CAO.

4.  **CITY OF SAN DIEGO**. The San Diego Water Board finds that the City of San Diego caused or permitted wastes to be discharged or to be deposited where they were discharged into San Diego Bay and created, or threatened to create, a condition of pollution or nuisance. From the early 1900s through February 1963, when the relevant tideland areas were transferred from the City of San Diego to the Port District, the City was the trustee of and leased to various operators, all relevant portions of the Shipyard Sediment Site. The wastes the City of San Diego caused or permitted to be discharged, or to be deposited where they were discharged into San Diego Bay through its ownership of the Shipyard Sediment Site contained metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), butyl tin species, PCBs, PCTs, PAHs, and TPH.

    The City of San Diego also owns and operates a municipal separate storm sewer system (MS4) through which it discharges waste commonly found in urban runoff to San Diego Bay subject to the terms and conditions of a National Pollutant Discharge Elimination System (NPDES) Storm Water Permit. The San Diego Water Board finds that the City of San Diego has discharged urban storm water containing waste directly to San Diego Bay at the Shipyard Sediment Site. The waste includes metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), total suspended solids, sediment (due to anthropogenic activities), petroleum products, and synthetic organics (pesticides, herbicides, and PCBs) through its SW4 (located on the BAE Systems leasehold) and SW9 (located on the NASSCO leasehold) MS4 conduit pipes.

Cleanup and Abatement Order                                          March 14, 2012
No. R9-2012-0024

The San Diego Water Board finds that the City of San Diego has also discharged urban storm water containing waste through its MS4 to Chollas Creek resulting in the exceedances of chronic and acute California Toxics Rule copper, lead, and zinc criteria for the protection of aquatic life. Studies indicate that during storm events, storm water plumes toxic to marine life emanate from Chollas Creek up to 1.2 kilometers into San Diego Bay, and contribute to pollutant levels at the Shipyard Sediment Site. The urban storm water containing waste that has discharged from the on-site and off-site MS4 has contributed to the accumulation of pollutants in the marine sediments at the Shipyard Sediment Site to levels, that cause, and threaten to cause, conditions of pollution, contamination, and nuisance by exceeding applicable water quality objectives for toxic pollutants in San Diego Bay. Based on these considerations the City of San Diego is referred to as "Discharger(s)" in this CAO.

5.   **STAR & CRESCENT BOAT COMPANY.** The San Diego Water Board finds that between 1914 and 1972, San Diego Marine Construction Company operated a ship repair, alteration, and overhaul facility on what is now the BAE Systems leasehold at the foot of Sampson Street in San Diego. Shipyard operations were conducted at this site over San Diego Bay water or very close to the waterfront. An assortment of waste was generated at the facility, including spent abrasive blast waste, paint, rust, petroleum products, marine growth, sanitary waste and general refuse. These wastes contained metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), butyl tin species, PCBs, PCTs, PAHs, and TPH. In July 1972, San Diego Marine Construction Company sold its shipyard operations to Campbell Industries, and changed its corporate name, effective July 14, 1972, to Star & Crescent Investment Co. On March 19, 1976, Star & Crescent Boat Company (Star & Crescent), was incorporated in California and on April 9, 1976, Star & Crescent Investment Co. (formerly San Diego Marine Construction Company) transferred some portion of its assets and liabilities to Star & Crescent. The San Diego Water Board's Cleanup Team and several other designated parties allege that Star & Crescent Investment Co. (formerly San Diego Marine Construction Company) transferred all of its liabilities and assets to Star & Crescent. Accordingly, these parties allege that Star & Crescent is the corporate successor of and responsible for the conditions of pollution or nuisance caused or permitted by San Diego Marine Construction Company. Star & Crescent denies that it is the corporate successor to San Diego Marine Construction Company's and denies any responsibility for San Diego Marine Construction Company's discharges of waste to the San Diego Bay Shipyard Sediment Site from 1914 to 1972.

The San Diego Water Board finds that San Diego Marine Construction Company caused or permitted wastes to be discharged or to be deposited where they were discharged into San Diego Bay and created, or threatened to create, a condition of pollution or nuisance. San Diego Marine Construction Company is no longer in existence. The San Diego Water Board declines to decide the legal and factual questions necessary to determine whether Star & Crescent is the corporate successor to and therefore liable for San Diego Marine Construction Company's discharges. Due to Star & Crescent's uncertain legal status and due to the pending federal court litigation to which Star & Crescent is a party and that the San Diego Water Board expects will address allocation issues associated with this Order, the San Diego Water Board does not name Star & Crescent as a Discharger under this

Cleanup and Abatement Order                                                March 14, 2012
No. R9-2012-0024

Order. The San Diego Water Board retains the authority to exercise its discretion to add Star & Crescent as a Discharger under this Order in the future. If the federal court determines that Star & Crescent is the corporate successor to San Diego Marine Construction Company (later Star & Crescent Investment Company), the San Diego Water Board directs the Cleanup Team to reevaluate whether it is appropriate to amend the Order to add Star & Crescent as a Discharger.

6. **CAMPBELL INDUSTRIES**. The San Diego Water Board finds that Campbell caused or permitted wastes to be discharged or to be deposited where they were discharged into San Diego Bay and created, or threatened to create, a condition of pollution or nuisance. These wastes contained metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), butyl tin species, PCBs, PCTs, PAHs, and TPH. From July 1972 through 1979, Campbell's wholly owned subsidiaries MCCSD and later San Diego Marine Construction Corporation operated a ship repair, alteration, and overhaul facility on what is now the BAE Systems leasehold at the foot of Sampson Street in San Diego. Shipyard operations were conducted at this site by Campbell over San Diego Bay waters or very close to the waterfront. An assortment of waste was generated at the facility including spent abrasive blast waste, paint, rust, petroleum products, marine growth, sanitary waste, and general refuse. Based on these considerations, Campbell is referred to as "Discharger(s)" in this CAO.

7. **CHEVRON, A SUBSIDIARY OF CHEVRONTEXACO**. Chevron, a subsidiary of ChevronTexaco (hereinafter, Chevron) owns and operates the Chevron Terminal, a bulk fuel storage facility currently located at 2351 East Harbor Drive in the City of San Diego adjacent to the NASSCO and BAE Systems leaseholds. Fuel products containing petroleum hydrocarbons have been stored at the Chevron Terminal since the early 1900s at both the currently operating 7 million gallon product capacity upper tank farm and the closed 5 million gallon capacity lower tank farm. Based on the information that the San Diego Water Board has reviewed to date, there is insufficient evidence to find that discharges from the Chevron Terminal contributed to the accumulation of pollutants in the marine sediments at the Shipyard Sediment Site to levels, which create, or threaten to create, conditions of pollution or nuisance. Accordingly, Chevron is not referred to as "Discharger(s)" in this CAO.

8. **BP AS THE PARENT COMPANY AND SUCCESSOR TO ATLANTIC RICHFIELD**. BP owns and operates the Atlantic Richfield Company (ARCO) Terminal, a bulk fuel storage facility with approximately 9 million gallons of capacity located at 2295 East Harbor Drive in the City of San Diego. Fuel products containing petroleum hydrocarbons and related constituents such as PAHs have been stored at ARCO Terminal since the early 1900s. ARCO owned and operated ancillary facilities include a wharf, fuel pier (currently BAE Systems Pier 4), and a marine fueling station used for loading and unloading petroleum products and fueling from 1925 to 1978, and five pipelines connecting the terminal to the pier and wharf in use from 1925 to 1978. Storm water flows from ARCO Terminal enter a City of San Diego MS4 storm drain that terminates in San Diego Bay in the Shipyard Sediment Site approximately 300 feet south of the Sampson Street extension. Based on the information that the San Diego Water Board has reviewed

Cleanup and Abatement Order                                                    March 14, 2012
No. R9-2012-0024

to date, there is insufficient evidence to find that discharges from the ARCO Terminal contributed to the accumulation of pollutants in the marine sediments at the Shipyard Sediment Site to levels, which create, or threaten to create, conditions of pollution or nuisance. Accordingly, BP and ARCO are not referred to as "Discharger(s)" in this CAO.

9. **SAN DIEGO GAS AND ELECTRIC, A SUBSIDIARY OF SEMPRA ENERGY**.
SDG&E owned and operated the Silver Gate Power Plant along the north side of the BAE Systems leasehold from approximately 1943 to the 1990s. SDG&E utilized an easement to San Diego Bay along BAE Systems' north property boundary for the intake and discharge of cooling water via concrete tunnels at flow rates ranging from 120 to 180 million gallons per day. SDG&E operations included discharging waste to holding ponds above the tunnels near the Shipyard Sediment Site.

The San Diego Water Board finds that SDG&E has caused or permitted waste (including metals [chromium, copper, lead, nickel, and zinc], PCBs, PAHs, and total petroleum hydrocarbons [TPH-d and TPH-h]) to be discharged or to be deposited where they were discharged into San Diego Bay and created, or threatened to create, a condition of pollution or nuisance. Based on these considerations SDG&E is referred to as "Discharger(s)" in this CAO.

10. **UNITED STATES NAVY**. The San Diego Water Board finds that the United States Navy (hereinafter "U.S. Navy") caused or permitted wastes to be discharged or to be deposited where they were discharged into San Diego Bay and created, or threatened to create, a condition of pollution or nuisance. The U.S. Navy owns and operates a municipal separate storm sewer system (MS4) at Naval Base San Diego (NBSD), formerly Naval Station San Diego or NAVSTA, through which it has caused or permitted the discharge of waste commonly found in urban runoff to Chollas Creek and San Diego Bay, including excessive concentrations of copper, lead, and zinc in violation of waste discharge requirements. Technical reports by the U.S. Navy and others indicate that Chollas Creek outflows during storm events convey elevated sediment and urban runoff chemical pollutant loading and its associated toxicity up to 1.2 kilometers into San Diego Bay over an area including the Shipyard Sediment Site.

The San Diego Water Board finds that the U.S. Navy has caused or permitted marine sediment and associated waste to be resuspended into the water column as a result of shear forces generated by the thrust of propellers during ship movements at NBSD. The resuspended sediment and pollutants can be transported by tidal currents and deposited in other parts of San Diego Bay, including the Shipyard Sediment Site. The above discharges have contributed to the accumulation of pollutants in marine sediment at the Shipyard Sediment Site to levels that cause, and threaten to cause, conditions of pollution, contamination, and nuisance by exceeding applicable water quality objectives for toxic pollutants in San Diego Bay.

Also, from 1921 to the present, the U.S. Navy has provided shore support and pier-side berthing services to U.S. Pacific fleet vessels at NBSD located at 3445 Surface Navy Boulevard in the City of San Diego. NBSD currently occupies 1,029 acres of land and 326

6

Cleanup and Abatement Order                                                    March 14, 2012
No. R9-2012-0024

water acres adjacent to San Diego Bay to the west, and Chollas Creek to the north near Pier 1. Between 1938 and 1956, the NBSD leasehold included a parcel of land within the Shipyard Sediment Site referred to as the 28th Street Shore Boat Landing Station, located at the south end of the present day NASSCO leasehold at the foot of 28th Street and including the 28th Street Pier. The San Diego Water Board finds that the U.S. Navy caused or permitted wastes to be discharged or to be deposited where they were discharged into San Diego Bay and created, or threatened to create, a condition of pollution or nuisance at this location when it conducted operations similar in scope to a small boatyard, including solvent cleaning and degreasing of vessel parts and surfaces, abrasive blasting and scraping for paint removal and surface preparations, metal plating, and surface finishing and painting. Prevailing industry-wide boatyard operational practices employed during the 1930s through the 1980s were often not sufficient to adequately control or prevent pollutant discharges, and often led to excessive discharges of pollutants and accumulation of pollutants in marine sediment in San Diego Bay. The types of pollutants found in elevated concentrations at the Shipyard Sediment Site (metals, butyltin species, PCBs, PCTs, PAHs, and TPH) are associated with the characteristics of the waste the U.S. Navy operations generated at the 28th Street Shore Boat Landing Station site. Based on the preceding considerations, the U.S. Navy is referred to as "Discharger(s)" in this CAO.

11. **SAN DIEGO UNIFIED PORT DISTRICT**. The San Diego Water Board finds that the Port District caused or permitted wastes to be discharged or to be deposited where they were discharged into San Diego Bay and created, or threatened to create, a condition of pollution or nuisance. The Port District is a special government entity, created in 1962 by the San Diego Unified Port District Act, California Harbors and Navigation Code Appendix I, in order to manage San Diego Harbor, and administer certain public lands along San Diego Bay. The Port District holds and manages as trust property on behalf of the People of the State of California the land occupied by NASSCO, BAE Systems, and the cooling water tunnels for SDG&E's former Silver Gate Power Plant. The Port District is also the trustee of the land formerly occupied by the San Diego Marine Construction Company and by Campbell at all times since 1963 during which they conducted shipbuilding and repair activities.[2] The Port District's own ordinances, which date back to 1963, prohibit the deposit or discharge of any chemicals or waste to the tidelands or San Diego Bay and make it unlawful to discharge pollutants in non-storm water directly or indirectly into the storm water conveyance system.

The wastes the Port District caused or permitted to be discharged, or to be deposited where they were discharged into San Diego Bay through its ownership of the Shipyard Sediment Site contained metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), butyl tin species, PCBs, PCTs, PAHs, and TPH.

The San Diego Water Board has the discretion to name the Port District in its capacity as the State's trustee as a "discharger" and does so in the Shipyard Sediment site CAO. The Port District asserts that its status as a lessor and State's trustee as well as other factors

---

[2]  San Diego Marine Construction Company and Campbell Industries owned and operated ship repair and construction facilities in past years prior to BAE Systems San Diego Ship Repair, Inc.'s occupation of the leasehold. See Sections 5 and 6 of the Technical Report.

Cleanup and Abatement Order                                March 14, 2012
No. R9-2012-0024

should only give rise to secondary and not primary liability as a discharger under this Order. Allocation of responsibility has not been determined and there is insufficient evidence to establish that present and former Port District tenants at the Site each have sufficient financial resources to perform all of the remedial activities required by this Order. In addition, cleanup is not underway at this time. Under these circumstances, it is not appropriate to accord the Port District secondary liability status it seeks.

The Port District also owns and operates a municipal separate storm sewer system (MS4) through which it discharges waste commonly found in urban runoff to San Diego Bay subject to the terms and conditions of an NPDES Storm Water Permit. The San Diego Water Board finds that the Port District has discharged urban storm water containing waste directly or indirectly to San Diego Bay at the Shipyard Sediment Site. The waste includes metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), total suspended solids, sediment (due to anthropogenic activities), petroleum products, and synthetic organics (pesticides, herbicides, and PCBs).

The urban storm water containing waste that has discharged from the on-site and off-site MS4 has contributed to the accumulation of pollutants in the marine sediments at the Shipyard Sediment Site to levels, that cause, and threaten to cause, conditions of pollution, contamination, and nuisance by exceeding applicable water quality objectives for toxic pollutants in San Diego Bay. Based on these considerations the San Diego Unified Port District is referred to as "Discharger(s)" in this CAO.

## FACTUAL BACKGROUND

12. **CLEAN WATER ACT SECTION 303(d) LIST**. The San Diego Bay shoreline between Sampson and 28th Streets is listed on the Clean Water Act section 303(d) List of Water Quality Limited Segments for elevated levels of copper, mercury, zinc, PAHs, and PCBs in the marine sediment. These pollutants are impairing the aquatic life, aquatic-dependent wildlife, and human health beneficial uses designated for San Diego Bay and are causing the Bay's narrative water quality objective for toxicity to not be attained. The Shipyard Sediment Site occupies this shoreline. Issuance of a CAO (in lieu of a Total Maximum Daily Load program) is the appropriate regulatory tool to use for correcting the impairment at the Shipyard Sediment Site.

13. **SEDIMENT QUALITY INVESTIGATION.** NASSCO and BAE Systems conducted a detailed sediment investigation at the Shipyard Sediment Site in San Diego Bay within and adjacent to the NASSCO and BAE Systems leaseholds. Two phases of fieldwork were conducted, Phase I in 2001 and Phase II in 2002. The results of the investigation are provided in the Exponent report *NASSCO and Southwest Marine Detailed Sediment Investigation, September 2003 (Shipyard Report, Exponent 2003)*. Unless otherwise explicitly stated, the San Diego Water Board's finding and conclusions in this CAO are based on the data and other technical information contained in the Shipyard Report prepared by NASSCO's and BAE Systems' consultant, Exponent.

The Shipyard Sediment Site is exempt from the Phase I Sediment Quality Objectives

Cleanup and Abatement Order                                                March 14, 2012
No. R9-2012-0024

promulgated by the State Water Board because a site assessment (the Shipyard Report) was completed and submitted to the San Diego Water Board on October 15, 2003. See State Water Board, *Water Quality Control Plan for Enclosed Bays and Estuaries – Part 1 Sediment Quality*, II.B.2 (August 25, 2009).

## IMPAIRMENT OF AQUATIC LIFE BENEFICIAL USES

14. **AQUATIC LIFE IMPAIRMENT**. Aquatic life beneficial uses designated for San Diego Bay are impaired due to the elevated levels of pollutants present in the marine sediment at the Shipyard Sediment Site. Aquatic life beneficial uses include: Estuarine Habitat (EST), Marine Habitat (MAR), and Migration of Aquatic Organisms (MIGR). This finding is based on the considerations described below in this *Impairment of Aquatic Life Beneficial Uses* section of the CAO.

15. **WEIGHT-OF-EVIDENCE APPROACH**. The San Diego Water Board used a weight-of-evidence approach based upon multiple lines of evidence to evaluate the potential risks to aquatic life beneficial uses from pollutants at the Shipyard Sediment Site. The approach focused on measuring and evaluating exposure and adverse effects to the benthic macroinvertebrate community and to fish using data from multiple lines of evidence and best professional judgment. Pollutant exposure and adverse effects to the benthic macroinvertebrate community were evaluated using sediment quality triad measurements, and bioaccumulation analyses, and interstitial water (i.e., pore water) analyses. The San Diego Water Board evaluated pollutant exposure and adverse effects to fish using fish histopathology analyses and analyses of PAH breakdown products in fish bile.

16. **SEDIMENT QUALITY TRIAD MEASURES**. The San Diego Water Board used lines of evidence organized into a sediment quality triad, to evaluate potential risks to the benthic community from pollutants present in the Shipyard Sediment Site. The sediment quality triad provides a "weight-of-evidence" approach to sediment quality assessment by integrating synoptic measures of sediment chemistry, toxicity, and benthic community composition. All three measures provide a framework of complementary evidence for assessing the degree of pollutant-induced degradation in the benthic community.

17. **REFERENCE SEDIMENT QUALITY CONDITIONS**. The San Diego Water Board selected a group of reference stations from three independent sediment quality investigations to contrast pollution conditions at the Shipyard Sediment Site with conditions found in other relatively cleaner areas of San Diego Bay not affected by the Shipyard Sediment Site: (1) Southern California Bight 1998 Regional Monitoring Program (Bight 98), (2) 2001 Mouth of Chollas Creek and Mouth of Paleta Creek TMDL studies, and (3) 2001 NASSCO and BAE Systems Detailed Sediment Investigation. Stations from these studies were selected to represent selected physical, chemical, and biological characteristics of San Diego Bay. Criteria for selecting acceptable reference stations included low levels of anthropogenic pollutant concentrations, locations remote from pollution sources, similar biological habitat to the Shipyard Sediment Site, sediment total organic carbon (TOC) and grain size profiles similar to the Shipyard Sediment Site, adequate sample size for statistical analysis, and sediment quality data comparability. The

reference stations selected for the Reference Sediment Quality Conditions are identified
below.

### Reference Stations Used To Establish Reference Sediment Quality Conditions

| 2001 Chollas/Paleta Reference Station Identification Number | 2001 NASSCO/BAE Systems Reference Station Identification Number | 1998 Bight'98 Reference Station Identification Number |
|---|---|---|
| 2231 | 2231 | 2235 |
| 2243 | 2243 | 2241 |
| 2433 | 2433 | 2242 |
| 2441 | 2441 | 2243 |
| 2238 | | 2256 |
| | | 2257 |
| | | 2258 |
| | | 2260 |
| | | 2265 |

18. **SEDIMENT QUALITY TRIAD RESULTS.** The San Diego Water Board categorized 6
of 30 sediment quality triad sampling stations at the Shipyard Sediment Site as having
sediment pollutant levels "Likely" to adversely affect the health of the benthic community.
The remaining triad stations were classified as "Possible" (13) and "Unlikely" (11). These
results are based on the synoptic measures of sediment chemistry, toxicity, and benthic
community structure at the Shipyard Sediment Site.

19. **BIOACCUMULATION.** The San Diego Water Board evaluated initial laboratory
bioaccumulation test data to ascertain the bioaccumulation potential of the sediment
chemical pollutants at the Shipyard Sediment Site. Examination of laboratory test data on
the chemical pollutant concentrations in tissue of the clam *Macoma nasuta* relative to the
pollutant concentrations in sediment indicates that bioaccumulation of chemical pollutants
is occurring at the Shipyard Sediment Site. The data indicates for several chemical
pollutants that concentrations in *Macoma nasuta* tissue increase proportionally as chemical
pollutant concentrations in sediment increase. Statistically significant relationships were
found for arsenic, copper, lead, mercury, zinc, tributyltin (TBT), PCBs, and high molecular
weight polynuclear aromatic hydrocarbons (HPAHs). These chemical pollutants have a
bioaccumulation potential at the Shipyard Sediment Site and are therefore considered
bioavailable to benthic organisms. No statistically significant relationships were found for
cadmium, chromium, nickel, selenium, silver, or PCTs.

20. **INDICATOR SEDIMENT CHEMICALS.** The San Diego Water Board evaluated the
relationships between sediment chemical pollutants and biological responses to identify

Cleanup and Abatement Order                                              March 14, 2012
No. R9-2012-0024

indicator chemical pollutants that may be impacting aquatic life and would therefore be candidates for assignment of cleanup levels or remediation goals. A two-step process was conducted. The first step in the selection of indicator chemicals was to identify chemicals representative of the major classes of sediment pollutants: metals, butyltins, PCBs and PCTs, PAHs, and petroleum hydrocarbons. The second step was the evaluation of relationships between these chemicals and biological responses. Results of the three toxicity tests, benthic community assessment, and bioaccumulation testing conducted in Phase 1 of the Shipyard study were all used to evaluate the potential of such relationships. Chemical pollutants were selected as indicator chemicals if they had any statistically significant relationship with amphipod mortality, echinoderm fertilization, bivalve development, total benthic macroinvertebrate abundance, total benthic macroinvertebrate richness, or tissue chemical concentrations in *Macoma nasuta*. Chemical pollutants selected as indicator chemicals include arsenic, copper, lead, mercury, zinc, TBT, total PCB homologs, diesel range organics (DRO), and residual range organics (RRO).

*IMPAIRMENT OF AQUATIC-DEPENDENT WILDLIFE BENEFICIAL USES*

21. **AQUATIC-DEPENDENT WILDLIFE IMPAIRMENT.** Aquatic-dependent wildlife beneficial uses designated for San Diego Bay are impaired due to the elevated levels of pollutants present in the marine sediment at the Shipyard Sediment Site. Aquatic-dependent wildlife beneficial uses include: Wildlife Habitat (WILD), Preservation of Biological Habitats of Special Significance (BIOL), and Rare, Threatened, or Endangered Species (RARE). This finding is based on the considerations described below in the *Impairment of Aquatic-Dependent Wildlife Beneficial* Uses section of this CAO.

22. **RISK ASSESSMENT APPROACH FOR AQUATIC-DEPENDENT WILDLIFE.** The San Diego Water Board evaluated potential risks to aquatic-dependent wildlife from chemical pollutants present in the sediment at the Shipyard Sediment Site based on a two-tier approach. The Tier I screening level risk assessment was based on tissue data derived from the exposure of the clam *Macoma nasuta* to site sediments for 28 days using the protocols specified by American Society of Testing Material (ASTM). The Tier II baseline comprehensive risk assessment was based on tissue data derived from resident fish and shellfish caught within and adjacent to the Shipyard Sediment Site.

23. **TIER I SCREENING LEVEL RISK ASSESSMENT FOR AQUATIC-DEPENDENT WILDLIFE.** The Tier I risk assessment objectives were to determine whether or not Shipyard Sediment Site conditions pose a potential unacceptable risk to aquatic-dependent wildlife receptors of concern and to identify whether a comprehensive, site-specific risk assessment was warranted (i.e., Tier II baseline risk assessment). The receptors of concern selected for the assessment include: California least tern (*Sterna antillarum brownie*), California brown pelican (*Pelecanus occidentalis californicus*), Western grebe (*Aechmophorus occidentalis*), Surf scoter (*Melanitta perspicillata*), California sea lion (*Zalophus californianus*), and East Pacific green turtle (*Chelonia mydas agassizii*). Chemical pollutant concentrations measured in clam tissue derived from laboratory bioaccumulation tests were used to estimate chemical exposure to these receptors of concern. Based on the Tier I screening level risk assessment results, there is a potential

 

Cleanup and Abatement Order                                                      March 14, 2012
No. R9-2012-0024

risk to all receptors of concern ingesting prey caught at the Shipyard Sediment Site. The chemical pollutants in *Macoma* tissue posing a potential risk include arsenic, copper, lead, zinc, benzo[a]pyrene (BAP), and total PCBs. The results of the Tier I risk assessment indicated that a Tier II baseline comprehensive risk assessment was warranted.

24. **TIER II BASELINE COMPREHENSIVE RISK ASSESSMENT FOR AQUATIC-DEPENDENT WILDLIFE.** The Tier II risk assessment objective was to more conclusively determine whether or not Shipyard Sediment Site conditions pose an unacceptable risk to aquatic-dependent wildlife receptors of concern. The receptors of concern selected for the assessment include: California least tern (*Sterna antillarum brownie*), California brown pelican (*Pelecanus occidentalis californicus*), Western grebe (*Aechmophorus occidentalis*), Surf scoter (*Melanitta perspicillata*), California sea lion (*Zalophus californianus*), and East Pacific green turtle (*Chelonia mydas agassizii):* Based on the Tier I screening level risk assessment results, there is a potential risk to all receptors of concern ingesting prey caught at the Shipyard Sediment Site and so a Tier II assessment was conducted. To focus the risk assessment, prey items were collected within four assessment units at the Shipyard Sediment Site and from a reference area located across the bay from the site. Chemical concentrations measured in fish were used to estimate chemical exposure for the least tern, western grebe, brown pelican, and sea lion and chemical concentrations in benthic mussels and eelgrass were used to estimate chemical pollutant exposure for the surf scoter and green turtle, respectively. Based on the Tier II risk assessment results, ingestion of prey items caught within all four assessment units at the Shipyard Sediment Site poses an increased risk above reference to all receptors of concern (excluding the sea lion). The chemicals in prey tissue posing a risk include BAP, PCBs, copper, lead, mercury, and zinc.

*IMPAIRMENT OF HUMAN HEALTH BENEFICIAL USES*

25. **HUMAN HEALTH IMPAIRMENT.** Human health beneficial uses for Shellfish Harvesting (SHELL), and Commercial and Sport Fishing (COMM) designated for San Diego Bay are impaired due to the elevated levels of pollutants present in the marine sediment at the Shipyard Sediment Site. This finding is based on the considerations described below in this *Impairment of Human Health Beneficial Uses* section of the CAO.

26. **RISK ASSESSMENT APPROACH FOR HUMAN HEALTH.** The San Diego Water Board evaluated potential risks to human health from chemical pollutants present in the sediment at the Shipyard Sediment Site based on a two-tier approach. The Tier I screening level risk assessment was based on tissue data derived from the exposure of the clam *Macoma nasuta* to site sediments for 28 days using ASTM protocols. The Tier II baseline comprehensive risk assessment was based on tissue data derived from resident fish and shellfish caught within and adjacent to the Shipyard Sediment Site. Two types of receptors (i.e., members of the population or individuals at risk) were evaluated:

   a. Recreational Anglers – Persons who eat the fish and/or shellfish they catch recreationally; and

Cleanup and Abatement Order                                          March 14, 2012
No. R9-2012-0004

    b.  Subsistence Anglers – Persons who fish for food, for economic and/or cultural reasons, and for whom the fish and/or shellfish caught is a major source of protein in their diet.

27.  **TIER I SCREENING LEVEL RISK ASSESSMENT FOR HUMAN HEALTH**. The Tier I risk assessment objectives were to determine whether or not Shipyard Sediment Site conditions potentially pose an unacceptable risk to human health and to identify if a comprehensive, site-specific risk assessment was warranted (i.e., Tier II baseline risk assessment). The receptors of concern identified for Tier I are recreational anglers and subsistence anglers. Recreational anglers represent those who eat the fish and/or shellfish they catch recreationally and subsistence anglers represent those who fish for food, for economic and/or cultural reasons, and for whom the fish and/or shellfish caught is a major source of protein in the diet. Chemical concentrations measured in *Macoma nasuta* tissue derived from laboratory bioaccumulation tests were used to estimate chemical exposure for these receptors of concern. Based on the Tier I screening level risk assessment results, there is a potential risk greater than that in reference areas to recreational and subsistence anglers ingesting fish and shellfish caught at the Shipyard Sediment Site. The chemicals in *Macoma* tissue posing a potential risk include arsenic, BAP, PCBs, and TBT.

28.  **TIER II BASELINE COMPREHENSIVE RISK ASSESSMENT FOR HUMAN HEALTH**. The Tier II risk assessment objective was to more conclusively determine whether Shipyard Sediment Site conditions pose unacceptable cancer and non-cancer health risks to recreational and subsistence anglers. Fish and shellfish were collected within four assessment units at the Shipyard Sediment Site and from two reference areas located across the bay from the Shipyard Site. Chemical concentrations measured in fish fillets and edible shellfish tissue were used to estimate chemical exposure for recreational anglers and chemical concentrations in fish whole bodies and shellfish whole bodies were used to estimate chemical exposure for subsistence anglers. Based on the Tier II risk assessment results, ingestion of fish and shellfish caught within all four assessment units at the Shipyard Sediment Site poses a theoretical increased cancer and non-cancer risk greater than that in reference areas to recreational and subsistence anglers. The chemicals posing theoretical increased cancer risks include inorganic arsenic and PCBs. The chemicals posing theoretical increased non-cancer risks include cadmium, copper, mercury, and PCBs.

*EVALUATING FEASIBILITY OF CLEANUP TO BACKGROUND*
*SEDIMENT QUALITY CONDITIONS*

29.  **CHEMICALS OF CONCERN AND BACKGROUND SEDIMENT QUALITY**. The San Diego Water Board derived sediment chemistry levels for use in evaluating the feasibility of cleanup to background sediment quality conditions from the pool of San Diego Bay reference stations described in Finding 17. The background sediment chemistry levels based on these reference stations are as follows:

Cleanup and Abatement Order                                                March 14, 2012
No. R9-2012-0024

### Table 1.  Background Sediment Chemistry Levels

| Chemicals of Concern | Units (dry weight) | Background Sediment Chemistry Levels[1] |
|---|---|---|
| **Primary COCs** | | |
| Copper | mg/kg | 121 |
| Mercury | mg/kg | 0.57 |
| HPAHs[2] | μg/kg | 663 |
| PCBs[3] | μg/kg | 84 |
| Tributyltin | μg/kg | 22 |
| **Secondary COCs** | | |
| Arsenic | mg/kg | 7.5 |
| Cadmium | mg/kg | 0.33 |
| Lead | mg/kg | 53 |
| Zinc | mg/kg | 192 |

1.  Equal to the 2005 Reference Pool's 95% upper predictive limits shown in Section 18 of the *Technical Report for Cleanup and Abatement Order No. R9-2012-0024.* The background levels for metals are based on the %fines:metals regression using 50% fines, which is conservative because the mean fine grain sediment at the Shipyard Investigation Site is 70% fines.

2.  HPAHs = sum of 6 PAHs: Fluoranthene, Perylene, Benzo[a]anthracene, Chrysene, Benzo[a]pyrene, and Dibenzo[a,h]anthracene.

3.  PCBs = sum of 41 congeners: 18, 28, 37, 44, 49, 52, 66, 70, 74, 77, 81, 87, 99, 101, 105, 110, 114, 118, 119, 123, 126, 128, 138, 149, 151, 153, 156, 157, 158, 167, 168, 169, 170, 177, 180, 183, 187, 189, 194, 201, and 206.

The San Diego Water Board identified constituents of primary concern (primary COCs), which are associated with the greatest exceedance of background and highest magnitude of potential risk at the Shipyard Sediment Site.  A greater concentration relative to background suggests a stronger association with the Shipyard Sediment Site, and a higher potential for exposure reduction via remediation.  Secondary contaminants of concern (secondary COCs) are contaminants with lower concentrations relative to background, and are highly correlated with primary COCs and would be addressed in a common remedial footprint.  Based on these criteria, the primary COCs for the Shipyard Sediment Site are copper, mercury, HPAHs,[3] PCBs, and TBT, and the secondary COCs are arsenic, cadmium, lead, and zinc.

---

[3] Petroleum hydrocarbons, including TPH, RRO, DRO, and other PAHs were eliminated as primary and secondary COCs for the following reasons.  HPAHs, a primary COC, are considered to be the most recalcitrant, bioavailable, and toxic compounds present in the complex mixture of petroleum hydrocarbons.  Other measures of petroleum hydrocarbons are generally correlated with HPAHs such that remedial measures to address HPAHs will also address

Cleanup and Abatement Order                                     March 14, 2012
No. R9-2012-0024

30.   **TECHNOLOGICAL FEASIBILITY CONSIDERATIONS**. Although there are
      complexities and difficulties that would need to be addressed and overcome (e.g. removal
      and handling of large volume of sediment; obstructions such as piers and ongoing shipyard
      operations; transportation and disposal of waste), it is technologically feasible to cleanup to
      the background sediment quality levels utilizing one or more remedial and disposal
      techniques.  Mechanical dredging, subaqueous capping, and natural recovery have been
      successfully performed at numerous sites, including several in San Diego Bay, and many
      of these projects have successfully overcome the same types of operational limitations
      present at the Shipyard Sediment Site, such as piers and other obstructions, ship
      movements, and limited staging areas.  Confined aquatic disposal or near-shore confined
      disposal facilities have also been employed in San Diego Bay and elsewhere, and may be
      evaluated as project alternatives for the management of sediment removed from the
      Shipyard Sediment Site.

31.   **ECONOMIC FEASIBILITY CONSIDERATIONS**. Under State Water Board
      Resolution No. 92-49, *Policies and Procedures for Investigation and Cleanup and
      Abatement of Discharges Under Water Code Section 13304*, determining "economic
      feasibility" requires an objective balancing of the incremental benefit of attaining further
      reduction in the concentrations of primary COCs as compared with the incremental cost of
      achieving those reductions.  Resolution No. 92-49 provides that "[e]conomic feasibility
      does not refer to the dischargers' ability to finance cleanup."  When considering
      appropriate cleanup levels under Resolution No. 92-49, the San Diego Water Board is
      charged with evaluating "economic feasibility" by estimating the costs to remediate
      constituents of concern at a site to background and the costs of implementing other
      alternative remedial levels.  An economically feasible alternative cleanup level is one
      where the incremental cost of further reductions in primary COCs outweighs the
      incremental benefits.

      The San Diego Water Board evaluated a number of criteria to determine risks, costs, and
      benefits associated with no action, cleanups to background sediment chemistry levels, and
      alternative cleanup levels greater than background concentrations.  The criteria included
      factors such as total cost, volume of sediment dredged, exposure pathways of receptors to
      contaminants, short- and long-term effects on beneficial uses (as they fall into the broader
      categories of aquatic life, aquatic-dependent wildlife, and human health).  The San Diego
      Water Board then compared these cost criteria against the benefits gained by diminishing
      exposure to the primary COCs to estimate the incremental benefit gained from reducing
      exposure based on the incremental costs of doing so.  As set forth in detail herein, this
      comparison revealed that the incremental benefit of cleanup diminishes significantly with
      additional cost beyond a certain cleanup level, and asymptotically approaches zero as
      remediation approaches background.  Based on these considerations, cleaning up to
      background sediment chemistry levels is not economically feasible.

---

environmental concerns associated with elevated levels of low molecular weight PAHs (LPAHs), total PAHs, TPH,
RRO and DRO.



Cleanup and Abatement Order                                      March 14, 2012
No. R9-2012-0024

### ALTERNATIVE SEDIMENT CLEANUP LEVELS

32. **ALTERNATIVE CLEANUP LEVELS.** Under State Water Board Resolution No. 92-49, *Policies and Procedures for Investigation and Cleanup and Abatement of Discharges under Water Code Section 13304*, the San Diego Water Board may prescribe alternative cleanup levels less stringent than background sediment chemistry concentrations if attainment of background concentrations is technologically or economically infeasible. Resolution No. 92-49 requires that alternative levels must result in the best water quality which is reasonable if background levels of water quality cannot be restored, considering all demands being made and to be made on the waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible. Resolution No. 92-49 further requires that any alternative cleanup level shall: (1) be consistent with maximum benefit to the people of the state; (2) not unreasonably affect present and anticipated beneficial uses of such water; and (3) not result in water quality less than that prescribed in the Water Quality Control Plans and Policies adopted by the State and Regional Water Boards.

The San Diego Water Board is prescribing the alternative cleanup levels for sediment summarized in the table below to protect aquatic life, aquatic-dependent wildlife, and human health based beneficial uses consistent with the requirements of Resolution No. 92-49. Compliance with alternative cleanup levels will be determined using the monitoring protocols summarized in Finding 34 and described in detail of Section 34 of the Technical Report.

**Table 2. Alternative Cleanup Levels: Shipyard Sediment Site**

| Aquatic Life | Aquatic Dependent Wildlife and Human Health | |
|---|---|---|
| | Surface Weighted Average Concentrations (site-wide) | |
| Remediate all areas determined to have sediment pollutant levels likely to adversely affect the health of the benthic community. | Copper | 159 mg/kg |
| | Mercury | 0.68 mg/kg |
| | HPAHs[1] | 2,451 µg/kg |
| | PCBs[2] | 194 µg/kg |
| | Tributyltin | 110 µg/kg |

1. HPAHs = sum of 10 PAHs: Fluoranthene, Pyrene, Benz[a]anthracene, Chrysene, Benzo[b]fluoranthene, Benzo[k]fluoranthene, Benzo[a]pyrene, Indeno[1,2,3-c,d]pyrene, Dibenz[a,h]anthracene, and Benzo[g,h,i]perylene.

2. PCBs = sum of 41 congeners: 18, 28, 37, 44, 49, 52, 66, 70, 74, 77, 81, 87, 99, 101, 105, 110, 114, 118, 119, 123, 126, 128, 138, 149, 151, 153, 156, 157, 158, 167, 168, 169, 170, 177, 180, 183, 187, 189, 194, 201, and 206.

In approving alternative cleanup levels less stringent than background the San Diego Water Board has considered the factors contained in Resolution No. 92-49 and the California Code of Regulations, Title 23, section 2550.4, subdivision (d):

*Alternative Cleanup Levels are Appropriate.*  Cleaning up to background sediment quality levels at the Shipyard Sediment Site is economically infeasible.  The alternative cleanup levels established for the Shipyard Sediment Site are the lowest levels that are technologically and economically achievable, as required under the California Code of Regulations Title 23 section 2550.4(e).

*Alternative Cleanup Levels are Consistent with Water Quality Control Plans and Policies.*  The alternative cleanup levels provide for the reasonable protection of San Diego Bay beneficial uses and will not result in water quality less than prescribed in water quality control plans and policies adopted by the State Water Board and the San Diego Water Board.  While it is impossible to determine the precise level of water quality that will be attained given the residual sediment pollutant constituents that will remain at the Site, compliance with the alternative cleanup levels will markedly improve water quality conditions at the Shipyard Sediment Site and result in attainment of water quality standards at the site.

*Alternative Cleanup Levels Will Not Unreasonably Affect Present and Anticipated Beneficial Uses of the Site.*  The level of water quality that will be attained upon remediation of the required cleanup at the Shipyard Sediment Site will not unreasonably affect San Diego Bay beneficial uses assigned to the Shipyard Sediment Site represented by aquatic life, aquatic-dependent wildlife, and human health.

*Alternative Cleanup Levels are Consistent with the Maximum Benefit to the People of the State.*  The proposed alternative cleanup levels are consistent with maximum benefit to the people of the State based on the San Diego Bay resource protection, mass removal and source control, and economic considerations.  The Shipyard Sediment Site pollution is located in San Diego Bay, one of the finest natural harbors in the world.  San Diego Bay is an important and valuable resource to San Diego and the Southern California Region.  The alternative cleanup levels will result in significant contaminant mass removal and therefore risk reduction from San Diego Bay.  Remediated areas will approach reference area sediment concentrations for most contaminants.  Compared to cleaning up to background cleanup levels, cleaning up to the alternative cleanup levels will cause less diesel emission, less greenhouse gas emission, less noise, less truck traffic, have a lower potential for accidents, and less disruption to the local community.  Achieving the alternative cleanup levels also requires less barge and crane movement on San Diego Bay, has a lower risk of re-suspension of contaminated sediments, and reduces the amount of landfill capacity required to dispose of the sediment wastes.  The alternative cleanup levels properly balance reasonable protection of San Diego Bay beneficial uses with the significant economic and service activities provided by the City of San Diego, the NASSCO and BAE Systems Shipyards and the U.S. Navy.

33. **PROPOSED REMEDIAL FOOTPRINT AND PRELIMINARY REMEDIAL DESIGN.**  Polygonal areas were developed around the sampling stations at the Shipyard Sediment Site using the Thiessen Polygon method to facilitate the development of the remedial footprint.  The polygons targeted for remediation are shown in red and green in



Cleanup and Abatement Order                                                March 14, 2012
No. R9-2012-0024

Attachment 2. The red areas are where the proposed remedial action is dredging. The areas shown in green represent inaccessible or under-pier areas that will be remediated by one or more methods other than dredging. Portions of polygons NA20, NA21, and NA22 as shown in Attachment 2 were omitted from this analysis because it falls within an area that is being evaluated as part of the TMDLs for Toxic Pollutants in Sediment at the Mouth of Chollas Creek TMDL and is not considered part of the Shipyard Sediment Site for purposes of the CAO.

The polygons were ranked based on a number of factors including likely impaired stations, composite surface-area weighted average concentration for the five primary COCs, Site-Specific Median Effects Quotient (SS-MEQ)[4] for non-Triad stations, and highest concentration of individual primary COCs. Based on these rankings, polygons were selected for remediation on a "worst first" basis.

In recognition of the methodologies and limitations of traditional mechanical dredging, the irregular polygons were converted into uniform dredge units. Each dredge unit (sediment management unit or "SMU") was then used to develop the dredge footprint. The conversion from irregular polygons to SMUs is shown in Attachments 3 and 4. These attachments show the remedial footprint, inclusive of areas to be dredged ("dredge remedial area," in red) and under-pier areas ("under-pier remedial area," in green) to be remediated by other means, most likely by sand cover. Together, the dredge remedial area and the under-pier remedial area constitute the remedial footprint.

Upland source control measures in the watershed of municipal separate storm sewer system outfall SW-4 are also needed to eliminate ongoing contamination from this source, if any, and ensure that recontamination of cleaned up areas of the Shipyard Sediment Site from this source does not occur.

34.   **REMEDIAL MONITORING PROGRAM.** Monitoring during remediation activities is needed to document that remedial actions have not caused water quality standards to be violated outside of the remedial footprint, that the target cleanup levels have been reached within the remedial footprint, and to assess sediment for appropriate disposal. This monitoring should include water quality monitoring, sediment monitoring, and disposal monitoring.

Post-remediation monitoring is needed to verify that remaining pollutant concentrations in the sediments will not unreasonably affect San Diego Bay beneficial uses. Post-remediation monitoring should be initiated two years after remedy implementation has been completed and continue for a period of up to 10 years after remediation. For human health and aquatic dependent wildlife beneficial uses, post-remediation monitoring should include sediment chemistry monitoring to ensure that post-remediation SWACs are maintained at the site following cleanup. A subset of samples should undergo bioaccumulation testing using *Macoma*. For aquatic life beneficial uses, post-remediation

---

[4] The SS-MEQ is a threshold developed to predict likely benthic community impairments based on sediment chemistry at the Shipyard Sediment Site. The development, validation, and application of the SS-MEQ are described in Section 32.5.2 of the Technical Report.

Cleanup and Abatement Order                                    March 14, 2012
No. R9-2012-0024

monitoring should include sediment chemistry, and toxicity bioassays to verify that post-remedial conditions have the potential to support a healthy benthic community. In addition, post-remediation monitoring should include benthic community condition assessments to evaluate the overall impact of remediation on the benthic community re-colonization activities.

Environmental data has natural variability which does not represent a true difference from expected values. Therefore, if remedial monitoring results are within an acceptable range of the expected outcome, the remedial actions will be considered successful.

35. **REMEDIAL ACTION IMPLEMENTATION SCHEDULE.** The Dischargers have proposed a remedial action implementation schedule and a description of specific remedial actions they intend to undertake to comply with this CAO. The remedial action implementation schedule will begin with the adoption of this CAO and end with the submission of final reports documenting that the alternative sediment cleanup levels have been met. From start to finish, remedial action implementation is expected to take approximately 5 years to complete.

The proposed remedial actions have a substantial likelihood to achieve compliance with the requirements of this CAO within a reasonable time frame. The proposed schedule is as short as possible, given 1) the scope, size, complexity, and cost of the remediation, 2) industry experience with the time typically required to implement similar remedial actions, 3) the time needed to secure other regulatory agency approvals and permits before remediation can start, and 4) the need to conduct dredging in a phased manner to prevent or reduce adverse effects to the endangered California Least Tern. Therefore, the remedial action implementation schedule proposed by the Dischargers is consistent with the provisions in Resolution No. 92-49 for schedules for cleanup and abatement.

36. **LEGAL AND REGULATORY AUTHORITY.** This Order is based on (1) section 13267 and Chapter 5, Enforcement, of the Porter-Cologne Water Quality Control Act (Division 7 of the Water Code, commencing with section 13000), commencing with section 13300; (2) applicable state and federal regulations; (3) all applicable provisions of statewide Water Quality Control Plans adopted by the State Water Resources Control Board and the *Water Quality Control Plan for the San Diego Basin* (Basin Plan) adopted by the San Diego Water Board including beneficial uses, water quality objectives, and implementation plans; (4) State Water Board policies for water quality control, including State Water Board Resolution No. 68-16, *Statement of Policy with Respect to Maintaining High Quality of Waters in California* and Resolution No. 92-49, *Policies and Procedures for Investigation and Cleanup and Abatement of Discharges Under Water Code section 13304*; and (5) relevant standards, criteria, and advisories adopted by other state and federal agencies.

37. **CALIFORNIA ENVIRONMENTAL QUALITY ACT.** In many cases, an enforcement action such as this could be exempt from the provisions of the California Environmental Quality Act ("CEQA"; Public Resources Code, section 21000 et seq.), because it would fall within Classes 7, 8, and 21 of the categorical exemptions for projects that have been

Cleanup and Abatement Order                                            March 14, 2012
No. R9-2012-0024

determined not to have a significant effect on the environment under section 21084 of CEQA.[5] In Resolution No. R9-2010-0115 adopted on September 8, 2010, the San Diego Water Board found that because the tentative CAO presents unusual circumstances and there is a reasonable possibility of a significant effect on the environment due to the unusual circumstances, the tentative CAO is not exempt from CEQA and that an EIR analyzing the potential environmental effects of the tentative CAO should be prepared.

As the lead agency for the tentative CAO, the San Diego Water Board prepared an EIR that complies with CEQA. The San Diego Water Board has reviewed and considered the information in the EIR and certified the EIR, adopting a statement of overriding considerations, in Resolution No. R9-2012-0025.

38. **PUBLIC NOTICE.** The San Diego Water Board has notified all known interested persons and the public of its intent to adopt this CAO, and has provided them with an opportunity to submit written comments, evidence, testimony and recommendations.

39. **PUBLIC HEARING.** A lengthy procedural history preceded adoption of this CAO. The San Diego Water Board has considered all comments, evidence and testimony pertaining to this CAO submitted to the San Diego Water Board in writing, or by oral presentations at the public hearing held on November 9, 14, 15, and 16, 2011, and March 14, 2012. Responses to many relevant comments have been incorporated into the Technical Report for this CAO and/or are provided in the Response to Comments Report, as revised, prepared by the San Diego Water Board Cleanup Team.

40. **TECHNICAL REPORT.** The *"Technical Report for Cleanup and Abatement Order No. R9-2012-0024 for the Shipyard Sediment Site, San Diego Bay, San Diego, CA"* is hereby incorporated as a finding in support of this CAO as if fully set forth here verbatim.

41. **COST RECOVERY.** Pursuant to Water Code section 13304, and consistent with other statutory and regulatory requirements, including but not limited to Water Code section 13365, the San Diego Water Board and the State Water Board are entitled to, and will seek reimbursement for, all reasonable costs actually incurred by the San Diego Water Board and the State Water Board to investigate unauthorized discharges of waste and to oversee cleanup of such waste, abatement of the effects thereof, or other remedial action required by this Order.

Unreimbursed reasonable costs actually incurred by the San Diego Water Board and the State Water Board for the development and issuance of this Cleanup and Abatement Order are as follows:

a. Contracts funded by the State Water Board Cleanup and Abatement Account or other San Diego Water Board contract funds for services in support of the development and issuance of this Cleanup and Abatement Order.

---

[5] Title 14 CCR sections 15307, 15308, and 15321

Cleanup and Abatement Order                                                    March 14, 2012
No. R9-2012-0024

     i.    DM Information Services, Inc. produced the electronic administrative record. This work was paid for with Cleanup and Abatement Account funds and San Diego Water Board contract funds in the amount of $109,908.

    ii.    The Department of Fish and Game provided technical consultation services on the fish histopathology and bile studies, and the wildlife risk assessments. This work was paid for with Cleanup and Abatement Account funds in the amount of $43,287.

    iii.    The Office of Environmental Health Hazard Assessment provided technical consultation services on the human health risk assessments. This work was paid for with San Diego Water Board contract funds in the amount of $12,009.

    b.    Filing fees for CEQA documents. Pursuant to Fish and Game Code Section 711.4, the San Diego Water Board must pay to the Department of Fish and Game a filing fee to defray the costs of managing and protecting California's vast fish and wildlife resources. The filing fee for the Environmental Impact Report is $2,919 and the County Clerk Processing fee is 50.00 for a total of $2,969.

The amount of past and future recoverable staff costs will be determined through the process set forth in Water Code section 13365. The Chair may designate an individual qualified under Water Code section 13365, subdivision (c)(4) to resolve dischargers' disputes about the reasonableness of past and future oversight costs the San Diego Water Board seeks to recover from the dischargers to this Order. Under Water Code section 13365, the determination of the reasonableness of oversight costs can include, but is not limited to, evaluation of documentary support (including information not already in the record) for requested oversight costs. The Assistant Executive Officer is authorized to amend this Order as necessary to include any undisputed oversight cost amounts or amounts derived through the dispute resolution process identified in Water Code section 13365, subdivision (c)(4) and determined to be owed by the discharger(s).

42.    **PROCEDURAL MATTERS.** At the public hearing, the San Diego Water Board Cleanup Team objected to argument made by counsel for SDG&E during SDG&E's presentation as mischaracterizing Cleanup Team witnesses' deposition testimony. The Cleanup Team's objections are overruled. The San Diego Water Board has considered the deposition testimony and counsel's legal argument. The transcripts speak for themselves. Counsel's characterization of the Cleanup Team witnesses' deposition testimony took some of the deposition testimony out of context, but counsel was making legal argument and not testifying. Accordingly, it is not necessary to strike any portion of counsel's presentation. All exhibits introduced and marked during the hearing were accepted and are included in the administrative record.

### *ORDER DIRECTIVES*

**IT IS HEREBY ORDERED** *that, pursuant to sections 13267 and 13304 of the Water Code, National Steel and Shipbuilding Company; BAE Systems San Diego Ship Repair Inc.; the City of San Diego; Campbell Industries; San Diego Gas and Electric; the United States Navy; and the*

Cleanup and Abatement Order
No. R9-2012-0024

March 14, 2012

*San Diego Unified Port District (hereinafter Dischargers), shall comply with the following directives:*

## A. CLEANUP AND ABATE

1. **Illicit Discharges**. The Dischargers shall terminate all illicit discharges, if any, to the Shipyard Sediment Site (see Attachment 1) in violation of waste discharge requirements or other order or prohibition issued by the San Diego Water Board.

2. **Corrective Action**. The Dischargers shall take all corrective actions necessary to remediate the contaminated marine bay sediment at the Shipyard Sediment Site as described below: Corrective action design details shall be included in the Remedial Action Plan required by Directive B.

   a. *Dredge Remedial Areas*. The sediments in the dredge remedial areas shown on Attachments 3 and 4 shall be dredged. This dredging shall remediate the sediment in the dredge remedial area to the concentrations in the table below for primary COCs, pursuant to confirmatory testing:

   | Primary COCs | Post-Remedial Dredge Area Concentrations (Background[1]) |
   |---|---|
   | Copper | 121 mg/kg |
   | Mercury | 0.57 mg/kg |
   | HPAHs[2] | 663 µg/kg |
   | PCBs[3] | 84 µg/kg |
   | Tributyltin | 22 µg/kg |

   1. See Finding 29, Table 1.
   2. HPAHs = High Molecular Weight Polynuclear Aromatic Hydrocarbons, sum of 6 PAHs: Fluoranthene, Perylene, Benzo(a)anthracene, Chrysene, Benzo(a)pyrene, and Dibenzo(a,h)anthracene.
   3. PCBs = Polychlorinated Biphenyls, sum of 41 congeners: 18, 28, 37, 44, 49, 52, 66, 70, 74, 77, 81, 87, 99, 101, 105, 110, 114, 118, 119, 123, 126, 128, 138, 149, 151, 153, 156, 157, 158, 167, 168, 169, 170, 177, 180, 183, 187, 189, 194, 201, and 206.

   If the concentration of any primary COC in subsurface sediments (deeper than the upper 5 cm) is above 120 percent of the post-remedial dredge area concentration after completion of initial dredging, then additional sediments shall be dredged by performing an additional "pass" with the equipment. If concentrations of primary

Cleanup and Abatement Order                                          March 14, 2012
No. R9-2012-0024

      COCs in subsurface sediments are below 120 percent of post-remedial dredge area concentrations, then the dredging is sufficient and may stop.

b.    ***Under-Pier Remedial Areas.*** The sediments in the under pier areas shown on Attachments 3 and 4 and other locations where significant impacts to infrastructure may occur shall be remediated by dredging, sand covering or other means.

c.    ***Post Remedial Surface-Area Weighted Average Concentrations.*** The Shipyard Sediment Site as shown in Attachment 2 shall be remediated to attain the following post remedial surface-area weighted average concentrations ("SWACs"):

| Primary COCs | Predicted Post-Remedial SWACs |
|---|---|
| Copper | 159 mg/kg |
| Mercury | 0.68 mg/kg |
| HPAHs[1] | 2,451 µg/kg |
| PCBs[2] | 194 µg/kg |
| Tributyltin | 110 µg/kg |

1.   HPAHs = sum of 10 PAHs: Fluoranthene, Pyrene, Benz[a]anthracene, Chrysene, Benzo[b]fluoranthene, Benzo[k]fluoranthene, Benzo[a]pyrene, indeno[1,2,3-c,d]pyrene, Dibenz[a,h]anthracene, and Benzo[g,h,i]perylene.

2.   PCBs = sum of 41 congeners: 18, 28, 37, 44, 49, 52, 66, 70, 74, 77, 81, 87, 99, 101, 105, 110, 114, 118, 119, 123, 126, 128, 138, 149, 151, 153, 156, 157, 158, 167, 168, 169, 170, 177, 180, 183, 187, 189, 194, 201, and 206.

3. **MS4 Interim Mitigation Measures**. Immediately after adoption of the CAO, the City of San Diego and the San Diego Unified Port District within the tideland area shall take interim remedial actions, as necessary, to abate or correct the actual or potential effects of releases from the MS4 system that drains to outfall SW4. Interim remedial actions can occur concurrently with any phase of corrective action. Before taking interim remedial actions, the City and the Port District shall notify the San Diego Water Board of the proposed action and shall comply with any requirements that the San Diego Water Board sets.

4. **MS4 Investigation and Mitigation Plan**. The City of San Diego and the San Diego Unified Port District within the tideland area shall prepare and submit a municipal separate storm sewer system (MS4) Investigation and Mitigation Plan (Plan) within 90 days after adoption of the CAO. The Plan shall be designed to identify, characterize, and

mitigate pollutants and pollutant sources in the watershed that drains to the MS4 outfall SW-4 at the Shipyard Sediment Site and contain, at a minimum, the following information:

a. **_Site Conceptual Model_**. The Plan shall contain a site conceptual model showing all of the current and former potential pollutant sources and pathways for pollutants to potentially enter the watershed that drains to the MS4 outfall SW-4.

b. **_Map_**. A detailed map to scale showing the location and all elements of, and potential pollutant sources within, the MS4 system within the watershed that drains to the outfall SW-4.

c. **_Sampling and Analyses_**. The Plan shall include sampling and analysis of the residual sediments within the MS4 system at key locations sufficient to characterize the sediments that will potentially be discharged to the Shipyard Sediment Site. The suite of chemical analyses must be adequate to identify the full range of site-specific waste constituents including, at a minimum, total PCB congeners, copper, mercury, lead, zinc, TPH, and HPAHs.

d. **_Sample Locations_**. At a minimum, samples must be collected within all catch basins and similar junctions where accessible, and at intervals adequate to detect potential sources and no greater than approximately 500 feet within the streets in the storm water infrastructure within the SW-4 watershed. In addition, samples must be collected at locations designed to assess contributions from potential pollutant sources such as businesses with industrial activities or other pollutant-generating activities within the current SW-4 watershed. The Plan shall identify the number and location of the proposed sampling locations, and provide justification for the sampling intervals within the streets.

e. **_Sampling Protocols and Quality Assurance Project Plan (QAPP)_**. The Plan shall include the planned sampling protocols and a Quality Assurance Project Plan (QAPP) to assure that all environmental data generated scientifically valid and of acceptable quality to meet the Plan's objectives.

f. **_Mitigation_**. The Plan shall include, at a minimum, the following mitigation activities:

    1. Removal and characterization of residual sediments in the MS4 system.

    2. Installation of structural treatment control best management practices (BMPs), where necessary and feasible, in the MS4 system to prevent or mitigate the entry of pollutants into the storm drains to the maximum extent practicable.

    3. Maintenance of BMPs, as necessary, to prevent degradation of their performance.

g.   *Activity Completion Schedule*: The Plan shall include a reasonable schedule for completion of all activities and submission of a final MS4 Investigation and Mitigation Report described in DirectiveA.5.

5.   **MS4 Investigation and Mitigation Implementation and Report**

a.   *Implementation.* The City of San Diego and the San Diego Unified Port District within the tideland area shall implement the MS4 Investigation and Mitigation Plan according to the Activity Completion Schedule described in Directive 4.g.

b.   *MS4 Investigation and Mitigation Report.* The MS4 Investigation and Mitigation Report shall include the following:

1.   Sampling protocols implemented.

2.   Location, type, and number of samples shown on detailed site maps and tables.

3.   Concentration and interpreted lateral extent of each constituent.

4.   Mass of residual sediments removed from the MS4 system.

5.   Interpretations regarding the potential for the pollutants within the MS4 system to contaminate or re-contaminate the Shipyard Sediment Site during or after the remedial activities.

6.   Evaluation of the effectiveness of the mitigation activities implemented.

7.   Recommendations for additional investigation and mitigation activities.

**B.   REMEDIAL ACTION PLAN AND IMPLEMENTATION**

1.   **Remedial Action Plan.** The Dischargers shall prepare and submit a Remedial Action Plan (RAP) to the San Diego Water Board no later than 90 days after adoption of the CAO. The RAP shall be complete and contain the following information

a.   *Introduction.* A brief description of the Shipyard Sediment Site and Site History.

b.   *Selected Remedy.* A detailed description of all of the remedial activities selected to attain all cleanup levels in Directive A.2.

c.   *Health and Safety Plan.* A Health and Safety Plan including employee training, protective equipment, medical surveillance requirements, standard operating procedures and contingency plans.

d.   *Community Relations Plan.* A Community Relations Plan for informing the public about (i) activities related to the final remedial design, (ii) the schedule for the remedial action, (iii) the activities to be expected during construction and

Cleanup and Abatement Order
No. R9-2012-0024

March 14, 2012

remediation, (iv) provisions for responding to emergency releases and spills during remediation, and (v) any potential inconveniences such as excess traffic and noise that may affect the community during the remedial action.

e. *Quality Assurance Project Plan.* A Quality Assurance Project plan (QAPP) shall be included describing the project objectives and organization, functional activities, and quality assurance/quality control protocols as they relate to the remedial action

f. *Sampling and Analysis Plan.* A Sampling and Analysis Plan defining (i) sample and data collection methods to be used for the project, (ii) a description of the media and parameters to be monitored or sampled during the remedial action, and (iii) a description of the analytical methods to be utilized and an appropriate reference for each.

g. *Wastes Generated.* A description of the plans for management, treatment, storage and disposal of all wastes generated by the remedial action.

h. *Pilot Testing.* The results of bench scale or pilot scale studies or other data collected to provide sizing and operations criteria to optimize the remedial design.

i. *Design Criteria Report.* A Design Criteria Report that defines in detail the technical parameters upon which the remedial design will be based. Specifically, the Design Criteria Report shall include the preliminary design assumptions and parameters, including (i) waste characterization; (ii) volume and types of each medium requiring removal or containment; (iii) removal or containment schemes and rates, (iv) required qualities of waste streams (i.e., input and output rates to stockpiles, influent and effluent qualities of any liquid waste streams such as dredge spoil return water, potential air emissions, and so forth): (v) performance standards; (v) compliance with applicable local, State and federal regulations; (vi) technical factors of importance to the design, construction, and implementation of the selected remedy including use of currently accepted environmental control measures, constructability of the design, and use of currently acceptable construction practices and techniques.

j. *Equipment, Services, and Utilities.* A list of any elements or components of the selected remedial action that will require custom fabrication or long lead time for procurement. The list shall state the basis for such need, and the recognized sources of such procurement.

k. *Regulatory Permits and Approvals.* A list of required federal, State and local permits or approvals to conduct the remedial action.

l. *Remediation Monitoring Plan.* A Remediation Monitoring Plan consisting of (i) water quality monitoring, (ii) sediment monitoring, and (iii) disposal monitoring consistent with Section 34.1 of the Technical Report. The water quality monitoring must be sufficient to demonstrate that implementation of the selected remedial activities do not result in violations of water quality standards outside the construction area. The sediment monitoring must be sufficient to confirm that the selected

remedial activities have achieved target cleanup levels within the remedial footprint specified in Directive A.2  The disposal monitoring must be sufficient to adequately characterize the dredged sediments in order to identify appropriate disposal options.

m.  *Site Map.* A site map showing the location of buildings, roads, property boundaries, remedial equipment locations and other information pertinent to the remedial action.

n.  *Contingencies.* A description of any additional items necessary to complete the RAP.

o.  *Remediation Schedule.* A schedule detailing the sequence of events and time frame for each activity based on the shortest practicable time required to complete each activity.  The initiation and completion of each activity must be no longer than the durations described in Attachment 5.

2. **RAP Implementation.** In the interest of promoting prompt cleanup, the Discharger may begin implementation of the RAP 60 calendar days after submittal to the San Diego Water Board, unless otherwise directed in writing by the San Diego Water Board.  The Dischargers shall complete implementation of the RAP based on the schedule in the RAP.  Before beginning RAP implementation activities, the Dischargers shall:

a.  Notify the San Diego Water Board of its intention to begin cleanup; and

b.  Comply with any conditions set by the San Diego Water Board, including mitigation of adverse consequences from cleanup activities.

c.  The Dischargers shall modify or suspend cleanup activities when directed to do so by the San Diego Water Board.

## C. CLEANUP AND ABATEMENT COMPLETION VERIFICATION

**Final Cleanup and Abatement Completion Report**.  The Dischargers shall submit a final Cleanup and Abatement Completion Report verifying completion of the RAP activities for the Shipyard Sediment Site within 90 days of completion of remediation.  The report shall provide a demonstration, based on a sound technical analysis, that sediment quality cleanup levels in Directive A.2 have been achieved.

## D. POST REMEDIAL MONITORING

1. **Post Remedial Monitoring Plan**.  The Dischargers shall prepare and submit a Post Remedial Monitoring Plan to the San Diego Water Board no later than 90 days after adoption of this CAO.  The Post Remedial Monitoring Plan shall be designed to verify that the remaining pollutant concentrations in the sediments will not unreasonably affect San Diego Bay beneficial uses.  At a minimum the Post Remedial Monitoring Plan shall include the following elements:

a.  *Quality Assurance Project Plan.* A Quality Assurance Project plan (QAPP) describing the project objectives and organization, functional activities, and quality assurance/quality control protocols for the post remediation monitoring.

Cleanup and Abatement Order                                              March 14, 2012
No. R9-2012-0024

b.   *Sampling and Analysis Plan.*  A Sampling and Analysis Plan defining (i) sample
     and data collection methods to be used for the post radiation monitoring, (ii) a
     description of the media and parameters to be monitored or sampled, and (iii) a
     description of the analytical methods to be utilized and an appropriate reference for
     each.

c.   **Sediment Chemistry.**  Site-wide post-remedial SWACs for the five primary COCs
     (copper, mercury, TBT, PCBs, and HPAH) shall be confirmed through composite
     sampling of the entire Shipyard Sediment Site.  Samples shall be collected at all 65
     sampling stations used to develop Thiessen polygons and composited on a surface
     area weighted basis into 6 polygon groups as shown in Attachment 6.

     1.   To prepare the composite samples, the 65 station locations within the six
          polygon groups shall be sampled.  The volume of the sample at each station
          shall be proportional to the area of the polygon the station represents.  These
          samples shall be collected from the 0-2 cm depth interval.  Two (2) grab
          samples shall be composited in the field at each station.

     2.   The individual samples shall be combined into six (6) composite samples
          representing the six (6) polygon groups as shown in Attachment 6.  Three (3)
          replicates shall be taken from each of these six (6) composite samples and
          analyzed for PCBs, copper, mercury, HPAHs, and TBT, and sediment
          conventional parameters (e.g., grain size, TOC, ammonia). See Attachment 7
          for the required list of PCB and HPAH analytes.

     3.   The average concentration of each of the six (6) composites shall be
          calculated from the analytical results of the replicates for each COC.  The
          average concentrations represent SWACs for each of the six (6) polygon
          groups.

     4.   The three replicate sub-samples of composite samples provide an estimate of
          variances in the compositing process.  Sample material from the 65 station-
          specific composite samples shall be archived for potential future analysis.

     5.   The mean concentration for each of the six (6) composite groups shall be used
          to calculate Site-Wide SWACs for each COC.

     6.   SWAC trigger concentrations shall be used to evaluate whether Site-Wide
          SWACs exceed the Predicted Post-Remedial SWACs, and whether further
          action is needed.  These concentrations represent the surface-area weighted
          average concentration expected after cleanup, accounting for the variability in
          measured concentrations throughout the area.  If the Site-Wide SWAC after
          remediation is below the trigger concentration then remediation shall be
          considered successful.  Exceedance of the trigger concentration shall result in
          further evaluation of the site-specific conditions to determine if the remedy
          was successful as detailed in Directive D.3.  The trigger concentrations for the
          primary COCs are listed below.

Cleanup and Abatement  er
No. R9-2012-0024

March 14, 2012

| Primary COCs | Trigger Concentrations |
|---|---|
| Copper | 185 mg/kg |
| Mercury | 0.78 mg/kg |
| HPAHs[1] | 3,208 µg/kg |
| PCBs[2] | 253 µg/kg |
| Tributyltin | 156 µg/kg |

1.  HPAHs = sum of 6 PAHs: Fluoranthene, Perylene, Benzo[a]anthracene, Chrysene, Benzo[a]pyrene, and Dibenzo[a,h]anthracene.
2.  PCBs = sum of 41 congeners: 18, 28, 37, 44, 49, 52, 66, 70, 74, 77, 81, 87, 99, 101, 105, 110, 114, 118, 119, 123, 126, 128, 138, 149, 151, 153, 156, 157, 158, 167, 168, 169, 170, 177, 180, 183, 187, 189, 194, 201, and 206.

d.  ***Bioaccumulation Testing.***  Nine (9) sediment samples shall undergo bioaccumulation testing using the 28-day *Macoma nasuta* test.  The samples selected for bioaccumulation testing shall be from stations SW04, SW08, SW13, SW21, SW28, and NA06, NA11, NA12, and NA20.  Tissue samples shall be analyzed for arsenic, cadmium, copper, lead, mercury, zinc, HPAHs, and PCBs. See Attachment 7 for the required list of PCB and HPAH analytes.

e.  ***Sediment Chemistry for Benthic Exposure.***  Samples shall be collected for chemical analyses at the following five station locations: SW04, SW13, SW22, SW23 and NA19.  . Sediments shall be analyzed for sediment conventional parameters (e.g., grain size, TOC, ammonia) and the following: arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, zinc, TBT, PCBs, and PAHs.  See Attachment 7 for the required list of PCB and PAH analytes. Results from the chemical analyses shall be evaluated in accordance with the flow diagram in Attachment 8 to determine if further evaluation or action is necessary based on benthic effects indicators.  SS-MEQ values shall be determined for each station and compared to the 0.9 SS-MEQ threshold.  The sediment chemistry results shall be compared to the 60% LAET thresholds.

f.  ***Sediment Toxicity.***  Sediment samples shall be collected for toxicity analyses at the following five station locations: SW04, SW13, SW22, SW23, and NA19.  Two types of sediment toxicity tests shall be conducted in accordance with protocols recommended by the San Diego Water Board:  (1) 10-day amphipod survival test using *Eohaustorius estuarius* exposed to whole sediment, and (2) 48-hour bivalve larva development test using the mussel *Mytilus galloprovincialis* exposed to whole sediment at the sediment-water interface.  Results from the toxicity analyses shall be evaluated in accordance with the flow diagram in Attachment 9 to determine if further evaluation or action is necessary based on benthic effects indicators.

Cleanup and Abatement Order
No. R9-2012-0024

March 14, 2012

g.  *Benthic Community Assessment.* Samples shall be collected to evaluate benthic communities at five randomly selected stations within the remediation footprint, excluding stations NA19, SW04, SW13, SW22, and SW23, at years 3 and 4 following completion of remediation activities. The random samples shall be stratified to assure two to three samples are collected from each of the NASSCO and BAE Systems areas. The benthic community analyses shall consist of full taxonomic analyses at the lowest feasible taxa level. This sampling shall be conducted only to evaluate the development of the benthic community following remediation.

h.  *Schedule.* Sampling and analyses for sediment chemistry and toxicity, and for bioaccumulation assessment shall occur at two and five years post-remediation. If the remedial goals described in Directive D.3.c.2 are not met, the sampling and analyses shall also occur at ten years post remediation. The Post Remedial Monitoring Plan shall include a schedule detailing the sequence of sampling events and time frame for each activity. The schedule shall also include the dates for submittal of the Post-Cleanup Monitoring annual progress reports as detailed in Directive E and final report as detailed in Directive D.3. below.

2. **Post Remedial Monitoring Plan Implementation.** The Dischargers shall implement the Post Remedial Monitoring Plan in accordance with the schedule contained in the Post Remedial Monitoring Plan unless otherwise directed in writing by the San Diego Water Board. Before beginning sample collection activities, the Dischargers shall:

a.  Notify the San Diego Water Board in advance of the beginning of sample collection activities in accordance with Provision G.6.; and

b.  Comply with any conditions set by the San Diego Water Board with respect to sample collection methods such as providing split samples.

3. **Post Remedial Monitoring Reports.** The Dischargers shall submit Post Remedial Monitoring Reports containing the following information:

a.  An evaluation, interpretation and tabulation of monitoring data including interpretations and conclusions regarding the potential presence and chemical characteristics of any newly deposited sediment within the cleanup areas, and interpretations and conclusions regarding the health and recovery of the benthic communities.

b.  The locations, type, and number of samples shall be identified and shown on a site map.

c.  An analysis of whether or not the remedial goals described below have been attained:

30

Cleanup and Abatement Order                                                    March 14, 2012
No. R9-2012-0024

1. **Year 2 Remedial Goals**

   - Composite site-wide SWACs below the Trigger Concentrations identified in D.1.c.6. above; and

   - Sediment chemistry below SS-MEQ and 60%LAET thresholds; and

   - Toxicity not significantly different from conditions at the reference stations described in Finding 17 and in the *Technical Report for Cleanup and Abatement Order No. R9-2012-0024 for the Shipyard Sediment Site, San Diego Bay, San Diego, CA*; and

   - The average of stations sampled shows bioaccumulation levels below the pre-remedial levels.

2. **Year 5 Remedial Goals**

   - Composite site-wide SWACs below the Trigger Concentrations identified in D.1.c.6. above; and

   - Sediment chemistry below SS-MEQ and 60%LAET thresholds; and

   - Toxicity not significantly different from conditions at the reference stations described in Finding 17 and as defined in the *Technical Report for Cleanup and Abatement Order No. R9-2012-0024 for the Shipyard Sediment Site, San Diego Bay, San Diego, CA*; and

   - The average of stations sampled shows bioaccumulation levels continuing to decrease below the pre-remedial levels and equal to or below the Year 2 post-remedial monitoring sampling event levels.

3. **Confirm remedial goals are maintained at year 10 (if goals were not met in year 5)**

   - Composite site-wide SWACs below the Trigger Concentrations identified in D.1.c.6. above; and

   - Sediment chemistry below SS-MEQ and 60%LAET thresholds; and

   - Toxicity not significantly different from conditions at the reference stations described in Finding 17 and defined in the *Technical Report for Cleanup and Abatement Order No. R9-2012-0024 for the Shipyard Sediment Site, San Diego Bay, San Diego, CA*; and

   - The average of stations sampled shows bioaccumulation levels below the pre-remedial levels and equal to or below the Year 5 post-remedial monitoring sampling event levels.

Cleanup and Abatement Order                                                                                    March 14, 2012
No. R9-2012-0024

4.   **SWAC Trigger Concentration, SS-MEQ Threshold, or 60% LAET Threshold Exceedance Investigation and Characterization.** Post remediation monitoring may indicate exceedance of one or more of the post-remediation Site-Wide SWAC trigger concentrations, SS-MEQ thresholds, or 60% LAET thresholds. In that event the Dischargers shall conduct an Exceedance Investigation and Characterization study to determine the cause(s) of the exceedance. There are several lines of investigation that may be pursued, individually or in combination, depending upon the type, scope, and scale of the exceedance(s) and site-specific conditions. The following approaches may be considered and implemented for the investigation and characterization effort:

a.   Recalculation of the 95% UCL incorporating more recent sampling data (e.g. the dredge performance monitoring data, pre-remediation monitoring data from July, 2009, the most recent post remediation verification monitoring data etc.).

b.   Identification of the specific subarea(s) that caused the excursion(s) using surrounding post remediation monitoring data and historical data as appropriate.

c.   Evaluation of changes in site conditions as a result of disturbances since the previous sampling event from spills, major storm events, construction activities, newly discovered pollutant sources or other causes.

d.   Analysis of the archived samples used to comprise the composite sample for the specific COC(s) exceeding the 95% UCL as a basis to understand which polygons have higher concentrations than expected. The data from this analysis could be used as a basis for spatial weighting of the data before recalculating 95% UCLs using interpolation methods such as inverse distance weighting.

5.   **Exceedance Investigation and Characterization Report.** The Dischargers shall prepare and submit an adequate Exceedance Investigation and Characterization Report describing the final results of the investigation and characterization study to the San Diego Water Board. If the exceedances are found to be significant, the Report shall include a recommended approach, or combination of approaches, for addressing the exceedance(s) by additional sampling of the affected area, re-dredging, natural recovery, reanalysis following the next scheduled monitoring event, or other appropriate methods. The Report shall be due within 90 days of discovery of the exceedance or as otherwise directed by the San Diego Water Board.

## E. QUARTERLY PROGRESS REPORTS

The Dischargers shall prepare and provide written quarterly progress reports which: (1) describe the actions which have been taken toward achieving compliance with this CAO during the

Cleanup and Abatement Order                                          March 14, 2012
No. R9-2012-0024

previous quarter; (2) include all results of sampling, tests, and all other verified or validated data received or generated by or on behalf of the Dischargers during the previous quarter in the implementation of the remedial actions required by this CAO; (3) describe all activities including, data collection and other field activities which are scheduled for the next two quarters and provide other information relating to the progress of work, including, but not limited to, a graphical depiction of the progress of the remedial actions; (4) identify any modifications to the Remedial Action Plan or other work plan(s) that the Dischargers proposed to the San Diego Water Board or that have been approved by San Diego Water Board during the previous quarter; and (5) include information regarding all delays encountered or anticipated that may affect the future schedule for completion of the remedial actions required , and a description of all efforts made to mitigate those delays or anticipated delays. These progress reports shall be submitted to the San Diego Water Board by the (15th) day of March, June, September, and December of each year following the effective date of this CAO.  Submission of these progress reports shall continue until submittal of the final Cleanup and Abatement Completion Report verifying completion of the Remedial Action Plan (RAP) for the Shipyard Sediment Site (see Directive C).

## F.  REPORTS AND WORKPLANS

The Dischargers shall prepare and submit all required plans and reports described in Directives B, C, and D of this Order to the San Diego Water Board for review and approval. The San Diego Water Board shall make these plans/reports available to the public for comment. If comments or concerns on these plans and reports are not resolved informally, then the Assistant Executive Officer will schedule the item for San Diego Water Board consideration at a public meeting.

## G.  NO FURTHER ACTION

Upon approval by the San Diego Water Board of the Final Cleanup and Abatement Completion Report (Directive C) and the Post Remedial Monitoring Reports (Directive D.3) remedial actions and monitoring will be complete and compliance with this CAO will be achieved.  At that time the San Diego Water Board will inform the Dischargers and other interested persons in writing that, based on available information, no further remedial work is required.  However, the portion of polygon SW29 not in the dredge footprint may be addressed by the San Diego Water Board under a separate future regulatory action based upon available information.

## H.  PROVISIONS

1.  **Cost Recovery**.  The Dischargers shall reimburse the State of California for all reasonable costs actually incurred by the San Diego Water Board and State Water Board to investigate, oversee, and monitor cleanup and abatement actions required by this CAO, including the cost to prepare CEQA documents according to billing statements prepared from time to time by the State Water Board.  If the Dischargers are enrolled in a reimbursement program managed by the State Water Board for the discharge addressed by this CAO, reimbursement shall be made pursuant to the procedures established in that program.

Cleanup and Abatement Order                                              March 14, 2012
No. R9-2012-0024

Within 60 days of the adoption of this CAO, the Dischargers shall reimburse the State of California in the amount of $168,173 for the unreimbursed costs actually incurred by the San Diego Water Board and State Water Board as described in Finding 41 of this Order.

Within 30 days of the adoption of this CAO, the Dischargers shall identify to the San Diego Water Board an entity or party, including contact information, authorized by the Dischargers to receive and pay future invoices issued by the State Water Board Cost Recovery Program for staff oversight costs incurred by the San Diego Water Board to investigate, oversee, and monitor cleanup and abatement actions required by this CAO.

2. **Waste Management**. The Dischargers shall properly manage, store, treat, and dispose of contaminated marine sediment and associated wastes in accordance with applicable federal, state, and local laws and regulations. The storage, handling, treatment, or disposal of contaminated marine sediment and associated waste shall not create conditions of pollution, contamination or nuisance as defined in Water Code section 13050. The Dischargers shall, as required by the San Diego Water Board, obtain, or apply for coverage under, waste discharge requirements or a conditional waiver of waste discharge requirements for the removal of waste from the immediate place of release and discharge of the waste to (a) land for treatment, storage, or disposal or (b) waters of the state. No waste discharge requirements or conditional waiver of waste discharge requirements shall be required for disposal of marine sediment and associated waste in a landfill regulated under existing waste discharge requirements.

3. **Request to Provide Information**. The Dischargers may present characterization data, preliminary interpretations and conclusions as they become available, rather than waiting until a final report is prepared. This type of on-going reporting can facilitate a consensus being reached between the Dischargers and the San Diego Water Board and may result in overall reduction of the time necessary for regulatory approval.

4. **Waste Constituent Analysis**. Unless otherwise permitted by the San Diego Water Board, all analyses shall be conducted at a laboratory certified for such analyses by the State Department of Health Services. Specific methods of analysis must be identified. If the Dischargers propose to use methods or test procedures other than those included in the most current version of "Test Methods for Evaluating Solid Waste, Physical/Chemical Methods, SW-846" (U.S. Environmental Protection Agency) or 40 CFR 136, "Guidelines Establishing Test Procedures for the Analysis of Pollutants; Procedures for Detection and Quantification", the exact methodology must be submitted for review and must be approved by the San Diego Water Board prior to use. The director of the laboratory whose name appears on the certification shall supervise all analytical work in his/her laboratory and shall sign all reports submitted to the San Diego Water Board.

Any report presenting new analytical data is required to include the complete Laboratory Analytical Report(s). The Laboratory Analytical Report(s) must be signed by the laboratory director and contain:

 

Cleanup and Abatement Order                                                March 14, 2012
No. R9-2012-0024

- A complete sample analytical report.

- A complete laboratory quality assurance/quality control (QA/QC) report.

- A discussion of the sample and QA/QC data.

- A transmittal letter that must indicate whether or not all the analytical work was supervised by the director of the laboratory, and contain the following statement, "All analyses were conducted at a laboratory certified for such analyses by the California Department of Health Services in accordance with current USEPA procedures."

5. **Duty to Operate and Maintain**. The Dischargers shall, at all times, properly operate and maintain all facilities and systems of treatment, control, storage, disposal and monitoring (and related appurtenances) which are installed or used by the Dischargers to achieve compliance with this CAO. Proper operation and maintenance also includes adequate laboratory controls and appropriate quality assurance procedures. This provision requires the operation of back-up or auxiliary facilities, which are installed by the Dischargers only when the operation is necessary to achieve compliance the conditions of this CAO.

6. **Field Work Notice**. The Dischargers shall give the San Diego Water Board at least fourteen (14) days advance notice of all field work or field activities to be performed by the Dischargers pursuant to this CAO; provided, however, that in a given instance, if it is impossible for the Dischargers to provide such notice, the Dischargers shall provide notice to the San Diego Water Board of all such field work or activities as far in advance of such work as is possible. In any event, any notification pursuant to this Provision shall be given at least twenty-four (24) hours prior to the given field activities, unless the San Diego Water Board agrees otherwise.

7. **Duty to Use Registered Professionals**. The Dischargers shall provide documentation that plans and reports required under this CAO are prepared under the direction of appropriately qualified professionals. California Business and Professions Code sections 6735, 7835 and 7835.1 require that engineering and geologic evaluations and judgments be performed by or under the direction of registered professionals. A statement of qualifications and registration numbers of the responsible lead professionals shall be included in all plans and reports submitted by the Dischargers. The lead professional shall sign and affix their registration stamp to the report, plan or document.

8. **Corporate Signatory Requirements**. All reports required under this Order shall be signed and certified by a responsible corporate officers of the Dischargers described in paragraph 5.a. of this provision or by a duly authorized representative of that person as described in paragraph 5.b.of this provision.

   a. ***Responsible Corporate Officer(s).*** For the purposes of this provision, a responsible corporate officer means: (i) A president, secretary, treasurer, or vice-president of the corporation in charge of a principal business function, or any other person who

Cleanup and Abatement Order                                                    March 14, 2012
No. R9-2012-0024

performs similar policy - or decision-making functions for the corporation, or (ii) the manager of one or more manufacturing, production, or operating facilities, provided, the manager is authorized to make management decisions which govern the operation of the regulated facility including having the explicit or implicit duty of making major capital investment recommendations, and initiating and directing other comprehensive measures to assure long term environmental compliance with environmental laws and regulations; the manager can ensure that the necessary systems are established or actions taken to gather complete and accurate information for permit application requirements; and where authority to sign documents has been assigned or delegated to the manager in accordance with corporate procedures.

b. **Duly Authorized Representative**. A person is a duly authorized representative only if

1. The authorization is made in writing by a person described in paragraph (a) of this provision;

2. The authorization specifies either an individual or a position having responsibility for the overall operation of the regulated facility or activity such as the position of plant manager, operator of a well or a well field, superintendent, position of equivalent responsibility, or an individual (A duly authorized representative may thus be either a named individual or any individual occupying a named position.); and

3. The written authorization is submitted to the San Diego Water Board.

c. **Changes to Authorization**. If an authorization under paragraph (b) of this provision is no longer accurate because a different individual or position has responsibility for the overall operation of the facility, a new authorization satisfying the requirements of paragraph (b) of this provision must be submitted to the San Diego Water Board prior to or together with any reports or information to be signed by an authorized representative.

d. **Certification Statement**. Any person signing a document under paragraph a. or b. of this provision shall make the following certification:

"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

9. **Duty to Submit Other Information**. When the Dischargers become aware that it failed to submit any relevant facts in any report required under this CAO, or submitted incorrect

Cleanup and Abatement Order                                        March 14, 2012
No. R9-2012-0024

information in any such report, the Dischargers shall promptly submit such facts or information to the San Diego Water Board.

10. **Electronic and Paper Media Reporting Requirements**.  The Dischargers shall submit both electronic and paper copies of all reports required under this CAO including work plans, technical reports, and monitoring reports.  Larger documents shall be divided into separate files at logical places in the report to keep file sizes under 150 megabytes.  The Discharger shall continue to provide a paper transmittal letter, a paper copy of all figures larger than 8.5 inches by 14 inches (legal size), and an electronic copy (on CD or other appropriate media) of all reports to the San Diego Water Board.  All paper correspondence and documents submitted to the San Diego Water Board must include the following identification numbers in the header or subject line:  Geotracker Site ID: T10000003580.  The Dischargers shall comply with the following reporting requirements for all reports and plans (and amendments thereto) required by this Order:

a. *Reports and Plans Required by this Order.*  The Dischargers shall submit one paper and one electronic, searchable PDF copy of all technical reports, monitoring reports, progress reports, and plans required by this Order.  The PDF copy of all the reports shall also be uploaded into the Geotracker database, as required by Provision G.10(b)(4) below.

b. *Electronic Data Submittals for Sediment Chemistry.*  All information submitted to the San Diego Water Board in compliance with this Order is required to be submitted electronically via the Internet into the Geotracker database http://geotracker.waterboards.ca.gov/ (Geotracker Site ID. T10000003580). The electronic data shall be uploaded on or prior to the regulatory due dates set forth in the Order or addenda thereto. To comply with these requirements, the Dischargers shall upload to the Geotracker database the following minimum information:

1. Laboratory Analytical Data: Analytical data (including geochemical data) for all sediment and water samples in Electronic Data File (EDF) format. Water, sediment, and soil include analytical results of samples collected from: dredging equipment, monitoring wells, boreholes, gas and vapor wells or other collection devices, surface water, groundwater, piezometers, and stockpiles.

2. Locational Data: The latitude and longitude of any permanent monitoring location (surface water or sediment sampling location) for which data is reported in EDF format, accurate to within 1 meter and referenced to a minimum of two reference points from the California Spatial Reference System (CSRS-H), if available.

3. Site Map: Site map or maps which display discharge locations, streets bordering the facility, and sampling locations for all sediment, soil, and water samples. The site map is a stand-alone document that may be submitted in various electronic formats. A site map must also be uploaded to show the maximum extent of any sediment and water pollution.  An update to the site map may be uploaded at any time.

Cleanup and Abatement Order                     March 14, 2012
No. R9-2012-0024

4. Electronic Report: A complete copy (in searchable PDF format) of all workplans, assessment, cleanup, and monitoring reports including the signed transmittal letters, professional certifications, and all data presented in the reports.

11. **Report Submittals.** All monitoring and technical reports required under this CAO shall be submitted to

Executive Officer
California Regional Water Quality Control Board
San Diego Region
9174 Sky Park Court, Suite 100
San Diego, CA 92123-4340

12. **Amendment.** This CAO in no way limits the authority of this San Diego Water Board to institute additional enforcement actions or to require additional investigation and cleanup consistent with the California Water Code. This CAO may be revised by the San Diego Water Board as additional information becomes available.

13. **Time Extensions.** If, for any reason, the Dischargers are unable to perform any activity or submit any documentation in compliance with requirements in this CAO, including the RAP, or in compliance with associated implementation schedules, including the RAP implementation schedule, the Dischargers may request, in writing, an extension of time. The written extension request shall include justification for the delay and shall be received by the San Diego Water Board reasonably (but not less than 15 calendar days) in advance of the deadline sought to be extended. An extension may be granted for good cause, in which case this CAO will be accordingly amended.

14. **Community Relations.** The Dischargers shall cooperate with the San Diego Water Board in providing information regarding the remediation of the Shipyard Sediment Site to the public. If requested by the San Diego Water Board, the Dischargers shall participate in the preparation of such information for distribution to the public and in public meetings which may be held or sponsored by the San Diego Water Board to explain activities at or relating to the Shipyard Sediment Site.

## I.  NOTIFICATIONS

1. **Enforcement Discretion.** The San Diego Water Board reserves its right to take any enforcement action authorized by law for violations of the terms and conditions of this CAO.

2. **Enforcement Notification.** The Porter-Cologne Water Quality Control Act commencing with Chapter 5, Enforcement and Implementation, section 13308, provides that if there is a threatened or continuing violation of a CAO, the San Diego Water Board may issue a Time Schedule Order prescribing a civil penalty in an amount not to exceed $10,000 per day for each day compliance is not achieved in accordance with that time schedule. Section 13350 provides that any person may be assessed administrative civil liability by the San Diego Water Board for violating a CAO in an amount not to exceed $5,000 for

Cleanup and Abatement Order                                     March 14, 2012
No. R9-2012-0024

each day the violation occurs, or on a per gallon basis, not to exceed $10 for each gallon
of waste discharged. Alternatively the court may impose civil liability in an amount not
to exceed $15,000 for each day the violation occurs, or on a per gallon basis, not to
exceed $20 for each gallon of waste discharged. Section 13385 provides that any person
may be assessed administrative civil liability by the San Diego Water Board for violating
a CAO for an activity subject to regulation under Division 7, Chapter 5.5 of the Water
Code, in an amount not to exceed the sum of both of the following: (1) $10,000 for each
day in which the violation occurs; and (2) where there is a discharge, any portion of
which is not susceptible to cleanup or is not cleaned up, and the volume discharged but
not cleaned up exceeds 1,000 gallons, an additional liability not to exceed $10 multiplied
by the number of gallons by which the volume discharged but not cleaned up exceeds
1,000 gallons. Alternatively the civil liability may be imposed by the court in an amount
not to exceed the sum of both of the following: (1) $25,000 for each day in which the
violation occurs; and (2) where there is a discharge, any portion of which is not
susceptible to cleanup or is not cleaned up, and the volume discharged but not cleaned up
exceeds 1,000 gallons, an additional liability not to exceed $25 multiplied by the number
of gallons by which the volume discharged but not cleaned up exceeds 1,000 gallons.

*I, David W. Gibson, Executive Officer, do hereby certify the forgoing is a full, true, and correct
copy of a CAO issued on **March 14, 2012.***


David W. Gibson
Executive Officer

Cleanup and Abatement Order                                    March 14, 2012
No. R9-2012-0024

**Attachment 1.  Shipyard Sediment Area**



Cleanup and Abatement Order
No. R9-2012-0024

March 14, 2012

## Attachment 2.  Polygons Targeted for Remediation



Cleanup and Abatement Order                                          March 14, 2012
No. R9-2012-0024

## Attachment 3.  Remedial Footprint Based on Sediment Management Units for BAE Shipyard



| Remedial Site (North) | |
| --- | --- |
| Dredge remedial Area ($\text{ft}^2$) | 438,300 |
| Under pier remedial area ($\text{ft}^2$) | 89,980 |
| Total Remedial Area ($\text{ft}^2$) | 528,295 |
| Dredge Volume ($\text{yd}^3$) | 90,800 |

**Note:** Presumed remedy within the remedial boundary is dredging, except for under pier remedial areas.

Cleanup and Abatement Order                                          March 14, 2012
No. R9-2012-0024

**Attachment 4. Remedial Footprint Based on Sediment Management Units for NASSCO Shipyard**



| Remedial Site (South) | |
|---|---:|
| Dredge remedial Area (ft$^2$) | 217,800 |
| Under pier remedial area (ft$^2$) | 13,725 |
| Total Remedial Area (ft$^2$) | 231,495 |
| Volume (yd$^3$) | 52,600 |
| TMDL area (ft$^2$) | 218,060 |

**Note:** Presumed remedy within the remedial boundary is dredging, except for under pier remedial areas.

**Attachment 5.  Remedial Action Implementation Schedule**



Cleanup and Abatement Order
No. R9-2012-0024

March 14, 2012

## Attachment 6.  Composite Sampling Area for Post-Remedial Monitoring



Tentative Cleanup and Abatement Order                    March 14, 2012
No. *R9-2012-0024*

**Attachment 7. Summed list of PCB and PAH analytes measured in bulk sediments.**

| PAH | Identifier | PAH | Identifier |
|---|---|---|---|
| Naphthalene | C0N | Pyrene | PYR |
| C1-Naphthalenes | C1N | C1-Fluoranthenes/pyrenes | C1F/P |
| C2-Naphthalenes | C2N | C2-Fluoranthenes/pyrenes | C2F/P |
| C3-Naphthalenes | C3N | C3-Fluoranthenes/pyrenes | C3F/P |
| C4-Naphthalenes | C4N | Benzo[a]anthracene | BAA |
| Acenaphthylene | ACEY | Chrysene | C0C |
| Acenaphthene | ACE | C1-Chrysenes | C1C |
| Biphenyl | BIP | C2-Chrysenes | C2C |
| Fluorene | C0F | C3-Chrysenes | C3C |
| C1-Fluorenes | C1F | C4-Chrysenes | C4C |
| C2-Fluorenes | C2F | Benzo[b]fluoranthene | BBF |
| C3-Fluorenes | C3F | Benzo[k]fluoranthene | BKF |
| Anthracene | C0A | Benzo[e]pyrene | BEP |
| Phenanthrene | C0P | Benzo[a]pyrene | BAP |
| C1-Phenanthrenes/anthracenes | C1P/A | Perylene | PER |
| C2-Phenanthrenes/anthracenes | C2P/A | Indeno[1,2,3,-c,d]pyrene | INDENO |
| C3-Phenanthrenes/anthracenes | C3P/A | Dibenzo[a,h]anthracene | DAH |
| C4-Phenanthrenes/anthracenes | C4P/A | Benzo[g,h,i]perylene | BGP |
| Dibenzothiophene | C0D | Total PAH[1] | TPAH |
| C1-Dibenzothiophenes | C1D | Priority Pollutant PAH[2] | PPPAH |
| C2-Dibenzothiophenes | C2D | Low Molecular Weight PAH[3] | LMWPAH |
| C3-Dibenzothiophenes | C3D | High Molecular Weight PAH[4] | HMWPAH |
| Fluoranthene | FLANT | | |

SCCWRP and U.S. Navy, 2005b
[1]Total PAH = sum of all listed PAH analytes
[2]Priority pollutant PAH = sum of C0N, ACEY, ACE, C0F, C0A, C0P, FLANT, PYR, BAA, C0C, BBF, BKF, BAP, INDENO, DAH, BGP
[3]Low Molecular Weight PAH = sum of C0N, C2N, ACEY, ACE, C0F, C0A, C0P
[4]High Molecular Weight PAH = sum of FLANT, PYR, BAA, C0C, BAP, DAH

Cleanup and Abatement Order
No. R9-2012-0024

March 14, 2012

**Attachment 7 (continued).  Summed list of PCB and PAH analytes measured in bulk sediments.**

| PCB Congener | Congener Number | PCB Congener | Congener Number |
|---|---|---|---|
| 2,2',5-Trichlorobiphenyl (Cl3) | 18 | 2,2',3,3',4,4'-Hexachlorobiphenyl (Cl6) | 128 |
| 2,4,4'-Trichlorobiphenyl (Cl3) | 28 | 2,2',3,4,4',5'-Hexachlorobiphenyl (Cl6) | 138 |
| 3,4,4'-Trichlorobiphenyl (Cl3) | 37 | 2,2',3,4',5',6-Hexachlorobiphenyl (Cl6) | 149 |
| 2,2',3,5'-Tetrachlorobiphenyl (Cl4) | 44 | 2,2',3,5,5',6-Hexachlorobiphenyl (Cl6) | 151 |
| 2,4,4',5'-Tetrachlorobiphenyl (Cl4) | 49 | 2,2',4,4',5,5'-Hexachlorobiphenyl (Cl6) | 153 |
| 2,2',5,5'-Tetrachlorobiphenyl (Cl4) | 52 | 2,3,3',4,4',5-Hexachlorobiphenyl (Cl6) | 156 |
| 2,3',4,4'-Tetrachlorobiphenyl (Cl4) | 66 | 2,3,3',4,4',5'-Hexachlorobiphenyl (Cl6) | 157 |
| 2,3',4',5 – Tetrachlorobiphenyl (Cl4) | 70 | 2,3,3',4,4',6-Hexachlorobiphenyl (Cl6) | 158 |
| 2,4,4',5 -Tetrachlorobiphenyl (Cl4) | 74 | 2,3',4,4',5,5'-Hexachlorobiphenyl (Cl6) | 167 |
| 3,4,4',5 -Tetrachlorobiphenyl (Cl4) | 81 | 2,3',4,4',5',6-Hexachlorobiphenyl (Cl6) | 168 |
| 3,3',4,4'-Tetrachlorobiphenyl (Cl4) | 77 | 3,3',4,4',5,5'-Hexachlorobiphenyl (Cl6) | 169 |
| 2,2'3,4,5'-Pentachlorobiphenyl (Cl5) | 87 | 2,2',3,3',4,4',5-Heptachlorobiphenyl (Cl7) | 170 |
| 2,2',4,4',5-Pentachlorobiphenyl (Cl5) | 99 | 2,2',3,4,5',6'-Heptachlorobiphenyl (Cl7) | 177 |
| 2,2',4,5,5'-Pentachlorobiphenyl (Cl5) | 101 | 2,2',3,4,4',5,5'-Heptachlorobiphenyl (Cl7) | 180 |
| 2,3,3',4,4'-Pentachlorobiphenyl (Cl5) | 105 | 2,2',3,4,4',5',6-Heptachlorobiphenyl (Cl7) | 183 |
| 2,3,3',4',6-Pentachlorobiphenyl (Cl5) | 110 | 2,2',3,4',5,5',6-Heptachlorobiphenyl (Cl7) | 187 |
| 2,3,4,4',5-Pentachlorobiphenyl (Cl5) | 114 | 2,3,3',4,4',5,5'-Heptachlorobiphenyl (Cl7) | 189 |
| 2,3',4,4',5-Pentachlorobiphenyl (Cl5) | 118 | 2,2',3,3',4,4',5,5'-Octachlorobiphenyl (Cl8) | 194 |
| 2,3',4,4',6-Pentachlorobiphenyl (Cl5) | 119 | 2,2',3,3',4,5',6,6'-Octachlorobiphenyl (Cl8) | 201 |
| 2,3',4,4',5'-Pentachlorobiphenyl (Cl5) | 123 | 2,2',3,3',4,4',5,5',6-Nonachlorobiphenyl (Cl9) | 206 |
| 3,3',4,4',5-Pentachlorobiphenyl (Cl5) | 126 | Total PCB[1] | TPCB |

SCCWRP and U.S. Navy, 2005b
[1]Total PCB = sum of all listed PCB congeners.

Cleanup and Abatement Order                                    March 14, 2012
No. R9-2012-0024

**Attachment 8.  Flow Diagram for the Sediment Chemistry Ranking Criteria (Low, Moderate, and High)**



Cleanup and Abatement Order                                    March 14, 2012
No. R9-2012-0024

**Attachment 9. Flow Diagram for the Toxicity Ranking Criteria (Low, Moderate, and High)**

